ARW:mh

AO 91 (Rev. 11/11) Criminal Complaint

# UNITED STATES DISTRICT COURT
### for the
### District of Minnesota

UNITED STATES OF AMERICA

v.

MOHAMED ABDIHAMID FARAH, *1*
ADNAN ABDIHAMID FARAH, *2*
ABDURAHMAN YASIN DAUD, *3*
ZACHARIA YUSUF ABDURAHMAN, *4*
HANAD MUSTAFE MUSSE and *5*
GULED ALI OMAR *6*

Case No. 15-MJ-312 (BRT)

## CRIMINAL COMPLAINT

I, the undersigned complainant, being duly sworn, state the following is true and correct to the best of my knowledge and belief.

SEE ATTACHMENT A

I further state that I am a Special Agent and that this complaint is based on the following facts:

SEE ATTACHED AFFIDAVIT

Continued on the attached sheet and made a part hereof: ☒Yes ☐ No

_____
*Complainant's signature*

Nicholas L. Marshall, Special Agent, FBI
*Printed name and title*

Sworn to before me and signed in my presence.

Date: April 18, 2015

_____
*Judge's signature*

City and state: Minneapolis, MN

The Honorable Becky R. Thorson, U.S. Magistrate Judge
*Printed name and title*

SCANNED
APR 2 0 2015
U.S. DISTRICT COURT ST. PAUL

ATTACHMENT A

## COUNT 1
(Conspiracy to Provide Material Support to
a Designated Foreign Terrorist Organization)

From in or about March 2014, through the present, within the State and District of Minnesota, and elsewhere, the defendants,

**MOHAMED ABDIHAMID FARAH,**
**ADNAN ABDIHAMID FARAH,**
**ABDURAHMAN YASIN DAUD,**
**ZACHARIA YUSUF ABDURAHMAN,**
**HANAD MUSTAFE MUSSE, and**
**GULED ALI OMAR,**

did unlawfully and knowingly conspire and agree with others, known and unknown to the grand jury, to provide material support and resources, as that term is defined in Title 18, United States Code, Section 2339A(b)(1), including personnel, to a foreign terrorist organization, namely, the *Islamic State in Iraq and the Levant*, knowing that it was a designated foreign terrorist organization and that the organization had engaged and was engaging in terrorist activity and terrorism; all in violation of Title 18, United States Code, Section 2339B(a)(1).

## COUNT 2
(Attempting to Provide Material Support to
a Designated Foreign Terrorist Organization)

On or about November 6, 2014, within the State and District of Minnesota, and elsewhere, the defendants,

**ZACHARIA YUSUF ABDURAHMAN,**
**MOHAMED ABDIHAMID FARAH, and**
**HANAD MUSTAFE MUSSE,**

while aiding and abetting each other and others known and unknown, and being aided and abetted by each other and others known and unknown, did knowingly attempt to provide material support and resources, including personnel, to a foreign terrorist organization, namely, the *Islamic State in Iraq and the Levant*, knowing that it was a designated foreign terrorist

1

organization and that the organization had engaged and was engaging in terrorist activity and terrorism, all in violation of Title 18, United States Code, Section 2339B(a)(1) and Section 2.

## COUNT 3
(Attempting to Provide Material Support to
a Designated Foreign Terrorist Organization)

On or about November 6, 2014, within the State and District of Minnesota, and elsewhere, the defendant,

### GULED ALI OMAR,

while aiding and abetting others known and unknown, and being aided and abetted by others known and unknown, did knowingly attempt to provide material support and resources, including personnel, to a foreign terrorist organization, namely, the *Islamic State in Iraq and the Levant*, knowing that it was a designated foreign terrorist organization and that the organization had engaged and was engaging in terrorist activity and terrorism, all in violation of Title 18, United States Code, Section 2339B(a)(1) and Section 2.

## COUNT 4
(Attempting to Provide Material Support to
a Designated Foreign Terrorist Organization)

On or about April 17, 2015, within the State and District of Minnesota, and elsewhere, the defendants,

### MOHAMED ABDIHAMID FARAH, and
### ABDURAHMAN YASIN DAUD

while aiding and abetting each other and others known and unknown, and being aided and abetted by each other and others known and unknown, did knowingly attempt to provide material support and resources, including personnel, to a foreign terrorist organization, namely, the *Islamic State in Iraq and the Levant*, knowing that it was a designated foreign terrorist organization and that the organization had engaged and was engaging in terrorist activity and terrorism, all in violation of Title 18, United States Code, Section 2339B(a)(1) and Section 2.

| Facebook Business Record | Page 252 |
|---|---|

**Image**



| | |
|---|---|
| **Id** | 581962675223551 |
| **Title** | |
| **Photo** | http://sphotos-g.ak.fbcdn.net/hphotos-ak-xfa1/v/t1.0-9/1926838_58 1962675223551_419717298_n.jpg?oh=12f0ba3e66a297b4df2abf4 b14314ff8&oe=5F0CEC3D&__gda__=1593274804_8e5e9f022f9dc6 69d1f6cceeba1b4224 |
| **Link** | http://www.facebook.com/photo.php?fbid=581962675223551&set =a.106292399457250.18172.100002294723801&type=1 |
| **Upload Ip** | 67.6.1.238 |
| **Album Name** | Profile Pictures |
| **Uploaded** | 2014-02-13 12:47:03 UTC |
| **Tags** | |
| **Comments** | **User** Muad Abdi (100001001625016) |
| | **Text** Anwar al`awlaki!!!! Mashallah |

Exhibit 1

Image

# AMONG THE BEILEVERS ARE MEN WHO HAVE BEEN TRUE TO THEIR COVENANT WITH ALLAH



**Id** 581961625223656
**Title**
**Photo** http://sphotos-e.ak.fbcdn.net/hphotos-ak-xfa1/v/t1.0-9/s720x720/1
926765_581961625223656_23484753_n.jpg?oh=7a4a9b92ec81e3
5bbf83ca95c4da6be5&oe=5F8690C0&__gda__=1587103207_1d73
44912508bbaa1d78c66cf4c6aef2
**Link** http://www.facebook.com/photo.php?fbid=581961625223656&set
=a.581961635223655.1073741825.100002294723801&type=1
**Upload Ip** 67.6.1.238
**Album Name** Cover Photos
**Uploaded** 2014-02-13 12:43:33 UTC
**Tags**

Facebook Business Record                                    Page 287

**Image**



Id 640783792674772
Title
Photo http://sphotos-b.ak.fbcdn.net/hphotos-ak-xpf1/v/t1.0-9/p720x720/10354132_640783792674772_210273472097236249_n.jpg?oh=15714cd96111a709dda5ee6797a1b0ee&oe=603F1030&__gda__=15922604471_4f08ae2174e0982191fd0524ed499cf5
Link http://www.facebook.com/photo.php?fbid=640783792674772&set=a.581961635223655.1073741825.100002294723801&type=1
Upload Ip 2601:2:5180:34f:9013:f2a4:6ad3:997c
Album Name Cover Photos
Uploaded 2014-06-09 04:06:13 UTC
Tags

UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA
Court File No.   15-MJ-312 (BRT)

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | **AFFIDAVIT IN SUPPORT** |
| vs. | ) | **OF CRIMINAL COMPLAINT** |
| | ) | **AND ARREST WARRANTS** |
| 1. MOHAMED ABDIHAMID FARAH, | ) | |
| 2. ADNAN ABDIHAMIDFARAH, | ) | |
| 3. ABDIRAHMAN YASIN DAUD, | ) | |
| 4. GULED ALI OMAR, | ) | |
| 5. HANAD MUSTAFE MUSSE, and | ) | |
| 6. ZACHARIA YUSUF ABDURAHMAN, | ) | |
| | ) | |
| Defendants. | ) | |

I, Nicholas L. Marshall, being first duly sworn, hereby depose and state as follows:

STATE OF MINNESOTA          )
                            ) ss.
COUNTY OF HENNEPIN          )

## I.

## INTRODUCTION AND AGENT BACKGROUND

1. I am a Special Agent with the Federal Bureau of Investigation ("FBI") and have been employed by the FBI since August 2008. I am currently assigned to the Joint Terrorism Task Force (hereinafter "JTTF") of the FBI's Minneapolis Division. That has been my assignment since November 2014. As part of my duties as a

1

Special Agent, I investigate, among other things, criminal violations relating to terrorism, such as material support to designated foreign terrorist organizations. The statements contained in this affidavit are based on information I have learned through my own investigation; my background, training, and experience as an FBI Special Agent assigned to the JTTF; the investigation of other FBI Special Agents and law enforcement officers; records and other evidence obtained during the course of this investigation; and discussions with individuals as set forth in this affidavit.

2. This affidavit is intended to show that there is probable cause to believe that the defendants, **MOHAMED ABDIHAMID FARAH, ADNAN ABDIHAMID FARAH, ABDIRAHMAN YASIN DAUD, GULED ALI OMAR, HANAD MUSTAFE MUSSE,** and **ZACHARIA YUSUF ABDURAHMAN** have committed various federal crimes. It does not set forth all of my knowledge about this matter.

## II.

## PURPOSE OF THE AFFIDVAIT

3. I make this affidavit in support of an application for a criminal complaint and arrest warrants for **MOHAMED ABDIHAMID FARAH ("M. FARAH"), ADNAN ABDIHAMID FARAH ("A. FARAH"), ABDIRAHMAN YASIN DAUD ("DAUD"), GULED ALI OMAR ("OMAR"), HANAD MUSTAFE MUSSE ("MUSSE"), and ZACHARIA YUSUF ABDURAHMAN ("ABDURAHMAN").** Based on my training and experience and the facts as set forth in this affidavit, there is probable cause to believe that **M. FARAH, A. FARAH, DAUD, OMAR, MUSSE,** and **ABDURAHMAN** have violated 18 U.S.C. § 2339B (Conspiring to Provide,

Attempting to Provide, and Providing Material Support to a Designated Foreign Terrorist Organization).

## STATEMENT OF PROBABLE CAUSE

### A.  OVERVIEW OF THE INVESTIGATION

4. For over ten months, FBI Minneapolis has conducted an investigation into a group of individuals, primarily young men between eighteen and twenty-four years of age, who have tried to join and in some cases succeeded in joining – terrorist organizations overseas. This group of individuals included young men who are friends; who have plotted together to travel to Syria to fight; and who assist each other with planning and funding their efforts. During this investigation, the government has prevented a number of these individuals from traveling to Syria. As will be explained later in this affidavit, one of those who traveled and joined a terrorist organization, ABDI NUR ("NUR"), who has been charged criminally, remains in contact with individuals in Minnesota who aspire to travel overseas. From his locale in Syria, NUR recruits individuals and provides assistance to those who want to leave Minnesota to fight abroad.

5. Other Defendants charged as a result of this investigation include ABDULLAHI YUSUF, who has pled guilty to conspiring to provide material support to ISIL, and HAMZA AHMED, who has been indicted on charges of conspiring and attempting to provide material support to ISIL and is currently pending trial in the District of Minnesota.

6. In this affidavit, I provide evidence sufficient to establish probable cause that the six defendants in the above-captioned matter have violated Title 18, U.S.C. Section

3

2339B by, inter alia, conspiring and attempting to leave Minnesota to join and fight for a terrorist organization in Syria.

## B. INTRODUCTION REGARDING THE ISLAMIC STATE OF IRAQ AND THE LEVANT ("ISIL")

7. As stated above, FBI Minneapolis is investigating numerous individuals who have traveled or are attempting to travel to Syria in order to involve themselves in the fighting that has consumed Syria for more than three years. A variety of armed groups are operating in Syria. Those armed groups include many terrorist organizations, among which is the Islamic State of Iraq and the Levant ("ISIL") (also known as the Islamic State of Iraq and Syria ("ISIS"), the Islamic State of Iraq and al-Sham (also "ISIS") or as the Islamic State (IS)). This group will be referred to as "ISIL" for the balance of this affidavit.

8. ISIL is a designated Foreign Terrorist Organization. On October 15, 2004, the United States Secretary of State designated al-Qa'ida in Iraq ("AQI"), then known as Jam'at al Tawhid wa'al-Jihad, as a Foreign Terrorist Organization under Section 219 of the Immigration and Nationality Act and as a Specially Designated Global Terrorist under section 1(b) of Executive Order 13224.

9. On May 15, 2014, the Secretary of State amended the designation of al-Qa'ida in Iraq as a Foreign Terrorist Organization under Section 219 of the Immigration and Nationality Act and as a Specially Designated Global Terrorist entity under section 1(b) of Executive Order 13224 to add the alias Islamic State of Iraq and the Levant ("ISIL") as its primary name. The Secretary also added the following aliases to the ISIL listing: the

4

Islamic State of Iraq and al-Sham ("ISIS"), the Islamic State of Iraq and Syria ("ISIS"), ad-Dawla al-Islamiyya fi al-'Iraq wa-sh-Sham, Daesh, Dawla al Islamiya, and Al-Furqan Establishment for Media Production.   Although the group has never called itself "al-Qa'ida in Iraq," this name has frequently been used to describe it through its history.   In an audio recording publicly released on June 29, 2014, ISIS announced a formal change of ISIS's name to Islamic State.

