UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA
15-CR-49 (MJD/FLN)

UNITED STATES OF AMERICA

        Plaintiff,

                                  **DEFENDANTS' JOINT MOTION**
v.                                  **TO DISMISS COUNTS 1-4 ON**
                                  **VOID FOR VAGUENESS GROUNDS**

HANZA NAJ AHMED (1)
ADNAN ABDIHAMID FARAH (3)
ABDURAHMAN YASI DAUD (4)
ZACHARIA YUSU ABDURAHMAN (5)
HANAD MUSTOFE MUSSE (6)
GULED ALI OMAR (7)

        Defendants

          **\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\***

The above defendants, through and by their undersigned counsel, and in accordance with Rule 12 (b), and the teaching and invitation of <u>Holder v. Humanitarian Law Project</u>, 561 U.S. 1, 18 (2010), move for an Order dismissing Counts 1-4.  The terrorism statute violates these defendants' First Amendment protections.  It is void for vagueness as applied.

Our grounds are these:

1.  This motion pertains to the terrorism charges:  Count 1 alleges a conspiracy "to provide material support and resources, including personnel, as that

1

term is defined in Title 18, United States Code, Sec. 2339A(b)(1), to a foreign

terrorist organization, namely, Islamic State in Iraq and the Levant . . ." ; an

alleged attempt to provide the same material support, lodged against Guled Ali

Omar (Count 2), and Mohamed Abdihamid Farah and Abdurahman Yasin Daud

(Count 4), and an aiding and abetting claim against Hamza Naj Ahmed, Mohamed

Abdihamid Farah, Zacharia Yusuf Abdurahman and Hanad Mustof Musse (Count

3).

2.   The terrorism charges involve three related statutory provisions.  The

material support provision is found in 18 U.S.C. 2339A(b)(1).  The defendant

must know that ISIL is a designated foreign terrorist organization as defined in 18

U.S.C. 2339B(g)(6); there is a related scienter requirement that the defendants

know that the organization had engaged in terrorist activity and terrorism. 18

U.S.C. 2339B(a)(1).

The statute also recognizes the concerns raised here.  18 U.S.C. 2339B(i)

provides that "[n]othing in this section shall be construed or applied as to abridge

the exercise of rights guaranteed under the First Amendment of the Constitution."

3.   The Fifth Amendment provides that "[n]o person shall be deprived of

life, liberty, or property, without due process of law."  The Supreme Court's "cases

establish that the Government violates this guarantee by taking away someone's

2

life, liberty, or property under a criminal law so vague that it fails to give ordinary people fair notice of the conduct it punishes, or so standard-less that it invites arbitrary enforcement." Johnson v. United States, 135 S.Ct. 2551, 2556 (2015) (citing Kolender v. Lawson, 461 U.S. 352, 357-58 1983)). A defense vagueness challenge may be made both the elements of the crime and the statutes establishing the penalty. Id. at 2557 (citing United States v. Batchelder, 442 U.S. 114, 123 (1979)).

4. In Johnson, our High Court emphasized that if a criminal statute features an "indeterminacy" a defendant may not be not given a fair notice of the charge. Id. at 2557. "Indeterminacy" describes the word "shapeless." Id. at 2560. Words matter, and these two, if present, suggest the underlying statute may be applied arbitrarily, due process considerations implicated. Id. at 2557.

5. The First Amendment provides that "Congress shall make no law ... abridging the freedom of speech." The First Amendment "protects speech and the speaker, and the ideas that flow from each." Citizens United v. Federal Election Commission, 130 S.Ct. 876, 899 (2009). To that preferred end, the Amendment "stands against attempts to disfavor certain subjects or viewpoints." Id. "If the First Amendment has any force, it prohibits Congress from fining or

3

jailing citizens, or associations of citizens, for simply engaging in political speech."  Id. at 904.

That's why blanket prohibitions on membership in organizations, even if nefarious, are unconstitutional under the First Amendment.  Scales v. United States, 367 U.S. 203, 229 (1961); Elfrandt v. Russell, 384 U.S. 11, 16 (1966).

