UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA
Criminal No. 15-49 (MJD/FLN)

UNITED STATES OF AMERICA,

          Plaintiff,

    v.                                              **GOVERNMENT'S   RESPONSE
                                   TO DEFENDANTS' PRETRIAL
1. HAMZA NAJ AHMED,                      MOTIONS**
2. MOHAMED ABDIHAMID FARAH,
3. ADNAN ABDIHAMID FARAH,
4. ABDURAHMAN YASIN DAUD,
5. ZACHARIA YUSUF ABDURAHMAN,
6. HANAD MUSTOFE MUSSE, and
7. GULED ALI OMAR,

          Defendants.

    The United States of America, by and through its attorneys, Andrew M. Luger, United States Attorney for the District of Minnesota, and Andrew R. Winter and John Docherty, Assistant United States Attorneys, hereby respectfully submits its response to Defendants' pretrial motions.

## STATEMENT OF FACTS

    The charges in the Superseding Indictment are the result of an a still on-going FBI investigation into the pipeline by which young men from the Twin Cities travel to Syria to join the Islamic State in Iraq and the Levant ("ISIL"), a designated foreign terrorist organization.  On May 18, 2015 the grand jury returned an eight-count Superseding Indictment which alleges: That all defendants conspired to provide material support to a designated foreign terrorist organization in violation of 18 U.S.C. § 2339B(a)(1) (count

1); that all defendants except Adnan Farah attempted to provide material support to a foreign terrorist organization in violation of 18 U.S.C. § 2339B(a)(1) (counts 2, 3, and 4); that defendants Hamza Ahmed and Mohamed Farah made false statements in violation of 18 U.S.C. § 1001 (counts 5 and 6); and that defendants Hamza Ahmed and Hanad Musse committed financial aid fraud in violation of 20 U.S.C. § 1097 (counts 7 and 8). Defendants have filed over 40 motions and a hearing on these motions is scheduled for September 2, 2015.

The charging documents and discovery show that from early 2014 until they were arrested in April of 2015, the defendants were members of a conspiracy seeking to provide material support to ISIL. The evidence shows that the defendants were inspired and guided, in part, by other individuals from Minnesota who had successfully traveled to Syria to join ISIL. The defendants were also inspired by men known to them from the Twin Cities who, in recent years, have fled the United States to Somalia where they have joined, and fought with, the designated foreign terrorist organization al Shabaab.

The investigation has revealed that in the Spring of 2014, Mohamed Farah, Abdurahman Daud, Guled Omar, Zacharia Abdurahman, Hanad Musse, Abdullahi Yusuf, Abdi Nur, and others met on multiple occasions and talked about traveling to Syria to fight with ISIL. At these meetings, the co-conspirators discussed routes of travel to Syria (including crossing into Mexico to then fly overseas), costs, and potential funding sources. At these meetings the co-conspirators viewed radical, violent jihadi videos and ISIL propaganda. Throughout the conspiracy, defendants used the internet to obtain ISIL

propaganda and to access the social media accounts of foreign fighters in both Syria and Somalia – all of this fueling their desire to travel overseas to join ISIL.

According to Yusuf, Omar introduced Ahmed to the group of aspiring travelers in the Spring of 2014. Omar told the group of coconspirators to make Ahmed feel welcome.

At a meeting in the Spring of 2014, defendant Daud informed members of the conspiracy that they should communicate using a certain telephone messaging application that was believed to be secure; in defendant Daud's own words, it was an app "the Feds don't know about." Following this recommendation by Daud, his co-defendants Abdullahi Yusuf and Mohamed Farah downloaded Daud's recommended app to their own cell phones to facilitate their planning efforts.

In March of 2014, Hanad Mohallim – a close friend of defendant Hamza Ahmed and Yusuf – departed the United States for Syria to join ISIL. Within weeks of Mohallim's departure, Yusuf and Abdi Nur applied for expedited passports to facilitate their own attempt to travel to Syria. The evidence will show that Adnan Farah and Abdullahi Yusuf obtained their passports entirely without their parents' knowledge. The group of co-conspirators, which included Daud, Omar, Mohamed Farah, and Abdurahman, recommended that Adnan Farah, Yusuf, and Abdi Nur travel to Syria by way of Minneapolis/St. Paul International Airport as those men were not thought to be "hot" – meaning not the subject of law enforcement's attention.

The investigation has shown that on May 24, 2014, Guled Ali Omar, Yusuf Jama, and the CHS (who had not, in May of 2014, yet begun working with the FBI) attempted

3

to leave the Twin Cities for Syria. According to Yusuf, Omar brought Jama into the group planning travel to Syria, Omar telling Yusuf that Jama "is coming to Syria with us now." In this May of 2014 attempt, Omar withdrew more than $5,000 from his bank account, the men loaded their packed luggage into a rented Toyota Camry, and came within minutes of leaving Minneapolis for California. There, Omar and Jama intended to cross into Mexico and travel onwards to Syria to join ISIL. The CHS had intended to stay in California until he made contact with a known ISIL fighter, Douglas McCain, who would provide the CHS with the logistics to reach Syria. Prior to the three men's departure, Omar's family intervened and stopped them from leaving that day – a fact confirmed by Omar himself when he was recorded in 2015 discussing the event.[1] Additionally, the investigation has shown that co-defendant Abdurahman provided advice to Jama, Omar and the CHS on the best way to travel from Minneapolis to California, encouraging them to use a Somali truck driver instead of driving themselves. [2]

Within days of the aborted May of 2014 attempt, coconspirators Abdullahi Yusuf and Abdi Nur (a/k/a "Curry") both initiated their own effort to travel to Syria to join ISIL.[3] As detailed in the complaint affidavit, on May 27, 2014, Nur dropped Yusuf off at a light rail station planning to meet Yusuf several days later in Turkey. At

---

[1] Omar in a March 3, 2015 recording: *"You remember me, you [the CHS] and Yusuf [Jama]? How we were going to Cali? And we're gonna, me and Yusuf were planning to go to Mexico to find shari [Somali: travel documents]. (UNI) from there and if we don't find shari, we were going to use our own passports. That was our second backup. Our second backup was our own passports."*

[2] *CHS: Remember last time? GO: When we were about to drive? CHS: Yeah. GO: When Yusuf rented the car. ZA: I told these guys, bro. I told these guys - Somali truck driver. Just pay a Somali truck driver, go in the back...he'll be going bro, from money.*

[3] Co-defendant Adnan Farah did not join at this time because, as the investigation has shown, his parents discovered his new passport and hid the document from him.

Minneapolis/St. Paul International Airport Yusuf was stopped and questioned by the FBI. Yusuf lied to agents, telling them he intended to vacation alone in Istanbul. Yusuf will testify that prior to this attempt, Daud and Nur had provided him with two phone numbers for ISIL contacts near the Turkish-Syrian border, which Yusuf then wrote on his arm. Yusuf was to call these numbers to contact the ISIL facilitators once he and Nur arrived in Turkey. The next day, May 28, 2014, Nur succeeded in flying out of Minneapolis/St. Paul International Airport and reaching Istanbul, Turkey. He thereafter crossed into Syria, joined ISIL, and became a consistent source of information and inspiration for the coconspirators in the United States.

In early June of 2014, co-conspirator Yusuf Jama – having been stopped by Omar's family on May 24, 2014 – again attempted travel to Syria and was this time successful. To avoid law enforcement and family scrutiny, Jama took a Greyhound bus from Minneapolis to New York City, where he boarded a flight from JFK International Airport to Istanbul, Turkey. Jama, like Nur, then crossed the border into Syria to join ISIL.[4] This method of travel would provide the blueprint for co-conspirators Mohamed Farah, Hanad Musse, Zacharia Abdurahman and Hamza Ahmed who would, as the Superseding Indictment alleges, make their own attempt at travel in November of 2014.

The investigation has shown that throughout 2014, the coconspirators continued to associate and plan for travel to Syria. In October of 2014 at a gathering of co-conspirators, Yusuf expressed concern to the group that he expected to be arrested soon

---

[4] According to Abdullahi Yusuf, Musse later told Yusuf that Jama was killed fighting for ISIL in the battle of Kobane. Yusuf also stated that both Musse and Omar characterized Jama's death as a martyr's death at a meeting of the conspiracy's members.

for his May 2014 attempt.   The coconspirators accelerated existing plans for at least eight men (Daud, Mohamed Farah, Adnan Farah, Abdurahman, Musse, Ahmed, Guled Omar, and Yusuf) to travel overseas to join ISIL.   The CHS reports that, at this time, Ahmed was part of the plan to travel overseas to join ISIL and had secured money for this purpose by obtaining school loans.   Daud's participation and encouragement of the ensuing November 2014 plot is evidenced by statements made by co-conspirators during the investigation.   For example, on March 3, 2015, Omar recounted Daud's participation in the November attempt[5] as did defendant Abdurahman on February 27[6] and March 15, 2015.[7]   Daud implicated himself in the JFK plot as well on March 19, 2015, when Daud stated "you know how last time we were up to something, everyone could tell?"

Evidence disclosed shows that in October of 2014 Daud advised Yusuf that Yusuf's options for his second attempt to leave the U.S. for Syria were to steal passports, then travel through Canada, or to obtain fraudulent passports and then travel through Mexico.   Daud also identified specific individuals from whom he (Daud) intended to steal passports.   Daud also specified that their flights from Mexico City to Europe could not include a connection in the U.S. because of the likelihood that they would get caught going through the U.S.   Further, as part of Daud's plan to finance travel to join ISIL, he

---

[5] In reference to Daud, Omar stated *"[i]f it wasn't for him that came up with the November 8th hype, Zach would not be in the position he is today. I would not be position I would today. How many other positions we in today. All because (unintelligible) the rush that he did to them."*

[6] In reference to Daud, Abdurahman stated: *"That boy made us hasty bro."* And later, Abdurahman stated *"[y]ou remember all those meetings?  How we're goin' do on this days...and then, they didn't do it, and then we already had everything together so,...we don't wanna wait for anyone.  Like if I just waited, December, and just went to Umra."*

[7] *Abdurahman: Like, what the hell's the plan? You're being bait doing this type of stuff. CHS: Yeah. Abdurahman: Go in the street, go give Dawah or go make hijra.  CHS: He just gas people up. Abdurahman: He made us hasty.*

told Yusuf that he intended to sell his vehicle, a green Honda Accord. According to Yusuf, Daud also insisted the everyone (meaning himself, Yusuf, Mohamed Farah, Adnan Farah, Zacharia Abdurahman, Hanad Musse) needed to prepare to leave the U.S. In a recorded statement form March 3, 2015, Omar confirmed this: "[h]e [Daud] was this close to making Abdullahi go through Mexico. When he [Abdullahi] had like three weeks left before his court." Omar, on the other hand, encouraged his co-conspirators to wait, which would allow him time to successfully depart before them. This is evidenced by Omar's statement on March 3, 2015: "I mean, I told them to be patient, give me two weeks after I leave."

Ultimately, as detailed in the complaint affidavit, four defendants (Ahmed, Musse, Abdurahman, and Mohamed Farah) tried to leave the United States for Syria by taking Greyhound buses from Minneapolis to New York City. All four defendants purchased overseas flights the same day they intended to depart (November 8, 2014), but were prevented from flying by law enforcement at JFK International Airport. All but Abdurahman were interviewed by law enforcement in New York. Ultimately, all defendants denied their intentions and insisted they were traveling alone for vacation.

Omar attempted to fly from Minneapolis to southern California the same day, November 6, 2014, that the other four conspirators caught buses to New York. Notably, after being stopped by law enforcement in Minneapolis and not allowed to board his flight, Omar telephoned co-defendant Musse to encourage Musse and his fellow JFK travelers to hold off on their departure to avoid getting caught. Omar recounted what he told a determined Musse as Musse was nearing departure: "I said 'Hanad, please don't

go. Please don't do this right now, don't do this…'.  He's like, 'Yo what the hell's your problem bro, you a punk man!" (unintelligible) I was like fine then. You listen to me, I said 'I just got caught up (unintelligible) didn't want to leave these niggas.'"

Upon returning to Minneapolis after the foiled attempt to leave from JFK, Ahmed was interviewed by FBI agents.  Ahmed and the other three defendants were provided with target letters from the United States Attorney's Office informing them they were targets of a federal criminal investigation into terrorism offenses.  After preventing Ahmed's attempt to travel overseas, the FBI examined the public content of his Twitter account.  There, agents saw multiple tweets, re-tweets, and posts evidencing Ahmed's support of ISIL. Several of these are identified in the complaint affidavit in this case, and notably, the activity on this account dated back to March of 2014, when Ahmed's close friend, Hanad Mohallim, departed for Syria to join ISIL.

Yusuf was arrested and charged in late November of 2014 with conspiring and attempting to provide material support to ISIL.  When Yusuf was detained, co-conspirators Omar, Daud, Adnan Farah, and others attended one or more of Yusuf's court appearances.  Ahmed was then arrested in early February of 2015 and was also detained. The investigation shows that the co-conspirators who remained on the street were concerned about the prospect of Ahmed and/or Yusuf cooperating with law enforcement and speaking about the group's criminal activities.  For example, on March 15, 2015, Abdurahman and Omar discussed their concern that Yusuf was cooperating with law enforcement.  Omar stated, "this n***** Abdullahi told them there are meetings." Abdurahman responded, "fear god" to which Omar replied, "…that's the worst thing.  I

8

was mad as hell." On April 6, 2015, Musse spoke to Abdurahman and the CHS stating in reference to Ahmed, "if he gives a deal right now, we can get locked up the next day."

