UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA
15-49 (MDJ/FLN)

United States of America,

    Plaintiff,

v.

Guled Ali Omar,

    Defendant.

**DEFENDANT GULED ALI OMAR'S INDIVIDUAL POSITION REGARDING SENTENCING**

## INTRODUCTION

Defendant, Guled Ali Omar, was among several defendants indicted in an eight-count superseding indictment filed in United States District Court on May 18, 2015. The initial charges against Omar included Conspiracy to provide material support to a designated foreign terrorist organization in violation of 18 U.S.C. §2339B(a)(1) and attempting to provide material support to a designated foreign terrorist organization in contravention of 18 U.S.C. §2339B(a)(1). Subsequently, on October 21, 2015, a fourteen-count second superseding indictment was filed in United States District Court. This expanded the charges against the Defendant. The second superseding indictment now charged Omar with conspiracy to murder outside the United States under 18 U.S.C. §956, conspiracy to provide material support to a designated foreign terrorist organization, two counts of attempting to provide material support to a designated foreign terrorist organization and attempted financial aid fraud under 20 U.S.C. §1097(a).

Efforts by Omar, and his attorney, to strike a plea negotiation with the U.S. Government similar to those of his co-defendants were unfruitful.[1] Omar was tried, along with his co-

---

[1] See pp. 17-18 of this Memorandum.

1

defendants Abdirahman Yasin Daud and Mohamed Abdihamid Farah beginning on May 7, 2016. He was found guilty on each of the charges leveled in the second superseding indictment on June 3, 2016. Following the Defendant's conviction, the District Court ordered a Presentence Report (PSR). The initial draft of this Report was submitted to the Government and Defense Counsel on August 31, 2016.

Both the Government and Defense filed objections to the PSR which are addressed in an Addendum accompanying the final draft of the Report which was dated October 20, 2016. In particular, the Defendant objected to: (1) a twelve-level guideline enhancement under USSG §3A1.4 (2) a two-level guideline adjustment for obstruction of justice under USSG §3C1.1 and also reserved the right "to present at his sentencing arguments relating to sentencing factors set forth in 18 U.S.C. §3553(a) and the substantive reasonableness of the sentencing guidelines as applied to this Defendant." Omar persists in these objections which will be addressed in the course of this Memorandum. This Memorandum will also discuss 18 U.S.C. §3553(a) sentencing factors and the propriety of a downward departure and/or variance for this Defendant.[2]

## FRAMEWORK

From the enactment of the Statutory Reform Act of 1984 until 2005, the sentencing guidelines promulgated by the sentencing commission were largely mandatory to be applied in virtually every Federal sentencing. Then, in *United States v. Booker, 543 U.S. 220* (2005) the Supreme Court held the mandatory nature of the guidelines violated the Sixth Amendment and struck down the statutory provisions making application of the guidelines mandatory. Now, in addition to the guidelines, a Judge must consider the relevant factors outlined in 18 U.S.C.

---

[2] Omar anticipates that a joint defense sentencing Memorandum may be filed with the Court. Portions of that argument are also incorporated in this Memorandum.

§3553(a) and has virtually unlimited discretion in the application of those factors. *Gall v. United States 552 U.S. 38* (2007).

A judge may also consider whether the applicable guidelines, fail to properly reflect §3553(a), rely on unsound judgment, fail to give adequate consideration to the defendant's characteristics or if alternative sentences are otherwise appropriate regardless of the guideline range. Rita v. United States 551 U.S. 338 (2007). Judges may ever vary from the guidelines based solely on policy considerations including disagreements with the underlying principles of the guidelines. *Kimbrough v. United States 552 U.S. 85* (2007). The guidelines are now "only one of the factors to consider when imposing sentence." *Gall v. United States 552 U.S. 59.* Nonetheless, all sentencing proceedings must begin with a correct calculation of the applicable guidelines range which becomes the "initial bench mark" for every defendants' sentence. I*d. 39.* Within this circuit, this becomes the first step in a three-stage process. After determining the correct guideline range, the sentencing judge must then consider whether a departure is warranted under the guidelines and then weigh the factors enumerated in 18 U.S.C. §3553(a) to determine the proper sentence based on the facts of each case. *United States v. John H. Sitting Bear 436 F 3rd 929, 934* (8th Cir. 2006). Accordingly, Omar will first begin by considering the disputed guideline issues.