## C. THE GOVERNMENT'S ISIL INVESTIGATION IN MINNESOTA

*ABDULLAHI YUSUF ATTEMPTS TO TRAVEL TO SYRIA ON MAY 28, 2014*

10. Through this investigation, I learned that on April 28, 2014, 18 year-old ABDULLAHI YUSUF ("YUSUF") went to the Minneapolis Passport Office and applied for an expedited passport, identifying his travel destination as Turkey.   YUSUF told the passport specialist that he planned to travel alone to Istanbul for a vacation and that he was planning to meet a friend there whom he had met on Facebook.   YUSUF also said he would be staying in a hotel, but was unable to provide the name of the hotel or any other details.   YUSUF said he had not received money from his parents, had never been to Turkey, and had no family connections to Turkey.   The passport specialist found his interaction with YUSUF so unusual that he contacted his supervisor who, in turn, alerted the FBI to YUSUF's intended travel.

11. Approximately one week later, on the morning of May 5, 2014, FBI surveillance observed YUSUF's father dropping YUSUF off at Heritage Academy, YUSUF's school in south Minneapolis.   After his father left, YUSUF did not enter the

5

school, but instead walked to a nearby mosque.  At approximately 10:30 a.m., FBI surveillance agents watched YUSUF travel to the Minneapolis Passport Office where YUSUF picked up his new passport.

12.  Later on May 5, 2014 YUSUF used his new passport as a form of identification to open a checking account with an associated debit card at Wells Fargo Bank. On May 23, 2014, YUSUF made a series of cash deposits totaling $1,500 into this new account.  One of these deposits was made at a drive-up ATM.  Agents have reviewed the ATM camera image and note that the vehicle driven by YUSUF was blue and had a broken driver's side rear-view mirror.

13. On May 24, 2014, YUSUF used his Wells Fargo debit card to purchase a $1,427.05 airline ticket.  YUSUF's itinerary was to take him from Minneapolis/Saint Paul International Airport ("MSP") to New York's John F. Kennedy International Airport ("JFK"), where, after an approximately 23 hour layover, he would fly to Moscow, Russia, then onward to Istanbul, Turkey. YUSUF was scheduled to depart MSP on May 28, 2014.

14.  On May 27, 2014, FBI surveillance personnel observed YUSUF, **M. FARAH**, and a third individual sitting together on a bench outside of a community college in Minneapolis, Minnesota. Approximately 30 minutes later, these men entered a blue Volkswagen Jetta with a broken driver's side mirror driven by a fourth individual. Later that afternoon, surveillance officers observed **M. FARAH** purchasing fuel for this same vehicle. At 5:00p.m., Macy's department store surveillance video captured images of **M. FARAH**, YUSUF, NUR, and a known fourth individual shopping together

at the Southdale Mall in Edina, Minnesota. In the video, all four men can be seen talking with each other, laughing, and shopping together. Later that night, FBI surveillance personnel observed **M. FARAH** and YUSUF engage in a private conversation, embrace each other, and then part ways.

15. The following morning, the day of YUSUF's intended departure, agents observed YUSUF's father drop him off at Heritage Academy in Minneapolis, Minnesota. Approximately one hour later, YUSUF left the academy and walked to the nearby mosque where he was picked up by an individual driving the blue Jetta with the broken mirror[1]. A review of telephone toll records obtained by subpoena has revealed that YUSUF had called NUR after he arrived at the mosque and that NUR, in turn, called YUSUF approximately 4 minutes before YUSUF was picked up at the mosque by the blue Jetta. Surveillance of the blue Jetta continued as it drove towards the Blue Line light rail station at 50th Street and Hiawatha Avenue. The blue Jetta parked several blocks from this rail station, at which time YUSUF got out and changed clothes. YUSUF was then driven to the light rail station where he hugged the driver of the blue Jetta, retrieved his luggage from the trunk, and boarded a light-rail train to MSP.

16. After proceeding through security, YUSUF was stopped by FBI agents who asked YUSUF if he would speak to them. During the subsequent interview, YUSUF told agents he was traveling to Istanbul alone for vacation, had no reservations, and knew no one in Turkey. During the interview, YUSUF made no mention of NUR. YUSUF was not allowed to board his flight. YUSUF's parents were interviewed by FBI Agents.

---

[1] According to a witness familiar with the vehicle, NUR was given access to the blue Jetta in May of 2014.

YUSUF's parents told the agents that YUSUF planned his travel, obtained his passport, purchased his airline ticket to Turkey, packed his bag, and traveled to the airport all without their knowledge.

17.   On February 26, 2015, YUSUF pled guilty to Conspiracy to Provide Material Support to a Foreign Terrorist Organization (ISIL), in violation of Title 18, United States Code, Section 2339B.  YUSUF is awaiting sentencing.  *See* Criminal No. 15-46 (MJD).

*NUR DEPARTS MINNESOTA FOR SYRIA ON MAY 29, 2014*

18.   On May 28, 2014 the Minneapolis Police Department located a report documenting the blue Jetta's involvement in a minor accident one week before YUSUF's attempted travel.  The police report identified the driver of the Jetta at the time of the accident as NUR, and the passenger as **DAUD**.  By the conclusion of these investigative steps it was the morning of May 29, 2014.  The FBI then attempted to ascertain NUR's whereabouts.  On the afternoon of May 29, 2014, agents learned that earlier that day, NUR had departed on a flight from MSP, and was scheduled to arrive in Istanbul, Turkey on May 30, 2014.  Also on May 30, 2014, Witness 1, a close relative of NUR, reported NUR missing and the blue Jetta stolen.

19.   NUR's banking records showed that on May 27, 2014, a $1,540 cash deposit was posted to his Wells Fargo Bank account.  On May 27, 2014, NUR paid Lufthansa $1,619.30, using his Wells Fargo debit card, for the travel described above.  Also of note, agents know that NUR deposited $160 at the same ATM in Minneapolis on the same day

that YUSUF deposited his funds as described earlier in this affidavit.  The $160 deposit by NUR was made within 19 minutes of the third of YUSUF's first three deposits on May 27th.  Investigation also revealed that NUR, like YUSUF, had filed an expedited passport application.  On NUR's application, he claimed that he planned to travel to Australia in early June of 2014.

20.  NUR's itinerary included a scheduled return to the United States on June 16, 2014.  Agents have confirmed that NUR was not aboard his return flight and there is no record that NUR has since lawfully re-entered the United States.  As will be explained in more detail below, NUR is overseas and has since been in contact with some members of the conspiracy via telephone to encourage and assist them in traveling from the United States to Syria to join ISIL.

*NUR's ELECTRONIC COMMUNICATIONS SHOW HE HAS TRAVELED TO SYRIA TO JOIN A TERRORIST ORGANIZATION*

21.  On or about May 31, 2014, Witness 1 showed agents several communications Witness 1 had with NUR after NUR unexpectedly left the United States.  Witness 1 had exchanged messages with NUR by Kik[2] and other means.  From my review of the Kik communications between NUR and Witness 1, I learned that NUR stated he had gone "to the brothers".  NUR also stated we "will see each other in afterlife inshallah" (sic) and advised Witness 1 "You cant come looking for me its to late for that" (sic); and "im not

---

[2]  Based on my training and experience, and conversations with other agents, I know Kik is a Canadian-based company that does not maintain records of user conversations. The Kik application is accessed via internet and unlike other messaging applications, Kik is accessed by username and password instead of the user's phone number.

coming back" (sic).  When Witness 1 replied "going to kill poor people is not the answer also poor Muslims I know u r playing to go to sirya but please change mind" (sic), NUR did not refuse his/her accusation, but instead replied, "...everybody dies but I want the best death [name of Witness 1] and take care of hooyo[3] for me inshallah".