6.  A defense void-for-vagueness as applied claim finds a more tangible resonance when the First Amendment is implicated.  The Supreme Court has cautioned against the possibility of "brooding governmental power," a power that "cannot be reconciled with confidence and stability in civil discourse that the First Amendment must secure."  Citizens United, 130 S.Ct. at 904.  "[T]he concept that government may restrict the speech of some elements of our society in order to enhance the relative voice of others is wholly foreign to the First Amendment." Id. at 904 (quoting Buckley v. Valeo, 424 U.S. 1, 48-49 (1976)).

Today's internet world has altered what once were ordinary avenues of expression.  Most the cases were written without the internet in mind.  Even so, "[r]apid changes in technology – and the creative dynamic inherent in the concept of free expression – counsel against upholding a law that restricts political speech in certain media or by certain speakers."  Id. at 913.  In whatever medium, then, "[t]he First Amendment confirms the freedom to think for ourselves."  Id. at 908.

4

It's still true:  "expression of dissatisfaction with the policies of the country [is] situated at the core of the our First Amendment values."  <u>Texas v. Johnson</u>, 491 U.S. 397, 411 (1989).

7.  Beyond the controversy of the case has engendered, <u>Citizens United</u> was a love sung to the First Amendment.  The opinion begins with a firm declaration that  First Amendment standards "must give the benefit to any doubt to protecting rather than stifling speech."  <u>Id</u>. at 892 (quoting <u>Federal Election Com'n v. Wisconsin Right to Life, Inc</u>., 551 U.S. 449, 469 (2007)(Opinion of Roberts, C.J.)(citing <u>New York Times Co. v. Sullivan</u>, 376 U.S. 254, 269-270 (1964)).  In deference to the legislative purgative, facial challenges are disfavored,  <u>Id</u>. at 932 (citing <u>Washington State Grange v. Washington State Republican Party</u>, 552 U.S. 442, 450 (2008)).

8.  Ours is to the terror statutes' applicability and not their facial vitality, a distinction "not so well defined . . . " <u>Citizens United</u>, 130 S.Ct. at  893 (2010).  The "as applied" challenge permits this Court to declare a statute unconstitutionally vague "to the extent that it reaches too far . . ." <u>Id</u>. at 932 (J.. Scalia, Alito and Thomas concurring)(quoting <u>Brockett v. Spokane Arcades, Inc</u>., 472 U.S. 491, 504 (1985)).  Where a statute "interferes with the right of free speech or of association, a more stringent vagueness test should apply." <u>Holder v.</u>

Humanitarian Law Project, 561 U.S. 1, 130 S.Ct. 2705, 2719 (2010)(quoting

Hoffman Estates v. Flipside, Hoffman Estates, Inc., 455 U.S. 489, 495 (1982)).

     9.  Holder featured a constitutional challenge to 18 U.S.C. 2339B.  The

opinion upheld the statute on a facial challenge, but left open the filing of motions

like this one.  "Of course," the Supreme Court counseled, "the scope of the

material-support statute may not be clear in every application." Id. at 2720.  "We

do not, however, address the resolution of more difficult cases that may arise

under the statute in the future."  Id. at 2712.

     For emphasis, the Court added this telling sentence, which we hope will

appear in this Court's Order:  "All this is not to say that any future applications of

the material-support statute to speech or advocacy will survive First Amendment

scrutiny."  Id. at 2730.  Our motion addresses "future applications," what the High

Court was worried about.

     The Holder opinion gives us a roadmap of why our claim has merit, in five

parts.

     Because 1) "[i]ndividuals who act entirely independently of the foreign

terrorist organization to advance its goals and objectives [are] not considered to be

working under the foreign terrorist organization's direction and control." Id. at

2721 (quoting Sec. 2339B(h)).

Because 2) under the material-support statute, defendants still "may say anything they wish on any topic."  In <u>Holder</u>, the government agreed that "the statue does not prohibit independent advocacy or expression of any kind."  <u>Id</u>. at 2723 (quoting Brief for Government 13).