Fearing their imminent arrest, Daud, Omar, Mohamed Farah, Adnan Farah, Abdurahman, and Musse proceeded in the early spring of 2015 to plan another attempt to leave for Syria. The CHS, who had become a CHS in early 2015 when he agreed to cooperate with the FBI, began providing information about the group's plans. The complaint affidavit filed in support of the arrest warrants for Daud, Mohamed Farah, Adnan Farah, Omar, and Musse details the next series of events leading up to the April 19, 2015, arrests.

In the weeks leading up to their April 2015 departure, members of the conspiracy discussed the nature of their contribution to ISIL, including becoming a martyr for the terrorist organization. For example, on March 15, 2015, Abdurahman and Omar discussed fighting for ISIL in Iraq and Syria while under Abdi Nur's command:

GO:     I personally think that, like, I will get shaahada[8] quick, Wallahi.
GO:     Look what I was doing at paintball, bro. What the hell? All right?
ZA:     Yo who would go to Iraq here bro?
CHS:   Wallahi me n****.
GO:     Me too n****.
CHS:   Willahi Billahi.
GO:     Abdirahman I don't think you would go.
ZA:     I would rather get shaahada in Shaam.[9]

ZA:     Paintball was amazing.
GO:     We was literally treating it like it was real war, bro.

---

[8] Martyrdom
[9] The caliphate established by ISIL.

9

ZA:    …These guys [ISIL] are smart. They did a tactical retreat in Kobani and now they're going back.

GO:    Wallahi, I wanna go to Baghdad bro. (Unintelligible) Damascus or Baghdad.

GO:    He said I'm already - he's, Abdi [Nur] right.  Wallahi.

ZA:    Wallahi Billahi, we gotta be his [Nur's] foot soldiers.

CHS:  Wallahi, right.

GO:    He's already learning Arabic, Wallahi.  I should have told him to speak Arabic to us.  He does that sometimes.  He speaks good Arabic now.

Defendants also knew, or believed, that other young men who had traveled to Syria had died violent deaths in battle.[10]  On March 3, 2015, defendant Omar spoke of encountering the younger brother of earlier traveler Yusuf Jama (who had attempted to leave for Mexico with the CHS and Omar in May of 2014, then had succeeded in leaving the United States for Syria; Jama was the first known traveler from Minnesota to leave the United States by taking a bus to JFK International Airport.).  In that meeting, Omar says, Jama's younger brother told Omar that Jama had become a martyr.  In addition, as noted in footnote four, above, the conspirators were aware of the reported death of earlier traveler Hanad Mohallim.

On March 30, 2015, Abdurahman is recorded asking the CHS whether he had seen an ISIL video posted online.  In this video, an ISIL fighter is shot in the stomach during battle:

ZA:    You guys ain't talking about nothing, you didn't see the new Wilaya video. Did you see it?

---

[10]  There has been no State Department confirmation of the deaths of the fighters mentioned in this memorandum other than Douglas McCarthur McCain, who's death in Syria in August of 2014 has been confirmed.

CHS:  I can, ah.
ZA:   He was shot right in the stomach five times.  Five times, bro.
ZA:   He was like he fell to the ground then he was saying shahadah.[11]
ZA:   Straight up.  You know they trying to get K-Town[12] back? (UNI)
      Yeah, one of the brothers was smiling was going like this. (UNI) We
      didn't leave our homes except for this Willahi Billahi. We didn't
      leave our homes except for this. You're gonna be shocked, bro, it
      came out last week and that's how the video ends. (UNI)

Later in the same recording, Abdurahman stated, "they [law enforcement] know we're

going to *jihad*, but they don't have the evidence."

Further evidence that the defendants intended to fight upon joining ISIL's ranks is

Daud's statement to Mohamed Farah and the CHS as they drove to California to pick up

their fake passports.  Daud told the two that he hoped to get an "AK" [assault rifle] upon

arrival in Syria and that he, Mohamed Farah and the CHS would become "shaheeds"

before even going to training camp.  Daud also stated he intended to "spit on America"

once he reached the border with Mexico.

The investigation shows that as the co-conspirators were in the planning stages of

this latest attempt, Musse had asked the CHS about what the CHS had told the passport

contact.  Musse specifically asked whether the CHS told the contact that the fake

passports were "for terrorists."  Even after Musse asked to retrieve his passport

photograph on April 6th because his father had learned of his plan to leave, Musse was

not done plotting to join ISIL: three days later, on April 9, 2015, Musse was recorded

telling Mohamed Farah, Adnan Farah, Abdurahman, and the CHS that "if Hamza's

---

[11] Martyrdom
[12] Kobani is a city in Northern Syria.

[Ahmed] not speaking, bro, that means we have a good time for us to work this all out, and complete the mission...".

Ultimately, Daud and Mohamed Farah drove with the CHS – in Daud's green Honda Accord – to San Diego to meet with the man they believed would sell them fake passports for their travel to Syria. These fake documents would, in turn, allow them to cross the border into Mexico, from where they intended to fly to Syria. Daud planned to sell his vehicle to the passport contact as payment for the documents; an idea discussed by Daud as early as October of 2014, a full three months before the CHS began to cooperate with the FBI. When defendants Mohamed Farah and Daud took possession of their new fake passports on April 19, 2015, they were taken into custody. The remaining defendants were arrested and taken into custody in Minneapolis immediately after the arrests of Daud and Mohamed Farah in San Diego.

1.    **Joint Motion to Retain Rough Notes and Evidence** (Dkt. 186)

The United States does not object to requiring the law enforcement officials involved in the investigation of this case to retain and preserve their rough notes or evidence.

However, the United States objects to any order concerning the disclosure of rough notes. Rough notes are not considered statements within the meaning of the Jencks Act, 18 U.S.C. § 3500. *United States v. Redding*, 16 F.3d 298, 301 (8th Cir. 1994) (concluding that rough notes are not a statement of a witness as there was no evidence witness signed, adopted or approved of notes); *United States v. Shyres*, 898 F.2d 647, 657 (8th Cir. 1990) (defendant not entitled to discover government agents' general notes from

witness interviews).  Nor are agent rough notes generally discoverable as a "statement" of the agent.  *See United States v. Simtob*, 901 F.2d 799, 808-09 (9th Cir. 1990) (defendant not entitled to discover testifying agents' destroyed rough notes of investigations; notes were not Jencks Act material but simply pieces of information put in writing to refresh memory); *United States v. Williams*, 875 F.2d 846, 853 (11th Cir. 1989) (defendant not entitled to discover agents' personal notes, contact sheets, witness lists, summaries of non-testifying witnesses' statements when the bulk of the material was not relevant to the subject matter of the agents' testimony).

2.    **Joint Motion to Compel Disclosure of Material Favorable to the Defendant** (Dkt. 183)

The United States is aware of its obligations under *Brady v.  Maryland*, 373 U.S. 83 (1963); *Giglio v. United States*, 405 U.S. 150 (1972); and their progeny.  The United States has complied, and will continue to comply, fully with *Brady*, *Giglio*, and their progeny.  The United States objects to the defendants' motion to the extent it goes beyond the requirements of *Brady*, *Giglio*, and their progeny.

3.    **Joint Motion for Early Disclosure of Jencks Act Materials** (Dkt. 179)

The United States objects to this motion.   It has been repeatedly and consistently held in this Circuit and District that the United States may not be required to make pretrial disclosure of Jencks material.  *United States v. Finn*, 919 F. Supp. 1305, 1315 (D. Minn. 1995); *see also United States v. Ben M. Hogan Co.,* 769 F.2d 1293, 1300 (8th Cir. 1985); *United States v. White*, 750 F.2d 726 (8th Cir. 1984).  Accordingly, the United

States objects to any court-ordered disclosure of such statements prior to the witnesses' testimony.

      4.    **<u>Motions to Suppress Statements</u>**  (Various Dkt. Nos. as specified below)

An individual is entitled to *Miranda* warnings only when he is interviewed by law enforcement while "in custody," meaning there has been a "formal arrest or restraint on freedom of movement of the degree associated with a formal arrest." *California v. Beheler*, 463 U.S. 1121, 1124-25 (1983). The in-custody determination requires two discrete inquiries: "first, what were the circumstances surrounding the interrogation; and second, given those circumstances, would a reasonable person have felt he or she was not at liberty to terminate the interrogation and leave." *Thompson v. Keohane*, 516 U.S. 99, 112 (1995) (footnote omitted).

"To determine whether a defendant was in custody for *Miranda* purposes, a court looks to the totality of the circumstances confronting the defendant at the time of the interview, and asks whether a reasonable person in his position would consider his freedom of movement restricted to the degree associated with formal arrest." *United States v. Huether*, 673 F.3d 789, 794 (8th Cir. 2012) (quotation omitted).

Courts consider the following non-exclusive factors, often referred to as the *Griffin*[13] factors, to inform the custody inquiry:

> (1) whether the suspect was informed at the time of questioning that the questioning was voluntary, that the suspect was free to leave or request the officers to do so, or that the suspect was not considered under arrest; (2) whether the suspect possessed freedom of movement during

---

[13] *United States v. Griffin*, 922 F.2d 1343, 1349 (8th Cir. 1990).

questioning; (3) whether the suspect initiated contact with authorities or voluntarily acquiesced to official requests to respond to questions; (4) whether strong arm tactics or deceptive stratagems were employed during questioning; (5) whether the atmosphere of the questioning was police dominated; or (6) whether the suspect was placed under arrest at the termination of the questioning.

*United States v. Aldridge*, 664 F.3d 705, 711 (8th Cir. 2011). The first three factors, if present, mitigate against the existence of custody, while the last three factors, if present, aggravate toward the existence of custody. *Axsom*, 289 F.3d at 500-01. Although "a particularly strong showing with respect to one factor may compensate for a deficiency with respect to other factors," *Griffin*, 922 F.2d at 1349, no one factor is dispositive, *United States v. Willie*, 462 F.3d 892, 897 (8th Cir. 2006).

The following defendants have moved to suppress the following statements:

**Defendant Hamza Ahmed.** (Dkt. 30) Defendant Ahmed gave a statement to New York-based agents of the FBI at John F. Kennedy International Airport on November 8, 2014, and gave a second statement, this time to Minneapolis-based agents, on November 9, 2014. Defendant Ahmed moved to suppress both statements at a time when he alone had been charged in this case. He did not renew, and in the government's view did not need to renew, those challenges after the Superseding Indictment was returned.[14] The admissibility of these statements has been fully briefed. *See* Docket Nos.

---

[14] The government views all of defendant Ahmed's previous motions as not needing to be renewed. Those motions are: Motion to Suppress Evidence and Statements (Docket No. 30); Motion to Suppress Fruits of Search Warrant (Twitter Search Warrant) (Docket No. 31); Motion to Dismiss Counts in the Indictment and Disclose Grand Jury Minutes (Docket Nos. 32 and 33); Defendant's Motion for Production of Brady Materials, Rule 16 Disclosures, and Notice of Surveillance Techniques (Docket No. 34); Motion for Pretrial Disclosure of 404(b) Evidence (Docket No. 35); and Motion for Bill of Particulars (Docket No. 37). The government filed a consolidated response to these motions (Docket No.

30 (Defendant Ahmed's Motion to Suppress Statements and Evidence, filed on April 29, 2015) and 46 (Government's Response to Defendant Ahmed's Pretrial Motions).

**Defendant Mohamed Farah.** (Dkt. 215) Defendant Mohamed Farah also gave a statement to the FBI on November 8, 2014, also at John F. Kennedy International Airport in New York City. Defendant Mohamed Farah has moved to suppress any statements he made to law enforcement after his arrest, however, the government will consider the Kennedy Airport interview to be within the scope of defendant Mohamed Farah's motion to suppress statements. The government does not consider defendant Mohamed Farah's interview of January 21, 2015, within the scope of his motion to suppress. On that occasion, Mohamed Farah was interviewed - at his request - in the presence of his attorney, Mr. Nwaneri, and he was advised that he was free to leave at any time. There are no post-arrest statements from defendant Mohamed Farah.

**Defendant Zachariah Abdurahman.** (Dkt. 188) Defendant Abdurahman moves to suppress the statement he gave on November 14, 2014 to three agents of the FBI. The statement was given at his home in Columbia Heights, Minnesota, with his mother, father, and younger brother in attendance. The interview was audio-recorded.

**Defendant Abdurahman Daud.** (Dkt. 204) Defendant Daud moves to suppress any statements he gave following his arrest in San Diego, California on April 19, 2015.

---

46). Ahmed's Motion to Dismiss Counts in the Indictment and Disclose Grand Jury Minutes (Docket Nos. 32 and 33) has now been re-filed as a Joint Motion by all defendants except Mohamed Farah (Docket Nos. 199 and 200). The government has a response to this re-filed motion below in this consolidated motions response.

There are no such statements.  Defendant Daud's Motion to Suppress Statements should therefore be denied as moot.