## ARGUMENT

### I. THE PSR FAILED TO PROPERLY CALCULATE THE GUIDELINE RANGE.

At the outset, Omar disputes two sentencing enhancements recommended in the PSR: a 12-level enhancement under USSG §3A1.4 (PSR, ¶ 165) and a two level adjustment for obstruction of justice under USSG §3C1.1 ( PSR, ¶ 173).

**A. Because there is no evidence Defendant's actions were intended to influence the activities of a nation-state, the 12-level enhancement under USSG §3A1.4(a) is unwarranted.**

In ¶165, the PSR recommended a 12-level enhancement based on USSG §3A1.4(a). The rationale set forth in the PSR is as follows:

> The Defendant's conviction for Conspiracy to Murder Outside the United States is a felony that involved his convictions for providing material support to a designated foreign terrorist organization, and the evidence in this case suggests it was calculated to influence or affect the conduct of a government by intimidation of coercion.

To determine whether this conclusion is justified, the Court must begin by examining the applicable guideline. USSG §3A1.4(a) states "if the offense is a felony that involved or was intended to promote a federal crime of terrorism increased by 12 levels…" The PSR, admittedly, correctly observed that Defendant's conviction under 18 U.S.C. §2339(B) was for attempting to offer material support to a foreign terrorist organization. However, this does not end the relevant inquiry.

Application note 1 states the phrase "federal crime of terrorism" under §3A1.4(a) "has the meaning given that term in 18 U.S.C. §2332(b)(g)(5). In turn, 18 U.S.C. §2332(b)(g)(5) states:

> The term "federal crime of terrorism" means an offense that-
> (A) is calculated to influence or affect the conduct of government by intimidation or coercion or to retaliate against government conduct…

Here, there was no evidence presented at trial that Omar, or any of his co-defendants, hoped to influence the actions of any nation-state. There was certainly no evidence suggesting that the Defendants, by their actions, hoped to influence the policy of the U.S. Government nor was there any indication that the Defendants believed their actions would influence the conduct of the governments of Syria or Iraq.

4

Instead, Defendants principal motivations, viewed most favorably to the Government, were to join in a religious struggle against an Islamic sect or, more generously, to safeguard and protect Sunni Muslims in the Middle East. While there may be combined political and religious incentives for these actions, this is not the same as behavior intended to affect the conduct or policy of a state actor. The Government simply presented no evidence suggesting that any of the Defendants felt they could influence the foreign or domestic policy of any nation-state by joining ISIS.

The 8th Circuit considered the parameters of USSG §3A1.4 in *United States v. Ali, 799 F 3rd 1008* (8th Cir. 2015), rehearing and rehearing en banc denied.[3] There, the 8th Circuit determined that an enhancement under §3A1.4 may be imposed for a defendant who has been convicted of providing material support to a designated terrorist organization *799 F 3rd 1030*. However, the Appellate Court cautioned that the sentencing judge must conclude, from the evidence presented at trial that the offense must have been "calculated, i.e. planned- for whatever reason or motive- to achieve the stated object." *Id. 1031* citing *United States v. Mohamed 757 F 3rd, 757, 760* (8th Cir. 2014). In *Ali*, and in this case, this burden required burden sufficient evidence to conclude the "offenses were calculated to influence or affect the conduct of government by intimidation or coercion or to retaliate against government conduct." *Id. 1031*. The 8th Circuit concluded the sentencing Court in *Ali* had sufficient evidence largely because the defendants fundraising efforts were intended to enhance the political objectives of Al-Shabaab which were in direct conflict with a nation-state. *Id. 1032*. That evidence is lacking here. Although Omar may have made general expressions of sympathy for the plight of those being killed in combat in Syria, this does not correspond to the type of concrete effort to undermine a state actor seen in *Ali*.

---

[3] Defense Counsel concedes the sentencing Judge's familiarity with this case.