22. Agents have viewed the publicly available content on NUR's Facebook account account and have observed several pictures of lions,[4] one picture of a person holding a t-shirt that says "Syria" on the front, and another image that states "The Caliphate is Coming."[5]  Agents have also viewed the publicly available content on NUR's Ask.fm page.[6]  On the page's header, NUR can be seen in a photograph posing with an assault rifle.  In response to questions asked by users, NUR explains that the Islamic State is the caliphate and that he chose this lifestyle to "receive Jannah inshallah."

23. On June 6, 2014 NUR called a relative from a known telephone number bearing the country code for Turkey ("90").  NUR told his relative that he had reached his destination and that he would not be calling again.  He then hung up. As will be

---

[3] I know "hooyo" to be the Somali language term for "mother."

[4] Your Affiant knows that militant Islamic extremists like to refer to themselves as lions, as in "Lions of Allah" or "Lions of Somalia".  This is a reference to being a strong warrior for the cause of *jihad.*  For example, on or about May 11, 2012, Ayman al-Zawahiri, the leader of al Qaeda, issued a statement "O Lions of Somalia, Do Jihad Against the Descendants of Abu Raghal" that was addressed to members of al Shabaab.

[5] Your Affiant knows the "caliphate" is a reference to land that is controlled by an Islamic supreme religious and political ruler.  Based on training and experience, your Affiant is aware that references to "expanding", "returning" and "regaining" the caliphate are common themes among Islamic extremists.

[6] Ask.fm is a global networking site where users can anonymously post questions to other users and provide answers to other users' questions.

explained below, this same phone number would be used to call home three weeks later by another man who traveled from the Twin Cities to Syria, where he joined ISIL.

24.  After learning that NUR had disappeared (but before he phoned home on June 6, 2014), Witness 1 went to the Dar al-Farooq mosque in Bloomington[7] and confronted several individuals with whom NUR had been associating.  At this time, **M. FARAH** told Witness 1 that NUR's ticket had been paid for and that NUR was likely already gone. Witness 1 also went to the home of **M. FARAH** and his brother, **A. FARAH**, to obtain information on NUR's whereabouts.  While there, **A. FARAH** told Witness 1 that if he told Witness 1 what happened, they would not be safe.  **A. FARAH** told Witness 1 that they don't know when they are leaving, that tickets just show up.  **A. FARAH** also told Witness 1 that he did not know when NUR was leaving, nor did NUR know when **A. FARAH** was leaving.

25. In June 2015, agents reviewed publicly available content on **A. FARAH**'s Facebook page and observed that a banner photograph is an image of Anwar Al-Awlaki. Your Affiant knows that Anwar Al-Awlaki was an American-born Islamic militant, and a member of the Designated Foreign Terrorist Organization al Qaeda in the Arabian Peninsula ("AQAP"), who was killed in 2011 in Yemen in an American drone strike. Cover photographs previously appearing on **A. FARAH**'s Facebook page include a photograph showing a black flag commonly used by jihadists, while another image was

---

[7]Dar al-Farooq has two locations, one on 17th Avenue SE in Minneapolis and another one in Bloomington.

that of a man pointing a large-caliber sniper rifle underneath the caption "AMONG THE BEILEVERS [sic] ARE MEN WHO HAVE BEEN TRUE TO THE COVENANT WITH ALLAH". Copies of these images are attached as Exhibit 1.

26.   Agents know that **A. FARAH** applied for his U.S. Passport on April 25, 2014. He listed a planned departure of May 30, 2014, with a stated destination of China. Your affiant notes that **A. FARAH**'s travel timeline is consistent with that of NUR, who obtained his passport on April 24, 2014, listed a planned departure in early June of 2014, and left for Syria on May 29, 2014. **A. FARAH**'s timeline is also consistent with that of attempted traveler YUSUF, who applied for his passport on April 28, 2014, listed a planned departure for early June of 2014, and then attempted to travel to Syria on May 28, 2014.

27.   When questioned about his travel plans in June of 2014, **A. FARAH** maintained he was planning to travel to China but acknowledged that he had no money to travel to China, did not have a job, nor did he know how much it would cost to travel to China. **A. FARAH** also said that his parents had taken his passport away from him after discovering the document in the mail.

28.   According to **A. FARAH**'s mother, **A. FARAH** had obtained a passport without her or her husband's assistance or knowledge. She said that **A. FARAH** had told her he wanted to study in China after high school, but she acknowledged that the family did not have funds for this. She stated that she and her husband kept the passport from **A. FARAH** because she was fearful he would disappear and that they would "not know where [he] went."

*OMAR AND Y.J. PREPARE TO LEAVE THE UNITED STATES FOR SYRIA TO
JOIN ISIL IN LATE MAY OF 2014*

29.   Agents conducting this investigation learned from a Confidential Human
Source ("CHS") that **OMAR,** Y.J., and the CHS[8] had also planned to leave the United
States to join ISIL in late May of 2014.   According to the CHS, he, **OMAR,** and Y.J.
planned to drive to California, then each make their separate way to Syria from there.
Bank records obtained show that **OMAR** withdrew $5,000 in cash from his federal
educational financial aid debit card in the weeks leading up to this attempted departure.
These withdrawals, occurring between May 8 and May 21, 2014, emptied his federal
educational financial aid account.   Records also show that **OMAR** had emptied his
personal account on May 23, 2014, by withdrawing $1,200 in cash.   Also, **OMAR's**
employer informed agents that **OMAR** had failed to show up for scheduled shifts
beginning on May 17th.

30.   After Y.J. rented a vehicle to drive to California, the three men met at
**OMAR's** house in Minneapolis on an unspecified date in late May.   The CHS stated that
after **OMAR** placed his luggage in the vehicle, **OMAR** was confronted by members of
his own family.   As a result of this confrontation, **OMAR,** Y.J., and the CHS abandoned
their immediate plans to travel overseas.

31. Bank records show that **OMAR** deposited $5,500 back into his
savings account on May 29, 2014.   **OMAR's** employer reported to agents that **OMAR**

---

[8] The CHS reported this conduct to the FBI only after the CHS began cooperating with the FBI in
January of 2015.  In 2014, the CHS had been part of a group of individuals seeking to join
ISIL.

returned to work on or about May 30, 2014.  As will be explained below, however, Y.J.
was able to leave the United States approximately one week later.