Because 3) even a defendant's communication with a terrorist group, direct or otherwise, is not prohibited, unless what is conveyed involves a "specific skill" or "specialized knowledge."  <u>Id</u>. at 2724.  A knowledge and skill set not shared by those recently graduated from South High School.  Terror classes are not taught in the public schools.

Because 4) "the statute [does not] prohibit an individual from associating with a terrorist group, or promoting its political goals."  <u>Id</u>. at 2730.  The statute prohibits instead is "the act of giving material support."  <u>Id</u>. (citation omitted).

And because 5) when a valid First Amendment claim is raised, it is this "court's own obligation to secure the protection that the Constitution grants to individuals," even in the terrorism context.  <u>Id</u>. at 2728.  Hence this motion.

10.  In cases decided before and after <u>Holder</u> and <u>Citizens United</u>, the Supreme Court has permitted a defendant to advocate with near impunity on almost any topic, including thoughts of violence.  The most recent First Amendment decision in the criminal arena is <u>Elonis v. United States</u>, decided June

7

1, 2015.   One Mr. Elonis, described as "an active user of the social networking Web site Facebook," made a habit of writing entries which "included graphically violent language and imagery."  135 S.Ct. 2001, 2004 (2015).  In one message, Mr. Elonis referenced the threat of blowing up a bridge, the hoped-for sound of "Boom, Boom, Boom."  Id. at 2007.

In sample photograph, Mr. Elonis is seen "holding a toy knife against his co-worker's neck," featuring the caption, "I wish." Id.

The Supreme Court described his posts as  "crude, degrading," containing "violent material about his soon-to-be ex-wife."  Id. at 2004.  Local law enforcement authorities became alarmed.  After an investigation, Mr. Elonis was charged with making threats to, among others, his wife.

At trial, Mr. Elonis "requested a jury instruction that 'the government must prove that he intended to communicate a true threat,'" which was denied.  Id. at 2007 (emphasis added).   "My writing is therapeutic," was his claim to the jury. Id. at 2006.

Elonis opines that a defendant's statements indicating the potential for violence, the yearning to kill, the use of means of manner and means to do so, the targeting of innocent individuals (read his spouse) may be unreasonable.  But not necessarily criminal.

In one sense, <u>Elonis</u> is a jury instruction case.  After a lengthy discussion as to quantum of proof  required, the Supreme Court determined that Mr. Elonis's intent had to be far more than what "a reasonable person" would have understood his thought process to be.  <u>Id</u>. at 2011.  Under that standard, the defendant could be convicted without any "awareness of some wrongdoing."  <u>Id</u>. (quoting <u>Staples v. United States</u>, 511 U.S. at 606, 607 (1994)). The government's suggested instruction – whether "a reasonable person would have recognized that the poses would be read as genuine threats," was cast aside, construed as a mere "negligence standard" inconsistent with the criminal intent required by a felony statute.  Id. at 2011.

In another sense, <u>Elonis</u> is a freedom of speech case, suggesting that the First Amendment protections should be considered in evaluating the criminal intent required.  <u>Id</u>. at 2005.  Mr. Elonis could say the things he did if he didn't mean or intend any actual harm.

11.  A similar result appears in <u>Snyder v. Phelps</u>, 562 U.S. 443, 131 S.Ct. 1207 (2011), where the question was whether an individual could picket military funerals.  "Marine Lance Corporal Matthew Snyder was killed in Iraq in the line of duty." 131 S.Ct. at 1213.  His funeral was to be at a Catholic Church in Westminster, Maryland, noticed in the local newspapers.  <u>Id</u>.  All the way from

9

Topeka Kansas traveled Albert Phelps along with "two of his daughters and four of his grandchildren."  Arriving just in time to hold up the following signs: "God Hates the USA/Thank God for 9/11," "America is Doomed," "Don't Pray for the USA," "Thank God for Ieds," "Thank God for Dead Solders," "Pope in Hell," Priests Rape Boys," "God Hates Fags," "You're Going to Hell," and "God Hates You." Id.   These placards, opined the Court, "reflected the church's view that the United States is overly tolerant of sin and that God kills American soldiers as punishment." Id. at 1213.