**Defendant Hanad Musse.** (Dkt. 168)  Defendant Musse moves to suppress a statement he gave to an FBI Agent on September 26, 2014; a statement he gave to FBI Agents at John F. Kennedy International Airport in New York City on November 8, 2014; a statement he gave to FBI Agents on November 9, 2014 at the Greyhound station in Minneapolis, Minnesota upon his return from New York; and a statement that was overheard by FBI surveillance personnel at an office of the State of Minnesota, Department of Public Safety, Driver and Vehicle Services on March 10, 2015.

As to the first three (November 6, November 8, and September 26) statements, the government intends to call witnesses to establish that the defendant was not in custody when he was questioned and, therefore, no *Miranda* warning was required.  As to the fourth statement however, there is no cognizable basis for suppression, nor does defendant Musse proffer one.  Musse was not questioned by law enforcement, but rather the statement was *overheard* by law enforcement while the defendant was talking with others in a public space, specifically, an office of the State of Minnesota, Department of Public Safety, Driver and Vehicle Services in South Minneapolis.  The government requests that this particular non-specific portion of defendant Musse's motion be stricken.

As to all of these statements, the government has disclosed to the defendants agent reports and, where applicable, audio-tape recordings of interviews.  At the motions hearing the government will introduce testimony from law enforcement personnel who were present at each interview as to the interview's non-custodial, voluntary nature.

17

After the hearing the government may ask leave of court to supplement the briefing on these motions in light of the motions hearing testimony, particularly the defense cross-examinations of these agents.

5.     **Motion to Suppress Search and Seizure Warrants** (Dkts. 203, 205, 216)

Defendant Daud moves for suppression of evidence seized as a result of search warrants. As to Daud's motion in Docket #205 to suppress evidence seized as a result of a tracker on his vehicle, this should be denied as moot, as should that portion of the motion in Docket #203 seeking suppression of the warranted search of a cellular telephone's SIM card. The government does not intend to offer any evidence at trial that was obtained from either the vehicle tracker or the SIM card. The remaining two search warrants (search of an iPod Touch and search of a cell phone with assigned number 612-978-6766) will be presented to the Court for a "four corners" analysis.

Defendant Mohamed Farah's motion (Docket 216) should be stricken due to a lack of specificity. The motion is overly broad, fails to point to which search is alleged to offend the constitution and does not – beyond boilerplate language – provide any specific legal basis for suppression.

6.     **Joint Motion for Disclosure of 404(b) Evidence** (Dkt. 184)

Defendants seek an order directing the government to disclose any "bad act" or other "similar course of conduct" evidence it intends to offer at trial pursuant to Rule 404(b) of the Federal Rules of Evidence. The United States is fully aware of its obligations under Rule 404(b) and intends on fully complying with its obligations. With respect to timing, the Federal Rules of Evidence do not require the immediate disclosure

18

of such evidence. Fed. R. Evid. 404(b) advisory committee's notes, 1991 Amendments ("Other than requiring pretrial notice, no specific time limits are stated in recognition that what constitutes a reasonable request will depend largely on the circumstances on each case.") The Government intends to produce all such evidence as soon as practicable, and respectfully requests the Court order all 404 (b) disclosures be made no later than fourteen days prior to trial and on a continuing basis thereafter.

       7.     **Motion to Suppress Identification Evidence** (Dkts. 166 and 193)

Defendant Hanad Musse has moved to suppress identification evidence. (Docket No. 166). There are two instances in which defendant Musse was identified from the display of photographs. Hotel employees in New York City identified Mr. Musse from photographs as someone who had stayed at their hotel the night before Mr. Musse attempted to fly out of John F. Kennedy International Airport, and co-defendant Hamza Ahmed identified defendant Musse from a photograph shown to him after defendant Ahmed returned by bus to the Twin Cities from New York City in November 2014.

The United States will not seek to introduce the identifications made by the hotel employees in New York. In discussions between the prosecutors and counsel for defendant Musse, the parties agreed that testimony as to the *Neil v. Biggers*, 409 U.S. 188 (1972) criteria regarding the identification made by co-defendant Ahmed is not necessary, as Mr. Musse and Mr. Ahmed know each other well. The government and Mr. Musse understand that the decision not to require testimony at this point is not a waiver of any other appropriate objections that might be made at trial if the government seeks to

introduce Ahmed's identification of defendant Musse (for example, an objection based on *Bruton v. United States*, 391 U.S. 123 (1968)).

Defendant Zachariah Abdurahman has also moved to suppress identification evidence.  (Docket No. 193).  Defendant Abdurahman's motion specifically includes voice identification evidence.

There were no visual identification procedures as to defendant Abdurahman used in the investigation of this case.  There were also no voice identification procedures used.  Transcripts of tape-recorded conversations have been disclosed to the defendants in this case (together with the underlying audiotapes).  In those transcripts, an indication is given as to who is speaking, by, for example, writing "MF" before a line of transcript on which Mohamed Farah is speaking, or "AD" before a line of transcript on which Abdurahman Daud is speaking.  These notations were provided by the CHS that was used in this case, who has listened to the tapes in the presence of FBI Agents.  This is not an identification procedure.  A voice identification procedure takes place when a witness is asked to choose the voice of a suspect from among several voices.  *See, United States v. Davis*, 103 F.3d 660, 665 (8th Cir. 1996) (victim teller in a bank robbery case identified voice of defendant from among four voices that she listened to say "give me all your fifties and hundreds").

The government maintains there is no basis for an evidentiary hearing on the issue of the procedure – such as it is.

8.    **Motion for Severance of Defendants**  (Dkts. 170, 187, 196, 212)

The United States hereby makes its response to defendants' various motions to sever defendants and charges.[15]  Rule 8 of the Federal Rules of Criminal Procedure allows for joinder of Defendants and Counts in criminal cases.  Rule 8(a) provides for joinder of offenses if the offenses "are of the same or similar character, or are based on the same act or transaction, or are connected with or constitute parts of a common scheme or plan."  Rule 8(b) provides for joinder of defendants when "they are alleged to have participated in the same act or transaction, or in the same series or acts or transactions.... All defendants need not be charged in each count."

"When a defendant moves for a severance, a district court must first determine whether joinder is proper under Federal Rule of Criminal Procedure 8.   These rules are to be 'liberally construed in favor of joinder.'"  *Id.* (quoting *United States v. Rimell*, 21 F.3d 281, 289 (8th Cir. 1994)).   "There is a presumption against severing properly joined cases, and such presumption is a 'strong' one."  *United States v. Cooper*, No. 06-CR-35-1-LRR, 2006 WL 2095217, at *2 (N.D. Iowa July 26, 2006) (quoting *United States v. Delpit*, 94 F.3d 1134, 1143 (8th Cir. 1996)).

In this case, the Defendants are charged in an overarching conspiracy to provide material support to a designated foreign terrorist organization in violation of Title 18 U.S.C. Section 2339B.   The events and acts in this case took place over the course of

---

[15] Docket 170 is Defendant Musse's Motion for Severance of Defendant; Docket 187 is Defendant Abdurahman's Motion for Severance of Defendant; Docket 195 is Defendant Ahmed's Motion to Sever Count 7; Docket 196 is Defendant Ahmed's Motion to Sever Defendant; Docket 206 is Defendant Daud's Motion to Sever Defendant; Docket 212 is Defendant Adnan Farah's Motion to Sever Defendants; and Docket 219 is Defendant Mohamed Farah's Motion to Sever Defendants.

over a year's time with much of the evidence overlapping as to multiple defendants. Under Rule 8, all offenses and defendants are properly joined and the motions to sever should be denied.

       a.     Joinder Under Rule 8 Is Proper Because the Defendants Were Charged Together as Part of One Criminal Conspiracy.

Federal Rule of Criminal Procedure 8(b) states that two or more defendants may be charged together "if they are alleged to have participated in the same act or transaction, or in the same series of acts or transactions, constituting an offense or offenses." The rule further provides, "The defendants may be charged in one or more counts together or separately. All defendants need not be charged in each count." Fed. R. Crim. P. 8(b).

The United States maintains that joinder under Rule 8 is proper in this case. "Ordinarily, indicted coconspirators should be tried together, especially where the proof of conspiracy overlaps." *United States v. Jarrett*, 684 F.3d800, 804 (8th Cir. 2012). Indeed, "[p]ersons charged in a conspiracy or jointly indicted on similar evidence from the same or related events *should* be tried together, even if each defendant did not participate in or was not charged with each offense." *United States v. Gravatt*, 280 F.3d 1189, 1191 (8th Cir. 2002)(emphasis added). A joint trial is indeed preferable because it "gives the jury the best perspective on all of the evidence and, therefore, increases the likelihood of a correct outcome." *United States v. Pherigo*, 327 F.3d 690, 693 (8th Cir. 2003).

The defendants are jointly indicted on similar evidence from related events. The factual interrelatedness of the evidence is apparent from the face of the Superseding Indictment, the charging documents, and the discovery provided to defendants. Because all defendants are jointly charged in Count 1, each defendant may be held accountable for actions taken by other defendants in furtherance of the conspiracy, and thus all of the evidence offered at trial relating to the activities of each defendant, regardless of whether the moving defendants directly participated in those activities, would be admissible against them even if they had separate trials. *United States v. Darden*, 70 F.3d 1507, 1527 (8th Cir. 1995).

b.    <u>Severance Under Rule 14 Is Improper Because the Benefits of a Joint Trail Outweigh Any Prejudice to the Defendants in This Case.</u>

Rule 14(a) states that if the joinder of defendants in an indictment "appears to prejudice a defendant or the government, the court may order separate trials of counts, sever the defendants' trials, or provide any other relief that justice requires." Fed. R. Crim. P. 14(a); *see also Darden*, 70 F.3d at 1527. "Where two or more defendants have been charged in the same indictment, there is a preference for a joint trial unless the benefits are outweighed by a clear likelihood of prejudice." *United States v. Hively*, 437 F.3d 752, 765 (8th Cir. 2006). "[A] court must weigh the inconvenience and expense of separate trials against the prejudice resulting from a joint trial of codefendants." *United States v. Pherigo*, 327 F.3d 690, 693 (8th Cir. 2003).

With seven defendants charged under one indictment, the benefits of a joint trial in this case are significant. Count 1 of the Superseding Indictment dates from March 1,

2014 to the present.  There are additional allegations such as Counts 7 and 8 – financial aid fraud charges - which further highlights the need for a joint trial in this case.  These counts are factually intertwined and the evidence will show that the fraud was committed to facilitate the defendants' travel overseas to join ISIL.  As the Eighth Circuit has recognized, "[s]uch trials save time and money for the courts, prosecutors, and witnesses."  *Darden*, 70 F.3d at 1527–28.    One can understand the benefits of a joint trial by imagining the time and resources it would require to present multiple juries with the same information that could have been introduced together in a single trial.

Apart from the benefits of a joint trial in this case, the prejudice to the defendants is low and has not been sufficiently demonstrated by the Defendants.    To justify severance, "[t]he necessary prejudice must be 'severe or compelling.'"  *Pherigo*, 327 F.3d at 693 (quoting *United States v. Warfield*, 97 F.3d 1014, 1018 (8th Cir. 1996)). "Severance is never warranted simply because the evidence against one defendant is more damaging than that against another, even if the likelihood of the latter's acquittal is thereby decreased."  *Hively*, 437 F.3d at 765 (citation omitted); *see also Delpit*, 94 F.3d at 1143.    Severance requires "a specific showing that a jury could not reasonably be expected to compartmentalize the evidence," *Hively*, 437 F.3d at 765.  The Defendants have the "heavy burden," *Hollins v. Department of Corrections*, 969 F.2d 606, 608 (8th Cir. 1992), of making such a showing, *Darden*, 70 F.3d at 1527, but they have failed to so here.

Federal courts routinely join defendants for trial – even when one co-defendant is charged separately with a more serious crime than the others.  By way of example, in

24

*United States v. Eufrasio*, the Court found that joining members of the Mafia for trial where not all defendants were charged with murder was permissible under the rules of joinder and severance.  935 F.2d 553 (3rd Cir. 1991).  The defendants not charged with murder claimed the joinder with the murder defendants "infected the entire trial with evidence of uncharged Mafia crimes and the murder conspiracy itself."  *Id* at 558. Relying on the "substantial leeway" found in Rule 8(b), the Court found that the rule "permits joinder of defendants charged with participating in the same…conspiracy, even when different defendants are charged with different acts, so long as indictments indicate all the acts charged against each joined defendant are charged as… acts undertaken in furtherance of …a commonly charged…conspiracy." *Id* at 567.

Defendants here have argued that prejudice will arise from the 'spillover' of evidence from one defendant to another.  This argument "is fatally flawed, however, because they gloss over the fact that they were indicted as members of a … conspiracy that included all of their co-defendants." *Darden*, 70 F.3d at 1527 (8th Cir. 1995).

Defendants allege the admission of co-conspirator hearsay during a joint trial would create a *Bruton* violation.  Federal Rule of Evidence 801(d)(2)(E) provides that a statement is not hearsay if it "is offered against an opposing party" and "was made by the party's coconspirator during and in furtherance of the conspiracy."  Fed. R. Evid. 801(d)(2)(E); *see also United States v. Spotted Elk*, 548 F.3d 641, 661 (8th Cir. 2008). This furtherance requirement is interpreted broadly.  *United States v. Edwards*, 994 F.2d 417, 422 (8th Cir. 1993).