Whether USSG §3A1.4 applies in this instance will have far reaching ranging and dramatic effects on Omar's guideline sentence. The adoption of §3A1.4(a) in the PSR added twelve-levels to the Defendant's guideline sentence. Moreover, a companion feature of §3A1.4(b) converted the Defendant from a category I to a category VI offender. If both adjustments were removed from the calculus, Defendant's presumptive sentence would be changed from "life" to either 135 to 168 months (without the enhancement for obstruction of justice) or 168 to 210 months (with the enhancement for the obstruction of justice).[4]

**B. The Defendant should not receive a two-level guideline adjustment for obstruction of justice.**

Omar also challenges the PSRs recommendation that he receives a two-level adjustment for obstruction of justice. The basis for this recommendation is found in ¶173 of the PSR. USSG §3C1.1 provides:

> If (1) the defendant willfully obstructed or impeded or attempted to obstruct or impede the administration of justice with respect to the investigation, prosecution or sentencing of the instant offense of conviction and (2) the obstructive conduct related to (A) the defendants' offense of conviction and any relevant conduct… increase the offense level by two levels.

The PSR assumes that because Defendant testified at trial and was convicted the jury wholly disbelieved his trial testimony. This is likely a reasonable assumption.[5] However, this does not mean a two-level enhancement for obstruction of justice is appropriate.

Application note 2 qualifies §3C1.1 by declaring:

---

[4] If the Court concludes that the §3A1.4 adjustments are appropriate, then USSG §4A1.3(b)(1) might independently warrant a downward departure. However, because USSG §4A1.3(b)(2)(A) states "a departure below the lower limit of the applicable guideline range for criminal history I is prohibited." It is questionable whether this would have any effect on the Defendant's guideline sentence since any sentence with an offense letter higher than 43- regardless of the criminal history category- creates a guideline sentence of life.

[5] Potentially the jury might have believed Omar never planned to travel abroad or join ISIS but that his encouragement of others was a sufficient link to the conspiracy to justify Omar's conviction. The PSR obviously does not envision this possibility and, at this point, trying to discern the jury's reasoning is conjecture.

> This provision is not intended to punish a defendant for the exercise of a constitutional right. A defendant's denial of guilt (other than a denial of guilt under oath that constitutes perjury), refusal to admit guilt… is not a basis for application of this provision. In applying this provision with respect to the alleged false testimony or statements by the defendant, the Court should be cognizant that inaccurate testimony or statements may sometimes result from confusion, mistake or faulty memory and thus, not all inaccurate testimony or statements necessarily reflect a willful attempt to obstruct justice.

Here, the most damning testimony against this Defendant were Omar's surreptitiously recorded statements by the Government's paid Informant. The Defendant conceded he made those statements but testified they were insincere braggadocio. This was not an entirely outlandish proposition. At least one Government witness, Abdirizak Mohamed Warsame, testified that he falsely bragged about being able to assemble a rocket launcher capable of downing an aircraft when, in reality, his only similar experience was in launching small model rockets.

This type of discredited testimony simply does not establish the necessary predicate for the application of this enhancement. When a defendant objects to an enhancement under §3C1.1, the trial Court "must review the evidence and make independent findings necessary to establish that the defendant committed perjury." *United States v. Dunnigan, 507 U.S. 87, 88* (1993). This means "a Court should address each element of the alleged perjury in a clear and distinct finding." *Id. at 88*. In *Dunnigan,* the Supreme Court noted that perjury requires "willful intent to provide false testimony" and noted that a "defendant's testimony at trial can be wholly disbelieved…" without being perjured. *Id. 87*. One specific illustration offered by the Supreme Court was when a defendant's testimony focused on his or her "lack of intent" *Id. 87*. That is precisely the situation here. The bulk of the Defendant's testimony focused on his sincerity during the informant's recording and on Omar's underlying intent during the specific events identified by Government at trial- for example, Omar's aborted trips in May and November 2014.

7

## II. APPLICATION OF THE STATUTORY FACTORS CONTAINED IN 18 U.S.C. 3553(a) SUGGESTS AN APPROPRIATE SENTENCE SHOULD NOT EXCEED 15 YEARS.