### Y.J. TRAVELS BY GREYHOUND BUS TO NEW YORK CITY TO BOARD A FLIGHT TO ISTANBUL, TURKEY

32.  Records obtained during this investigation show that on June 1, 2014, Y.J.
purchased an airline ticket for travel to Chicago, Illinois on June 2, 2014.  On June 2,
2014, Y.J. departed MSP at 11:35 a.m. and arrived at O'Hare Airport in Chicago at 12:54
p.m.  After a short time on the ground, Y.J. departed O'Hare and returned to MSP by
5:51 p.m.  Y.J.'s total time on the ground in Chicago was less than four hours.  Your
affiant believes that this one-day trip to Chicago was a trial run undertaken so that Y.J.
could determine if he would have any difficulty getting on an aircraft and taking a trip.

33.  On June 3, 2014, Y.J. then purchased a round-trip ticket from JFK to Istanbul,
Turkey, and he purchased a Greyhound bus ticket from Minneapolis to New York City.
According to records of U.S. Customs and Border Protection, Y.J. departed JFK on June
9, 2014, for Istanbul.  To date, Y.J. has not returned to the United States, although the
ticket he purchased was round trip with a scheduled arrival back in New York on June
19, 2014.

34.  According to a family member, Y.J. called home on June 25, 2014.  Y.J.
would only tell this family member that he was fine, and that he was outside the United
States.  The caller ID feature on the family member's phone captured the number from
which Y.J. was calling.  Your affiant knows this to be the same telephone number used

14

by co-conspirator NUR to call his relative on June 6, 2014, as described earlier in this affidavit.

## THE NOVEMBER 6-8 EFFORTS OF FIVE MEN TO TRAVEL FROM MINNESOTA TO SYRIA

35.    Between November 6, 2014 and November 8, 2014, **M. FARAH, MUSSE, ABDURAHMAN, OMAR** and HAMZA AHMED ("AHMED")[9]  attempted to leave the United States and make their way to Syria to join, and fight with, ISIL. These individuals attempted to either fly from MSP to San Diego, then go to Syria from San Diego, or, similar to Y.J., attempted to take Greyhound buses from Minnesota to New York City's John F. Kennedy International Airport ("JFK") and fly from there to countries that are close to Syria. Their efforts failed.

*NOVEMBER 5 and 6, 2014: M. FARAH, MUSSE, ABDURAHMAN, and AHMED PURCHASE BUS TICKETS; OMAR ATTEMPTS TO TRAVEL*

36.    In November of 2014, **M. FARAH,    MUSSE,   ABDURAHMAN,** AHMED and **OMAR**, each attempted to leave the United States and make their way to Syria to join, and fight with, ISIL. As will be explained below, OMAR attempted to fly from Minneapolis to San Diego, then travel to Syria from San Diego. The other four men, similar to Y.J. mentioned earlier in this affidavit, attempted to leave by taking a Greyhound bus from Minneapolis to New York City, then flying to Europe.

---

[9] AHMED has been indicted in the District of Minnesota on charges of conspiring to provide material support to a foreign terrorist organization, attempting to provide material support to a foreign terrorist organization, and making false statements in connection with a terrorism investigation. *See* Criminal Case No. 15-49 (MJD/FLN).

37. On November 5 and 6, 2014 **M. FARAH, MUSSE, ABDURAHMAN,** and AHMED purchased Greyhound bus tickets from Minneapolis to New York City. Following these purchases, but before the other four men had actually left Minneapolis, **OMAR**[10] attempted to fly from MSP to San Diego, California. Having been notified of **OMAR's** ticket purchase however, FBI agents met **OMAR** at MSP. Agents learned that **OMAR** had checked no luggage and was carrying his passport. **OMAR** was not allowed to board his flight to San Diego.[11]

---

[10] **OMAR** is the younger brother of indicted fugitive Ahmed Ali Omar (09-CR-50 (MJD/FLN)) who departed Minnesota in December 2007 and joined the Designated Foreign Terrorist Organization *al Shabaab*. At present, Ahmed Ali Omar remains a fugitive. On or about August 15, 2012, **OMAR** attempted to travel to Nairobi, Kenya, but was stopped before he could depart. When interviewed by Customs and Border Protection officials, **OMAR** advised that he was traveling to Africa to attend his uncle's wedding. When later interviewed by the FBI about his planned travel, **OMAR** stated that he was traveling to Kenya to get married. **OMAR** asserted that two of his uncles had arranged a marriage for him. **OMAR** further stated that he had not yet met or had any contact with his fiance. **OMAR** planned to remain in Kenya for 90 days. On the morning of his travel, **OMAR** arrived at the airport via light rail. He had no checked baggage but did bring one carry-on gym bag in which he had packed an iPad, white t-shirts, muscle shirts, and extra shoes.

[11] On November 6, 2014, following OMAR's unsuccessful attempt to fly to San Diego, two federal agents and an FBI Somali-English interpreter went to OMAR's residence to attempt to interview family members about his travel. (As noted above in this affidavit, family members frequently are not aware of the alleged "vacation" travel plans of their sibling or son who is attempting to travel to Syria.) Upon arrival, the FBI personnel were threatened by OMAR's younger brother, Mohamed Ali Omar. Because of references Mohamed Ali Omar made to having a "permit to carry," and for other reasons, the following day, a search warrant was executed at OMAR's residence, seeking firearms and firearms accessories. That search turned up two empty boxes for Glock pistols, a partially-empty box of ammunition, and a holster. In an interview with FBI Agents, Mohamed Ali Omar stated that the empty Glock pistol boxes were for firearms he had owned, but that he no longer owned them and that he was "not comfortable" telling agents the current whereabouts of those pistols. Mohamed Ali Omar was indicted by a grand jury for threatening federal agents, in violation of Title 18, United States Code, Section 115, and was tried on that charge during the week of March 9, 2015. The jury found Mohamed Ali Omar guilty of the crime charged. He is currently detained pending sentencing.

*NOVEMBER 8, 2014: **M. FARAH, ABDURAHMAN, MUSSE** AND
**AHMED** ATTEMPT TO TRAVEL TO SOUTHEASTERN EUROPE
WITH THE INTENT TO ENTER SYRIA AND ENGAGE IN
TERRORIST ACTIVITY*

38.    On November 8, 2014, **M. FARAH, ABDURAHMAN, MUSSE**, and

AHMED were in New York, and that morning each of them booked travel out of JFK to

various destinations in southeastern Europe.  **M. FARAH** and AHMED were booked on

the same flight to Istanbul, Turkey.[12]  From Istanbul, their scheduled itineraries deviated:

**M. FARAH** was ticketed to Sofia, Bulgaria [13] while AHMED was ticketed to Madrid,

Spain -- with a change of planes in Istanbul, Turkey.  **ABDURAHMAN** and **MUSSE**

were booked on the same flight from JFK to Athens, Greece. All four men were

prevented from traveling by federal agents at JFK.