Mr. Snyder's father sued Phelps, his family members and the demonstration's apparent sponsor, the Westboro Baptist Church, for defamation, intrusion upon seclusion, and intentional infliction of emotional distress, among other torts.  A jury awarded 2.9 million in compensatory damages, eight million more in punitive.

The defendants claimed a First Amendment protected right to picket, no matter how offensive the signs were to the dead soldier's family.  The Supreme Court agreed the messages were "particularly hurtful to many," Id. at 1218, and accentuated Mr. Phelps' fathers' "already incalculable grief," Id.   But since the speech occurred in a public place, it was entitled to "special protection," even if

the signs were "outrageous." Id. at 1219. A subjective dislike for content can never be the test for a tort or punishment. The last paragraph in Phelps:

> Speech is powerful. It can stir people to action, move them to tears of both joy and sorrow, and – as it did here – inflict great pain. On the facts before us, we cannot react to that pain by punishing the speaker. As a Nation we have chosen a different course – to protect even hurtful speech on public issues to ensure that we do not stifle public debate. That choice requires that we shield Westboro from tort liability for its picketing in this case.

Id. at 1220.

12. The result in Snyder was predictable. Almost thirty-years ago, in Smith v. Collin, 439 U.S. 916 (1978), the setting was Skokie, Illinois, a suburb of Chicago with 70,000 residents the majority of whom were Jewish. There the National Socialist Party of America was permitted to assemble and march "wearing uniforms with swastikas," the Nazi symbol prominently displayed, reminiscent of the German military uniforms worn during the Holocaust.

The High Court discerned the march in Skokie to be "potentially explosive and dangerous, inflamed by unforgettable recollections of traumatic experiences in the Second World War conflict." Id. at 918. For the demonstration was "taunting and overwhelmingly offensive to the citizens [of Skokie]," yet permitted on First Amendment grounds. The High Court went so far as to recognize that, for some

Judges, a "need to apologize for the result." Id (quoting 578 F.2d 1197, 1121 (7th Cir. 1978)).

13.  These defendants are encouraged to raise a First Amendment defense, each step of the way. Camreta v. Greene, 131 S.Ct. 2020, 2044 (2011)(citing Snyder and indicating the First Amendment defense is available to a criminal charge).  Adnan Farah, for one, broached the First Amendment issues in his appeal from the Order of Detention.  In denying release under any circumstance, this Court noted only that what he said in could be used as evidence, not that he couldn't say what he did or that his speech was crime.  Memorandum of Law and Order, Docket entry 63 (Filed May 15, 2015)(citing Wisconsin v. Mitchell, 508 U.S. 476, 489 (1993)("The First Amendment, moreover, does not prohibit the evidentiary use of speech to establish the elements of a crime or to prove motive or intent."); United States v. Abdel Rahman, 189 F.3d 88, 118 (2nd Cir. 1999) (finding that in terrorism prosecution, although a defendant may not be prosecuted for expressing hostility against the United States, his statements may nonetheless be used against him when relevant to prove a pertinent fact in a criminal prosecution))."

Mr. Adnan Farah's detention appeal did not ask for an as applied ruling. This collective motion now does.

14.  The prosecution impacts the defendants' First Amendment rights by arbitrarily applying the term "personnel" under the statute.  The Indictment "reaches too far," Citizens United, 130 S.Ct. at 932.

In 2004, Congress amended Sec. 2339B, limiting the definition of "personnel" to an individual who "[work]s under that terrorist organization's direction or control or . . .  Organize[s], manage[s], supervi[s], or other direct[s] the operation of that organization." 18 U.S.C. 2339B(h).  The statute is written with a key caveat: it carves out the conduct of "[i]ndividuals who act entirely independently of the foreign terrorist organization to advance its goals or objectives."  Id.