The admissibility of these statements under the co-conspirator exception to the hearsay rule disposes of the *Bruton* issue. *See United States v. Singh*, 494 F.3d 653, 659 (8th Cir. 2007)(*Bruton* does not preclude the admission of otherwise admissible statements by a co-conspirator under Rule 801(d)(2)(E)). Defendants' reliance on *Bruton* as a basis for severance of defendants is misplaced, as is any reliance on *Crawford v. Washington,* 541 U.S. 36 (2004). In *Crawford*, the Supreme Court held that where the government offers hearsay evidence that is "testimonial" in nature, the Confrontation Clause requires actual confrontation. The federal courts of appeals are unanimous in holding that *Crawford* does not apply to coconspirator hearsay because such hearsay is non-testimonial. *See e.g. United States v. Olguin*, 643 F.3d 384, 392 (5th Cir. 2011); *United States v. Hargrove*, 508 F.3d 445, 448 (7th Cir. 2007); and *United States v. Martinez*, 430 F.3d 317, 328-29 (6th Cir. 2005).

When the hearsay declarant is the defendant, there is no Confrontation Clause issue: a party whose own out-of-court statement is offered against him "does not need to cross-examine himself." *4 John Henry Wigmore, Evidence § 1048*, at 4 (Chadbourn rev. 1972). Coconspirator hearsay, an out-of-court statement by a coconspirator of the defendant imputed to the defendant, should not be barred by the Confrontation Clause for the same basic reason: just as a defendant has no need to cross-examine himself, he has no need to cross-examine his own agent. *Cf. Bourjaily v. United States*, 483 U.S. 171, 190 (1987). It stands to reason that coconspirator hearsay does not run afoul of the Confrontation Clause for a second reason: it is uttered *during* the crime and to further the crime – which includes the cover-up. By contrast, "*testimonial* statements," the kind of

26

hearsay about which the Supreme Court was concerned in *Crawford* and subsequent cases, are statements made *after* the crime and about the crime in retrospect.

Defendants argue that a jury would be unable to compartmentalize the evidence as it relates to each. However, courts routinely use limiting instructions in these situations and juries have managed to compartmentalize statements and return verdicts accordingly. *See Zafiro v. United States*, 506 U.S. 534, 539 (1993) (stating that "less drastic measures, such as limiting instructions, often will suffice to cure any risk of prejudice"); *United States v. Miller*, 116 F.3d 641, 679; *see also Pherigo*, 327 F.3d at 693 (describing analysis used by Eighth Circuit to evaluate juries' abilities to compartmentalize evidence, including the adequacy of the trial judge's instructions). The defendants do not specify why a jury would not be able to do the same in their cases.

Defendant Daud specifically argues that admission of the evidence from the pre-January 2015 time-frame will confuse the jury and prejudice him. *See* Docket 206, p. 2. This assertion is not supported by the evidence in the case which amply demonstrates his participation in the conspiracy from its infancy. The discovery in this case shows, among other things, that Daud a) attended meetings with his co-defendants in early 2014 to plan travel to Syria, b) supplied phone numbers for ISIL fighters to Abdullahi Yusuf to aid him upon arrival in Turkey, c) encouraged the "JFK 4" to accelerate their departure from the United States, and d) spearheaded a plan in October of 2014 for Yusuf and others – to include himself – to leave the United States via Mexico before Yusuf was to be arrested.

Defendants also cite Mohamed Farah's recorded threat to kill the federal agents investigating them if "there's no way out". Made during and in furtherance of the

conspiracy, this threat is admissible against all members of the conspiracy but, if necessary, the less-drastic measure of a limiting instruction will suffice to cure any risk of prejudice from the admission of this statement.

In addition to the joint motions for severance, Musse and Ahmed each separately and specifically move to sever Counts 7 and 8 - the financial aid fraud counts.  For the reasons stated above, these motions for severance should also be denied.

The Defendants have failed to meet their heavy burden to prove specific prejudice, and to the extent there is any arguable prejudice to a defendant, such prejudice does not outweigh the significant benefits of joinder.  As such, the United States respectfully requests that this Court deny the Defendants' motions to sever counts and defendants.

9.    **Joint Motion to Disclose Informants and Make Informants Available for Interview** (Dkt. 174)

Defendants have moved this Court for an order requiring the government to disclose the identity of any informants used in this case and to make informants available for interview.  The government opposes this motion.

To the extent the motion seeks the disclosure of informants who will not testify, the government need not disclose these informants.  Where the informant will not be a witness at trial, and was not present for any matter that will be the subject of testimony, the informant need not be disclosed.

The CHS who is extensively written about in the memorandum of law accompanying the defendants' motion will be a prosecution witness at trial.  The identity of the CHS is probably already quite clear to the defendants from the materials disclosed

28

in discovery, and as can be seen from defendants' memorandum, information about the CHS is already being put to use by the defendants to attempt to cast doubt on the CHS's veracity. The identity of the CHS will be disclosed to the defense at the same time as the Jencks materials. At that time, defendants will also receive witness statements and other materials asked for in their motion to the extent such materials are in the possession of the government and disclosure is required by law.

The government is privileged to withhold the identity of informants to further and protect the public interest in effective law enforcement. *Rovario v. United States*, 353 U.S. 53, 59, (1957). The government recognizes that this is not a limitless privilege. "[w]here the disclosure of an informer's identity, or of the contents of his communication, is relevant and helpful to the defense of an accused, or is essential to a fair determination of a cause, the privilege must give way." *Roviaro*, 353 U.S. at 60 - 61. Because "no fixed rule with respect to disclosure is justifiable," the decision to order disclosure varies with the particular circumstances of each case. *Id*. at 62. A defendant bears the burden of demonstrating that the disclosure of an informant's identity "is material to the outcome of his case; in other words, that disclosure is vital to ensure a fair trial." *United States v. Gonzalez Rodriguez*, 239 F.3d 948, 951 (8th Cir.2001); *United States v. Harrington*, 951 F.2d 876, 878 (8th Cir.1991) ("Evidence is material only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different.")

Given the disclosures already provided, the disclosures to be provided with the Jencks materials, the fact that the CHS's identity is probably already known to the

defendants, the fact that the CHS will be subject to cross-examination at trial, and the fact that concerns about the CHS's veracity are at least mitigated by the fact that tape recordings exist (and have been disclosed) of almost all the conversations to which the CHS would be expected to testify, this Court should decline to order disclosure of the CHS's identity any earlier than the date on which the government will voluntarily turn over Jencks materials.

10.   **Joint Motion for Disclosure of Government Files and Other Information Regarding Informants and/or Confidential Human Sources Under Attorney General's Guidelines** (Dkt. 176)

The defendants are mistaken in thinking that internal guidelines such as the Attorney General's Guidelines create any right or entitlement for defendants in criminal cases. They do not. *United States v. Caceres*, 440 U.S. 741, 751-752 (1979).

The government is in compliance with Fed. R. Crim. P. 16 and will remain so. The government is in compliance with *Brady v. Maryland* and other sources of its Constitutional, due process obligation to disclose materially exculpatory evidence, and will remain so. And the government has, and will continue, to provide far more, and earlier, in terms of witness statements than the Jencks Act requires.

This motion should be denied.

11.   **Joint Motion for Disclosure of Polygraph Examinations** (Dkt. 177)

The government requests that this motion be denied as moot. The government is not aware of any polygraph examinations conducted upon any of the witnesses it intends to call to testify at trial. Nor is it aware of polygraph examinations performed upon any person interviewed by the government in connection with the investigation or any

hearsay declarant. Even if such polygraph information existed, the motion should be denied because the results of polygraphs are generally inadmissible at trial. While there is no *per se* ban on the use of polygraph evidence, it is disfavored in the Eighth Circuit. *United States v. Gill*, 513 F.3d 836, 846 (8th Cir.2008). To be admissible, polygraph evidence must be relevant, and its probative value must not be "substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury." *U.S. v. Montgomery*, 635 F.3d 1074, 1094 (8th Cir. 2011). As a threshold matter, polygraph evidence must also be reliable. Fed.R.Evid. 702; *Daubert v. Merrill-Dow Pharmaceuticals*, 509 U.S. 579, 113 S.Ct. 2786. As the Supreme Court has noted, "there is simply no consensus that polygraph evidence is reliable." *United States v. Scheffer*, 523 U.S. 303, 309, 118 S.Ct. 1261, 140 L.Ed.2d 413 (1998).

Defendant's motion for the disclosure of polygraph evidence should be denied.

12. __Joint Motion for Disclosure of Rule 16(a)(1)(G) Materials__ (Dkt. 178)

The government is aware of the provisions of the rule governing disclosure of expert opinion testimony and will comply with them. As of this writing, the government has no such material to disclose. The government is currently in discussions with a potential expert witness. If and when that person becomes an expert witness for the prosecution, all required disclosures will be made.

13. __Joint Motion for Impeaching Information and Exculpatory Evidence__ (Dkt. 180)

The United States is aware of and has and will continue to comply with its obligations pursuant to *Brady v. Maryland, Giglio v. United States*, and their progeny.

The government does not object to defendants' motions that the government comply with its obligations with respect to *Brady, Giglio* and the Federal Rules of Criminal Procedure to the extent that such compliance is required by law. The government agrees to provide this information to defendant no later than the time set for the disclosure of Jencks Statements or as soon as practicable after the government receives such information, whichever is later. The government objects to defendant's motion to the extent that it is overbroad and seeks to compel the government to provide information not required.

14. **Joint Motion for Notice of Government's Intent to Use Residual Hearsay Exception Under Rule 807** (Dkt. 181)

As of this writing, the government has no evidence whose introduction it will seek under the residual hearsay clause of Fed. R. Evid. 807. Should that situation change, the government will comply with the rule, which requires advance written notice to the adverse party. The advance written notice to the adverse party must be given far enough in advance of trial to allow the adverse party adequate time to prepare to meet the evidence. Whether that equates to the thirty days' advance notice requested by the defendants in their motion, the government leaves to the sound judgment of the trial court.

The government will abide by the rule, and although an order directing the government to follow the rule is unnecessary, the government does not object to one being entered.

15.     **Joint Motion for Access to Jury Selection Records and Materials**  (Dkt. 189)

Defendants' joint motion for access to jury selection records and materials is, by its terms, limited to surveys of the representativeness of the jury wheels. These surveys are required by the Administrative Office of United States Courts. Defendants also seek the Jury Selection Report (also referred to as the "JS-12"). *See* Docket 189, p. 4. The government does not raise a specific objection to this motion and leaves this matter to the sound discretion of this Court.

16.     **Joint Motion for Bill of Particulars**  (Dkt. 190)

The defendants' joint motion for a bill of particulars should be denied because the indictment in this case is perfectly sufficient and has been supplemented by voluminous governmental disclosures that have gone well beyond what the government is legally obligated to provide. In particular, the information chiefly sought by the defendants – the identity of co-conspirators and the nature of the material support allegedly provided to ISIL – has been amply provided by the government.

The Superseding Indictment in this case is in full compliance with Fed. R. Crim. P. 7, in that it provides the defendants with a plain, definitive statement of the essential facts underlying the crimes charged, and alleges each and every element of each crime alleged by the grand jury in its Superseding Indictment. The Superseding Indictment has been supplemented by voluminous governmental disclosures. Over and above the thousands of pages of reports and business records that have been disclosed, the government has also disclosed many hours of tape recorded conversations between the

various defendants and the CHS.  On an ongoing basis, as they become available, the government is providing defendants with transcripts of those tape-recorded conversations.  The government has had, as of this writing, three defendants in for meetings at which both prosecutors and one or two FBI Agents meet with the defendant and his counsel to provide an outline of the evidence possessed by the government.  A fourth and fifth defendant is scheduled to meet with the government within the next week, and the remaining three defendants have requested such meetings.  Those requests will be honored by the government.

The government has also already turned over Jencks Act materials.  Of particular note to this motion, the government has disclosed 100 pages of FBI reports documenting proffer statements given by cooperating defendant Abdullahi Yusuf.  In those statements, Yusuf describes the conspiracy up to his own arrest in November of 2014.  In a typical case in this district, that Jencks Act material would not have been disclosed until at least two weeks before trial (and perhaps even closer to trial than that), and under the Jencks Act itself, not until the prosecution had concluded its direct trial examination of Mr. Yusuf.

In their motion for a bill of particulars, the defendants specify nine categories of information they seek.  Five of those categories – numbers one, two, three, four, and six – are classic efforts to misuse a bill of particulars in order to learn additional detail about the government's case. Item one asks where and when the defendants entered into the conspiracy charged in Count One of the Superseding Indictment; item two seeks the identity of co-conspirators; item three asks for the affiliation of each conspirator with

ISIL "to the extent applicable;" item four, which has five sub-parts, seeks information about each and every act of provision of "material support and resources allegedly provided by, or agreed to be provided by, or attempted to be provided by, the Defendants;" while item six actually asks for details about each act of "terrorism" or "terrorist activity" engaged in by ISIL – an impossible undertaking, given that organization's record of (very well-publicized) terrorist violence.