Regardless of the appropriate guideline sentence, the Court must ultimately consider what sentence is appropriate for each individual Defendant in light of the statutory sentencing factors set forth in 18 U.S.C. §3553(a) which provide the overarching framework for a sentencing judge. *Nelson v. United States 555 U.S. 350, 351* (2009). 18 U.S.C. §3553(a) directs:

> The Court shall impose a sentence sufficient, but not greater than necessary, to comply with the purposes set forth in paragraph (2) of this subsection. The Court, in determining the particular sentence to be imposed, shall consider-
> (1) the nature and circumstances of the offense and the history and characteristics of the defendants:
>
> (2) the need for the sentence imposed-
>
> > (A) to reflect the seriousness of the offense, to promote respect for the law and to provide just punishment for the offense;
> >
> > (B) to afford adequate deterrence for criminal conduct;
> >
> > (C) to protect the public from further crimes of the defendant and;
> >
> > (D) to provide the defendant with needed education or vocational training… or other correctional treatment in the most effective manner;

18 U.S.C. §3553(a)(6) also cautions the sentencing court

> …to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct.

A consideration of each of these statutory factors suggest that Omar should not receive a sentence exceeding 15 years and that a shorter sentence may also be appropriate.

Broadly speaking, 18 U.S.C. §3553(a) requires the Court to consider factors: (1) relating to the offense, see 18 U.S.C. §3553(a)(1)(2)(A), (2) the need to safeguard society, see 18 U.S.C. §3553(a)(2)(B)(C), (3) the defendant's unique circumstances and needs, see 18 U.S.C. §3553(a)(B)(C)(D) and (4) to ensure the sentence imposed is fair, just and does not treat any

8

defendant with unreasonable favor or harshness, see 18 U.S.C. §3553(a)(6). This section of Omar's Memorandum will address each of these considerations.

**A. A sentence of 15 years or less recognizes the severity and seriousness of the offense, promotes respect for the law, provides just punishment and adequate deterrence.**

On one level, Omar and his co-Defendants seem to be the functional equivalent of the Three-Stooges of international terrorism. Their efforts to abandon the United States were naïve, ill-considered and bumbling. Their recorded statements are rich with angst and self-importance. Yet, at the same time, the Defendants seem to have been inspired and radicalized by others, not much different than themselves, who managed to travel to Syria, join ISIS and either fall victim of violence or inflict violence to promote the aims of that organization. Omar recognizes that his ineptitude is scarcely a mitigating factor. Plotting to commit a murder outside the United States or seeking to render material support to a foreign terrorist organization are serious and troubling offenses which have far reaching implications. This is particularly true when the intended beneficiary of the crimes is ISIS- a terrorist organization known for its brutish and barbaric behavior and its callous disregard for all human life.[6]

This acknowledgement does not mean that the draconian sentence recommended by the guidelines is appropriate for this particular Defendant even in light of the grave nature of his conviction. Omar was 19 or 20 at the time these events occurred. A sentence of 10 years represents approximately 50% of his life at the time of these events. A sentence of 15 years would amount to 75% of the Defendant's life.[7] At this juncture, the average federal defendant is sentenced to between 40 to 45 months in custody. *United States Sentencing Commission:*

---

[6] Although the Defendant was tried, presented a vigorous defense and solicited a not guilty verdict from the jury, he respects their decision, and for purposes of sentencing concedes the validity of the verdict and that these convictions form the basis for the sentence to be imposed in this case.

[7] This is the functional equivalent of a 43.5 year sentence for the author of this Memorandum.

*Quarterly Data Report, USSC, 3rd Quarter Release through June 30, 2016, p. 28*.[8] Consequently, a 15-year sentence would be approximately 400% longer than a typical commitment to the Bureau of Prisons and clearly reflect the seriousness of these offenses.

Moreover, a punishment in this range also seems to generally reflect the sentences imposed by other Courts for defendants convicted of similar crimes. Frankly, sentences for terror related convictions seem to be somewhat randomized.[9] Recent sentences seem to range from a low of 48 months, *United States v. Conley* to a high of 360 months, *United States v. Elhuzayel, United States v. Edmonds.*[10] It is difficult to find a fact pattern which suggests an "average" sentence for offenses such as the one involved here or to reach any conclusions regarding a quantifiable measure of "seriousness" associated with these offenses. For example, in *Conley*, the defendant received only a 48 month sentence; yet, there are certain circumstances involved in Conley's behavior which seem more egregious than Omar. For example, Conley actually obtained firearm training in anticipation of traveling to Syria. *Final Report*, p. 6. By the same token, other defendants whose behavior seemed to more closely parallel Omar have received longer sentences than Conley- but still shorter than 15 years. For example, in *United States v. Wolfe,* the defendant was stopped attempting to board a plane from Houston to Toronto as the

---

[8] Available at http://www.ussc.gov/sites/default/files/pdf/research-and-publications/federal-sentencing-statistics/quarterly-sentencing-updates/USSC_Quarter_Report_3rd_16_Final.pdf.pdf.