39.  **M. FARAH, MUSSE**, and AHMED were interviewed in New York.[14]

During his non-custodial interview, **M. FARAH** told the agents he was traveling alone

to Sofia, Bulgaria, and possibly Greece, for vacation and sightseeing.  **M. FARAH** told

them he had not made any reservations at any hotels in Bulgaria or Greece.  When

asked, **M. FARAH** could not explain why he had waited until the day of his departure

to purchase his airline ticket and he claimed he traveled alone on the Greyhound bus

from Minneapolis.

-----

[12] Your affiant knows Turkey to be a country foreign fighters frequently utilize as a gateway to enter
Syria.  Indeed, I am aware that individuals previously have traveled from Minnesota to Turkey in order to
engage in fighting in Syria on behalf of ISIL,  a designated Foreign Terrorist Organization.

[13] While Bulgaria shares a border with Turkey and with Greece, your affiant believes that M. FARAH
intended to debark in Istanbul and not continue on to Bulgaria.

[14] ABDURAHMAN was interviewed by agents in Minneapolis several days later.

40. Likewise, AHMED told agents he was traveling alone to Madrid, Spain for vacation.   He stated that he recognized someone on the Greyhound bus from Minneapolis but claimed he did not know this person by name.   When shown a photo of **M. FARAH**, he confirmed that this was the person he recognized from the bus, but claimed he did not know this person by name.   AHMED insisted he was flying by himself and was using his own money to fund his travel.   AHMED acknowledged that he had wiped all of the contacts from his cell phone while he was on the Greyhound bus traveling to New York.   He told agents that he was going overseas and would not need them.

41. **MUSSE** told agents that he was traveling alone to Greece to "chill". **MUSSE** told agents he did not know anyone in Greece, nor had he made reservations there.

42.   When later interviewed by agents in Minneapolis, **ABDURAHMAN** also claimed he was traveling overseas alone for a vacation, that he selected Greece at the "last moment", and that he hid his plans from his parents.   **ABDURAHMAN** later changed his version of the facts and stated he was traveling with MUSSE to Greece. Without being asked, **ABDURAHMAN** volunteered that if he had planned to go to Syria to join ISIS, he would have gone to Istanbul.

43. As noted above, all four men claimed they were traveling alone for vacation.   However, a review of their itineraries shows their trips to be exceedingly short to reasonably constitute an overseas vacation.   Based on AHMED's scheduled return

flight, he would have had a single day to vacation in Madrid before returning to the U.S. Similarly, **MUSSE** and **ABDURAHMAN** would have had three days in Athens, and **M. FARAH**, a mere two days in Bulgaria.

44.   Investigation has shown that all four men flying out of JFK on November 8th had purchased their tickets that same day.   Records further show that **ABDURAHMAN** and **MUSSE** purchased their tickets for their Athens flight within 12 minutes of each other (7:05 and 7:17a.m. on November 8, 2014).   Likewise, **M. FARAH** and AHMED purchased their tickets for Istanbul within 12 minutes of each other (9:00 a.m. and 9:12 a.m. on November 8, 2014).   Internet records show that **M. FARAH** had viewed fares for other destinations, including Athens, immediately prior to purchasing his ticket to Bulgaria.

45.   Agents have reviewed Greyhound records for **M. FARAH**, **ABDURAHMAN**, **MUSSE**, and AHMED.   Based upon information provided, your affiant knows that all four men purchased their bus tickets from Minneapolis to NYC within a 16-hour timeframe on November 5th and 6th, and specifically, that **M. FARAH** and AHMED's purchases occurred within twenty-five (25) minutes of each other. Further, both **M. FARAH** and AHMED used Greyhound's mobile website with both online purchases resolving to the same IP (internet protocol) address.   Your affiant knows that using the same IP address within such a close timeframe means that **M. FARAH** and AHMED likely used either the same computer or the same mobile device to purchase their Greyhound bus tickets for the trip from Minneapolis to New York City.

46. Agents have reviewed phone tolls which establish not only links between the four men, but also significant contact in the days leading up to their attempt to travel overseas from JFK. For example, AHMED and **MUSSE**'s phones exchanged 147 text messages and 7 phone calls between November 5th and 6th. **ABDURAHMAN** and AHMED's phones exchanged 25 text messages and 5 phone calls between November 6th and 7th. Between November 6th and 8th, **ABDURAHMAN** and **MUSSE** exchanged 52 phone calls and 6 text messages.

47. As described above, **M. FARAH** and AHMED denied traveling with each other or anyone else. Agents have reviewed video footage of **M. FARAH**'s and AHMED's activities at the Minneapolis bus station prior to their departure to New York and have noted that **M. FARAH** and AHMED arrived at the station together, walked into the Greyhound station together, and then checked in together. **M. FARAH** and AHMED returned to a waiting area and sat together at a table for approximately 30 minutes before boarding the bus together. The Greyhound bus then departed for NYC.

48. Your affiant has reviewed bank records provided by Wells Fargo. Documents obtained show that both **M. FARAH** and AHMED opened Wells Fargo checking accounts on November 6, 2014. **M. FARAH** immediately deposited $1,315, including a single electronic deposit of $1,180. On this same day, AHMED made two separate cash deposits of $1,400 and $111.26. Video footage from a drive-up ATM depicts **M. FARAH** making two cash deposits on November 6th, 2014. The vehicle used by **M. FARAH** is one that registers to AHMED's father. Approximately one hour after **M.**

20

**FARAH**'s deposits, AHMED made a $1,400 cash deposit from the same vehicle at the same ATM.

*PUBLIC CONTENT ON CO-CONSPIRATOR AHMED'S TWITTER ACCOUNT*

49.   In November of 2014, your affiant conducted an open-source review of Twitter and located an account belonging to AHMED. From my review of the publicly available content associated with AHMED's Twitter account, I have learned that he posted Tweets that appear supportive of ISIL.  The following are examples of these tweets:

   a. July 11, 2014: "May this khilafa [15] be the real thing…".

   b. July 15, 2014: "Hate the kuffars [16] and Oppressors and the likes, love the Mumineen". [17]

50. From my review of the publicly available content on AHMED's Twitter account, I have also observed that AHMED "re-tweets", or appears to copy and paste pro-ISIL tweets of other Twitter users.  The following are examples:

   a. March 3, 2014: "How can they defeat Us when we're already Destined for Victory?  The Question is 'am I gona take part of that Victory"? #Islam".

---

[15] A "khilafah" is a unified Muslim state.

[16] A "kuffar" is an infidel, or non-believer.

[17] "Mumineen" is an Arabic term meaning devout.

b. July 15, 2014: "@AbuAlibaghdadi: We have all Kuffar, Rafidah,[18] Hypocrites and AQ against us no LOL?  What an honor subhanallah! #ISIS #IS."

c. November 3, 2014: "Khaled al-Dakheel's [19] last question:  If the war against Al Qaeda gave rise to 100s of terror groups, how many groups will rise up after ISIS?"