In Holder, the as-applied First Amendment challenge was rejected.  The complaining parties in that case sought to "train" and provide "expert advice" to a designated terrorist organization; they possessed by their own admission a "specialized knowledge."  Id. at 2721.  Their questioned conduct fit the statute's requirement.  Accord United States v. Farhane, 634 F.3d 127 (2nd Cir. 2011)(physician who swore oath of allegiance to Al Qaeda and who offered to "serve as an on-call doctor for the organization, standing ready to treat wounded mujahideen in Saudi Arabia"); United States v. Shah, 474 F. Supp. 2d 492, 498-99 (S.D.N.Y. 2007)(defendant "volunteered as a medic for the al Qaeda military");

Lindh, 212 F. Supp. 2d at 549 (defendant received combat training and served an

an al Qaeda combat unit); United States v. Goba, 220 F. Supp. 2d 182, 193-194

(W.D.N.Y. 2002)(same).

 The key distinction made in Holder, as there should be here, was between

"active" and "nominal" membership.  Holder does not interpret the First

Amendment as a kind of lazy muzzle.   For if a defendant's interest in ISIS is

"independent" of that organization and not a joinder with it, the terrorism statute

does not apply.  Id. at 2721; 18 U.S.C. 2339(B)(h).  Merely writing about an

organization in e-mails texts, or voicing an interest on a clandestinely recorded

tape, or narrating a selfie, does not suffice.  Id. at 2722-23.  Holder opines that if

the defendants' knowledge of the terror organization is only "general or

unspecialized" and the individual in turn conveys that knowledge in abstract terms

or yearnings, there is no crime, either.  Id. at 2724.

 15.  The First Amendment Establishment Clause prohibits the governmental

diminution of religious practice and belief.  Hernandez v. C.R.I., 490 U.S. 680,

699 (1989).  There are "very broad protection[s]" in federal law for the exercise of

"religious liberty."  Holt v. Hobbs, 135 S.Ct. 853, 859 (2015)(quoting Burwell v.

Hobby Lobby Stores, Inc., 134 S.Ct. 2751 (2014)).

The discovery indicates the defendants' belief that the Assad government in Syria was committing genocide against Muslims. Which independent evidence confirms. See e.g., Anne Barnard and Somini Segupta, "Syria Is Using Chemical Weapons Again, Rescue Workers Say," May 6, 2015, New York Times. The Defendants' motivations recognized the religious obligation to assist Muslims in need, a collective desire to associate and travel to the Mideast for reasons of faith. Even if that belief does not "squarely fit" within the divergent doctrines of Islam, it nonetheless may be "sincerely held," reflecting a First Amendment protected expression. See United States v. Ali, 682 F.3d 705, 710 (8th Cir. 2012).

16. This Court has expressed the often held view that it does not know the case as well as the litigants do, and therefore ruling without all the facts is to be avoided. Yes and no. Ours has been framed now with sufficient detail.

Take again Adnan Farah. Like the others, he's on tape, and he kept a Facebook page the Court can look at early. He never went to an airport, purportedly to fly out. Those who got on a bus didn't forfeit their First Amendment claims, however.

He and all co-defendants share certain characteristics, namely a complete lack of a special skill set, no training of any kind, and an inability to train anyone else. The discovery and Complaint evince a certain curiosity about ISIS. In some

15

texts appear a willingness to associate with its doctrines.  But none of these defendants sent money; none fought here or abroad.  That they knew how to shoot a gun is missing as well.

The word "personnel" has been defined to include "employees or employee-like operatives who serve the designated group and work at its command."  <u>Lindh</u>, 212 F. Supp. 2d. at 572.  No evidence exists of personal payments, the status of an knowing, clandestine operative.

These kids were not acting within the meaning of the statute.  Curious as to an unknown, they had yet to become under the direction or control of ISIS; had yet, by law, to become terror "personnel."  <u>Holder</u>, 561 U.S. at 23.

The advent of the internet, 24/7 access, and the near constant communication has changed the landscape of our social fabric, if not how the law should work going forward.  The ISIS YouTube tapes are everywhere, and can be seen without caution.  The sonorous call to Jihad is just a click away.