Item five is a legal interrogatory, asking for the inter-relationship between the conspiracies described in different counts of the Superseding Indictment. Items eight and nine are also legal interrogatories, asking the government to specify which acts demonstrate that defendants were acting under ISIL's direction and control, and which acts demonstrate, essentially, that the defendants are guilty ("what acts allegedly demonstrate that defendants conspired, or attempted, to organize, manage, supervise, or otherwise direct the operation of ISIL").

None of these items is a proper use of a bill of particulars. But more importantly, there is simply no need for a bill of particulars in this case at all.

### A.    The Superseding Indictment is Sufficient.

There is no need for a bill of particulars if the indictment is sufficient. An indictment is "legally sufficient on its face if it contains all of the essential elements of the offense charged, fairly informs the defendant of the charges against which he must defend, and alleges sufficient information to allow a defendant to plead a conviction or acquittal as a bar to subsequent prosecution." *United States v. Wessels*, 12 F. 3d 746, 750 (8th Cir. 1993) (*citing United States v. Young*, 618 F.2d 1281, 1286 (8th Cir. 1980)).

An indictment is sufficient "unless it is so defective that it cannot be said, by any reasonable construction, to charge the offense" the defendant is charged with. *United States v. Hayes*, 574 F.3d 460, 472 (8th Cir. 2009). Further, an indictment will generally be held sufficient if it tracks the language of the charging statute. *United States v. Sewell*, 513 F.3d 820, 821 (8th Cir. 2008).

When it comes to the specific subject of conspiracy indictments, the Eighth Circuit has held that some of the exact types of information sought by the defendants in this case – "the persons with whom, and the locations and times at which, he [committed the offenses charged]" need not be specified. *United States v. Huggans*, 650 F.3d 1210, 1217-1218 (8th Cir. 2011).

The indictment in this case is more than sufficient under Fed. R. Crim. P. 7 and the cases cited above.

### B.    A Bill of Particulars is not a Discovery Device.

A bill of particulars is not available to a defendant upon request. Courts will only order the government to produce a bill of particulars when the indictment is so vague that the defendant cannot tell what he is charged with. The district court has discretion to grant or deny a motion for a bill of particulars, *United States v. Bowie*, 618 F.3d 802, 817 (8th Cir. 2010). When a defendant seeks a bill of particulars for an improper purpose, the district court should exercise that discretion by denying the motion.

One such improper purpose is seeking a bill of particulars to obtain discovery. "A bill of particulars is not a discovery device to be used to require the government to provide a detailed disclosure of the evidence that it will present at trial." *United States v.*

*Huggans*, 650 F.3d 1210, 1220 (8th Cir. 2011)(*quoting United States v. Livingstone*, 576 F. 3d 881, 883 (8th Cir. 2009)).   Yet discovery is exactly what these defendants are seeking with their motion; details about dates, times, purposes, identities, and other specific items, including, apparently, a catalogue of each and every act of terrorism perpetrated by ISIL.

In their memorandum in support of their motion for a bill of particulars, the defendants claim they need a bill of particulars to (a) identify co-conspirators; and (b) obtain more specifics about the material support provided, in order that they can prepare a constitutional challenge to 18 U.S.C. § 2339B.   It is difficult to fathom how the defendants can claim they need help identifying co-conspirators.  Dozens of hours of tape recordings been turned over to the defendants, in which several identified co-conspirators discuss their criminal plan. In addition, multiple unredacted search warrant affidavits have been disclosed to defendants in which coconspirators are referenced. Also, additional information about other participants can be gleaned from the proffer reports of Abdullahi Yusuf.

In support of their claim that a bill of particulars is needed to provide specifics about what material support was provided, and when, and to whom, and so forth, the defendants cite Judge Tunheim's pretrial order in *United States v. Warsame*, 537 F. Supp. 2d 1005, 1011 (D. Minn. 2008).  Their use of that case is selective.  The government's bill of particulars in that case set forth the "material support" that defendant Warsame had allegedly provided, but did so by category; "personnel," "training," and "currency."  In subsequent briefing (not, apparently, in the bill of particulars itself) the government made

clear that by "personnel" it meant that defendant Warsame had provided himself to al-Qaeda, by attending an al-Qaeda training camp in Afghanistan. No greater details appear to have been provided in the bill of particulars. Judge Tunheim found the bill of particulars sufficient, and denied a defense motion to require the government to provide more details.

In this case, the Superseding Indictment already alleges that material support was provided to ISIL in the form of "personnel," and again, the discovery in this case, supplemented by discussions between the prosecutors and defense counsel, makes clear that "personnel" means the defendants themselves.

The defendants' motion for a bill of particulars should be denied.

17.    **Joint Motion to Limit Visible Display of Security During Trial**  (Dkt. 192)

The fundamental legal principles relevant to a Court's consideration of what security measures are appropriate during a trial are well-settled. The language from *Taylor v. Kentucky*, 436 U.S. 478, 485 (1978) that the defendants quote in their motion – "one accused of a crime is entitled to have his guilt or innocence determined solely on the basis of the evidence introduced at trial, and not on grounds of official suspicion, indictment, continued custody, or other circumstances not adduced as proof at trial" – accurately encapsulates the defendant's due process rights that are implicated by visible displays of security measures during a trial. The government agrees entirely with the quoted language.

The Supreme Court has also held, however, that "[i]t is essential to the proper administration of criminal justice that dignity, order, and decorum be the hallmarks of all court proceedings in our country. The flagrant disregard in the courtroom of elementary standards of proper conduct should not and cannot be tolerated." *Illinois v. Allen*, 397 U.S. 337, 347 (1970). "The safety of a . . . courtroom is an essential state interest." *Gilmore v. Armontrout*, 861 F.2d 1061, 1071 (8th Cir. 1988).

The security measures put into place so far in this litigation have been appropriate and necessary. Several hearings in this case have been held in a courtroom whose gallery was packed with spectators, several of whom refused to follow simple rules of courtroom decorum. Fist-pumping salutes have been exchanged between the defendants in the well of the courtroom and members of the public in the gallery. At each hearing, the prosecutors are aware of some spectators who have openly declined to stand when the Court enters and leaves the courtroom. The detention hearing for these defendants, held on April 23, 2015 before Magistrate Judge Thorson in St. Paul, was held in a particularly tense environment. The Marshals' Service removed several individuals from the courtroom because of their behavior, and thought it prudent to provide escorts to some members of the prosecution team after the hearing. In the days shortly after the hearing, an individual was arrested after he posted on Twitter threats of a "bloodbath" if "the Feds" did not release the defendants in this case.

This is not the atmosphere in which federal criminal cases ought to be conducted. The government understands that any security measures must be carried out as unobtrusively as possible in order to guard against any unfair prejudice to the defendants.

However, the defendants have not cited, and the government has not found, any case holding that a federal court's guarding against prejudice to the defendant must extend to the extreme of that court running unnecessary risks to the safety of court personnel or the general public, or must extend to allowing a federal trial to take place in a chaotic and disrespectful atmosphere, much less an intimidating atmosphere. The Supreme Court has recognized that keeping security measures invisible can only accomplish so much - "jurors are quite aware that the defendant appearing before them did not arrive there by choice or happenstance . . . we have never tried, and could never hope, to eliminate from trial procedures every reminder that the State has chosen to marshal its resources against a defendant to punish him for allegedly criminal conduct." *Holbrook v. Flynn*, 475 U.S. 560, 567-68 (1986).   The answer to this is not the foregoing of necessary safety precautions, it is a trial judge who "assiduously works to impress jurors with the need to presume the defendant's innocence . . . ." *Holbrook*, 475 U.S. at 568, as we know this Court will do.

*United States v. Honken*, 378 F. Supp. 2d 1010 (N.D. Iowa, 2004),[16] cited by the defendants in their motion, describes in detail the analysis the Eighth Circuit requires a trial court to undertake before placing a defendant in restraints.   While this motion concerns general courtroom security measures, not restraint of a defendant, the *Honken* analytical scheme is still appropriate.   First, the Court considers whether restraints are necessary to prevent the defendant from escaping and to protect others in the courtroom;

---

[16] *Honken* is not, as the defendants state, an Eighth Circuit case, but a case from the District Court for the Northern District of Iowa.  However, *Honken* discusses applicable Eighth Circuit law on the question of courtroom security at length.

second, the Court must consider whether placing the defendant in restraints prejudices the defendant. *Honken*, 378 F. Supp. 2d at 1029. The Court must then "balance the possibility of prejudice against the need to maintain order in the courtroom and custody over incarcerated persons." *United States v. Stewart*, 20 F.3d 911, 915 (8th Cir. 1994).

The defendants ask that any security measures that extend beyond having uniformed and plain-clothes officers in the courtroom during trial be invisible. If it is possible to take the necessary security precautions without those precautions being visible, that is welcome news. But if such precautions are not possible, then the Court, consistent with the decision-making criteria above, should balance the need for the security measures against the possibility of prejudice. As noted above, the Constitution does not require that the Court balance those considerations by taking unnecessary risks with public safety. The government will not object to any appropriate cautionary instruction that the Court thinks is advisable to give if it turns out that necessary and appropriate security measures cannot be completely hidden from the jury's view.

18. **Joint Motion to Dismiss Counts in the Indictment and Inspect Grand Jury Minutes** (Dkt. 199)

This motion is a duplicate of Docket Nos. 33 and 34, filed on May 29, 2015 on behalf of defendant Hamza Ahmed alone. In addition to the response filed earlier by the government (Docket No. 46), the government respectfully submits the following.

The defendants claim that the material support counts in the Superseding Indictment (Counts 1 – 4) fail to plead an essential element of the offense and must therefore be dismissed. The defendants also claim that even if the Court upholds the

facial validity of the material support counts in the Superseding Indictment, the defendants are nevertheless entitled to examine the grand jury records to assure themselves that the grand jury was properly instructed on the law.

Defendants are wrong.  The Superseding Indictment set forth each and every element of the offenses charged.  Because they are not elements of the offense, neither statutory exceptions nor affirmative defenses were pleaded in the Superseding Indictment.  This includes the statutory exception which defendants incorrectly claim is an element of the offense, namely that the term "personnel," as defined at 18 U.S.C. § 2339B(h) does not include persons who act entirely independently of a designated foreign terrorist organization, without placing themselves under the terrorist organization's direction or control.  Defendants' motion to dismiss counts 1 – 4 should therefore be denied.  Because the defendants' motion for inspection of the grand jury minutes is contingent on their motion to dismiss (notwithstanding defendants' protestation that it stands independently), their motion for inspection should also be denied.

**THE INDICTMENT IS SUFFICIENT.  IT ALLEGES THE COMMISSION OF EACH AND EVERY ELEMENT OF THE CRIMES CHARGED.**

Fed. R. Crim. P. 7 requires that "the indictment or information must be a plain, concise, and definite written statement of the essential facts constituting the offense charged."  An indictment "is legally sufficient on its face if it contains all of the elements of the offense charged, fairly informs the defendant of the charges against which he must defend, and alleges sufficient information to allow a defendant to plead a conviction or acquittal as a bar to a subsequent prosecution."  *United States v. Hernandez*, 299 F. 3d

984, 992 (8th Cir. 2002). It follows that an indictment is not sufficient if it does not contain all the elements of the crime charged, *United States v. Zangger*, 848 F.2d 923, 925 (8th Cir. 1988). An indictment will generally be found sufficient if, read in its entirety, it informs the defendant of all the elements of the offense, even if lacking factual detail about the crime charged. *United States v. Glecier*, 923 F.2d 496, 501 (7th Cir. 1991). In the case of a conspiracy charge, such as count one of the Superseding Indictment, the Supreme Court has held that a conspiracy count need only "identify the offense which the defendants conspired to commit" . . . and that it need not "with technical precision, state all the elements essential to the commission of the [substantive] crime." *Williamson v. United States,* 207 U.S. 425, 447 (1908).

Defendants here claim that counts 1 -4 of the Superseding Indictment are insufficient because those counts fail to allege that the defendants intended to place themselves under the direction or control of ISIL when they provided, attempted to provide, or conspired to provide material support and resources, in the form of "personnel" (themselves) to ISIL. However, the claimed missing element is not an element at all, but a statutory exception, and it is well-settled law that an indictment does not need to negative statutory exceptions.

To be legally sufficient, an indictment need only allege the elements of the offense – it need not allege the absence of affirmative defenses or the inapplicability of statutory exceptions. The Supreme Court has held that "[b]y repeated decisions it has come to be a settled rule in this jurisdiction that an indictment or other pleading founded on a general provision defining the elements of an offense or of a right conferred, need not negative

the matter of an exception made by a proviso or other distinct clause, whether in the same section or elsewhere, and that it is incumbent on one who relies on such an exception to set it up and establish it." *McKelvey v. United States*, 260 U.S. 353, 357 (1922)(citations in original omitted); *see also, United States v. Sisson*, 399 U.S. 267, 288 (1970)("[i]t has never been thought that an indictment, in order to be sufficient, need anticipate affirmative defenses"); *Edwards v. United States*, 312 U.S. 473, 482-83 (1941)(citing *McKelvey*).