[9] Defendants discussion of comparative sentences is based largely on the data underlying the "Final Report to the Court by United States concerning Sentencing Nationwide following Conviction for Providing Material Support to Terrorist Organizations." Docket No. 698, hereafter "Final Report"

[10] One case, *United States v. Pham* resulted in an even lengthier sentence (480 months). However, that case not only appears to be an outlier but also has a set of unique facts which suggest that it is not necessarily comparable to the case of an attempted traveler. The defendant in Pham actually left his home in London and successfully traveled to Yemen. There he received militaryl training and committed crimes of violence involving the use of a machine gun. He planned a terrorist attack in the United Kingdom (although it is unclear whether the plan was implemented) Pham and was ultimately arrested in the United Kingdom in 2012 and later extradited to the United States. Certainly, Pham's involvement in actual acts of violence makes it a significantly different offense. *See Final Report, 10.*

first leg of a planned trip to the Middle East where he hoped to lend support to ISIS. Wolfe received an 82-month prison sentence, *Final Report,* p.8.

From the data provided by Government, it appears that sentences exceeding 15 years have only been meted out to defendants with particularly unique conduct or extraordinarily vile objectives. For example, in *United States v. Bell*, the defendant succeeded in leaving the United States only to be denied entry to Poland and Jordan. *Final Report*, p. 6. In *United States v. Kibir* and *United States v. Deleon*, the defendants received 25 year sentences where the object of their crime was to travel to Afghanistan and kill U.S. troops in that country, *Final Report*, p. 7. In *United States v. Elfgeeh*, the defendant received a 270-month sentence after he was able to communicate with ISIL leaders which the enabled ISIS to relieve an isolated unit in the Syrian city of Homs, *Final Report*, p. 10. The defendants in *United States v. Edmonds* received prison sentences of 30 and 21 years imprisonment but the object of their offense was an attack on an Illinois National Guard Base rather than travel abroad, *Final Report*, p. 13. In general, it appears that unsuccessful efforts to travel abroad, with hopes of supporting a terrorist organization, such as that seen here, are unlikely to result in sentences exceeding 15 years absent exceptional circumstances. This presumably reflects a general sense of the magnitude of this type of offense.

**B. A sentence of 15 years or less will afford appropriate safeguards to society.**

In addition, a sentence of 15 years or less will also meet the statutory requirements of 18 U.S.C. §3553(a)(2)(B)(C) by affording adequate deterrence to criminal conduct while, at the same time, protecting the public from potential further crimes of this defendant. A sentence in this range will certainly receive public notice and dissuade others who might be sympathetic to ISIS from emulating this behavior. Yet, this sentence will not be so harsh and punitive that it creates a backlash, inspiring others with similar backgrounds to perceive a truly oppressive

sentence as further evidence supporting the misguided belief that the United States is intrinsically hostile to persons of Muslim faith.

More importantly, a sentence of 15 years or less will be sufficient to deter the Defendant and, hopefully, enable prison officials to develop appropriate programming which will allow Omar to return from prison as a productive member of society. If the Defendant receives a 15 year sentence, he will be in his 30's before he is released from custody. Statistically, by this point, his prospects for recidivism will have significantly declined. For example, an offender released at age 36 is approximately 30% less likely to reoffend than an inmate released in his early 20's. *United States Sentencing Commission: Recidivism among Federal Offenders: A Comprehensive Review, March 2016, p. 23*.[11] A longer sentence can be justified in this instance only with the conviction that the defendant is irredeemable. For the reasons set forth in the following section of this Memorandum that conclusion is unjustified.

### C. A sentence of 15 years or less will take into account Omar's background and needs and be sufficient to provide the Defendant with appropriate education or other correctional treatment to assure his entry into society.