### OMAR, A. FARAH, M. FARAH, ABDURAHMAN, DAUD, AND MUSSE PLAN ANOTHER ATTEMPT TO LEAVE THE U.S. FOR SYRIA

51.  Following their return from New York, **MUSSE, M. FARAH,**   and

**ABDURAHMAN** have continued to associate with each other.  The CHS has joined their

discussions, as have **DAUD, A. FARAH,** and **OMAR.**    Some of these conversations

have been consensually audio-recorded by the CHS using equipment provided by the

FBI.[20]

---

[18] "Rafidah" is a reference to Shi'a Islam.

[19] Dr. Khalid Al-Dakhil is a widely published Saudi-Arabian professor of political sociology.

[20] This is the same CHS who, prior to becoming a CHS, had joined Y.J. and **OMAR** in their failed attempt in May 2014 to drive to California in order to travel to Syria, and the same CHS to whom **OMAR** had described his failed effort in November 2014 to leave the U.S. and travel to Syria. The CHS originally denied to the FBI and, on two occasions, a federal grand jury that he had engaged in criminal activity.  The CHS later admitted to the FBI that he had been untruthful about his own involvement, and that prior to becoming a CHS, he was part of a conspiracy to provide material support to a foreign terrorist organization, specifically ISIL.

52. In February of 2015, FBI agents obtained information from the CHS indicating that **OMAR, M. FARAH, A. FARAH, DAUD, ABDURAHMAN,** and **MUSSE** were discussing yet another plan to leave the United States to join ISIL. Beginning in February of 2015, the CHS was present for multiple conversations in which the defendants discussed past efforts to leave the country as well as their desire to again attempt to travel to Syria to join ISIL.

53. During one such conversation with the CHS on March 3, 2015, **OMAR** recounted how he had attempted to travel overseas via "Cali"[21] in November of 2014. **OMAR** told the CHS, "I was trying to get out right then and there." **OMAR** described his efforts to cover up the fact that he was attempting to leave the country. **OMAR** referenced the purchase of a round-trip ticket, booking a hotel, and having an individual in California ready to pick him up at the airport. **OMAR** told the CHS "I was precautious (sic), bro...I had three friends lying for me so I could go in Cali..." **OMAR** told the CHS, "I have experience with this shit, I got caught up before..."[22] **OMAR** told the CHS that after he was stopped at MSP by the FBI, he called **MUSSE**, who was with the group attempting to fly out of JFK. He stated, "[e]ven when I got caught up, the first thing I did when I got caught up, is I let them know. I called Hanad from a different phone, called from (a different phone)..."

---

[21] Your affiant believes that "Cali" refers to the State of California.

[22] Your affiant believes this statement to be a direct reference not only to OMAR's attempted travel to Syria in May of 2014, but also the attempt by OMAR in August of 2012 to travel to Somalia to join the Designated Foreign Terrorist Organizational *Shabaab*.

54. In late February of 2015, the CHS recorded a conversation with **ABDURAHMAN** in which **ABDURAHMAN** acknowledged his attempt to travel via JFK in November of 2014, as described earlier in this affidavit. In reference to **DAUD's** previous participation in encouraging the group's travel through JFK, **ABDURAHMAN** told the CHS that **DAUD** "made us hasty."

55. On March 23, 2015, the CHS recorded a conversation with **M. FARAH** in which **M. FARAH** recounted his effort to leave the U.S. via New York City in November of 2014 as described above in this affidavit. **M. FARAH** told the CHS "I had my passport. I was at my grandma's. I took it, I tricked her." He also stated, "I can tell you one thing, when I went on... Greyhound, Allah it was the best feeling in my life."

56. As a result of the unsuccessful attempts by YUSUF and **OMAR** in May of 2014, and by **M. FARAH, MUSSE, ABDURAHMAN, AHMED**, and **OMAR** in November of 2014, members of this group discussed a plan to obtain false passports for yet another attempt to leave the U.S. for Syria. The CHS learned from members of the conspiracy that others were in current contact with NUR who, as explained earlier in this affidavit, is fighting with ISIL in Syria. The CHS had learned from **ABDURAHMAN** that NUR may have a trusted contact in Mexico who could provide false passports to those members of the conspiracy interested in traveling from the Twin Cities to Syria from Mexico. In a recorded conversation on March 16, 2015, however, **OMAR** told members of the conspiracy that NUR may have been killed as NUR had not been heard from recently.

57.   In response to their previously stated desire to use forged passports to travel to Syria, the CHS later represented to **OMAR** that he may be able to secure a contact in California for the production of forged passports.  **OMAR** encouraged the CHS to explore this as an option for obtaining forged travel documents.  When the CHS later informed **OMAR** that he had in fact obtained such a contact in San Diego, California, **OMAR** and the CHS in turn notified other members of the conspiracy of the existence of this new source for forged passports.

58.   In mid-March, 2015, **ABDURAHMAN** told the CHS in a recorded conversation that as long as he has his job, no one will suspect him of anything.  He then stated that if the defendants go through Turkey, they need something [a flight] that goes straight to Turkey from Mexico.  **ABDURAHMAN** told **OMAR** and the CHS that "time is killing us" and that he wanted to leave for Syria in a month or less.

59.   On March 19, 2015, the CHS recorded a conversation with **DAUD** in which **DAUD** discussed the details of the plan to use fake passports to leave the U.S. for Syria. **DAUD** informed the CHS that he had money and that "I'm ready, bro." **DAUD** wanted to know how long it would take to obtain the fake passports.  **DAUD** claimed that the "kuffar", his mother, and his family all think he is getting married and that this was the perfect situation for his departure.  In reference to the attempt to leave via JFK in November of 2014, **DAUD** stated, "you know how last time, we were up to something, everyone could tell?"

60.   On March 16, 2015, the CHS recorded a conversation with A. **FARAH** in which A. **FARAH** congratulated the CHS for securing the fake passport contact.    A.

24

FARAH later told the CHS, "It's dunya.[23]   There's nothing for me in this world, bro." Regarding the group's plan to drive to San Diego, obtain fake passports, cross into Mexico, then travel to Syria to join ISIL, A. **FARAH** told the CHS, "we gotta be smart, brother, we can't make dumb decisions like we always do.   Rational decisions."   A. **FARAH** then stated, "we gotta be smart about the transportation."

61.   On March 23, 2015, the CHS recorded a conversation in which **DAUD** and **M. FARAH** discussed the plan to use fake passports to leave the U.S. for Syria.  **DAUD** advised that they could not ride together (to California).  **M. FARAH** agreed.  **DAUD** acknowledged "this, that's fraud" and then states, "yea, I'ma go to jail.   I don't care." During this conversation, **M. FARAH** stated "the American identity is dead.  Even if I get caught, I'm whatever...I'm through with America.  Burn my ID."