In our not so brave new electronic world, free and undefined associations are encouraged and permitted.  Your friends on Facebook may be friends, or they may not be.  You can say you're a close pal, click yet another box and yet not mean a thing by it.  And no one, in the internet world, seems to know the difference.  The ennui of the electronic youth does not provide "fair notice of what

is prohibited."  Holder, 561 U.S. at 27 (quoting United States v. Williams, 553 U.S. 285, 304 (2008)).

 Indeed the "[r]apid changes in technology" inundate this case.  Citizens United, 130 S.Ct. at 913.  In the real day-to-day life, no one has more than five to ten close friends.  On Facebook you can have thousands, including those who say they are linked with ISIS but may not be.  And if some are, that isn't a crime.  Holder, 130 S.Ct. at 2721.

17.  The central problem this prosecution is how to distinguish protected speech and religious association from criminal conduct.  On our facts that fine line, to use Johnson's phrasing, has become a "shapeless" "indeterminacy."  135 S.Ct. at 2557, 2560.  Subject to arbitrary application.

For every bit of evidence you can say yes, it's free speech; you can say, too, it's a conspiracy.

You can describe an act as evidence of a misguided friendship.

You can say the handshake and nod and trip to the basketball court at a local mosque was an embrace of ISIS dysphoria, a jump shot taken by an amateur.

Counts 1 through 4 must be dismissed.

17

Dated: August 7, 2015                    Respectfully submitted,

                                         /s/ Paul Engh

                                         _____

                                         PAUL ENGH
                                         Suite 1225 First Bank Plaza
                                         220 South Sixth Street
                                         Minneapolis, MN  55402
                                         (612) 252-1100
                                         Engh4@aol.com

                                         Attorney for Adnan Abdihamid Farah


Dated: August 7, 2015                    GASKINS, BENNETT, BIRRELL,
                                         SCHUPP, LLP

                                         /s/ Andrew Birrell

                                         _____

                                         Andrew S. Birrell, 133760
                                         Paul C. Dworak, 391070
                                         333 South Seventh Street, Suite 3000
                                         Minneapolis, MN 55402
                                         612.333.9500
                                         abirrell@gaskinsbennett.com
                                         pdworak@gaskinsbennett.com

                                         Attorneys for Hanad Mustofe Musse

Dated August 7, 2015                     MITCHELL, BRUDER & JOHNSON

                                         /s/ Glenn P. Bruder

                                         _____

                                         Glenn P. Bruder, 148878
                                         7505 Metrol Boulevard, Suite 325
                                         Edina, MN 55439
                                         952.831.3174
                                         gbruder@bruderlaw.com

                                         Attorney for Guled Ali Omar


Dated:  August 7, 2015                   DELEON & NESTOR

                                         /s/ Bruce D. Nestor

                                         _____

                                         Bruce D. Nestor, 0318024
                                         3547 Cedar Avenue South
                                         Minneapolis, MN 55407
                                         612.659.9019
                                         nestor@dnestlaw.com

                                         Attorney for Abdurahman
                                         Yasin Daud

Dated: August 7, 2015                      FELHABER LARSON

                                           /s/ Jon M. Hopeman

                                           _____
                                           Jon M. Hopeman, 47065
                                           Marenie E. Fearon, 305078
                                           220 South Sixth Street, Suite 2200
                                           Minneapolis, MN 55402
                                           612.339.6321
                                           jhopeman@felhaber.com
                                           mfearon@felhaber.com

                                           Attorneys for Zacharia Yusuf
                                           Abdurahman


Dated: August 7, 2015                      MURRAY LAW, LLC

                                           /s/ JaneAnne Murray

                                           _____
                                           JaneAnne Murray, 384887
                                           310 Fourth Avenue South, Suite 5010
                                           Minneapolis, MN 55415
                                           612.339.5160
                                           jm@mlawllc.com

                                           Attorney for Hamza Naj Ahmed