Defendant McKelvey was convicted in the district court of obstructing access to public lands. The statute which the indictment alleged he had violated contained a proviso stating that "this section shall not be held to affect the right or title of persons, who have gone upon, improved or occupied said lands under the land laws of the United States, claiming title thereto, in good faith." McKelvey moved to dismiss the indictment because it did not allege that the proviso did not apply to him, 260 U.S. at 356-357. The Supreme Court, in the language quoted above, rejected his claim. Since then, "the cases rejecting this argument [i.e., the argument that the inapplicability of statutory exceptions and affirmative defenses needs to be pleaded in the indictment] are numerous." *United States v. Messina,* 481 F.2d 878, 880 (2d Cir. 1973).

The Eighth Circuit has three times applied *McKelvey*'s holding to a defendant's claims that an indictment should be dismissed for insufficiency, holding each time that the "element" a defendant alleged was missing was in fact an affirmative defense or a statutory exception. *United States v. Stanko*, 491 F.3d 408 (8th Cir. 2007) (indictment alleging felon in possession of a firearm legally sufficient even though it did not allege

44

that defendant's prior felony was outside the scope of 18 U.S.C. § 921(a)(20)(A), exempting antitrust crimes and other business regulatory offenses from the class of felony convictions that disqualify one from possessing a firearm); *Bistram v. United States*, 237 F.2d 243, 245 (8th Cir. 1956) (affirming district court's denial, in a kidnapping case, of a defense motion to dismiss the indictment on the grounds that the indictment did not allege that the kidnapping victim was not the minor child of the defendant); *Weare v. United States*, 1 F.2d 617 (8th Cir. 1924)("[i]t is the well-established rule that ordinarily an exception created by a proviso or other distinct or substantive clause, whether in the same section or elsewhere in the act, is defensive, and need not be negatived in an indictment.").

*Weare* went on to hold that "[i]f the negation of an exception in the enacting clause of a statute is essential to accurately describe the offense, then the accusations of the indictment must show that the accused is not within the exception." Because the crime of providing material support to a designated foreign terrorist organization is completely described without negating the exception that is at issue in this motion, it was not necessary for the Superseding Indictment to allege the inapplicability of that exception.

§ 2339B(h) defines an exception, not an element of the crime, for several reasons, including the structure of the statute and the plain language of the exception. Defendants seek to buttress their argument by quoting several portions of the section's legislative history, but even the snippets of legislative history they quote do not indicate that § 2339B(h) was meant by Congress to define an additional element of the crime.

45

     **a.**    **The structure of the statute.**  18 U.S.C. § 2339B begins by defining the offense of providing material support to a designated foreign terrorist organization in the section cited in the Superseding Indictment, Section 2339B(a)(1).  Following that, a number of sections describe the obligations of financial institutions (§ 2339B(a)(2)), civil penalties (§ 2339B(b)), injunctions (§ 2339B(c)), extraterritorial jurisdiction (§ 2339B(d), and other topics, finally coming, in the statute's final three sections, to three statutory exceptions.  Other than the exception at issue in this motion, § 2339B(h), the other two exceptions are a "Rule of Construction" forbidding the abridgement of First Amendment rights (§ 2339B(i)) and an "Exception," stating that "no person may be prosecuted under this section" for material support provided to a foreign terrorist organization if that material support was provided with the approval of the Secretary of State and the concurrence of the Attorney General (§ 2339B(j)).  The § 2339B(h) exception, in other words, is found with two other sections of the statute that are also immediately recognizable as exceptions.  The exception's location, far from the section that defines the crime, also strengthens the conclusion that § 2339B(h) creates a statutory exception, not an element of the crime.

     The exception contained in § 2339(h) also begins with the same language as the exception that is actually labeled "Exception" (§ 2339B(j)):  "No person may be prosecuted under this section . . ." which is further indication that § 2339B(h) defines an exception, not an element.  After first stating that "no person may be prosecuted under this section who did not knowingly provide 'personnel' to work under the terrorist organization's direction or control," the § 2339B(h)'s second and concluding sentence

uses in language that is classically that of an exception – "individuals who act entirely independently of the foreign terrorist organization to advance its goals or objectives shall not be considered to be working under the foreign terrorist organization's direction and control."

       **b.**    **The plain text of § 2339B(h)**.  Defendants' claim that § 2339B(h) creates an additional criminal element rests in part on their assertion that "the wording of § 2339B(h) is not even phrased as an exception, but as an affirmative requirement of the government's proof."  This assertion completely overlooks the fact that, as described above, the first sentence of § 2339B(h) is phrased precisely the same way ("no person may be prosecuted . . .") as § 2339B(j) – a section helpfully labeled "Exception."  In addition, while the defendants quote the first sentence of § 2339B(h), they do not quote the section's second sentence, which defines a class of defendants who are not covered by (are excepted from, in other words) the statute – persons "who act entirely independently of a foreign terrorist organization to advance its goals or objectives."

       Defining a class of defendants who are excepted from the statute is consistent with how the statutory exceptions in the cases described in this motion response are phrased. Persons who have settled on public land are excepted from a statute making it a crime to obstruct access to public lands (*McKelvey*);  persons convicted of antitrust felonies are excepted from a statute prohibiting convicted felons from possessing firearms (*Stanko*); parents are excepted from a statute criminalizing kidnapping (*Bistram*); and so on.

       **c.**    **The legislative history.**  Defendants quote several witnesses who testified before Congressional committees considering the passage of § 2339B(h).  The portions of

the legislative history quoted by the defendants show only that these witnesses believed the language of § 2339B(h) "more clearly defined" or "clarified" the mental state requirement. Clarification can come as easily, perhaps more easily, in an exception than in an amendment of the elements of a crime. The defendants do not quote even one item of legislative history that states that § 2339B(h) adds an element to the crime.

In addition, defendants note that § 2339B(h) applies only to 18 U.S.C. § 2339B, and not to § 2339A. This is not surprising. Action taken entirely independently of a terrorist organization can only occur when there is a terrorist organization to be independent from, and 18 U.S.C. § 2339A is silent about terrorist organizations. 18 U.S.C. § 2339A, short-titled "Providing Material Support to Terrorists," defines a crime the essence of which is the criminalization of providing material support to violations of an enumerated list of federal criminal statutes. It is no help in interpreting § 2339B(h) to point out that the same language was not inserted into § 2339A, for the simple reason that it would be impossible to make the language of § 2339B fit within § 2339A, because § 2339A has nothing to do with organizations.

Finally, defendants quote the government's response (Docket No. 46) to the earlier, Hamza Ahmed-only motion (Docket Nos. 33 and 34), that "[n]o court has held that the government must specifically charge and prove that a defendant knew that he would work under that terrorist organization's direction or control, or to organize, manage, supervise, or otherwise direct the operation of that organization." Defendants' Memorandum in Support of Motion (Docket No. 200) at 18. Defendants characterize this statement as "bizarre" and "mistaken." The government stands by its statement. There is

no case holding that § 2339B(h) is an element of the offense – something the government must "charge and prove." The government has located no such case. The defendants, highly motivated to find such a case, do not cite one. What, precisely, is "bizarre" about saying that there is no case standing for a particular proposition, the government is at a loss to know.

### DEFENDANTS ARE NOT ENTITLED TO PRODUCTION OF GRAND JURY RECORDS.

Defendants' motion for production of grand jury records depends entirely on their motion to dismiss Counts 1 – 4 for failure to state an element of the crime. The defendants claim that this Court should order the government to produce the grand jury's records "even if the Court finds the indictment to be facially sufficient. . . .," Memorandum of Defendants (Docket No. 200) at 3. However, the defendants do not then carry through and make any argument that the records should be produced in the absence of the Court finding the indictment not sufficient. At page 15 of their Memorandum the defendants state that production is needed to avoid the injustice of being indicted on the basis of improper instructions. Of course, if § 2339B(h) does not define an element of the crime, then there would be nothing improper about instructions that do not include § 2339B(h) as an element. Defendants also claim that they may have been indicted on insufficient evidence. Other than this statement, however, they do not explain what an alleged evidentiary insufficiency has to do with whether § 2339B(h) defines an element.

Defendants then effectively concede that they cannot obtain the grand jury records without prevailing on their motion to strike counts of the Superseding Indictment for insufficiency. They write: "As noted above, in order to sustain a conviction under § 2339B where the material support being offered or provided is "personnel," the government must establish that the "personnel" were acting or were planning to act either under the terrorist organization's direction or control, or in some managerial capacity with respect to the organization. See § 2339B(h)." Memorandum of Defendants (Docket No. 200) at 15. In fact, the government does not need to establish any such thing. As the cases from *McKelvey* onward have held, the government need neither charge nor prove the inapplicability of statutory exceptions or affirmative defenses. It is only based on their (erroneous) reading of the statute that the defendants assert an entitlement to the grand jury records, so they can ascertain whether the jury was instructed consistently with the defendants' misreading of § 2339B(h).

Defendants' motion for disclosure of grand jury materials depends upon the success of their motion to dismiss counts of the indictment. Since the defense motion to strike counts should, for the reasons set forth above, be denied, it follows that the motion for production of grand jury materials should also be denied.

19.    **Joint Motion to Dismiss the Material Support Counts in the Indictment on the Grounds of Unconstitutional Overbreadth and Vagueness** (Dkt. 201)

Defendants' claims that one of the statutes under which they are charged, 18 U.S.C. § 2339B, is void for vagueness, overbreadth, or both, are set forth at great length. That length is the result of the defendants' describing imaginary situations that might

arise if the facts of this case were different (if, for example, the defendants in this case were being prosecuted for chopping a thief's hands off, Defendants' Supporting Memorandum of Law (Docket No. 202) at page 19), and from describing interesting – but irrelevant – musings by various commentators about ISIL's lack of conformity to those commentators' conception of what attributes a "terrorist organization" ought to have.  However, as applied to the defendants in this case, not some other defendants in some other case that might arise some other day, the statute they are charged with violating, 18 U.S.C. § 2339B, is neither vague nor overbroad.  Notwithstanding the length at which it is propounded, the defense claims are flatly incorrect and should be rejected by the Court.

**Legal Principles - Vagueness**

Convicting someone of violating a criminal law that is unconstitutionally vague violates that person's Fifth Amendment right to due process of law.  *Johnson v. United States,* 135 S.Ct. 2551, 2556 (2015).  A criminal statute is unconstitutionally vague if it "fails to provide a person of ordinary intelligence fair notice of what is prohibited, or is so standardless that it authorizes or encourages seriously discriminatory enforcement." *Holder v. Humanitarian Law Project*, 561 U.S. 1, 18 (2010).

Courts analyze vagueness challenges as applied to the particular facts of the case before it.  "We consider whether a statute is vague as applied to the particular facts at issue, for '[a] plaintiff who engages in some conduct that is clearly proscribed cannot complain of the vagueness of the law as applied to the conduct of others.'"  *Holder*, 561 U.S. at 18-19 (*quoting Village of Hoffman Estates v. Flipside, Hoffman Estates, Inc*., 455

U.S. 489, 494-495 (1982)).    "A court should therefore examine the complainant's conduct before analyzing other hypothetical applications of the law."  *Hoffman Estates* at 495.  Defendants concur that their vagueness claim in this case is limited to their own conduct.  Defendants' Supporting Memorandum of Law (Docket No. 202) at 2 ("the material support statute is overbroad and void for vagueness as applied to the Defendants").    Because vagueness challenges are decided by analyzing the facts of the case in which the vagueness challenge was made, defendants' hypotheticals about fact situations that might come up if other defendants were being prosecuted in other cases are irrelevant, and because the actions of the defendants in this case were "clearly proscribed," their vagueness challenge fails.

**Legal Principles - Overbreadth**

A criminal law is overbroad if it prohibits a substantial amount of protected speech.  *United States v. Williams*, 553 U.S. 285, 292 (2008).  Unlike vagueness, which implicates Fifth Amendment due process rights, overbreadth is concerned with the inhibition of First Amendment-protected speech, balanced against the protection of society that results from properly designating as criminal certain types of behavior:  "On the one hand, the threat of enforcement of an overbroad law deters people from engaging in constitutionally protected speech, inhibiting the free exchange of ideas.  On the other hand, invalidating a law that in some of its applications is perfectly constitutional – particularly a law directed at conduct so antisocial that it has been made criminal – has obvious harmful effects.  In order to maintain an appropriate balance, we have vigorously enforced the requirement that a statute's overbreadth be substantial, not only in an

absolute sense, but also relative to the statute's plainly legitimate sweep." *Williams*, 553 U.S. at 292 (citations omitted; emphasis in original). "In a facial challenge to the overbreadth and vagueness of a law, a court's first task is to determine whether the enactment reaches a substantial amount of constitutionally protected conduct. If it does not, then the overbreadth challenge must fail." *Hoffman Estates v. Flipside*, 455 U.S. 489, 494 (1982).

Because 18 U.S.C. § 2339B does not proscribe protected speech at all, it is not overbroad. In particular, this prosecution does not seek to punish defendants for what they say, but rather, uses defendants' speech only as evidence, a use of speech that the Supreme Court has upheld against a First Amendment challenge, *Wisconsin v. Mitchell*, 508 U.S. 476, 489 (1993) and a principle whose application to terrorism cases in particular has been upheld by the Second Circuit, *United States v. Abdel Rahman*, 189 F.3d 88, 118 (2d Cir. 1999). Defendants' overbreadth claim fails.