Despite the serious character of the offenses for which he was convicted, portions of the PSR present Omar in a sympathetic light. The PSR recognized that Omar's parents each suffered in their flight from Somalia (PSR, ¶193) and that his mother still suffers psychological trauma from the experience (PSR, ¶196). The physical injuries and emotional scars suffered by Omar's father caused him to become violent and abusive. When Omar was nine, he attempted to intercede to protect his mother; shortly afterward, Omar's father abandoned the family (PSR, ¶195). This did not ease the Defendant's life. Instead, he suffered physical and sexual abuse from a mentally ill relative (PSR, ¶198). The Probation Officer drafting the PSR confirmed, as a result

---

[11] Available at http://ussc.gov/sites/default/files/pdf/researchandpublications/research-publications/2016/recidivism_overview.pdf

of this abuse, "Defendant has numerous dark, permanent welts across his back" (PSR, ¶198).

Even with this deprivation, Omar remained close to his family, describing his mother as a "hero" to him (PSR, ¶196). Omar felt protective of his younger siblings (PSR, ¶198) and, in collateral interviews, his mother and siblings each praised him (PSR, ¶204, 208). According to Omar's siblings, the Defendant "put the needs of other family members before his own and never missed a special event. He was kind and always very helpful" (PSR, ¶208). Omar's siblings believe that his use of drugs made him pliable and, if sober, he would not have been inclined to commit this offense (PSR, ¶208). At his trial, the Defendant testified with apparent sincerity, about the trauma experienced by his family when Omar's older brother, Ahmad Omar, left the United States without explanation in November 2007. By February 2008, it was learned that Ahmad had returned to Somalia and Omar's family has little contact with him for nearly a decade (PSR, ¶201). Yet, with this knowledge, Omar stands convicted of precisely the same behavior as his brother.

This inevitably raises the question of what led Omar to this position and what sentence can be tailored to "provide the Defendant with needed education… or other correctional treatment" as mandated by 18 U.S.C. §3553(a)(D). Some clues for the first part of this inquiry can be found in the PSR. Omar reported that he had a hard time "fitting in" at the mosque and, beginning in high school, began smoking marijuana. Eventually his use increased to each weekend and approximately two days during the school week (PSR, ¶200). Yet, while Omar had difficulty making meaningful connection with his contemporaries, he also found it difficult to associate with non-Muslims outside of school (PSR, ¶220). This led Omar to see-saw between drug binges[12] and increasing association with persons having extremist views (PSR, ¶220).

---

[12] Omar apparently experimented with cocaine and regularly used Percocet and promethazine. He also used oxycodone and Xanax approximately four times each week prior to his arrest (PSR, ¶ 221).

13

According to Omar, his marijuana and drug use made him feel "unclean and weak." The Defendant viewed his behavior as sinful and wanted to do something to make himself "right with God." (PSR, ¶214). When he learned of the fighting in Syria, he sensed a calling to remedy the "oppression and injustice…and wanted Syrians to have basic rights." Omar "felt it was important to do what he could to help the situation in Syria." The Defendant felt his family's experience fleeing Somalia may have made him "especially sympathetic" to others experiencing similar strife (PSR, ¶211). During this time, he also began to be influenced by the teachings Anwar Al-Awlaki (PSR, ¶215).

Although the PSR does not explore the issue at length, the Defendant may have also been predisposed to radicalization due to his brother's departure and Omar's efforts to make sense and justify this behavior (PSR, ¶220). Omar also knew and maintained contact with Abdi Nur following Nur's departure for Syria. It appears the Defendant admired Nur and, in contrast with his own experiences "believed Nur's actions served a purpose…" while "the Defendant was searching for meaning in his own life." (PSR, ¶216).

To obtain insight how Omar could be influenced in this fashion requires some information about the circumstances which brought his family to the United States and the difficulty some Somalis have adjusting to Western society. In that context, Omar's actions become more understandable and less aberrant. Somalia acquired its independence in 1960 but, without a history of democracy or self-government enjoyed less than a decade of democratic rule. By 1969, the democratically elected president had been overthrown and had been replaced military junta headed by Major General Mohamed Syaad Barre. Barre employed repression in an effort to maintain power.[13] Barre was overthrown in 1990 and by early 1991, the infrastructure of

---

[13] James, George. "*Somalis Overthrown Dictator, Mohamed Syaad Barre is Dead*." New York Times, January 3, 1995.

the country itself had collapsed. Somalis with money or international connections emigrated overseas while a second wave of refugees consisting of "largely of Somalia's rural poor, who bore the brunt of the war-torn country's failing infrastructure" fled to refugee camps where they suffered abject hardship.[14] This was the journey undertaken by Omar's parents.