62.   On March 28, 2015, **OMAR** told the CHS that he wished to delay his own travel to Syria because he did not want to travel with **M. FARAH, ABDURAHMAN,** or

_____

[23]The term "dunya" refers to the physical world (as opposed to the spiritual world).

MUSSE. **OMAR** stated "I don't want to go anywhere with them" and "I feel like if I go anywhere with them it's an automatic failure."

63. On March 30, 2015, **A. FARAH, DAUD**, and **M. FARAH** each provided a passport photograph to the CHS for use in the fake passports. On April 1, 2015, **ABDURAHMAN** provided his photograph to the CHS for use in his fake passport. On April 3, 2015, **ABDURAHMAN** expressed concern to the CHS about traveling with other members of the group, fearing that the number of men involved in the plot increased the probability of getting caught by law enforcement, and he asked the CHS for the return of his passport photograph. A short time later, the CHS returned the photograph to **ABDURAHMAN**.

64. On April 5, 2015, **A. FARAH** gave **MUSSE**'s photograph to the CHS for use in **MUSSE**'s fake passport. On April 8, 2015, **MUSSE** told the CHS he would no longer travel with the group because his father confronted him, asking him if he had plans to leave the country.

65. On March 30, 2015, when discussing the plan to travel to San Diego, cross the border into Mexico and then travel to Syria, **DAUD** told the CHS, "this is the perfect time...this shows Allah I'm not about this life." **DAUD** also stated, "I don't want nobody, except Allah, to know what I'm doing right here." He later stated to the CHS, "we got the frickin' equation, bro...we just need to execute."

66. In separate meetings on April 3, 2015, both **DAUD** and **A. FARAH** each gave $100 in cash to the CHS as a down-payment for the production of their fake

passports. On or about April 9, 2015, **ABDURAHMAN** provided the down-payment of $100 to the CHS for **M. FARAH**'s fake passport.

67. During a recorded conversation with the CHS, both **DAUD** and **M. FARAH** described recent communications with NUR wherein NUR described fighting with ISIL. **DAUD** recounted one such conversation about the battle for Kobani[24] in which NUR relayed to **DAUD** that three fighters he was with "got shahada" and that an additional twelve to thirteen fighters were shot. Your affiant knows that "shahada" is a term referring to a martyr's death.

68. Regarding the plan to pick up the fake passports in California and travel on to Syria, **M. FARAH** told the CHS that this was "our best...opportunity" and "whoever takes it is gonna take it. Whoever doesn't, is gonna regret (it] the rest of their life."

69. **M. FARAH, A. FARAH, DAUD**, and the CHS had discussed and planned to use a rental vehicle to travel to San Diego to pick up their fake passports.   In the days prior to their departure for San Diego, **DAUD** encountered difficulties selling his vehicle, the funds from which were to be used by the group to travel to Syria.  On April 16, 2015, **DAUD** and the CHS spoke with an undercover employee of the FBI (the "UCE"), who was posing as the provider of the false passports, by telephone and informed him of the possible delay.    **M. FARAH** was also present during the conversation.   In this recorded conversation, the UCE offered to purchase **DAUD**'s vehicle from **DAUD** upon arrival in California.  **DAUD** and the UCE then negotiated a purchase price for **DAUD**'s vehicle.

[24] Your affiant knows that beginning in September of 2014, ISIL launched an offensive to capture the city of Kobani, a city in northern Syria near the Turkish border.   By early October 2014, ISIL largely succeeded in capturing the city.   However, in January of 2015, a battle to retake Kobani took place, resulting in ISIL's withdrawal from the city by month's end.

**DAUD** agreed to accept $5500 and the fake passports in exchange for his vehicle. **DAUD** agreed to conduct the transaction upon arrival with his fellow travelers in San Diego.

70.  On April 17, 2015, **DAUD** spoke with the CHS in person. In this recorded conversation, **DAUD** told the CHS that **A. FARAH** would not be joining the group traveling to San Diego.  By way of explanation, **DAUD** recounted for the CHS a recent phone conversation that he and **A. FARAH** had with an ISIL fighter currently located in Syria.  According to **DAUD**, this ISIL contact provided details to **DAUD** and **A. FARAH** on how to get into Syria once they had arrived in Turkey.  **DAUD** and **A. FARAH** concluded that the costs associated with getting into Syria from Turkey to join ISIL had increased. **DAUD** stated that the ISIL contact told **A. FARAH** that he should be patient and that his opportunity to travel would come in the future.  **DAUD** also told the CHS that **A. FARAH**'s mother believed her sons (**A. FARAH** and **M. FARAH**) were about to leave Minneapolis for Chicago.  **DAUD** told the CHS that the FARAHs' mother would allow **M. FARAH** to travel to Chicago, but would not permit **A. FARAH** to leave.  In a separate conversation on April 17, 2015, **DAUD** told the CHS that **A. FARAH** had an alternate plan to get to Syria.

71. At approximately 8:15p.m. on April 17, 2015, **M. FARAH, DAUD**, and the CHS left Minneapolis in **DAUD**'s vehicle, bound for San Diego, California.

72.   In summary, at the time the CHS began having recorded conversations about travel to Syria to join and fight with ISIL, it was known:  That **M. FARAH, MUSSE, ABDURAHMAN**, and AHMED had attempted to leave for Syria through JFK on

29

November 8, 2014; that **M. FARAH** and A. **FARAH** had had conversations with Witness 1 in which they revealed that they were aware of the way in which it was communicated to potential ISIL travelers that it was time for them to leave, and the way that tickets for travel to Syria would "just show up" when it was time for a particular traveler to go; that **OMAR** had attempted to travel to Syria by first going to California with Y.J. and the CHS (and that Y.J. had later reached Syria by taking a bus to JFK); that **OMAR** had tried to travel from MSP to San Diego on November 6, 2014; that NUR had traveled to Syria and that YUSUF had tried to travel to Syria; finally, agents were also aware that **OMAR** had, in July of 2012 driven to the airport two men from Minnesota who were on their way to Somalia to join, and fight with, a designated foreign terrorist organization.

73. Based on the foregoing, I respectfully submit to this Court that there is evidence amounting at least to probable cause to believe that **M. FARAH, A. FARAH, ABDURAHMAN, DAUD, OMAR,** and MUSSE have committed the federal crimes specified above in this affidavit, and that the nature of these crimes further supports the issuance of a warrant by this court for the arrest of **M. FARAH, A. FARAH, ABDURAHMAN, DAUD, OMAR,** and MUSSE.

Respectfully submitted,

NICHOLAS L. MARSHALL
Special Agent
Federal Bureau of Investigation

Subscribed and sworn to before

me on this _____ day of April, 2015.

Becky R. Thorson
United States Magistrate Judge