## 18 U.S.C. § 2339B IS NOT VAGUE AS APPLIED TO THE CONDUCT OF THESE DEFENDANTS.

In support of their vagueness claim, the defendants postulate a number of hypothetical situations that cannot be found in the indictment, in the complaint that preceded the indictment, in the discovery, or indeed anywhere in this case. Since vagueness challenges are analyzed as-applied, the vagueness claim must be evaluated based on the defendants' own conduct, not imaginary hypotheticals. Assertions unmoored from the facts of this case, such as that it might be hard to tell whether

"terrorism" or "terrorist activity" includes chopping off thieves' hands or killing adulterous women in a revenge killing can be - and should be - simply ignored.

### ISIL's Status is not Vague for Purposes of this Case

The defendants' claim that some people find it hard to categorize ISIL misses the point. The government must prove that ISIL was designated by the Secretary of State, acting pursuant to Section 219 of the Immigration and Nationality Act, as a designated foreign terrorist organization at the time the defendants conspired or attempted to provide material support to ISIL. The government will do this by introducing the appropriate *Federal Register* notices into evidence. The government does not need to prove, and will not try to prove, that ISIL meets the criteria proposed by the various academics and journalists whose views are described in the defendants' motion. The defendants may choose to dispute the fact of ISIL's designation, but they may not choose to dispute the validity of that designation. Any such claim is statutorily barred, 8 U.S.C. § 1189(a)(8) (defendant in a criminal case may not contest the validity of a terrorist organization's designation). This statutory bar has been upheld against constitutional challenge, *United States v. Afshari*, 392 F.3d 1031 (9th Cir. 2004). As one district court has put it, "[d]efendants are free to argue that al-Shabaab was not, in fact, a designated FTO. That they are barred from arguing that al-Shabaab's designation was improper is of no event, because proper designation is not an element of the offense." *United States v. Ahmed*, 2015 WL 1321612 *16 (EDNY 2015) (emphasis in original).

Even if the defendants are not contesting the validity of ISIL's Section 219 designation but are instead claiming that the imprecision (in their view) of ISIL's

54

resemblance to some people's conception of what a terrorist group ought to look like generally supports their vagueness challenge, the claim still misses the point. What matters in deciding a vagueness challenge are the facts of the case at bar. The evidence at trial will prove beyond a reasonable doubt that these defendants knew full well that ISIL was a designated foreign terrorist organization that engaged in terrorism and terrorist activity. [17]

For example, a number of the defendants in this case attended the November 24, 2014 detention hearing for defendant Abdullahi Yusuf (District Court Criminal Case No. 14-MJ-1024 (MJD)) and learned directly of ISIL's designation when that designation was spoken about at length by counsel for both the defense and the prosecution.

The government will also prove that the defendants were aware that ISIL engaged in terrorism and terrorist activity by using the defendants' own words in tape-recorded conversations, by using conversations that will be testified to by a participant in those conversations, and by using the defendants' own words on social media. For example, paragraph 67 of the criminal complaint in this case describes a conversation between the CHS, defendant Abdirahman Daud, and defendant Mohamed Farah in which Daud and

---

[17] In any event, the fact that a terrorist organization holds territory and exercises governmental functions does not disqualify that organization from being a terrorist organization. ISIL is no different in this regard from several designated foreign terrorist organizations. For example, al Shabaab controlled most of Somalia for many years. Sig Jarle Hansen, *Al Shabaab in Somalia* (Oxford University Press 2013) pages 83 – 92 (describing al Shabaab governance of the areas it controlled, including taxation, policing, courts, even road construction, as well as al Shabaab's ownership of several radio and TV stations, and noting that al Shabaab "controlled most of southern Somalia."). Hamas is the *de facto* government of the Gaza Strip, having prevailed in Palestinian elections held in January of 2006. Beverly Milton-Edwards and Stephen Farrell, *Hamas* (Polity Press 2010), pages 1 – 4. Hezbollah actively participates in Lebanese politics. Augustus Richard Norton, *Hezbollah* (Princeton University Press 2007), pages 98-105 (describing Hezbollah's 1992 decision to enter Lebanese parliamentary elections).

Farah describe recent communications they have had with ISIL fighter Abdi Nur. In those communications, Nur described fighting in the Syrian city of Kobani, and stated that three fighters with Nur were killed and a further twelve to thirteen had been shot. A tape-recorded conversation turned over in discovery catches defendant Guled Ali Omar stating that he will become a "shaheed" (a martyr) soon after arriving in Syria, while defendant Abdirahman Daud, also in a disclosed, tape-recorded conversation, made similar remarks about becoming a shaheed while driving to San Diego. When the CHS was recounting to Hanad Musse his dealings with the (purported) Mexican vendor of false passports, Musse actually asked the CHS whether the CHS had informed the passport vendor that he was dealing with "terrorists."

These defendants cannot avail themselves of the void for vagueness doctrine because of any alleged ambiguity about the status of ISIL.

### The Statutory Definitions of "Terrorist Activity" and "Terrorism" are not Vague as Applied to These Defendants.

The defendants' chief complaint about the Immigration and Nationality Act's definition of "engaging in terrorist activity" seems to be that the definition does not have a clause limiting its reach to politically-motivated violence. Defendants, however, can point to no constitutional requirement that Congress punish only support of politically-motivated violence. And again, the question whether the statutory definition of "terrorist activity" is vague because it lacks a political motivation clause is a question for another case; even if there were such a requirement, it would be met here, given that the ISIL

violence defendants conspired and attempted to support serves that organization's political agenda. In an as-applied vagueness challenge that is conclusive.

From defendant Abdirahman Daud saying that the first thing he would do when he reached Mexico is "spit on America," to defendant Mohamed Farah saying that his American identity is dead so "burn my ID," to defendant Hanad Musse expressing his openness to perpetrating an attack inside the United States if he cannot reach Syria, to defendant after defendant at one time or another describing the United States as a land of "kuffars," (infidels) the acts of these defendants – the acts by which this Court must judge their vagueness challenge – were acts motivated by anti-American political views.

Defendants' go on to postulate one situation after another, and claim that it is unclear whether the Immigration and Naturalization Act's definition of "terrorist activity" encompasses them. None of these situations have anything to do with the case at bar:

- A revenge killing for adultery;

- The lawful solicitation of payments by crime victims to secure an individual's release from prison;

- Punishing a thief by cutting off his hands; and

- Enlisting in a country's armed forces.

The defendants in this case are charged with conspiring to provide and attempting to provide material support to ISIL, a designated Foreign Terrorist Organization, and doing so by traveling to Syria themselves to join and fight with the organization. No defendant is charged with honor killing, or hand chopping, or soliciting money from crime victims. The defendants do not even try and claim that the defendants' own

57

conduct is anything but, in the words of Justice Marshall in the *Hoffman Estates v. Flipside* case, "clearly proscribed."

The defendants' also claim that the Foreign Relations Authorization Act's definition of "terrorism" is vague. This definition incorporates the political dimension whose absence from the Immigration and Naturalization Act's definition of "terrorist activity" greatly troubled the defendants. However, the defendants now note that the definition speaks of "sub-national" groups and return to their claim that ISIL's status, whether national or sub-national, is "ambiguous."

The short answer to this is that the defendants are accused of violating the laws of the United States and that under U.S. law ISIL is most emphatically not a nation-state. Under U.S. law ISIL must be considered sub-national, because it exists within the nation-states of Iraq and Syria.

The same response may be made to defendants' final vagueness claim, their assertion that the definition of "material support" in the form of "personnel" in 18 U.S.C. § 2339B is vague. Specifically, defendants return once again to the ambiguity that they claim exists – because some commentators say they find ambiguity - as to ISIL's status; is it a national state or is it not? Simply traveling to ISIL-controlled areas of Syria would constitute, defendants claim, "material support" because someone within the territory of a nation is subject to that nation's "direction and control." 18 U.S.C.§ 2339B(h). The next step in defendants' argument is to argue that if traveling to ISIL-controlled areas of Syria is "material support" then § 2339B penalizes "mere membership," but the Supreme Court has held that it cannot. However imaginative this argument may be, it is premised on

58

there actually being ambiguity as to ISIL's status, and under the only definition that matters for this case, the one provided by U.S. law, there is no ambiguity. Under the laws of the United States ISIL is not recognized as a national entity.

Defendants' vagueness challenges are all unavailing and should be rejected by this Court.

**18 U.S.C. § 2339B IS NOT OVERBROAD.**

To prevail on their overbreadth claim, the defendants must show that 18 U.S.C. § 2339B prohibits a "substantial" volume of activity protected by the First Amendment. They have failed to do this.

Defendants quote *Holder v. Humanitarian Law Project*'s holding that § 2339B does not criminalize "independent advocacy" with such frequency that one turns to the definition of "terrorist activity" expecting to find a statutory ban on independent advocacy. One would search in vain. Defendants' overbreadth claim reduces to an assertion that the Immigration and Naturalization Act's definition of "terrorist activity" is overbroad because it prohibits, among other things, "solicit[ing any person] for membership in a [designated Foreign Terrorist Organization]" 8 U.S.C. § 1182(a)(3)(B)(iv)(V)(bb). Defendants inaccurately characterize this as the type of ban on "mere" membership that *Holder* prohibited, *Holder*, 518 U.S. at 18.

The distinction that the Supreme Court drew in *Holder* was between independent advocacy or passive membership on the one hand and active conduct on behalf of a terrorist organization on the other. The former is not material support; the latter is. If a person is soliciting new members on behalf of a terrorist organization, he is not a "mere"

59

member.  He is a recruiter, and his recruitment activity is material support of the terrorist organization.

This statute thus does not contradict *Holder*'s observation that "mere" membership is not criminalized.

Moreover, a litigant making a vagueness challenge must show that the statute in question prohibits a "substantial" amount of protected activity.  Defendants cannot point to any protected activity that is covered by the statute.  Indeed, defendants concede that the Supreme Court has held that the statute does not cover "mere" membership, and defendants here are not charged with "mere" membership.  Defendants do not explain what "mere" membership in ISIL is, and as a practical matter one cannot become a "mere" member of ISIL.  It would be impossible for this Court to find that the number of people wishing to become mere members of ISIL, but deterred from doing so by § 2339B is anything like "substantial."

Finally, although overbreadth claims are measured against the amount of constitutionally-protected speech that may be proscribed by a statute, and not, as in the case of vagueness, necessarily by examining the specific conduct of the defendants in the case at bar, it is worth noting that the prosecution now before this Court does not seek to criminalize the defendants' speech.  The defendants' free speech rights are not abridged when the things they say are used against them. *Wisconsin v. Mitchell*, 508 U.S. 476, 489 (1993) ("The First Amendment . . . does not prohibit the evidentiary use of speech to establish the elements of a crime or to prove motive or intent.  Evidence of a defendant's previous declarations or statements is commonly admitted in criminal trials subject to

evidentiary rules dealing with relevancy, reliability, and the like."). This rule is not altered in federal terrorism prosecutions. *United States v. Abdel Rahman*, 189 F. 3d 88, 118 (2d Cir. 1999)(in terrorism prosecution "while the First Amendment fully protects Abdel Rahman's right to express hostility against the United States, and he may not be prosecuted for so speaking, it does not prevent the use of such speeches or writings in evidence when relevant to prove a pertinent fact in a criminal prosecution.").

* * *

These defendants are being prosecuted for conspiring and attempting to provide material support and resources, in the form of themselves, to ISIL. Because their own conduct is "clearly proscribed" they may not complain that the statute under which they are being prosecuted, 18 U.S.C. § 2339B may be vague in some other situations. Nor does § 2339B chill expressive activity, which is fatal to defendants' claim of unconstitutional overbreadth. Defendants' vagueness and overbreadth claims should be denied by this Court.

### 20 USC 1097 IS NOT VAGUE AS APPLIED TO THE CONDUCT OF AHMED AND MUSSE (Dkts. 164 and 197)

Defendants Ahmed and Musse argue that Title 20 U.S.C. Section 1097 is unconstitutionally vague as applied. This motion should be denied because the plain language of the statute provides adequate notice of what conduct is proscribed and the *mens rea* requirement makes it sufficiently narrow to avoid arbitrary enforcement.

Title 20 U.S.C. Section 1097 provides that "[a]ny person who knowingly and willfully embezzles, misapplies, steals, obtains by fraud, false statement, or forgery, or

61

fails to refund any funds, assets, or property provided or insured under this subchapter and part C of subchapter I of chapter 34 of title 42" shall be punished. Because Title 20 U.S.C. Section 1097 does not implicate First Amendment freedoms, this challenge must be analyzed as-applied, in light of the facts before the court. *United States v. Mazurie*, 419 U.S. 544, 550 (1975). A court evaluating an as-applied challenge considers whether the statute in question was unconstitutionally vague as to the particular conduct of the defendants in the case at hand. *Id*. Finally, the vagueness inquiry "looks at what a person of 'common intelligence' would 'reasonably' understand the statute to proscribe, not what the particular defendant understood the statute to mean. *United States v. Warsham*, 312 F.3d 926 (8th Cir. 2002)(*citations omitted*).