In the United States, this wave of Somali immigrants tended to congregate in distinct geographic areas and migrated "into the lowest strata in the racial and economic stratification in America. They became excluded from the core community and experienced "limited contact across groups [placing] them on the margins of mainstream America's understanding of social rights."[15] In this environment, even Somali youth who appeared, as Omar, to experience some measure of academic success, struggled to balance their Somali-American identity and felt "treated like outsiders at school and at work despite the fact they have lived most of their lives in the United States." These young men, like Omar often "develop a desire to do something meaningful with their lives."[16] Into this maelstrom ISIS emerged portraying itself as a vehicle through which young men, such as Omar, could find a sense of purpose and identity. ISIS' print and video messages depict its adherents as dedicated and fearsome warriors[17] while simultaneously highlighting the ravages of the Syrian War.[18]

---

[14] Boyle, Elizabeth and Ahmed, Ali. "*Culture, Structure and the Refugee Experience in Somalia Immigrant Family Transformation*", International Migration, 48.1 (2010); 47-79, p. 59.

[15] Abdi Cawo, *The Newest African-Americans?: Somali Struggles for Belonging*. Bildhaan: An International Journal of Somali Studies: Vol. 11, Article 12, 2012 (90-107) pp. 98, 103-104.

[16] Richardson, Matthew. *Al-Shabaab's American Recruits: A Comparative Analysis of Two Radicalization Pathways*. M.A. Thesis, University of Texas at El Paso, 2012 (p. 68).

[17] James P. Farwell, *The Media Strategy of ISIS*, Survival, Vol. 56, No. 6, December 2014, 2015, p. 50 (December 2014 – January 2015) ("*The Media Strategy of ISIS*").

[18] See, e.g. Katrin Bennhold, *Jihad and Girl Power: How ISIS Lured 3 London Girls*, New York Times, August 17, 2015, available at http://www.nytimes.com/2015/08/18/world/europe/jihad-and-girl-power-how-isis-lured-3-london-teenagers.html?_r=0.

The Government's depiction of ISIS video propaganda displayed during the course of Omar's trial was, of course, selective. The Government selected videos featuring armed combat and brutality, yet that does not wholly appear to be a balanced perspective of the ISIS propaganda effort. In reality, civilian life is juxtaposed with military themes on a two-to-one ratio in ISIS propaganda. This includes photo essays depicting agriculture, crafts and industry. When depicting ISIS' military activity, the propaganda employs a victimhood narrative "routinely parad[ing] dead or maimed children, women and old people before cameras as they sought to maximize the political value of the collateral damage caused by enemy airstrikes."[19]

In this manner, ISIS attempted to legitimize and "justify the innumerable crimes of its active members."[20] Moreover, ISIS did not honestly portray itself as a brutal terrorist organization but instead held itself out to be more akin to a nation-state holding and administering a recognized territory. In this way, ISIS propaganda effectively obscured more objective media portrayals.[21] In light of this experience, Omar's attraction to ISIS and its adherence is unsurprising.

Fortunately, the PSR also suggests that Omar recognizes both the wasted nature of his drug addled past and the moral bankruptcy of his flirtation with ISIS. A professor from Minneapolis Community and Technical College (MCTC) has reached out to Omar, providing

---

[19] Charlie Winter, *Documenting the Virtual Caliphate*, Quilliam 2015, available at http://www.quiilliamfoundation.org/wp/wp--content/uploads/2015/10/FINAL-documenting-the-virtual-caliphate.pdf.

[20] Id.

[21] It is easy to scornfully dismiss ISIS propaganda and disdainfully suggest that only a truly amoral person might be favorably influenced by the brutality seen in brief video clips shown at the trial. Before reaching that conclusion, it might be prudent to watch the current Tom Cruise vehicle, Jack Reacher. In the movie, a villain, who is ironically engaged in the drug trade with a terrorist organization, threatens harm to the teenage daughter of the character portrayed by Tom Cruise. Our military hero coldly responds that he plans to break the villain's arms and legs and then snap the villain's neck as he watches helplessly. In the climatic final fight scene, Cruise's character carries out this promise with the approbation of the audience.