In Counts 7 and 8, the government alleges that both Ahmed and Musse violated federal law by using specified amounts of financial aid to purchase plane tickets to Istanbul and Athens respectively. The evidence will show that when the defendants applied for financial aid, they acknowledged in writing that the funds provided would be used *only* to pay the cost of attending an institution of higher education. The jury will also hear evidence that in the days and weeks immediately prior to their November 2014 attempt to join ISIL, both Ahmed and Musse withdrew large sums of cash from their financial aid accounts ($2700 and $2400 respectively) which they in turn deposited in their newly-opened personal checking accounts. Both defendants then used these federal funds to purchase their plane tickets on the same date of their intended departure, November 8, 2014.

Defendants argue that the term "misapply" in the context of this charge is "meaningless and vapid". *See* Docket 165, p. 3. One need only look at the defendants' own citation to the dictionary to conclude that the term "misapply" in this context is sufficiently clear: the American Heritage Dictionary defines the term as "to use or apply wrongly." Ultimately, a person of common intelligence who promises to use free financial aid to pay the costs of higher education can reasonably know that it is wrong to use that money to fly to Europe as part of a scheme to join a terrorist organization. Not only would a reasonable person conclude that using federal financial aid to buy a plane ticket for travel to Europe is a misapplication of federal financial aid, but in addition, these defendants did so to join a terrorist organization.

<u>Arbitrary Enforcement</u>

Using Title 20 U.S.C. Section 1097 to prosecute individuals who use federal financial aid to fund overseas travel to join a terrorist organization falls within the well-established discretion afforded to prosecutors and law enforcement. The statute itself provides the minimal requirements to guide police and prosecutors in the execution of their constitutional duties and any concern that the financial aid fraud statute would be used arbitrarily is purely speculative. It is surely within the ambit of a prosecutor to pursue charges against anyone who uses free financial aid to facilitate their terrorism-related activities.

Defendants' vagueness challenges are all unavailing and should be rejected by this Court.

<u>Selective Prosecution</u>

Defendants Ahmed and Musse each make an allegation of selective prosecution with respect to the financial aid fraud allegations contained in Counts 7 and 8. A selective prosecution claim requires a defendant to establish that: (1) similarly situated individuals of a different race were not prosecuted; and (2) the decision to prosecute was motivated by a discriminatory purpose. *United States v. Armstrong*, 517 U.S. 456, 465 (1996). The "defendant's evidentiary burden is a heavy one and [courts] are mindful of the broad discretion given to prosecutors in carrying out their duty to enforce criminal statutes." *United States v. Leathers,* 354 F.3d 955, 961 (8th Cir. 2004). In *Armstrong*, the Supreme Court of the United States explained why a movant claiming selective prosecution bears such a heavy evidentiary burden:

> A selective-prosecution claim asks a court to exercise judicial power over a "special province" of the Executive. The Attorney General and United States Attorneys retain "broad discretion" to enforce the Nation's criminal laws. They have wide latitude because they are so designated by statute as the President's delegates to help him discharge his constitutional responsibility to "take Care that the Laws be faithfully executed." U.S. Const., Art. II, § 3; see 28 U.S.C. §§ 516, 547. As a result, the presumption of regularity supports their prosecutorial decisions and, in the absence of clear evidence to the contrary, courts presume that they have properly discharged their official duties.

*Armstrong*, 517 U.S. at 464 (quotations and citations omitted).

In support of this heavy burden, Defendants Ahmed and Musse have offered no credible evidence that race played a role in the government's charging decision. Defendants have cited to no instances where other non-Somali individuals who, like

them, used federal student loan money to facilitate travel to join a terrorist organization were not prosecuted. Second, Defendants Ahmed and Musse have not shown that the decision to prosecute an individual who used federal student loan money to purchase plane tickets to facilitate joining a terrorist organization was motivated by a discriminatory purpose. Improper motive exists only when the prosecution is "deliberately based upon an unjustifiable standard such as race, religion, or other arbitrary classification." *Wayte v. United States*, 470 U.S. 598, 608 (1985). Absent credible evidence on these essential elements, the defendants' claims fail and their motion should be denied.

In support of the claim that the statute is subject to arbitrary enforcement, Defendants argue that the use of financial aid to facilitate travel to join a terrorist organization is akin to buying a ticket to Daytona Beach for spring break, and because students who fly to Florida using student loan money are (allegedly) not prosecuted, neither should those who use federal financial aid to travel overseas to join a terrorist organization. Assuming *arguendo* that spring break travelers are not routinely prosecuted, the decision to pursue charges against Ahmed and Musse for using financial aid to facilitate a federal crime of terrorism would fall squarely within the recognized discretion afforded to prosecutors to discharge their constitutional responsibilities.

Further, Ahmed and Musse incorrectly opine that Title 20 U.S.C. Section 1097 is "meant to be brought against school administrators or financial aid workers…". *See* Docket 165, ps. 8-9. A cursory read of Title 20 U.S.C. Section 1097 confirms the contrary in that the statute applies to **"[a]ny person** who knowingly and willfully

embezzles, misapplies…or failed to refund" federal financial aid (emphasis added). "Any person" means just that - any person, whether that person is a school administrator, financial aid worker or student. Because the statute has been used to prosecute school administrators or financial aid workers who abuse their access to financial aid does not mean it is inapplicable to defendants such as Ahmed and Musse.

The defendants' motion should be denied.

20.    **Motion to Suppress Installation and Monitoring of Tracking Device** (Dkt. 205)

Defendant Daud moves for suppression of evidence seized as a result of search warrants. As to Daud's motion to suppress evidence seized as a result of a tracker on his vehicle, this motion should be denied as moot. The government does not intend to offer any evidence at trial that was obtained from this vehicle tracker. The remaining warrants (search of an iPod Touch, search of a cell phone with assigned number 612-978-6766, and search of a T-Mobile SIM card) will be presented to the Court for a "four corners" analysis.

21.    **Motion to Dismiss Indictment – Free Exercise of Religion** (Dkt. 207)

Defendants assert that they are under a religious obligation to travel to "the Caliphate," and that preventing them from doing so is a violation of their religious rights. However, because 18 U.S.C. § 2339B is religiously neutral any incidental effect it has on the free exercise of religion need not be justified by a compelling governmental interest. If this Court should disagree with the government about that proposition, and conclude that a compelling governmental interest is required, the government's interest in

66

preventing material support being provided to designated foreign terrorist organizations is such an interest.  Neither 18 U.S.C. § 2339B nor its use in this case offend the Free Exercise Clause.

The First Amendment provides that "Congress shall make no law respecting an establishment of religion, or *prohibiting the free exercise thereof . . . .*" (emphasis added). The Supreme Court has held that "a law that is neutral and of general applicability need not be justified by a compelling governmental interest even if the law has the incidental effect of burdening a particular religious practice." *Church of The Lukumi Babalu Aye v. City of Hialeah*, 508 U.S. 520, 531 (1993)(*citing Employment Div., Dept. of Human Resources of Oregon v. Smith*, 494 U.S. 872 (1990)).

18 U.S.C. § 2339B is religiously neutral.  Nothing in the text of the statute singles out any religion at all.  Neither religion in general, nor any religious faith in particular, are so much as mentioned in the law's text.  All persons, of whatever faith, are barred by the law from giving material support and resources to any designated foreign terrorist organizations.  The State Department's list of designated foreign terrorist organizations (available at http://www.state.gov/j/ct/rls/other/des/123085.htm, last accessed on August 20, 2015) does not categorize terrorist organizations by the religious beliefs (if any) those groups may seek to advance or by the faith of their members.  A review of the State Department's list shows that the organizations on it are diverse, based in countries all over the world, and eclectic in the ideologies these groups seek to advance by terrorism.

Given that 18 U.S.C. § 2339B is religiously neutral, any incidental burden it places on the practice of religion need not, consistent with the holding of *Church of the*

*Lukumi Babalu*, above, be justified by any compelling governmental interest. If, however, one is needed, it must be borne in mind that in the hierarchy of governmental interests "[i]t is 'obvious and unarguable' that no governmental interest is more compelling than the security of the Nation." *Haig v. Agee*, 453 U.S. 280, 307 (1981)(*quoting Aptheker v. Sec'y of State*, 378 U.S. 500, 509 (1964)).

18 U.S.C. § 2339B does not unconstitutionally infringe on the free exercise of anyone's religion. The defense motion should be denied.

22.    **Joint Motion to Dismiss Counts 1-4 on Void for Vagueness Grounds** (Dkt. 210)

This motion of defendants is almost completely duplicative of their "Joint Motion to Dismiss the Material Support Counts in the Indictment on the Grounds of Unconstitutional Over Breadth and Vagueness" (Docket No. 201) (hereinafter the "Joint Motion"), and the Court is respectfully directed to the government's response to the Joint Motion for the government's response to this motion.

There are some minor differences between the Joint Motion and this motion, which the government addresses here. First, this motion states at page six that *Holder v. Humanitarian Law Project* concerned a facial vagueness challenge, but on page 13 that the vagueness challenge in *Holder* was as-applied. The vagueness challenge in *Holder* was as-applied, *see Holder*, 561 U.S. at 18-19 (*quoting Village of Hoffman Estates v. Flipside, Hoffman Estates, Inc.*, 455 U.S. 489, 494-495 (1982)); "We consider whether a statute is vague as applied to the particular facts at issue, for '[a] plaintiff who engages in

68

some conduct that is clearly proscribed cannot complain of the vagueness of the law as applied to the conduct of others.'"

Defendants' effort to use *Elonis v. United States*, 135 S.Ct. 2001 (June 1, 2015) and *Holder v. Humanitarian Law Project*, 561 U.S. 1 (2010) as authority for the proposition that the government may not use a criminal defendant's speech as evidence in that defendant's prosecution ignores the fact that in both *Elonis* and *Holder*, the speech was the crime: *Elonis* was a prosecution for transmitting threats in interstate communication, in violation of 18 U.S.C. § 875(c), while the Supreme Court observed in *Holder* that ". . . § 2339B regulates speech on the basis of its content.  Plaintiffs want to speak to the PKK and the LTTE, and whether they may do so under § 2339B depends on what they say.  If plaintiffs' speech to those groups imparts a "specific skill" or communicates advice derived from "specialized knowledge . . . then it is barred." *Holder*, 561 U.S. at 27 (the case at bar does not, however, involve "material support" in the form of speech, as did *Holder*).

As noted above in the government's response to the joint motion, whatever First Amendment issues may be presented by a prosecution in which the defendant's speech is the alleged crime, those concerns are not present when the defendant's speech is used only as evidence.  The defendants' free speech rights are not abridged when the things they say are used against them.  *Wisconsin v. Mitchell*, 508 U.S. 476, 489 (1993); *United States v. Abdel Rahman*, 189 F. 3d 88, 118 (2d Cir. 1999).

Finally, the defendants' assertion on page 16 of this motion that the defendants had not yet come under ISIL's direction or control and were therefore not "terror

'personnel'" ignores the plain language of 18 U.S.C. § 2339B(a)(1), which states that "[w]hoever knowingly provides material support or resources to a foreign terrorist organization, *or attempts or conspires to do so,* . . ." is guilty of an offense against the United States (emphasis added).  The defendants, according to the allegations of the Superseding Indictment, both conspired and attempted to provide personnel to ISIL.  The fact that the defendants did not reach Syria means only that they attempted and conspired to commit a crime, and had not yet completed that crime.  It does not mean that no crime was committed.

This motion, like the Joint Motion, should be denied by the Court.

### 23.    **Renewed Motion for Reconsideration of Detention for Reasons of Delay** (Dkt. 211)

Defendant Adnan Farah has filed a new motion for release, relying primarily on the length of time this case may take to come to a resolution.  This motion should be denied.  Pretrial Services has recommended detention, and this defendant is charged with a crime which carries a presumption of detention.   There has been no change in circumstances mitigating the seriousness of the criminal conduct engaged in by the defendants, nor have the attendant risks of placing these men in the community been diminished.   This Court has several times informed defendants that it is open to consideration of a thoughtful release plan and that it is essential that any such release plan include community involvement as one of its components. The government has promised several times in open court to carefully consider any such release plan with an open mind.

It is no help to that process to speculate about how long this litigation will last. A release plan should be presented to the Court if defendant Adnan Farah hopes to be released.

24.    **Motion for Use of a Written Jury Questionnaire** (Dkt. 182)

Defendants request a jury questionnaire be used by the trial court. The government requests this motion be denied at this stage, with the opportunity to renew the motion prior to trial. First, while the government concedes that there has been pretrial publicity, the defendant has not made a showing that there has been prejudicial pretrial publicity. In fairness, such showing could be made at any time up until trial because publicity could potentially be ongoing. This increases the chances that some of it be unfairly prejudicial. Second, the manner of jury selection should be left to the sound discretion of the District Court, which may choose to employ the use of a questionnaire or some other method to determine the existence and scope of prejudicial pretrial publicity. Accordingly, this motion should be denied.

Dated: August 21, 2015

Respectfully Submitted,

ANDREW M. LUGER
United States Attorney

  *s/ Andrew R. Winter*
BY:  ANDREW R. WINTER
Assistant U.S. Attorney
Attorney ID No. 0232531

  *s/ John Docherty*
BY:    JOHN DOCHERTY
Assistant U.S. Attorney
Attorney I.D. 017516X