16

him with reading material and has sought to broaden his views (PSR, ¶218). Omar stated that he does not bear a grudge against those who testified against him and views his prosecution as a "intervention" which was "important" in changing his path (PSR, ¶218). The PSR portrays Omar's attraction to radical beliefs as less a product of a twisted ideology than an outgrowth of isolation, deprivation and childhood exposure to violence. Fortunately, these experiences are not character flaws and do not suggest an inherent propensity towards violence. Instead, each of these factors can be systematically addressed during a reasonable period of confinement. Hopefully, this will result in the Defendant attaining his freedom while he is still young enough to become a productive member of society.

### D. A sentence of more than 15 years will create issues of disparity between Omar and his co-Defendants and others charged with similar offenses.

A final consideration under 18 U.S.C. §3553(a)(6) is the Court's need to avoid unwarranted sentencing disparities among similarly situated defendants. While the Government's *Final Report* suggests that a sentence of 15 years or less is a rough equivalent for similarly situated defendants across the nation, a sentence exceeding 15 years would, under the circumstances of this case, almost certainly create an unwarranted disparity between Omar and his co-Defendants. The PSR concluded that Omar was an "average participant in the offense" (PSR, ¶172) the Defendant does not dispute this characterization.

Omar's co-Defendants include numerous persons who were allowed to plead guilty to a Conspiracy to Provide Material Support to a Foreign Terrorist Organization as a result of plea negotiations with the Government. Omar was not afforded this opportunity. On at least two occasions, Omar sought plea agreements with the Government which would have been similar to those of his co-Defendants who avoided trial. In September 2015, Omar sought plea agreements similar to those negotiated by Musse and Abdirahman. The Government responded on

September 8, 2015, through an email authored by AUSA Winter that "…the Government does not have a plea offer to extend to Mr. Omar at this time." Later, in Spring 2016 Omar and his remaining co-Defendants jointly sought a plea negotiation with the Government asking only that the Government not require the Defendants to plead guilty to the offense contained in the second superseding indictment alleging a violation of 18 U.S.C. §956(a). The Government again rejected this initiative.

      The U.S. Attorney certainly had the freedom to do so and there is no suggestion that the Government's use of its discretion was inappropriate. However, the Government's actions *did* have a profound effect on the sentence to which Omar is now exposed. Rather than facing a statutory maximum of 15 years in prison, Omar faces the prospect of spending the balance of his life in custody. Yet, while facing a draconian and dramatically longer sentence than his co-Defendants, Omar's PSR labeled him merely an average participant in this conspiracy. In other words, Omar's involvement is no more worrisome than many of his fellow Defendants who, due to more favorable plea negotiations, face significantly shorter sentences. This creates the real prospect of a dramatic disparity between the punishment meted out to individuals engaging in similar behavior. This danger is exacerbated here because the Government's theory for the §656(a) convictions is that anyone trying to join ISIS is implicitly plotting to commit murder outside the United States due to the intrinsically violent nature of that organization. As a consequence, every Defendant convicted under §2339B could have been convicted under §956(a) but was spared that outcome due to the ability to negotiate a plea agreement with the Government.

      The Court should not turn a blind eye to the history which created this particular circumstance. A Defendant's future should not be so dramatically affected by the Government's

charging and plea negotiating decisions. This is particularly true when this creates the risk that individuals, acting in a similar manner, will face vastly different outcomes at sentencing. To avoid treating similarly situated defendants in an unreasonably disparate manner this Court should limit Omar's punishment no more than 15 years in prison. This will assure Omar does not receive a sanction which confines him for decades longer than his fellow Defendants, solely due to Omar's inability to negotiate a similar plea agreement with the Government.

## CONCLUSION

For the above stated reasons, the Defendant respectfully requests his sentence be 15 years or less.

Dated: November 3, 2016
Respectfully submitted,

MITCHELL, BRUDER & JOHNSON
*/s/ Glenn P. Bruder*
Attorney for Defendant
7505 Metro Boulevard
Suite 325
Edina, MN 55439
(952) 831-3174