UNITED STATES DISTRICT COURT
District of Minnesota
Criminal No. 15-49 (07) (MJD/FLN)

| | |
|---|---|
| UNITED STATES OF AMERICA, | |
| Plaintiff, | |
| v. | GOVERNMENT'S POSITION ON SENTENCING |
| GULED ALI OMAR (07), | |
| Defendant. | |

COMES NOW the United States of America, by and through its undersigned attorneys, Andrew M. Luger, United States Attorney for the District of Minnesota, and Andrew R. Winter, John Docherty, and Julie E. Allyn, Assistant United States Attorneys, and submits the following position on sentencing. After consideration of all the facts of this case, as well as the United States Sentencing Guidelines (hereinafter the "U.S.S.G."), and the factors set forth at Title 18, United States Code, Section 3553(a), the United States believes that a sentence of forty years' imprisonment is sufficient, but not greater than necessary, to achieve justice in the sentencing of this defendant.

## I.      INTRODUCTION

Following a three-defendant jury trial of over three weeks, defendant Guled Ali Omar was convicted of all five federal felonies with which he was charged in the Second Superseding Indictment (Docket No. 292):  Count One, Conspiracy to Murder Outside the United States, in violation of 18 U.S.C. § 956; Count Two, Conspiracy to Provide Material Support to a Designated Foreign Terrorist Organization (ISIL), in violation of 18 U.S.C. § 2339B; Count Three, Attempting to Provide Material Support to a Designated Foreign

Terrorist Organization (ISIL), in violation of 18 U.S.C. § 2339B; Count Four, Attempting to Provide Material Support to a Designated Foreign Terrorist Organization (ISIL), in violation of 18 U.S.C. § 2339B; and Count 13, Attempted Financial Aid Fraud, in violation of 18 U.S.C. § 1097(a).[1]

The evidence at trial showed a large, long-term conspiracy that contained within it three distinct efforts by the conspirators to reach Syria, where they would join, and fight and kill for, ISIL – one attempt in the Spring of 2014 which resulted in two travelers reaching Syria, while a third traveler was denied boarding at the airport by law enforcement; a second attempt, in the Fall of 2014, in which five travelers tried to reach Syria, but all were denied boarding at either Minneapolis – Saint Paul International Airport or John F. Kennedy International Airport in New York City; and a third and final attempt, in the Spring of 2015, in which two conspirators tried to reach Syria via Mexico after driving to San Diego, California, to buy fake passports, then planned to use those fake passports to cross into Mexico, from where they would make their way to Syria. This third attempt was unsuccessful, and was followed immediately by the arrest of six of this case's defendants.

---

[1] By the time of trial, several of the defendants named in the Second Superseding Indictment had entered negotiated pleas of guilty. In order to prevent jury confusion, a special form of indictment was prepared for the jury. In the indictment prepared for the jury, counts which named only those defendants who had pleaded guilty were removed. The counts of the indictment were then re-numbered, to avoid gaps in the numerical sequence of counts. Finally, the Second Superseding Indictment was renamed, simply "Indictment" for the jury's sake. The counts set forth in this Sentencing Position, and indeed, all references to a charging document, are to the Second Superseding Indictment, and not to the jury-only special form of indictment.

A detailed recitation of the facts of the case can be found in Common Appendix A, which is attached to this Sentencing Position, and in the Report of Presentence Investigation prepared by the United States Probation Office.  The evidence in this case shows, however, that Guled Ali Omar was singularly committed to joining, fighting, and killing for ISIL from the inception of the conspiracy in the spring of 2014 until it was brought to an end by law enforcement's intervention on April 19, 2015.

Several men from Minnesota have died in Syria as a result of the conspiracy of which defendant Guled Omar was a part.  Other men from Minnesota have reached Syria, and are active members of ISIL, a dangerous international terrorist organization which threatens the national security of the United States.  The defendant lied to his family, he lied to the jury, and, in the self-serving interview with the probation office in advance of sentencing, he has continued to lie about his conduct and his motivations.  The defendant has demonstrated a total lack of remorse and responsibility for his crimes. To protect the public from the danger which the defendant poses, to provide just punishment, and to deter others from joining foreign terrorist organizations, the 40-year sentence and a lifetime period of supervised release is appropriate.

## II.    THE FACTS OF THE CASE AGAINST DEFENDANT OMAR

The evidence in this case shows that Guled Ali Omar was singularly committed to joining, fighting, and killing for ISIL from the inception of the conspiracy in the spring of 2014 until it was brought to an end by law enforcement's intervention on April 19, 2015.[2]

---

[2] As discussed more fully below, the record also reveals Defendant Omar's previous attempt to join a different foreign terrorist organization, *al-Shabaab* in 2012.

3

## A. Defendant Omar's Role in the Spring 2014 Plot to Join ISIL

*"I was so emotionally touched at the fact that Hanad [Mohallim], {when he left} and he made it…I was touched, bro."* – *Defendant Guled Omar, CHS Recording on April 1, 2015*

When Hanad Mohallim ("Mohallim") left the United States to join ISIL in March of 2014, his departure inspired Defendant Omar and other members of the conspiracy to undertake travel to Syria to join, fight and kill for ISIL. More so than his co-conspirators, Omar was experienced in making attempts to join a terrorist organization, having tried to join *al-Shabaab* in 2012, and having assisted other men in traveling from Minnesota to Somalia to fight.[3]

Abdullahi Yusuf ("Yusuf") testified that when Mohallim "disappeared" to Syria, he approached several associates, including Omar, to get information. Omar refused to discuss Mohallim over the phone, but would later pick Yusuf up and, along with co-defendant Adnan Farah, they would discuss this new development. Over dinner at the Karmel 24 mall, Omar took the opportunity to share his past experience in trying to leave the U.S., specifically discussing his effort to travel in 2012 to join *al-Shabaab* and the lessons learned. *Yusuf 5/13/16, Tr. ps. 42-44.* Afterwards, the three men went to the Dar al Farooq Youth and Family Center ("DAF") in Bloomington to meet with co-conspirators Zacharia Abdurahman, Abdirizak Warsame, Mohamed Farah, Abdi Nur and Abdirahman Daud. The men played basketball together in the gymnasium, then returned to the mosque

---

[3] Pursuant to Rule 404(b), the government presented evidence during trial demonstrating that Omar's attempt to fly to Kenya in 2012, then travel into Somalia, was part of an attempt to provide material support to the *al-Qeada* affiliated terrorist organization known as *al-Shabaab*.

area of DAF later in the evening.  There, the group discussed the conflict in Syria and used Abdurahman's and Mohamed Farah's devices to watch the "anti-West" ISIL propaganda channel on YouTube called *Enter the Truth*.  This channel carried numerous propaganda videos depicting the West as the corrupt enemy of Islam.  *Yusuf 5/13/16, Tr. p. 49.*

This same evening, Defendant Omar encouraged Yusuf to read the e-book, <u>*Black Flags from the East*</u>.  *Yusuf 5/13/16, p. 60.*  Among other topics, the book[4] chronicled the rise of the global *jihad* movement and presented Al-Qaeda and the Taliban in a favorable light.  Following Defendant Omar's recommendation, Yusuf downloaded the e-book when he got home that evening and would later read its contents. *Id*. Yusuf testified that the interactions that night with Omar and several other defendants was an initiation into the conspiracy. *Id*.

As part of this recruitment, Defendant Omar later gave Yusuf an ultimatum, telling him, "***we are about to go on a long, hard journey*** *and that if [you] turned around and walked away, that there would be no hard feelings…the group [is] trying to get to Syria and fight and if [you] wanted to be a part of that, [you] could*."  *Yusuf 5/13/16, p. 78.*  Succumbing to Omar's entreaties, Yusuf agreed to Omar's proposal and formally joined the group.  Yusuf was then included in open and specific discussions regarding the logistics of getting to Syria to join and fight for ISIL.  This included Defendant Omar using his laptop to display world maps as members of the conspiracy discussed how to travel to Turkey, then into Syria.  *Yusuf 5/13/16, p. 80.*

---

[4] Trial Exhibit 52.

Simultaneously, Mohallim's cousin, Abdirahman Bashir, became more popular with Defendant Omar and other members of the conspiracy seeking to join ISIL. Bashir testified at trial that when Omar and the others learned about Mohallim's success in joining ISIL, they began calling Bashir more often and trying to spend more time with him, which stood to reason given Bashir's direct access to Mohallim who was, by the end of March of 2014, on the ground with ISIL in Syria. *Bashir 5/19/16, Tr. p. 9.* During March of 2014, Defendant Omar maintained contact with another ISIL fighter formerly from Minnesota, Douglas McCain, a/k/a "*Tooth*".[5] Evidence from the investigation demonstrated that McCain and Mohallim traveled simultaneously to Istanbul, Turkey, in early March of 2014. Defendant Omar would recount in 2015 his contact with McCain after McCain arrived in Turkey in 2014: "*I can't believe I actually talked to [McCain] on Twitter...[I swear to god]*[6] *that's when he was in, that's when he was like, first in Turkey...*".[7]

Yusuf and Warsame testified that Defendant Omar was elected *Amir* of the large group planning travel to Syria to join ISIL in the Spring of 2014.[8] Omar admitted as such in a recording in 2015: "*…and even the first time, remember they had Abdi [Nur] and all of us and **they made me Amir**?... So when it was me and Abdi, and uh and Hanad, and Abdullahi Bones*[9]*, and Yusuf [Jama] and Zach and A-Zak and, uh, who else…. **It was ten***

---

[5] Douglas McCain was subsequently killed in Syria while fighting for ISIL.
[6] Material in curved brackets has been translated into English from a foreign language, usually either Somali or Arabic.
[7] Trial exhibits 203 (audio) and 204 (transcript, p. 54).
[8] *See Yusuf 5/13/16, Tr. at p.100, and Warsame 5/24/16, Tr. p. 28*, respectively.
[9] "Bones" is a nickname for co-conspirator Abdullahi Yusuf.

*of us and they appointed me as Amir, you know*?"[10] As *Amir* for this group, Omar gave

advice and instructions to members of the conspiracy on a variety of topics, including how

to obtain their passports, what to say during a passport interview, and what to say and do

at the airport when attempting to travel overseas.  Defendant Omar later took credit for

helping Yusuf attempt to leave the U.S.[11]

Further, in April of 2014, Yusuf was present when Omar gave the same ultimatum

to co-conspirator Hanad Musse as he had given to Yusuf earlier.  Yusuf testified that as he,

Defendant Omar, and Musse sat outside the Dar al-Farooq mosque one Monday in mid to

late April of 2014, Omar told Musse "*you can join or you can walk away*."  Yusuf testified

that at that moment, Musse opted in.[12]  Corroboration of Omar's influence over Musse can

be found in a 2015 recording in which Musse is heard recalling Defendant Omar's role in

the spring 2014 plot: "*Guled scared me bro you know.  After Curry [Nur], exactly I was*

*about to leave.  I told him, 'yo, give me the green go.'*  *You know he was still emir, right*?

*He was the emir of all of us…Told him 'yo, do I got the green go?'*"[13]

The record has established that Defendant Omar also played a significant role in

encouraging co-conspirator Yusuf Jama to join the conspiracy to join ISIL in early 2014.

The evidence established that Omar and Warsame first introduced Jama to members of the

group planning travel to Syria in April of 2014.  Omar and Warsame both told Yusuf that

---

[10] Trial Exhibits 197 (audio) and 198 (transcript, p. 32)

[11] *See* Trial Exhibits 203 (audio) and 204 (transcript, p. 91) where Omar tells others, "we almost got Abdullahi out."

[12] Yusuf trial testimony, p. 105.

[13] Trial Exhibits 237 (audio) and 238 (transcript, ps. 36-37).

Jama had been trying to get to Somalia to fight for al-Shabaab, but that now, "*he has a passport and he has money and he's ready to go*" to Syria to join ISIL.[14]  *Yusuf 5/13/16, Tr. at 75-76*.  Warsame admitted during his testimony that he and Defendant Omar gave Jama information about traveling to Syria and had encouraged Jama to join ISIL.  *Warsame 5/24/16, Tr. at 26-27*.  Also, Omar himself would acknowledge having been Jama's *Amir* in the spring of 2014.[15]

By May of 2014, Defendant Omar was one of only a few co-conspirators who had, at that time, both money and a passport in place for travel.  Because Omar believed that he was under law enforcement scrutiny from his prior attempt to leave the U.S., he discussed taking a rental car to Mexico and flying from there with other defendants thought to be similarly 'hot'.[16]  Defendant Omar discussed with his co-conspirators the fact that several men he knew who had joined *al-Shabaab* had successfully traveled there by way of Mexico – even after having been stopped by police along the way.  Again, in a 2015 recorded conversation, Omar confirmed events from the spring of 2014: "*me and Yusuf [Jama] were planning to go to Mexico and trying to find {travel documents} from there and if we don't find {travel documents}, we were going to use our own passports.*"[17]

Yusuf testified that Defendant Omar participated in a conversation with him and Daud about using more secure forms of communication, such as "Surespot", as part of their

---

[14]  Trial evidence established the Jama's half-brother, Ahmed Bashi, had traveled to Somalia in 2012 and had joined *al-Shabaab*.  Trial evidence further established that Defendant Omar assisted Bashi in his travels overseas to join the terrorist organization.
[15]  Trial Exhibit 197 (audio) and 198 (transcript, p. 32).
[16]  Warsame testified that the 'Mexico plan' included Defendant Omar, Jama, and Bashir.
[17]  Trial Exhibit 197 (audio) and 198 (transcript, p. 32).

collective efforts to leave the U.S.  *Yusuf 5/13/16, Tr. p. 85*.  Yusuf testified that for those ready to travel, Defendant Omar, as *Amir*, had set the date of departure at June 1, 2014; Omar's rationale being an early summer date would provide co-conspirators the plausible cover of a post-graduation trip. *Id. p. 87*.

As Defendant Omar prepared for his own May 2014 attempt, he assisted his co-conspirators with their preparation. For example, Omar gave Yusuf $200 for an expedited passport and, on one occasion, drove Yusuf to a passport office to fill out the passport application paperwork.  *Yusuf 5/13/16, Tr. pages 106-07*.  Omar also cautioned Yusuf to "*[have] a rock-solid story*" before going to the passport office.  *Id. at p. 107*.  Further, Defendant Omar discussed TSA protocols and what to say if questioned at the airport – to include accusing the TSA of racial and religious profiling.  *Yusuf 5/16/16, Tr. p. 9*.  After Yusuf successfully opened a checking account, Defendant Omar and co-conspirator Nur accompanied Yusuf to a branch bank to make a deposit of cash for travel to Syria.  *Yusuf 5/13/16, Tr. p. 141*.

### B.  Defendant Omar's May 24, 2014 Attempt to Join ISIL

*"You remember me, you and Yusuf?  How we were going to Cali? And we're gonna, me and Yusuf were planning to go to Mexico and trying to find {travel documents} from there and if we don't find {travel documents}, we were going to use our own passports."* – Defendant Guled Omar, on March 3, 2015

In May of 2014, Defendant Omar approached Bashir and told him that he was driving to California with another person but needed another driver.  Omar asked if Bashir would drive with him.  Omar explained that he planned to cross the border into Mexico where he would find someone to make a fake passport for him.  Omar told Bashir that if

that plan didn't work, he would use his own passport.  *Bashir 5/19/16, Tr. p. 24.*  Omar also admitted these same facts about the spring 2014 plot on tape in 2015.[18]  Shortly after recruiting Bashir, Defendant Omar introduced Bashir to Yusuf Jama who, as explained above, had been brought into the conspiracy by Omar and Warsame.  Omar, Jama, and Bashir then shopped together[19] in preparation for their imminent departure to California, then on to Syria.

Defendant Omar funded the May 2014 attempt with monies received from the Department of Education.  Bank records, business records, testimony and the CHS recordings all established that Defendant Omar fraudulently secured the federal funds from the Department of Education for the purpose of financing travel to join ISIL.  PSR, ¶¶ 63, 64, and 67.  Yusuf accompanied Defendant Omar in May of 2014 when Omar collected his financial aid disbursement from MCTC and described Omar's disappointment in the amount of aid authorized (approximately $4200) because it was lower than the $5000 Defendant Omar had anticipated.  *Yusuf 5/13/16, Tr. at p. 134.*  Bank statements in evidence show that from May 8th through May 21st of 2014, Omar made ten $500 withdrawals from his financial aid account.  PSR, ¶ 64.  This sum was added to $1200 in cash withdrawn from his personal savings account.[20]

---

[18] Trial Exhibits 197 (audio) and 198 (transcript, p. 33)
[19] Trial testimony established that co-defendants Abdurahman and Warsame joined these men when they went shopping for their departure.
[20] Trial Exhibit 151.

On May 24, 2014, Jama rented a Toyota Camry[21] while Defendant Omar, driving a family vehicle, picked up Bashir at his home.  The three conspirators met at a parking lot in Minneapolis where they moved all their belongings into the rental vehicle.  While Jama went to shower in a nearby apartment, Defendant Omar and Bashir both drove to Omar's house so that Omar could leave his family's car at home.  Bashir took care to park some distance away to avoid raising any suspicions but upon Omar's arrival at his home, the defendant was confronted by family members who accused him of attempting to leave the country.  Omar's brother confronted Bashir and removed the keys from the Camry's ignition - effectively thwarting the three co-conspirators' efforts to begin the drive to leave the United States.  *Bashir 5/19/16, Tr. pages 27 – 31*.  Defendant Omar would later recount the events from this attempt to join ISIL when he was surreptitiously recorded in 2015.  On March 15, 2015, Omar explained to Abdurahman: "*Zach, you don't have it as bad as we do.  Me and this nigga [referencing Bashir] was in the same car as [Jama]!  We were supposed to travel together…Remember how my family was screaming?*"[22]

After this foiled attempt, Omar and the group of conspirators met at Powderhorn Park in South Minneapolis.   Here, the defendant discussed the failed May 24th attempt with the others in the group.  Nur was present at this meeting and notably told the group that he was not deterred by what had happened to Omar, Bashir, and Jama; insisting that he would continue his plan to leave the U.S.  *Warsame 5/24/16, Tr. ps. 37-38*.

---

[21] Trial Exhibit 65.
[22] Trial exhibits 203 (audio) and 204 (transcript, p. 121).

Though his May 24, 2014 plan had been thwarted, Omar continued to participate in the conspiracy and support others in the group trying to leave the U.S. to join ISIL. For example, only a few days after his failed attempt he drove with Nur, Warsame, and Mohamed Farah to Augsburg College. There, Omar and the men met Jama to secure a piece of luggage from him. Jama, also undeterred by the events of May 24th still planned to leave the U.S. for Syria - and did so on June 7, 2014. Together in the car, Omar and the group watched an *al-Shabaab* video that containing images of Minnesota-born *al-Shabaab* fighter, Troy Kastigar. Though he would have been a teenager at the time, Defendant Omar took credit for *"[helping] that brother [Kastigar] travel." Yusuf 5/13/16, Tr. p.168*. Omar and the men then discussed the imminent travel of Yusuf and Nur – set to occur within the following 48 hours.

### C. Defendant Omar Aids Yusuf's May 28th Attempted Departure

*"We almost got Abdullahi out*." – Defendant Omar on March 15, 2015.[23]

Defendant Omar played a critical role in co-conspirator Yusuf's attempt to join ISIL on May 28, 2014. As outlined above, Defendant Omar encouraged Yusuf to join the conspiracy and recommended radical reading material, like the e-book <u>Black Flags from the East</u>.[24] During this spring 2014 timeframe, Omar was Yusuf's *Amir*. Omar prepared Yusuf with information about how to handle law enforcement questioning, which included cautioning Yusuf to have a "*rock solid story*" to tell law enforcement. *Yusuf 5/13/16, Tr. p.107*. He helped Yusuf obtain his passport by providing $200 and, on one occasion, giving

---

[23] Trial Exhibits 203 (audio) and 204 (transcript, p. 91).
[24] Trial Exhibit 52.

Yusuf a ride to the passport office.  *Id.*  Defendant Omar discussed TSA protocols and what to say if questioned at the airport – to include falsely accusing the TSA of racial and religious profiling.    Once Yusuf successfully opened a checking account, Omar accompanied Yusuf to a branch bank to make a deposit in advance of Yusuf's departure to Syria.  In 2015, Defendant Omar confirmed his conduct with respect to Yusuf when he said: "*[w]e almost got Abdullahi out*."[25]

### D.  Defendant Omar's Role in Nur's May 29th Departure

Just as Defendant Omar had played a crucial role by bringing Yusuf into the conspiracy and helping him prepare for his May 2014 attempt, Omar played a similar role in encouraging Nur to join, fight, and kill for ISIL.  On April 3rd of 2015, Defendant Omar boasted about having radicalized Nur at the outset of the conspiracy.[26]  In the following excerpt, Defendants Omar, Warsame and Abdurahman reminisce about the early stage of the conspiracy when they listened to the radical teachings of an unidentified Somali sheikh.  Specifically, Defendant Omar told the others that, until Omar came along, Nur was unwilling to act on his radical ideology:

> GO:  *Zach was.  He was in the car.  We were driving my car.*
> AW:  *And we were listening to the*
> GO:  *Yup*
> AW:   *Adnan was there too.*
> GO:  *And we were listening the Somali sheik.*
> AW:  *The Somali sheik*
> GO:  *We were listening to that [UI]*
> AW:  *[UI] yep, exactly.*

---

[25] Trial Exhibits 203 (audio) and 204 (transcript, p. 91).
[26] Trial Exhibits 229 (audio) and 230 (transcript, ps. 96-98).

> GO: **That's when we found Abdi. [UI] That's when I started talking to him…** I remember the first day, **me and Abdi** [UI] you know. [UI] **talking about life. "Do you think this is life?"**
> AW: [UI] you and Abdi.
> CHS: He didn't know about it?
> AW: This is before though.
> GO: He didn't.
> AW: Yeah, he did.
> GO: He did, but he didn't know about [OV]
> AW: He had the concept down.
> CHS: Yeah.
> GO: **He had the Anwar al-Aulaqi. That's what he had down, but he was never like action type.** I remember that first day. He was like, "You know what? [UI] {world} [UI], but that's my mom."
> AW: Ha, wallahi. I remember [UI].
> GO: He said, "If I cut off, if I cut off the love I have for my mom, nothing can stop me."
> AW: Wallahi, billahi. You remember sometimes [UI].
>  GO: Yeah, yeah, **we always used to tell him bro. {Remember when you were praying} all that. Wallahi, we were {lions} bro.**

Further evidence of Defendant Omar's role in radicalizing Nur was found in a statement the defendant made on April 2nd of 2015. As Defendant Omar, Warsame and Bashir watched the ISIL video titled <u>Al-Baraka State – Battlefield Lion</u>[27] the soundtrack to the video, a *jihadi nasheed,* jogged Omar's memory: "***Abdirizak, remember this nasheed? Me, you, and Abdi [Nur]. Everyday. Loud.***" Omar's interest in Nur's success as an ISIL fighter did not stop after Nur had left the U.S. Indeed, as Omar admitted on cross-examination, he searched on Facebook 45 times for Nur starting the day Nur left Minnesota for Syria. The trial evidence further established that Omar maintained contact with Nur via Skype phone calls and secure messaging platforms while Nur[28] was in Syria and Iraq.

---

[27] Trial Exhibit 206.

[28] It is believed that Nur has since been killed in Syria or Iraq while fighting for ISIL.

### E. Omar's Participation in the Conspiracy Through the Summer of 2014

Throughout the summer of 2014, the defendant and his co-conspirators consumed ISIL's increasingly graphic propaganda videos. The trial evidence established that Defendant Omar talked about an ISIL video released in July of 2014 titled *Upon the Prophetic Methodology*.[29] Released in the summer of 2014, this video graphically depicted the mass executions of young Shia' men captured at an Iraqi Security Forces recruitment depot overrun by ISIL. The video shows the execution of hundreds of young men sitting on a concrete pad, their hands bound behind their back. Truckloads of the Shia victims are filmed begging for their lives, forced to denounce Iraqi politicians, only to be marched to an open ditch where they are shot in the head as ISIL's ubiquitous black flag is strategically placed within the camera's viewfinder. At the close of the video, dozens of other victims are paraded to the edge of the Tigris river, unceremoniously shot in the head, then pushed into its waters.

In addition to consuming ISIL propaganda, Defendant Omar and others held meetings to discuss logistics and they worked to save money to fund their next attempt. Business records, trial testimony, and Defendant Omar's own statements confirmed that he and his co-conspirators worked together at a mail processing facility at the end of the summer of 2014.

As the summer of 2014 progressed, Defendant Omar played the long game; hoping that law enforcement would give up investigating him for his radical activities: "*[w]hen*

---

[29] Trial Exhibit 178.

*we were working at Doherty everything was going perfect…We were working, the kuffar were not, they didn't even know we worked together, they didn't even know nothing, bro."[30]*

Defendant Omar also practiced battlefield skills by attending paintball sessions with co-conspirators; a fact confirmed by Omar himself on March 15, 2015:

> OMAR:   *Wallahi **we had fun at paintball though**.  Don't lie.*
> ZA:       *Paintball was amazing.*
> OMAR:   ***We was literally treating it like it was real war**, bro.[31]*

### F.  Defendant Omar's Participation in the Conspiracy in the Fall of 2014

Evidence of Defendant Omar's on-going participation in the fall 2014 plot to join ISIL is abundant.  As Omar plotted his own third attempt to join the designated terrorist organization, he also advised and counseled his co-conspirators to achieve the same end.  Though Omar would eventually insist that he not travel with a large group for fear of getting caught, he continued to provide support and advice to the other conspirators.

For approximately a two or three-week period during the fall of 2014, Defendants Omar, Abdurahman, Daud, Adnan Farah, Mohamed Farah, and Musse, all attended "tawheed meetings" together.   Omar led these meetings at which the conspirators discussed the "oneness" of Islam, ISIL's latest propaganda videos, events in Syria, as well as novel methods of travel into Syria to join ISIL.  *Bashir 5/19/16, Tr. at 68-69.*  For example, at one such meeting, Abdurahman specifically discussed his plan which contemplated travel to Egypt then onward into Syria from there.

---

[30] Trial Exhibits 203 (audio) and 204 (transcript, p. 123).
[31] Trial Exhibits 203 (audio) and 204 (transcript, p. 89).

In a March 3, 2015, recording, Omar detailed to Bashir many aspects of the fall 2014 phase of the conspiracy; taking time to do so because, as Omar noted, there was a significant gap in Bashir's knowledge of intervening events: *"remember how there's a time that you were missing?  Like you were not around us. And there was a time Musab became Amir. I'm a tell you the whole story from the beginning."*  Omar explained, "*first day we were at Ikhlas [mosque].  It was me, Daud, and Musab, M-dot[32], Adnan, Hanad Musse, (UNI) at Ikhlas, all talking about how we're going to (UNI)...".[33]*  Omar explained that he had wanted to leave separate from the core group by traveling with his father to Somalia, then journeying to Syria from there: *"You know what my plan was?  My Dad is leaving soon to Africa.  I'm a go with him in December." [34]*  Later in this conversation, Omar explained the scheme involving his father in greater detail:

> *And me my Dad was going to take me. He was gonna...get a paper written for me, from his doctor and say that I'm his PCA worker[35] and I have to go with him to take care of him because he has the uh, {what's called} PTS.  He has some couple diseases that he always needs somebody to be with him, you know?  So he was going to do that for me, so I was definitely gonna make it through.*

But despite having his own scheme, Defendant Omar still counseled and advised his co-conspirators on achieving the goals of the conspiracy: *"I told them to [elect] an Amir.  They were like, 'Alright, we'll choose an Amir amongst us.'"[36]* Omar explained to Bashir the strife between the elected *Amir* ("Musab") and his co-defendant Daud; a

---

[32] 'M-Dot' is a nickname for co-defendant Mohamed Farah.
[33] Trial Exhibits 197 (audio) and 198 (transcript, p. 25).
[34] Trial Exhibits 197 (audio) and 198 (transcript, p. 25).
[35] "PCA" stands for personal care attendant.
[36] Trial Exhibits 197 (audio) and 198 (transcript, p. 25).

conflict that centered on members of the group planning with Daud but not consulting "Musab" about those plans. Defendant Omar described how he had cautioned his co-defendants and proposed a solution: "*'Dude that's not cool,' {I said.} 'There is a leader and there is somebody that ya'll is supposed to be following up with everything that you plan (UNI).' We called Daud that same day. You know we got to get this clear, we gotta get this clear with Daud that there's leadership and that you have to understand that you gotta listen to whoever's in lead. Call Daud up, 'Come right now'*." According to Omar, the elected *Amir* "Musab" eventually relented, which then allowed Daud to direct the logistics of the co-conspirators – action that resulted in the setting of the November 8, 2014 departure date for the "JFK Four".

Omar admitted that he was willing to assist Yusuf with a second attempt to leave the U.S. to join ISIL after Yusuf heard from his then-lawyer that Yusuf would be charged within three weeks. As Omar explained, he had offered to help get Yusuf out again but wanted more time to do so than Daud was then proposing: "**I was like, 'Yes, maybe we could work something out.' But three weeks is not enough time bro**. *What the hell is with you? We gonna drive out of Minneapolis and [Yusuf]'s gonna get caught up, and get even worse charges then he's getting right now.*"[37]

### Omar's Plan to Travel to Syria With Hamza Ahmed

As part of his March 3 confession, Omar also described how co-defendant Hamza Ahmed came to be a member of the conspiracy and the JFK Four plot. Defendant Omar

---

[37] Trial Exhibits 197 (audio) and 198 (transcript, p. 32).

said that he had originally made plans with Ahmed to travel to Syria: "***Hamza wanted to go with me***. *Beginning, Hamza wanted to go with me 'cause **he was like, 'Yo, Guled, I'm gonna go with you to Spain'."*** Later in that same recording, Omar stated, "*I remember when me and Hamza came, when we became friends, you know? **That was our plan***."[38]

Bashir's testimony regarding the fall 2014 plot further corroborated Omar's role in guiding and advising co-defendant Ahmed. Bashir recounted an occasion when he had just learned from Mohallim and Nur that members of the conspiracy in Minnesota were plotting to leave for Syria imminently. He first confronted Abdurahman and learned that Mohallim and Nur were correct; that the group was indeed planning an imminent departure. Bashir described the ensuing conversation with Daud, Adnan Farah, and Abdurahman where the four men discussed money for travel to Syria as the now-firm November 8th departure date approached. Bashir testified that Ahmed joined the meeting after it was underway. Bashir, who needed money to travel and had heard that Ahmed had money, asked Ahmed for help. Ahmed confirmed to the group that he indeed had extra money, but needed to speak with Defendant Omar before committing the money. *Bashir 5/19/15, Tr. ps. 102-05.*

This fact is further corroborated by business and bank records establishing that Ahmed defrauded the Department of Education in the amount of $2700 – much more than needed for his own bus ticket to New York and airfare to Syria – as well as Ahmed's sworn

---

[38] Three weeks before his March 3rd statement to Bashir, Defendant Omar similarly admitted, "*I was planning on Hamza coming with me. I already told Hamza. I was like, 'Hamza, listen...' **I told him to get a flight. Go to, take your flight. When you get to California, wait for me there…We're gonna cross the border together**.*" Trial Exhibits 189 (audio) and 190 (transcript, p. 17).

testimony during his guilty plea.   When asked under oath during his plea about the remainder of the financial aid he had withdrawn in the fall of 2014, Ahmed admitted that this extra financial aid had been given to co-defendant Adnan Farah.

### G. Defendant Omar's November 6, 2014 Attempt to Join ISIL (PSR, para 47)

*"I'm like, 'How the fuck am I scared nigger? I'm showing you my money. I'm showing you I'm leaving too. I'm just not trying to leave in a dumb way'."* – Defendant Omar, March 3, 2015[39]

*"I was trying to be out right then and there, bro.  I was trying to get on that plane right away.* – Defendant Omar, March 28, 2015

As set forth in detail in the PSR, Defendant Omar attempted to fly from MSP to San Diego, California on November 6, 2014 – all contemporaneous with his co-conspirators' departures to JFK International Airport on the east coast.   Omar had exercised a degree caution by creating a back-story; something he has learned to do based upon his two prior failures to travel overseas to join a terrorist organization – one in 2012 and the other in the spring of 2014: "*I'm not going to get in trouble because it's a back and forth ticket to Cali. I already have the hotel booked in Cali, I already have somebody picking me up from Cali. I was precautious bro.*"[40]  But his effort to conceal his true criminal intentions were laid bare by evidence collected in the case, not the least of which was his own admission in 2015 when Omar confessed on tape that he was "***trying to be out right then and there.  I was***

---

[39] Trial Exhibits 197 (audio) and 198 (transcript, ps. 28-29)
[40] Trial Exhibits 197 (audio) and 198 (transcript, p. 29).

*trying to get on that plane right away.  Get on the taxi and get the hell out.  Wallahi. I was going to use my own [passport], bro, that time."* [41]

### H. Defendant Omar Aided and Encouraged the 'JFK Four'

> "*I give them the three numbers. I gave them Abdi's number.  I gave them Abu Hud's number.  And I gave them another brother's number, you know? Told them {put your trust in God.}* – Defendant Guled Omar, March 3, 2015[42]

Not only did Defendant Omar attempt to get to Syria via Mexico on the same day as the 'JFK Four' bought their Greyhound bus tickets, but he affirmatively aided his co-conspirators with their contemporaneous attempt.  First, as the March 3 soliloquy by Omar set forth, he encouraged the group to elect an *Amir* and work through the ensuing conflict between Daud and "Musab".  Second, he attempted to dissuade them from traveling together for fear that they could more readily be caught.[43]  Third, and most significantly, Omar gave three ISIL contact numbers to the four men prior to their departure to New York.  Finally, after he was stopped at MSP on his way to San Diego, Defendant Omar tried to warn his co-conspirators headed to JFK by calling Musse on MagicJack to encourage them to abort their plans and wait for another opportunity.[44]

---

[41] Trial Exhibits 220 (audio) and 221 (transcript, p. 22).

[42] Trial Exhibits 197 (audio) and 198 (transcript, p. 29).

[43] In his March 3 statement to Bashir, he said "*I was thinking about them because **I have experience with this shit. I got caught up before.  I know how it feels**…I was like, 'You're all gonna leave from the same bus station? You're all going to leave from the same airport?'"* Id. at p. 29.

[44] "*I called him from a Magic Jack number.  I said, 'Hanad, please don't go' {I said.}. 'Please don't do this right now, don't do this right now.'"* Id.

### I.   Defendant Omar on the Deaths of Mohallim and the Karie Brothers

The deaths of co-conspirator Mohallim and his three Canadian cousins (the Karie brothers) only inspired Defendant Omar, further highlighting his dedication to ISIL.  The trial evidence established that shortly after the failed November 2014 attempts, Omar and the other conspirators heard about Mohallim's and the Karie brothers' deaths in Kobane while fighting for ISIL.  Bashir testified that shortly after receiving the news, Omar exalted the deaths, assuring Bashir that they were "*shaheeds*" who had "*died for a just cause"* and that he knew how Bashir felt because he [Omar] had "*lost people too*."[45]   Omar also described Mohallim's and the Karie's martyrdom as "*beautiful*".  But it was not only Bashir who testified to this fact.    Defendant Omar himself was recorded on April 1, 2015, describing their deaths in the same terms, telling Bashir that "***the whole city was talking about it***…***We were saying…it was beautiful***."[46]

### J.  Nur Asked Omar to Murder U.S. Service Members

In March of 2015, Defendant Omar would inform Bashir that Nur sent him a 'hit-list' containing the names and addresses of U.S. Air Force pilots who, according to Nur, were responsible for the deaths of ISIL members Mohallim and his cousins, the Karie brothers.[47]  According to Omar, Nur (and ISIL itself) wanted these service members killed

---

[45] Omar having "*lost people too*" was a reference to associates of Omar's who have been killed fighting for the designated terrorist organization, al-Shabaab.

[46] Trial Exhibit 229 (audio) and 230 (transcript, ps. 57-58). In this same passage, Warsame also described the men dying together as "*beautiful*".

[47]  Trial Exhibits 218 (audio) and 219 (transcript, ps. 16-18).

as revenge for these deaths.  On March 26, 2015, Omar recounted one of the conversations

he had with Nur on this topic:

> *"[Nur]'s like 'there's a brother in here that does hacking and **he hacked into**
> **their system and found out the brothers that killed Hanad** and them is,' I
> mean 'the kuffar that killed Hanad and them, I have their addresses and
> their names and everything' and [Nur] sent it to me."*

Omar later continued, *"he's like 'these are the 16 pilots that took part with the*

*airstrikes that the brothers died in.'…[Nur's] like 'those are the people who-whose*

*hands, our brother's blood's on…'."*  Defendant Omar did not advance that particular

plot; not due to the illegal and extraordinarily depraved nature of the request, but rather,

because it would be difficult to accomplish within the borders of the United States.  As

Defendant Omar succinctly put it, *"[Nur] thinks it's a battlefield.  He thinks it's as easy*

*as it is over there."*[48]

### K. Early 2015 – Defendant Omar Plots a Third Attempt

> *"Damn. Wallahi, you don't even know how much I'm sick of this place*
> *bro. We gotta just, we gotta stop saying, just talking and come up with*
> *real shit."*  Defendant Omar, on March 3, 2015[49]

> *"I want to be the tank hunter in the video."*  Defendant Omar, on April
> 1, 2015[50]

During the late winter and early spring of 2015, Defendant Omar remained fully

engaged in the conspiracy to join, fight and kill for ISIL.  Among other things, the

defendant attended numerous planning sessions, maintained contact with ISIL fighters in

---

[48]Trial Exhibits 218 (audio) and 219 (transcript, p. 29).
[49] Trial Exhibits 197 (audio) and 198 (transcript, p. 19).
[50] Trial Exhibits 229 (audio) and 230 (transcript, p. 150).

Syria and Iraq, researched overseas flights on his smart phone, and contemplated aiding acts of terrorism inside the U.S.

Keenly aware of law enforcement's continued interest in him, Omar favored employing a disguise to throw off investigators and family alike: *"**I'm going to become {moderate.}  I'm gonna become a moderate**, but not something like I'm gonna go in the streets and start partying."*[51]  He further defended the practice of faking moderate behavior against the argument that doing so is 'haram', meaning an act that is forbidden by Allah. Omar reasoned, *"I believe that you can say that **it's not haram if your life is in danger**."*[52]

During this time, Omar continued to maintain contact with ISIL fighters in Syria and Iraq.  In the winter and early spring of 2015, the defendant discussed his contact with Abdi Nur, Abu Suliman, Mohamed Roble, Abu Khattab, and others then fighting for ISIL.

On March 15th and into the early morning hours of March 16th, 2015, Defendants Omar and Abdurahman spent the better part of two hours plotting and planning travel to Syria to join and fight for ISIL.  This particular recorded conversation[53] covered a wide variety of criminal topics and serves as probative evidence of Defendant Omar's state of mind during this phase of the conspiracy.  Given the length of the recording and the resulting volume of relevant statements made therein, the following are but a few of the highlights of the evidence provided from Omar himself.

---

[51] Trial Exhibits 193 (audio) and 194 (transcript, p. 20).
[52] Trial Exhibits 193 (audio) and 194 (transcript, p. 20).
[53] Trial Exhibits 203 (audio) and 204 (transcript, p. 38).

First, evidencing his extraordinary dangerousness, Defendant Omar contemplated giving information to ISIL fighters that would allow them to come to the U.S. to commit acts of terrorism:

> *You know what I had in my head? {You know what was in my head?}  I we really (UNI) go through Mexico to **learn all the spots there, make connections there, send some brothers back over there.  And, I know some dudes.  If they get determined to come through, back to this country and do something here, willahi, they will take it.  Wallahi, scope it out for them, bro.  Just learn the routes, everything. {Boom.} Imagine that like six [ISIL], brothers, those dudes is from like from Iraq coming to Mexico.**  They already look Mexican...They're Arab.  They're coming into this country as immigrants.  Imagine {what they could do?} They'll do crazy damage. **Wallah we have a big opportunity.***[54]*

Defendant Omar confirmed that he had been in contact with ISIL fighters Abu Hud and Abu Sulayman, both of whom encouraged him to travel to Syria soon.[55]  As Defendant Omar and Abdurahman discussed the difficulties of crossing the Mexican border, Omar asked Bashir if he [Omar] should bring a gun to the Mexican border.  Bashir attempted to downplay any need for a weapon, but Omar persisted: "*but when you talking 'bout buy {gun} in Cali, cross the border, **just in case any nigga trys us, {I will shoot him.}**...you want to have it when we're trying to cross the border.... **Just in case they try to grab you or some shit.**"*[56]  Defendant Omar also discussed the anticipated thrill of going on night-raids with ISIL[57] and his belief that once in Syria or Iraq he would obtain martyrdom quickly.[58]    Regarding al-Shabaab, Omar discussed the significant number of videos

---

[54] Id. at p. 38-39.
[55] Trial Exhibits 203 (audio) and 204 (transcript, p. 27).
[56] Id. p. 68
[57] Id. ps. 90-91
[58] Id. p. 85

available produced by al-Shabaab available for viewing,[59] and the fact that his family thinks he is a "*die hard al-Shabaab*" member.[60]

During this planning session with Abdurahman, Defendant Omar placed a phone call to ISIL fighter Abdi Nur.  After Abdurahman boasted to Nur that "*we are the hot boys on the block now, bro*", Defendant Omar took the phone and congratulated Nur on his wedding, encouraging Nur to "***put her to work***".[61]  The defendant then asked Nur if he remembered "*what you told me before...**about the route***", after which they engaged in an extended and coded conversation about the fake passport plan, the fact that the Minnesota-based conspirators now had their 'connect', and the estimated costs of travel into Syria.[62]

Following the call, Defendants Omar and Abdurahman discussed their future alongside Nur, who had recently been promoted within the ranks of ISIL:

| | |
|---|---|
| **OMAR:** | *He said, "Fifty brothers that were, uh, that were in our, um, that were in our {battalion,} out of all of them they chose me."* |
| ZA: | *And he became Emir.* |
| **OMAR:** | ***He said they're training him to become a Emir.*** |
| ZA: | *And soon {he's gonna become?}* |
| GAO: | *Yeah, yeah.* |
| ZA: | *Subhanallah.* |
| **OMAR:** | *So when they, when they go out for battles, **when they go out for battles he's going to be leading the, uh,*** |
| ZA: | *The battles.* |
| **OMAR:** | ***The caravan***. *Yeah.* |
| ZA: | *He's probably going to have Ansari brother showing him around...* |
| ZA: | *... we gotta be his foot soldiers.[63]* |

---

[59] Id. p. 87

[60] Id. p. 90

[61] Id. p. 99

[62] Trial Exhibits 203 (audio) and 204 (transcript, ps. 105-08).

[63] Trial Exhibits 203 (audio) and 204 (transcript, ps. 114-115).

Though fully engaged in the on-going conspiracy, Defendant Omar had a separate time-table for his next attempt to join ISIL. During this same March 15 conversation, Omar and Abdurahman discussed their departures but could not agree on the best timeline:

> ZA:      *Stop waiting, bro. What are you waiting for, bro?*
> **OMAR**:    **I just don't want to be hasty**, *bro.*
> ZA:      *I'm not being hasty. Wallahi, I'm not being hasty, bro.*
> **OMAR**:    *Wallahi,* **I think we should wait til winter, at least December**.
> ZA:      *Wallahi Billahi, I'm not waiting for winter.*[64]

Regardless of his differing view on *when* to travel to join ISIL, Omar remained committed to advising and encouraging other members of the conspiracy who were poised to leave immediately. For example, in the following excerpt, Omar advised his co-conspirators not to use social media once they made it outside the U.S., noting that *al-Shabaab* members had done so to their peril:

> **[S]o you don't ruin it for anyone**, *bro. Cause the ALS [al-Shabaab] brothers, they ruin them.* **Adaki**[65] **you know them**. *The nigger that left for Mexico,* **pictures, everyday new selfie. {This guy got away} and he's showing off right now.** *Every single day about motorcycle.* **Very bad**.[66]

On April 1, 2015, Omar encouraged Warsame to wage *jihad* wherever he finds the non-believers: *"...you're still obliged to fight. You know that right?* **{It's your obligation} to fight. Because there's kuffar in Muslim lands here and there. That's {duty} for you**… *Once you go, you don't come back.  …***you better fight 'em** *[UI] don't come back bro. [UI] Wallahi, billahi,* **don't come back until it's blazin fire**."[67]

---

[64] Trial Exhibits 203 (audio) and 204 (transcript, p. 61).
[65] "Adaki" is an indicted *al-Shabaab* fugitive.
[66] Trial Exhibits 203 (audio) and 204 (transcript, p. 72).
[67] Trial Exhibits 229 (audio) and 230 (transcript, ps. 81 and 83).

When the March 15th conversation turned to financing travel, Defendants Omar and

Abdurahman discussed the ever-present issue of money and financing overseas travel:

> ZA:    *My cousin and them, they're broke as hell, you know what they did to go to ALS [al-Shabaab], they went to Cedar.  Carried balaki donation for people, ah, with disease and everything. 'You gonna, you gonna donate?  {Money} Everybody paid {money} donation.  They made their money with that…It's just uh….Bro I know people will not go for that. Especially youth.*
>
> **OMAR:   *We didn't used to lie, wallahi, we didn't used to lie. We used to tell people to use specific words to use.*[68]**

In the above excerpt, Abdurahman stated that when his cousin joined *al-Shabaab*,[69] they

lied to members of the community to raise money for the terrorists.  Abdurahman opines

that the same tactic would no longer work, especially with the younger generation.  Omar

then admitted that he had also raised money for *al-Shabaab* but when he did so, he did not

need to lie about the purpose for the money –only that the fund-raisers chose their words

carefully.

### L.  Defendant Omar Opted to Employ Tactical Patience

*"I don't think right now is a good time…we have to figure out who's going to get locked up and who's not."*  Defendant Omar, on March 28, 2015.[70]

*"The kuffar, they learned their lesson…They aren't going to let that happen again.  Right or wrong.  I don't know, bro.  I don't want to sound selfish, but I don't want to go anywhere with them."*  Defendant Omar, on March 28, 2015[71]

---

[68] Trial Exhibits 203 (audio) and 204 (transcript, p. 77-78)

[69] The cousin referred to is believed to be Mustafa Salat, an indicted *al-Shabaab* fugitive charged in 09-CR-00050 (MJD).

[70] Trial Exhibits 220(audio) and 221 (transcript, ps. 26-27)

[71] Trial Exhibits 220(audio) and 221 (transcript, p. 16)

By mid-April of 2015, Omar decided to employ caution to ensure his own and his co-conspirators' success in traveling overseas to join ISIL.  Defendant Omar did not, however, withdraw from the conspiracy to join and fight for ISIL.

### M. Defendant Omar's Affiliation with the FTO *al-Shabaab*

Setting Omar apart from the other defendants in this case is the overwhelming evidence of his previous affiliation with another designated foreign terrorist organization. Offered at trial under FRE 404(b) and detailed in paragraphs 128-130 of the PSR, the evidence established that Omar helped Mohamed Guled Osman, a/k/a "Bashi", travel to Somalia to join the terrorist organization known as *al-Shabaab* ("ALS"), and that in 2012, Omar himself attempted to fly overseas to Kenya where he could then cross the border into Somalia and join his friend Bashi.  Omar was recorded during the ISIL investigation reminiscing about having pledged '*bay'ah*' [loyalty] to Bashi before his departure in 2012.[72]  In a 2015 recording, Defendant Omar described how his own family "***think I'm a die-hard al-Shabaab.  They know I love my brother so much***."[73]  And while making this admission, Defendant Omar was watching the ISIL-produced 'sniper video'.[74]

Defendant admitted on the stand that prior to Bashi's departure, Bashi had asked Omar about his older brother, Ahmed Omar, an ALS fighter[75].  *Omar 5/27/16, Tr. p. 10.* Omar admitted on the stand that he gave Bashi a ride to the airport on July 18th of 2012

---

[72] Trial Exhibits 229 (audio) and 230 (transcript, p. 125-26).
[73] Trial Exhibits 203 (audio) and 204 (transcript, p. 91).
[74] Trial Exhibit 205.
[75] Defendant Omar's older brother, Ahmed Ali Omar, left the United States in 2007 to fight for the designated foreign terrorist organization, *al-Shabaab*, in Somalia.  He is a federal fugitive from justice in case number 09-CR-00050(03)(MJD).

and that Bashi joined ALS when he got to Somalia.  *Id. at pages 11-12*.  Omar admitted that two weeks after that – on Omar's 18th birthday – he applied for his own passport, claiming that he planned to travel to Ethiopia.[76]  Within two weeks, Omar booked travel to Kenya instead.  *Id. p. 14*.

Bashi was subsequently charged with providing material support to *al-Shabaab*[77], but has since reportedly been killed in Somalia while fighting for that terrorist organization. The Court heard the painful testimony of Bashi's step-father, Ibrahim Bashi, during trial. Ibrahim Bashi is also the step-father of deceased ISIL fighter Yusuf Jama, whom Omar helped to join ISIL.

During his trial, Omar was confronted with the story he gave to the FBI when they interviewed him in 2012 about his trip to Kenya.  Omar admitted on the stand that he had lied to the FBI about the reason for his travel.  Id. p. 17.  He did not admit on the stand that he was going to join *al-Shabaab* in 2012, but rather, Omar offered yet another story; to wit, that he was going to Kenya to marry his first cousin who, according to Omar, had been raped.  Id. at p. 16-17.

The evidence at trial also proved that Defendant Omar used information and tactics learned from *al-Shabaab* fighters to better his and his co-conspirators chances at joining ISIL.  For example, Omar admitted when testifying he was aware of an *al-Shabaab* fugitive, Shirwa Ahmed, who had significantly changed his appearance in order to evade law enforcement.  This al-Shabaab member had shaved his head and beard, or, as Omar

---

[76] *See* Trial Exhibit 9, Omar's passport application from 2012.
[77] *See* 09-CR-00050 (MJD).

described it to his co-conspirators, he had "*balded up*".  *Id. at pages 20-22*.  Defendant

Omar also admitted on tape that he had raised money for *al-Shabaab*.[78]

### N.  Defendant Omar Committed Perjury During His Trial

As set forth in the PSR in paragraphs 131-135, Defendant Omar testified falsely

during his trial in 2016.  The vast majority of Defendant Omar's sworn testimony was in

direct conflict with the evidence in the case, defied common sense, and offended the truth-

seeking process.  Omar's calculated lies were so prolific that a comprehensive discussion

is impractical within the confines of this sentencing memorandum.  However, a discussion

of several examples of his perjury follows.

#### 1.  *Omar Lied About the May 24, 2014 Attempt to Join ISIL*

Omar testified falsely regarding his May 2014 attempt to join ISIL.  He told the

jurors that he was not making an attempt to join ISIL but rather, he had planned to go to

California to 'reward' himself for '*making it through my first year in college with good

grades and I did good, so I want this to be my chill time*."  *Omar 5/26/16, Tr. p. 54*.  Over

and above the overwhelming evidence that his May 2014 trip to California was an attempt

to join ISIL, the absurdity of Omar's sworn testimony was highlighted by his college grades

for the relevant time-period[79] which showed that Defendant Omar had failed one class,

withdrew from two others, and had received a 'B' in Arabic.

---

[78] Trial Exhibits 203 (audio) and 204 (transcript, ps. 77-78).
[79] Trial Exhibit 357.

### 2.  *Omar Lied About Nur and Yusuf*

Beyond lying about his own intentions, Omar flatly denied knowing that any of his co-conspirators were planning to go to Syria in the spring of 2014.  *Omar 5/26/16, Tr. p. 37.*  Omar specifically denied knowing that Yusuf or Nur were planning to leave the U.S. for Syria in the spring of 2014.  *Id. p. 55.*  The level of deceit displayed in his testimony is underscored by comparing it to the defendant's own recorded words from 2015 when he took credit for radicalizing Abdi Nur before Nur left for Syria: "*[t]hat's when we found Abdi. [UI] That's when I started talking to him…* He had the Anwar al-Aulaqi.  That's what he had down, but he was never like action type… We always used to tell him bro. {Remember when you were praying} all that.  Wallahi, we were {lions} bro."[80]

On cross-examination, Omar also lied about Nur's role in sending Omar the names of American pilots that ISIL wanted to kill.  Demonstrating what can only be explained as a remarkable level of loyalty to a co-conspirator and ISIL operatives fighting overseas, Omar attempted to convince the jury and this Court that despite what he repeatedly said on tape about Nur sending him the hit-list, that he had been "mistaken" when he identified Nur as the source of that hit-list. *Omar 5/27/16, Tr. 104-06.*

### 3.  *Omar Lied About ISIL Videos*

As to other ISIL videos, Omar testified that he and his co-conspirators watched them and laughed because they "*look[ed] at it as a joke*" and that "*I honestly never believed…this was actually real.*"   *Omar 5/26/16, p. 66.*   Not surprisingly, no rational

---

[80] Trial Exhibits 229 (audio) and 230 (transcript, p. 96-97).

person, nor any other member of this conspiracy for that matter, has viewed or could view the horrific violence depicted in ISIL videos as fake.  For Defendant Omar to suggest under oath that he thought the tragic and brutal beheadings, shootings, and burnings of other human beings were "staged" is a singularly offensive lie that, standing alone, merits an enhancement for obstruction.  Despite the audacity of this lie, perhaps Defendant Omar offered it at trial because he understood that his fascination with the celebration of the violence depicted in the ISIL videos is without explanation.  In fact, his fascination and celebration of the brutality speaks volumes about who the defendant is: a committed terrorist.

Omar also lied to the jury and this Court when he testified he never searched for the video depicting ISIL's burning of the Jordanian pilot on his phone.  When confronted with evidence from his own cell phone that he had indeed searched for that video, Omar claimed that someone else may have used his phone to conduct those searches, and went so far as to suggest that the search had been conducted on his phone by a government informant. *Omar 5/27/16, ps. 49-50.*

### 4. Omar Lied About the Conduct of the Cooperating Witnesses

Exacerbating his perjury was the defendant's thinly-veiled effort to demonize individuals who chose to cooperate with the government.  Omar's testimony was replete with instances of blame-shifting onto Yusuf, Bashir, and Warsame for conduct that was, as the trial evidence proved, directly attributable to Omar himself.  For example, Omar testified that Yusuf called a meeting after Mohallim left and that during this meeting, Yusuf taught everyone about what Assad was doing in Syria and that Mohallim had left fight in

Syria.  Omar told the jury he and the others were "*confused and shocked*" by what Yusuf

told the group.  *Omar 5/26/16, Tr. Ps. 28-29.*  The trial record contains a mountain of

evidence contrary to Omar's claim about Yusuf, including Bashir's testimony, Warsame's

testimony, Omar's recorded statements in 2015, and the contents of Omar's own Facebook

page in 2013[81].

Another example of the defendant's attempt to demonize the cooperators was his

claim that Warsame was first to inform him that Jama had traveled to Syria.  Omar testified

that in early June of 2014, Warsame approached him and told him, *"[Jama] left"*.  Omar

told the jury that in response, he asked Warsame where Jama went, and when Warsame

told him Syria, Omar claimed he was "*confused and shocked by it when he first told me*

*that*."  Despite the overwhelming evidence that Omar and Jama jointly attempted to leave

for Syria less than two weeks before that time, Omar attempted to convince the jury that it

was Warsame who first informed him of Jama's plan. *Omar 5/26/16, Tr. ps. 57-58.*

Omar further perjured himself by attempting to shift blame to Bashir.  One example

was Omar's sworn testimony that Bashir came to him with the idea to drive to California

in the spring of 2014.  *Omar 5/26/16, Tr. ps. 39-40.*  The evidence abundantly established

that the contrary proposition was true; rather, it was Omar who approached Bashir to join

Omar and Jama in their pre-existing plot to drive to California, cross into Mexico, then fly

---

[81] During cross-examination, Omar admitted that in June of 2013 – approximately 10
months before any conversations with Yusuf – Omar was keenly aware of the conflict in
Syria and, further, that he had taken the public position on his Facebook page that Syria's
president Assad was "*a kuffar*" who was "*no different that the west*."  *Omar 5/27/16, Tr.*
*pages 24-25.*  Omar also admitted that in 2013 he had posted on Facebook that he *"wanted*
*to see the death of Bashar al-Assad*."  *Id*.

to Syria.   Not only did Bashir credibly testify that Omar approached him with the proposition,[82] but Omar himself – in a 2015 recorded conversation when Omar didn't know anyone else would be listening – confirmed his own perjury: *"And then Yusuf [Jama]'s like, 'ok.'  And then we were like, 'Ok, Daud's not going to come.'*  ***That's why we came to you and told you to come drive with us***, *because [Daud] was supposed to drive with us instead, you know?"[83]*

A further example of Defendant Omar attempting to demonize Bashir was his effort to convince the jury that following Bashir's second grand jury appearance, Bashir warned him that the FBI was investigating him and encouraged him to leave the country because Omar "*was going to be arrested*."  This, in turn, would become Omar's phony explanation for why he later participated in the recorded discussions about getting a fake passport; to wit, he was "*scared*" and "*confused*" and decided to escape the U.S before he was unjustly arrested.  *Omar 5/26/16 Tr. ps. 94 – 96*.  One need only examine the entirety of Omar's recorded statements from February through April of 2015 to know that the above assertion by Omar was patently and absurdly false.

### O. Defendant Omar's Statement to Probation

Defendant Omar spoke with a probation officer following his conviction by the jury. *See* PSR, ¶¶ 149-59.  Just as he had lied to the jury in his trial, Omar lied profusely to the Court's officer, attempting to paint himself as a man concerned only with righting the oppression and injustice in Syria, as well as honoring his family.

---

[82] Bashir 5/19/16, Tr. p. 24.
[83] Trial Exhibits 197 (audio) and 198 (transcript, ps. 32-33).

Among the many lies uttered to the probation officer, Omar maintained, as he had done in front of the jury, that his trip to California in May of 2014 was solely for vacation (PSR, ¶ 151); that the recorded inculpatory statements offered at trial were untrue and made solely to impress Bashir and his peers (¶ 153); that he and Yusuf moved apart from the group of conspirators in the fall of 2014 (¶ 154); that his fall of 2014 attempt to join ISIL was instead a trip to attend his sister's wedding (¶ 155); and that in April of 2015, he decided to "*change his ways, and [] chose family over leaving*" (¶ 158).   Without explaining any of his actions or statements in evidence to the contrary, Omar attempted to portray himself as one who cared for his mother and simply wanted to be a better man. Further, Omar characterized his affiliation with the terrorist organization *al-Shabaab* as simply one of trying to make sense of his older brother's departure and beliefs.   PSR, ¶ 220.   As this memorandum as set forth already in significant detail, this self-serving characterization finds absolutely no support in the evidence.

## III.   THE REPORT OF PRESENTENCE INVESTIGATION

### A.  Factual Statements in the PSR

The United States has no objections to the factual assertions in the PSR.

### B.   Sentencing Guidelines Calculations in the PSR

The PSR calculates a base offense level of 33 for Count 1, Conspiracy to Murder Outside the United States.   For Counts 2, 3, and 4, Conspiring and Attempting to Provide Material Support to a Designated Foreign Terrorist Organization, the PSR calculates a base offense level of 26.   Lastly, for Count 13, Attempted Financial Aid Fraud, the PSR calculates a base offense level of 6.    The United States concurs that the terrorism

adjustment of U.S.S.G. § 3A1.4 applies to each count of conviction, resulting in a 12 level increase in offense level and a criminal history of Category VI.  The PSR concluded that a two-level increase applied to Counts 1, 2, 3, 4, and 6 for obstruction of justice based upon the defendant's perjurious trial testimony.  The government agrees with the application of this upward adjustment under Section 3C1.1.

The PSR found an adjusted offense level of 47.  Because all adjusted offense levels greater than 43 are treated as a level of 43, U.S.S.G. Application Note 2 to Ch. 5, Part A (Sentencing Table), the defendant has an offense level of 43 and a criminal history category of VI, resulting in a guidelines sentence of life imprisonment.

### 1.  Obstruction Enhancement Under U.S.S.G. § 3C1.1

A two-level enhancement for obstruction of justice is authorized if the defendant has committed perjury.  *United States v. Whiting*, 522 F.3d 845, 849 (8th Cir. 2008)(*citing* U.S.S.G. § 3C1.1).  A defendant commits perjury "by testifying falsely under oath in regard to a material matter and by doing so willfully, rather than out of confusion, mistake, or faulty memory."  *Id*. at 849-50.  The enhancement is also applicable when a defendant *attempts* to commit the obstructive behavior.  *See* § 3C1.1 ("…or *attempts* to obstruct impede the administration of justice with respect to the investigation, prosecution, or sentencing of the instant offense of conviction.").

Defendant testified under oath and willfully lied to the jury about material facts. Contrary to the overwhelming weight of the evidence, Defendant testified under oath that he was a drug-addled follower who wanted to impress his friends by boasting about committing acts of terrorism.  This false testimony was material and purposefully

calculated to thwart the prosecution of the offenses of conviction. Omar's testimony was specifically crafted to undercut the government's legal theory in the case, it was intended to insulate his co-conspirators (e.g. Nur and Daud) from criminal liability, and furthermore it sought to blame the cooperating witnesses for criminal conduct that Omar himself had committed.

Clearly, the jury rejected Defendant Omar's lies. With its guilty verdicts on all counts alleged as to the defendant, the jury found that he had committed the crimes alleged by the grand jury. The fact that the *petit* jury saw through the defendant's perjury does not mitigate the offensive nature of his testimony, nor lessen the propriety of applying the two-level increase for obstruction of justice.

### 2. Terrorism Adjustment Under U.S.S.G. § 3A1.4(a)

The defendant disputes the PSR's application of U.S.S.G § 3A1.4(a), the terrorism adjustment, which increases his Offense Level by 12 levels and places him in Criminal History Category VI. Defendant Omar contends that insufficient evidence exists to conclude that he had the specific intent to commit a federal crime of terrorism "calculated to influence or affect the conduct of government by intimidation or coercion." PSR, A.2. The government concurs with the PSR's conclusion that the terrorism adjustment should apply to the defendant. As will be discussed below, the evidence in the case established overwhelmingly that Defendant Omar's offenses were felonies that involved, or were intended to promote, a federal crime of terrorism.

Section 3A1.4 is categorized under chapter three as a victim-related adjustment for terrorism. Section 3A1.4 states, in pertinent part, that:

(a) If the offense is a felony that involved, or was intended to promote, a federal crime of terrorism, increase by 12 levels; but if the resulting offense level is less than level 32, increase to level 32.

(b) In each such case, the defendant's criminal history category from Chapter Four (Criminal History and Criminal Livelihood) shall be Category VI.

Application Note 1 to Section 3A1.4 states that the term "federal crime of terrorism" has the meaning given in 18 U.S.C. § 2332b(g)(5). Section 2332b(g)(5) states, in pertinent part:

(5) the term "Federal crime of terrorism" means an offense that–

(A)     is calculated to influence or affect the conduct of government by intimidation or coercion, or to retaliate against government conduct; and

(B)     is a violation of –
(i)     . . . 956(a)(1) (relating to conspiracy to murder, kidnap, or maim persons abroad), . . . 2339A (relating to providing material support to terrorists), 2339B (relating to providing material support to terrorist organizations) . . . .

This adjustment reflects an understanding by both Congress and the Sentencing Commission that "an act of terrorism represents a particularly grave threat because of the dangerousness of the crime and the difficulty of deterring and rehabilitating the criminal, and thus that terrorists and their supporters should be incapacitated for a longer period of time." *United States v. Meskini*, 319 F.3d 88, 92 (2d Cir.), *cert denied sub nom. Haouari v. United States*, 538 U.S. 1068 (2003). "We have recognized that 'Congress and the Sentencing Commission had a rational basis for creating a uniform criminal history category for all terrorists under [U.S.S.G.] § 3A1.4(b), because even terrorists with no prior criminal behavior are unique among criminals in the likelihood of recidivism, the difficulty

of rehabilitation, and the need for incapacitation.'" *United States v. Stewart*, 590 F.3d 93, 143 (2nd Cir. 2009) (*quoting Meskini*, supra, 319 F.3d at 92).

In the case at bar, the evidence fully supports the conclusion that the crimes for which Defendant Omar was convicted were felonies that involved, or were intended to promote, a federal crime of terrorism. The disjunctive phrases in § 3A1.4 makes clear that the predicate offense must either (1) "involve" a federal crime of terrorism or (2) be "intended to promote" a federal crime of terrorism and that each clause has a separate meaning.

### a. The "Involve" a Federal Crime of Terrorism Theory

For § 3A1.4 to apply under this prong, an offense must have been "calculated to influence or affect the conduct of government by intimidation or coercion, or to retaliate against government conduct," and the offense must be one of those enumerated in § 2332b(g)(5). The government submits that the Court must determine by a preponderance of the evidence that the defendant's offense was "calculated to influence or affect the conduct of government by intimidation or coercion or to retaliate against government conduct." *United States v. Jayyousi,* 657 F.3d 1085, 1115 (11th Cir. 2011); *United States v. Awan,* 607 F.3d 306, 317 (2d Cir. 2010); *United States v. Ashqar,* 582 F.3d 819, 824 (7th Cir. 2009) (preponderance of the evidence standard applies to consideration of the terrorism enhancement). The Court may draw reasonable inferences regarding the defendant's intent in committing the crime based upon the evidence. *See United States v. Mohammed,* 693 F.3d 192, 201-02 (D.C. Cir. 2012) (affirming the district court's application of the terrorism enhancement where the court "pointed to specific statements

in the record – which Mohammed does not dispute he made – from which it [the district court] drew plausible inferences").

Counts 1 – 4 for which the defendant stands convicted *are* enumerated in § 2332b(g)(5).  As summarized in this memorandum and the PSR, the body of evidence demonstrating that Counts 1 – 4 were "calculated to influence or affect the conduct of government by intimidation or coercion, or to retaliate against government conduct" is significant.  The testimony of the government's expert Charles Lister, the ISIL propaganda videos, the social media content pouring forth from the co-conspirators and, of course, Omar's own recorded statements, e.g. that "*America's time is coming*",[84] establish by more than a preponderance of the evidence that the application of this adjustment to Counts 1 – 4 under the first prong is proper.

### b.  The "Intended to Promote" Theory.

The Second Circuit has noted that by using the term "intended to promote" the terrorism enhancement casts a "broader net" than the statutory definition alone.  *Stewart*, 590 F.3d at 137.  In order to satisfy the requirements of the terrorism enhancement, "[t]he criminal conduct at issue need not itself meet the statutory definition of a federal crime of terrorism if 'a goal or purpose [of the defendant's act] was to bring or help to bring into

---

[84] Several members of the conspiracy, including Omar, have attempted to justify their crimes by claiming they sought to join ISIL in order to topple the regime of Bashir al Assad in Syria, only.  This attempt to divorce themselves from both the murderous practices of ISIL and the terrorist organization's global aspirations is understandable but fraudulent.  However, even if the Court were to accept as true Omar's newly fashioned description of his motivations for joining ISIL: to overthrow the Assad regime, the application of § 3A1.4 would remain proper.  Indeed, the attempt to topple a government through violence necessarily "influences or affects the conduct of government."

being a crime listed in'" the statutory definition.  *Id.* (*quoting United States v. Mandhai,* 374 F.3d 1243, 1247 (11th Cir. 2004).  Thus, the "intended to promote" theory applies where the defendant's offense is intended to encourage, further, or bring about a federal crime of terrorism, even though the defendant's own crime of conviction or relevant conduct may not include a federal crime of terrorism.  Therefore, in order to apply under the "intended to promote" theory of applicability, "the defendant's offense need not itself be 'calculated' as described in Section 2332b(g)(5)(A)."  *Id.*

Count 13, Attempted Financial Aid Fraud, is not enumerated in § 2332b(g)(5). Therefore, the Court must determine under the second prong that Defendant's attempted use of federal financial aid "intended to promote" a federal crime of terrorism.  Here too the burden is satisfied because 'a goal or purpose [of the defendant's act] was to bring or help to bring into being a crime listed in'" the statutory definition.  *Stewart,* 590 F.3d at 137.  Simply stated, when Defendant Omar attempted to use his federal financial aid to attempt to travel to Syria to fight and kill for ISIL in May of 2014, his goal or purpose was to bring or help to bring into being violations of Title 18 U.S.C. §§ 956(a) and 2339b – both offenses enumerated in § 2332b(g)(5).

Defendant Omar suggests that he lacked the specific intent to commit a federal crime of terrorism "calculated to influence or affect the conduct of government by intimidation or coercion."  Even if specific intent was required for the adjustment to apply, the evidence in the record as to Defendant Omar's words and conduct in this case would sustain that burden.  However, specific intent is *not* required for Section 3A1.4's application.  *See United States v. Awan,* 607 F.3d 306, 317 (2d Cir. 2010)(defendant's

42

personal motive for committing an offense that involves a federal crime of terrorism is not relevant).

Further, the guidelines – including both prongs of § 3A1.4 – are to be determined on the basis of all acts committed by the defendant, and all acts of others that were within the scope of the jointly undertaken criminal activity, in furtherance of the criminal activity, and reasonably foreseeable in connection with that criminal activity. U.S.S.G. Section 1B1.3(a) and (b). This section imputes to Defendant Omar, by way of example, the evidence that ISIL has repeatedly called for violent attacks against Western countries, to include the United States. For all the foregoing reasons, Defendant Omar's objection to the application of the § 3A1.4 Adjustment should be overruled.

## IV. THE COURT SHOULD SENTENCE THE DEFENDANT TO FORTY YEARS' IMPRISONMENT.

In *Gall v. United States,* 552 U.S. 38 (2007), the Supreme Court set forth the appropriate sentencing methodology: the district court calculates the advisory Guidelines range and, after hearing from the parties, considers the 18 U.S.C. § 3553(a) factors to determine an appropriate sentence. 552 U.S. at 49-50; *United States v. Ruvalcava-Perez,* 561 F.3d 883, 886 (8th Cir. 2009) ("In sentencing a defendant, the district court should first determine the appropriate Guidelines range, then evaluate whether a traditional departure is warranted, and finally decide whether or not to impose a guideline sentence after considering all the § 3553(a) sentencing factors.")

The district court may not assume that the Guidelines range is reasonable, but instead "must make an individualized assessment based on the facts presented." *Id.* at 50.

If the court determines that a sentence outside the Guidelines range is called for, it "must consider the extent of the deviation and ensure that the justification is sufficiently compelling to support the degree of the variance." *Id.* Section 3553(a) requires the Court to analyze a number of factors, including, "the nature and circumstances of the offense," "the history and characteristics of the defendant," "the need for the sentence to reflect the seriousness of the offense," "the need for deterrence," "the need to protect the public from further crimes of the defendant," and "the need to avoid unwarranted disparities."  18 U.S.C. § 3553(a).

### A.  Nature and Circumstances of the Offense

The nature and circumstances of the offense are set forth in detail in Common Appendix A.  The defendant stands convicted of both conspiring to murder outside of the United States and to provide material support to the designated foreign terrorist organization known as ISIL.  He also stands convicted of two separate substantive attempts to provide material support to ISIL and attempting to use federal financial aid to fund one of those attempts.

The terrorist organization he sought to join, fight and kill for, and the one he recruited other members to join, is one of the most dangerous and violent in existence. ISIL has, within the past two years, carried out mass casualty terrorist attacks in Beirut, Paris, Antwerp, Nice, and San Bernardino, while a man claiming to be acting on ISIL's behalf has carried out a mass shooting, killing 50 persons, at a nightclub in Orlando.  And on a near-weekly basis, ISIL takes credit for "lone-wolf" attacks against innocent civilians world-wide.

44

As has been discussed in this sentencing position paper, the loss of life in this conspiracy, both among conspirators who have been killed while fighting for ISIL and innocent victims of terrorist acts, has been immense.  The threat to the national security of the United States has been grave.  The extraordinary seriousness of the defendant's criminality is a reason for a sentence of forty years' imprisonment in this case.  *See* 18 U.S.C. § 3553(a)(1) and (a)(2)(A).

### B.  History and Characteristics of the Defendant

The defendant is 22 years old.  He was born in a refugee camp in Nairobi, Kenya.  He emigrated to the United States with his parents and siblings at a very young age and moved to Minneapolis when he was approximately 3 to 4 years old.  PSR, ¶ 193.  He attended public schools in America, graduated from South High School in Minneapolis, and has no criminal record.  According to the defendant, he has suffered abuse at the hands of an older brother and his father.   Defendant admits that he has smoked marijuana since he was in high school and has regularly taken other drugs, such as Percocet, ocycodone, and Xanax.  PSR, ¶ 221.  Employment includes a 4-month period as a security guard between December 2014 and April 2015, and one-year as a part-time security guard between July 2013 and June 2014.  PSR, ¶¶ 226-27.

The facts demonstrate that Defendant Omar has a long-standing and singular commitment to terrorism and to organizations that engage in and promote terrorism.  Among the defendants to be sentenced by this Court, Defendant Omar stands alone as one who has tried three separate times to join a terrorist organization:  in 2012 he attempted to join *al-Shabaab*, and in 2014 he tried twice to join ISIL.  Then, despite these failures, Omar

continued to plot yet another attempt in 2015. As set forth above in this memorandum, Defendant Omar described on tape an unconscionable future scheme by which he would leverage his father's illnesses[85] as a way to travel Somalia where he would, in turn, abandon his father and join ISIL in Syria. Defendant Omar's persistence is both astonishing and troubling and his willingness to mask his criminal intentions makes him an extraordinarily dangerous individual.

The evidence in the case demonstrates that Omar is directly linked to multiple terrorists. Not just members of ISIL, but also the al-Qaeda affiliate in Somalia, *al-Shabaab*. There are numerous references by Omar himself regarding ALS members "Miski", "Bashi", his brother Ahmed Omar, "Shirwa" from Virginia, Troy Kastigar, and others. These are the men he talks about. These are the people he admires. These people who are all members of a designated terrorist organization.

The evidence in the case demonstrated that Defendant Omar aided, encouraged, and assisted many men in joining, or attempting to join ISIL. Yusuf Jama, Abdi Nur, Abdullahi Yusuf, Abdirizak Warsame, Hanad Musse, Zacharia Abdurahman, Hamza Ahmed, Adnan Farah, Mohamed Farah, Abdirahman Daud, and Mohamed Roble, a/k/a 'Rose', would all appear on Omar's terrorism recruitment resume. And to that resume can also be added the now-deceased *al-Shabaab* fighter, Ahmed Bashi. This list of jihadists and aspiring jihadists attributed to Omar signals the scope of his crimes which, in turn, justifies the lengthy sentence requested in this matter.

---

[85] According to the PSR, Omar's father is paralyzed as a result of an injury sustained in the civil war in Somalia. PSR, para. 193.

The scope of criminal conduct attributed to Omar includes his scheme to use funds from the Department of Education to help him join a terrorist organization. Omar betrayed his country, his fellow taxpayers, and other students who genuinely seek to educate themselves as a means by which to contribute to society and to better themselves. Omar, on the other hand, willingly took what was offered and turned it against the government; marking a reprehensible betrayal of a well-intentioned program.

### C. The Need for the Sentence Imposed to Reflect the Seriousness of the Offense, to Promote Respect for the Law, and to Provide Just Punishment for the Offense

The defendant stands convicted of extremely serious crimes. Considering the seriousness of his crimes, promoting respect for the law and providing just punishment are important factors in this case. As the Supreme Court has recognized, "combating terrorism is an urgent objective of the highest order." *Holder v. Humanitarian Law Project,* 561 U.S. 1, 28, 130 S. Ct. 2705, 2724 (2010).

Although the defendant has no criminal history, his participation in these conspiracies and the other substantive offenses cannot be viewed as discrete, isolated events. The defendant was singularly committed to joining ISIL and to helping others do the same. Defendant Omar took dozens of deliberate steps, engaged in countless conversations, and offered innumerable pieces of advice to other like-minded jihadists – actions all designed to further the aims of ISIL. Omar had offered his own person in the service of the deadly criminal terrorist organization. Disturbingly, the defendant was also willing to share information with the terrorist organization which, Omar had hoped, would result in ISIL committing acts of terrorism here in the United States.

Omar has repeatedly demonstrated a lack of respect for the laws of the United States. Just one of the many examples is his perjured trial testimony.  The level of deceit displayed by Omar after taking an oath to testify truthfully provides this Court with an unadorned example of his utter lack of respect for the justice system.  Adding to his lies was the arrogance that accompanied his testimony which, the government argues, sheds important light on who Defendant Omar is and whether there will ever be a moment in his life when he reflects on his crimes and becomes capable of change.  Through this perjured trial testimony, Omar offered to this Court firm evidence that he has no intention of ever abiding by the laws of the United States.  These facts indicate that a term of forty years' imprisonment and lifetime supervised release is necessary to reflect the seriousness of the defendant's crime and to promote respect for the law.

Respect for the law is a particularly important factor in this case.  No trial in the aggregate memory of the U.S. Attorney's Office has been conducted in more of an atmosphere of intimidation, harassment, and incipient violence than the trial of this case. The families of cooperating defendants were harassed in the courtroom, in full view of the testifying witness; there was a fistfight in the corridor outside the courtroom; multiple individuals had to be ejected from the courtroom for not following the Court's rules of behavior.  A stern sentence is needed to promote respect for the law, to demonstrate clearly that this is a nation of laws.

### D. The Need for the Sentence to Afford Adequate Deterrence to Criminal Conduct, and the Need for the Sentence Imposed to Protect the Public from Future Crimes of This Defendant

In this case, there is a need for both individual and general deterrence. Individual deterrence discourages a defendant from ever committing such a crime again. General deterrence is necessary to deter other people from committing similar crimes. "Congress specifically made general deterrence an appropriate consideration . . ., and we have described it as 'one of the key purposes of sentencing.'" *Ferguson v. United States,* 623 F.3d 627, 632 (8th Cir. 2010) (*quoting United States v. Medearis,* 451 F.3d 918, 920 (8th Cir. 2006)).

Minnesota has seen far too many instances of young men traveling to join terrorist organizations overseas and many of those young men have either died themselves or killed others, or both. Despite these deaths and the surrounding investigation and prosecutions, here yet another group of Minnesota men attempted to leave the United States to become terrorists. General deterrence in this District, at this time, is no small interest. As the Court witnessed in the Courtroom and surrounding press coverage, despite the gravity of the charges, the defendants had significant community support. General deterrence is necessary to impress upon the greater community that no matter your age, religion, or politics, trying to become a terrorist has serious, dire consequences. The government respectfully requests the Court strongly consider the impact on both this defendant and the broader community when imposing an appropriate sentence.

A substantial sentence is necessary to deter individuals, like the defendant, from supporting international terrorism. As the Supreme Court has recognized:

49

> 'Material support' is a valuable resource by definition. Such support frees up other resources within the organization that may be put to violent ends. It also importantly helps lend legitimacy to foreign terrorist groups – legitimacy that makes it easier for those groups to persist, to recruit members, and to raise funds – all of which facilitate more terrorist attacks.

*Holder v. Humanitarian Law Project* at 2725.

The case for individual deterrence, and the case for a sentence that protects the public from further crimes of the defendant, was laid out in the Introduction at the beginning of this pleading.  Terrorism, being motivated by fanaticism, is uniquely difficult to deter.  An effort must nevertheless be made.

Undoubtedly, the most important objective of any government is the physical safety of the people.  Physical safety is the necessary precondition to the exercise of all other rights, such as freedom of expression, of religion, and of the press, to name only a few. Defendant Omar's multiple efforts to reach Syria, and his participation in all aspects of this conspiracy make him extraordinarily dangerous and less susceptible to real rehabilitation. Importantly, Omar has shown no remorse, no repentance, and no willingness to accept that what he has done violates society's norms or its laws.  A forty-year sentence will incapacitate the defendant and protect the public thereby making it impossible for him to carry out his agenda against the government and the people of the United States.  Given the compelling need to deter the continued threat that home-grown terrorists and those that support them pose to the United States and our allies, a substantial term of imprisonment would send a clear message to any would-be jihadists that such conduct is not tolerated by the U.S. government.

### E.  The Kinds of Sentences Available, the Need to Avoid Disparities, and the Sentencing Guidelines and Related Policy Statements

As noted by the Court during the hearing held to present the assessments of the court's expert, Daniel Koehler, there is no counter-radicalization programming offered by the Bureau of Prisons.  This particular 3553(a) factor appears to be inapplicable to this defendant, though should that change during his term of imprisonment, the government will of course not stand in the way of defendant Omar receiving any programming that will reduce the risk he currently represents to the safety of the public.

The United States has submitted a Report concerning sentences imposed on defendants who have traveled overseas, or attempted to travel overseas, in the past two years in support of a designated foreign terrorist organization.  *See*, Docket No. 698.  A review of the sentences imposed is telling.  Of twenty defendants, in fourteen cases where convicted of an 18 U.S.C. § 2339B violation, fourteen of those defendants, or nearly three-quarters, were sentenced to the statutory maximum term of 15 years' imprisonment.  Only four of these convictions followed trial; the rest were all the result of guilty pleas.  In short, courts are imposing the maximum sentences allowed by law in 2339B cases, even when defendants have admitted to their wrongdoing and initiated the rehabilitative process by pleading guilty.

Defendant Guled Omar did not plead guilty.  Rather, the defendant proceeded to trial and – despite perjuring himself and obstructing justice – he was convicted not only of multiple 2339B counts and attempted financial aid fraud, but also of conspiracy to murder

outside of the United States. The sentence of 40 years' imprisonment requested by the government is consistent with the national sentencing pattern in similar cases.

## V.    CONCLUSION

For all these reasons, the United States respectfully asks this Court to sentence defendant Guled Ali Omar to forty years' imprisonment and a lifetime period of supervised release.

Dated: November 3, 2016                    Respectfully submitted,

ANDREW M. LUGER
United States Attorney

*s/ Andrew R. Winter*

BY: ANDREW R. WINTER
Assistant United States Attorney
Attorney ID No. 232531

JULIE E. ALLYN
Assistant United States Attorney
Attorney ID No. 256511

JOHN DOCHERTY
Assistant United States Attorney
Attorney Reg. No. 017516X

## COMMON APPENDIX A – THE SYRIAN INSURRECTION AND ISIL

This Appendix A to the Government's Sentencing Positions describes (a) historical and Syrian current affairs context that is common to all nine Sentencing Positions being submitted to the Court by the government, and (b) a capsule summary of the facts proven at trial.  This Appendix is reproduced in each of the government's sentencing positions, and is identical in each.  No attempt has been made to write a factual summary that is more comprehensive than the very thorough Reports of Pre-Sentence Investigation written in this case by United States Probation officers.  However, this Common Appendix A does go into more detail than the PSRs about the history of the Syrian insurrection, and the role in that insurrection of the designated foreign terrorist organization the Islamic State in Iraq and the Levant, or "ISIL."   If there is interplay between events in Syria and events in Minnesota, Common Appendix A tries to correlate events in Syria with significant events that were happening in this case, here in Minnesota, at about the same time as the events in Syria.

As to the first part of Common Appendix A, history and current events, Common Appendix A relies upon the trial testimony of the government's expert witness, Charles R. Lister, Senior Fellow at the Middle East Institute, Washington, D.C.  Common Appendix A does not summarize all of Mr. Lister's testimony.  Instead, it highlights those parts of his testimony which are important to understanding the issues in these sentencings.  These matters are a short history of the Syrian insurrection, the origins of ISIL, as well as ISIL's extraordinary brutality and the part such brutality plays in ISIL's recruitment of foreign fighters.  Finally, this Common Appendix A concludes with a brief description of ISIL's

1

understanding of the importance, to what in ISIL's view would be an observant Muslim, of participating in the fighting now taking place in Syria.

The second part of Common Appendix A seeks to provide an overview of the facts of the case, and to provide a description of the facts of the case that can be referred to in all of the government's sentencing position papers.

The facts concerning historical background and Syrian current events in Common Appendix A are taken from a transcript of the trial testimony of the government's expert witness, Charles R. Lister, Senior Fellow at the Middle East Institute, Washington, D.C. As to other trial facts, which have not yet been transcribed, Common Appendix A relies on the contemporaneous notes of Assistant U.S. Attorneys and FBI Special Agents.

**Developments in Syria from the Arab Spring (2011) to 2013 Abu Musab al-Zarqawi's founding of ISIL (2013)**

Syrian President Bashar al-Assad took power in 2000, continuing the reign of his father, Hafez al-Assad. Between them, the two Presidents al-Assad have ruled Syria as a dictatorship for more than forty years. Bashar al-Assad has used brutal repression against his political opponents, including extensive and intrusive police surveillance followed by arrest, torture, and execution. The efforts of ordinary citizens, during the "Arab Spring," to protest against the regime, were met by the Assad regime with violence.

The Arab Spring began at the end of 2011, and was triggered by a Tunisian man who burned himself to death in a desperate act of protest after being humiliated by the police. The Arab Spring anti-dictatorship movement spread across North Africa and the Middle East in the months that followed.

2

In Syria, the wealthy had for decades been supporters of the regime. After Bashar al-Assad took power in 2000, this increased, and the gap between rich and poor in Syria became even more stark than it had been. When Bashar al-Assad introduced economic liberalization measures, with support given to small businesses, it turned out that the small businesses that received assistance were the small businesses of regime supporters.

On March 6, 2011, the Syrian internal security services arrested 15 schoolboys in the southern Syrian city of Deraa, alleging that they had been chanting revolutionary songs as they walked home from school. All the boys were tortured, and several of them were killed. Peaceful protests of the boys' arrest were met by the regime with live ammunition, resulting in several deaths. Over the next few days, protests spread to numerous Syrian cities. The arrest and torture of these schoolboys in Deraa, and the regime's heavy-handed response to it, marks the beginning of the Syrian insurrection against President Bashar al-Assad. The insurrection soon transitioned from peaceful protest to armed revolt against the Assad regime.

The reaction of the Bashar al-Assad regime to the events in Deraa was consistent with the reaction to opposition of President Bashar al-Assad's father, Hafez al-Assad, during the time he had been Syria's president. For example, in the 1980s a splinter faction of the Muslim Brotherhood tried to rise up in arms against President Hafez al-Assad in the Syrian city of Hamaa. President Hafez al-Assad responded with months of artillery shelling of Hamaa, which killed between 10,000 and 40,000 of the city's inhabitants.

As protests and fighting spread across Syria during 2011, the United States expressed sympathy for Syrians engaged in peaceful, anti-Assad protests. U.S.

3

Ambassador to Syria Robert Ford attended several anti-regime protests, a clear signal of U.S. government support. The regime responded by physically threatening the U.S. Embassy, and at one point withdrew security personnel from around the embassy and allowed pro-regime thugs to ransack the building. The United States then withdrew its diplomats from Syria. The United States has had no diplomatic or consular representation in Syria since 2011.

Arab Spring opposition to the Assad regime spanned all sectors of Syrian society. One component of the anti-regime opposition was a specifically religious, Islamic opposition. For a time following the U.S. invasion of Iraq, President Bashar al-Assad was able to neutralize the Islamic opposition within Syria by busing Islamic fighters over the border into Iraq, where they could fight Americans and their Iraqi allies. Eventually some of these Islamic fighters returned from Iraq (or Lebanon, another place to which the Assad regime had sent them) to Syria.

## I. THE SYRIAN HISTORICAL AND CURRENT EVENTS CONTEXT OF THIS CASE.

### A. Abu Musab al-Zarqawi, the Origins of ISIL, and the Roots of ISIL's Extreme Violence

In 1999, Abu Musab al-Zarqawi was released from the Jordanian prison where he had been serving a sentence for support of a terrorist organization. Shortly after his release from prison, Zarqawi traveled to Afghanistan, where he made contact with the senior leadership of al-Qaeda. With $200,000 of al-Qaeda's money, and a plot of land donated by the Taliban, Zarqawi established a terrorist training camp in Afghanistan. In 2000, Zarqawi and the organization he had founded attempted to perpetrate the "millennium

4

plot," which included attacks on the Radisson Hotel in Amman, and several other western hotels in Amman.  The plot was foiled.

When the U.S. invaded Afghanistan following the attacks of September 11, 2001, Zarqawi fought for a short while, but then fled Afghanistan, going first to Iran, and then on to northern Iraq.  Following the U.S. invasion of Iraq, Zarqawi and his organization conducted a campaign of bombings against the United States military and other targets, including the United Nations and the Jordanian embassy. At this time, Zarqawi did not have any official relations with al-Qaeda, but in late 2003 and on into 2004 Zarqawi reached out to al-Qaeda in an effort to have his organization and al-Qaeda work together. In May of 2004, Zarqawi conducted his first videotaped beheading, of U.S. hostage Nicholas Berg.  Several months after this atrocity, in October of 2004, Zarqawi "made *baya*" (swore allegiance) to al-Qaeda. Zarqawi's organization took the name "al-Qaeda in Iraq," and became al-Qaeda's first international affiliate.

Zarqawi was ferociously anti-Shiah, and his organization in turn became deeply anti-Shiah. Zarqawi believed the Shiah had to be fought until they were all exterminated. Zarqawi dispatched his own father to carry out a suicide bombing at a Shiah shrine in the Shiah holy city of Qatib, in southern Iraq, which killed a Shiah ayatollah.  Shiah were referred to by the insulting term "rafidi" which means "one who refuses," specifically, one who refuses to recognize the legitimacy of the line of succession from the prophet that is recognized by Sunni Islam.  The Assad regime, although its top members are Alawites, gets support from Iran, the dominant Shiah power in the middle east, and opposition or

support for the Assad regime tends to fall along Shiah-Sunni lines, with Shiah in support of the regime, and Sunni in opposition to it.

Following the pledge of *baya*, tension between Zarqawi and al-Qaeda persisted, primarily over the issue of brutality and the killing of Muslims.  Zarqawi's bombing campaign in Iraq may have targeted non-Muslims, but the bombs were very powerful, were often detonated in public places, and as a result they killed many Muslims.  In Zarqawi's view, such deaths were acceptable, because Zarqawi believed Iraqi society needed to be thoroughly cleansed of all western and secular influences.  To al-Qaeda, however, Zarqawi's bombings were a catastrophe in terms of al-Qaeda's ability to maintain the support of ordinary Muslims.  There was an exchange of letters between al-Qaeda and Zarqawi over this issue, at the end of which al-Qaeda ordered Zarqaqi to be more discriminating in his bombing.  In response, Zarqawi's behavior, if anything, actually got worse.

Zarqawi was killed by American military action in June of 2006.  In October of 2006 one of his successors as the leader of al-Qaeda in Iraq renamed the organization "the Islamic State in Iraq."  After some years in which it was not clear whether the Islamic State in Iraq was or was not still part of al Qaeda, the two organizations formally split in 2013.

Before the split, in May through August of 2011, discussion began about opening a Syrian wing of the Islamic State in Iraq.  In August of 2011, seven senior members of the organization crossed into Syria, and activated a dormant network of safehouses in northeastern Syria.  In Syria, this group went by the name Jabhat al-Nusra, the "support group."  When the split between the Islamic State and al-Qaeda occurred in 2013, Jabhat

al-Nusra remained a part of al-Qaeda, while the Islamic State went on its own, independent path.

In June of 2014, abu Bakr al-Baghdadi, then leader of what had become the Islamic State in Iraq and the Levant, or "ISIL," mounted the steps of the pulpit in a mosque in Mosul, Iraq and proclaimed the re-establishment of a caliphate, a supreme Islamic religious and political entity that had a legitimate claim to the loyalty of every Muslim in the world.

### B. ISIL's Need for, and Recruitment of, Foreign Fighters

Several factors drove ISIL to need foreign fighters to fill its ranks.

First, as testified to by Mr. Lister, ISIL did not govern populations so much as it controlled them.  Its theological rulings were bizzare (the sale of ice cream was forbidden because ice cream did not exist in the prophet's time, and the sale of cucumbers was forbidden because cucumbers were sexually suggestive, for example), and its punishments for even minor infractions were extraordinarily sadistic and carried out in public. ISIL could recruit from the local population only through fear, and as a result local recruits understandably tended not to be good fighters.  Second, from August of 2013 until July of 2014, ISIL did not fight the Assad regime; instead, it waged war on other anti-regime opposition groups.  Of the 7,000 people killed in combat by ISIL during the first six months of 2014, not one was an Assad regime soldier.  At this same time, the Assad regime stopped fighting ISIL, probably because the regime recognized that ISIL was doing the regime's work for it.  These facts made it impossible for ISIL to augment its numbers by allying with other opposition groups.

7

In response, ISIL recruited very heavily from abroad, relying on three different recruiting messages.

First, abu Bakr al-Baghdadi, in his role as caliph and leader of the faithful, claimed that it was the duty of all Muslims throughout the world to come and join the Islamic State, and to fight for that state. Second, ISIL used its extreme brutality as a recruiting tool. To do so, ISIL characterized its actions to a local audience as expressions of power and dominance over a Shiah-dominated Iraqi government, and to an international audience as an organization that was bringing power back to Sunni Islam by showing no mercy to the enemies of Sunni Islam. To publicize its brutal acts, ISIL has proven very savvy at using electronic media. As the evidence at trial showed, many ISIL propaganda videos were enthusiastically viewed by defendants in this case.

Third and finally, ISIL has adopted an apocalyptic ideology about the end times which places great value on dying as a martyr in Syria at this particular time in human history. At the end of human history, ISIL preaches, Jesus will descend from heaven to the white minaret of the main mosque in Damascus, and from there will lead an army to the Syrian village of Dabiq, northeast of Aleppo, where the final battle between the forces of good and the forces of evil will be fought. As Mr. Lister explained:

> . . . one of the reasons why ISIL has been so effective at recruiting so heavily from non-Syrian and Iraqi populations is because it has claimed to be operating in Syria within this broader mindset. The idea that you can go and fight in Syria in order to contribute towards bringing about the end of the world is something that its ideology – its propaganda, sorry, has made very clear for a long time. In fact, Dabiq was something that Abu Musab al-Zarqawi all the way back in the 2000s spoke about very clearly, our armies will one day reach Dabiq, and, you know, bring about the end of days. So

8

it's a core tenet, it's a core principle of ISIL's belief.  And fundamentally, it's a core reason for why they wanted to operate in Syria all along.

When asked to link this ideology to the recruitment of a potential foreign fighter, Mr. Lister continued:

> I mean, generally speaking, there is a belief within these organizations that if you fight in the name of Allah, in the name of God, and you die as a martyr, you will automatically go to paradise.  I believe their understanding is that if you die in these battles, which ISIL claims to be bringing out the end of days, then you will obtain a, you know, a high place in paradise alongside God.  So the importance of fighting in Syria specifically, as I say, is of that utmost importance.

Finally, Mr. Lister pointed out in his testimony that some of the outrages perpetrated by ISIL, such as the beheadings of western hostages, were "trying to bait the west into intervening more," in order to precipitate the final battle between Muslims and non-believers.

As a result of all three factors, a vast majority of ISIL's forces at for example, the battle of Kobani, under the command of ISIL commander Omar al-Shishani, were foreigners, who sustained huge casualties.  Of note, the battle of Kobani pitted ISIL against Kurdish militia.  At no time, did the battle of Kobani involve combat between ISIL and Assad regime forces.

## II.    THE FACTS OF THIS CASE

The evidence at trial demonstrated the existence of a conspiracy among the defendants to travel to Syria via Turkey, cross the border into Syria, and there join, and fight for, ISIL.  There were three major efforts by the defendants to reach Syria, in the Spring of 2014, the Fall of 2014, and the Spring of 2015.

9

The Spring of 2014 effort had two components. In one, defendant Guled Omar, together with Abdirahman Bashir (then a member of the conspiracy, later a cooperating human source for the FBI) and Yusuf Jama, attempted to drive to Mexico and travel onwards from Mexico to Turkey and then Syria. In preparation for this attempt, defendant Omar withdrew $5,000 in cash using his federal student financial aid debit card. Those funds were never repaid, and as a result of this financial behavior, defendant Omar was later found guilty of federal financial aid fraud, in violation of 20 U.S.C. § 1097. The attempt at driving was thwarted by defendant Omar's family. Later, however, on June 9, 2014, Yusuf Jama left the Twin Cities by Greyhound bus, traveled to New York City's John F. Kennedy International Airport (hereinafter "JFK"), and flew from there to Turkey and onwards to Syria. Jama is believed to have later been killed in combat while fighting for ISIL and against Kurdish militia at the battle of Kobani.

The second component of the conspirators' Spring of 2014 effort involved cooperating defendant Abdullahi Yusuf's attempt to travel on May 28, 2014, and Abdi Nur's successful travel on May 29, 2014. Yusuf was booked on an itinerary that would have taken him on the Russian airline Aeroflot from Minneapolis-Saint Paul to JFK, then on to Moscow, Russia, before taking an Aeroflot flight from Moscow to Istanbul. However, when Yusuf applied for a passport on April 28, 2014, he aroused the suspicions of an alert passport specialist in the Minneapolis passport office. The passport specialist relayed his suspicions to his supervisor, who told the FBI. As a result, FBI Agents were waiting for Yusuf when he arrived at the Minneapolis – Saint Paul airport on May 28 to

catch his flight to JFK.  Yusuf was denied boarding, and after continuing to falsely claim to the FBI that he was going solo to Istanbul for vacation, sent home.

The Fall of 2014 effort also had two components. In the first, defendant Guled Ali Omar again tried to reach Mexico, this time by taking a flight from Minneapolis – Saint Paul to San Diego.  The FBI was told that defendant Omar had made a travel booking, and federal agents met Omar at the airport.  Omar arrived at the airport carrying no luggage, and in possession of his passport.  He was denied boarding and sent home.  After being turned away at the airport, defendant Omar telephoned defendant Hanad Musse, using "Magic Jack," an application that disguises one's telephone number. In that call, defendant Omar pleaded with defendant Musse to drop their own plans to travel to Syria.  In that telephone call, defendant Omar told defendant Musse that "I just got caught up."

The plans from which defendant Omar was trying to dissuade defendant Musse involved Musse and three other defendants – Mohamed Farah, Hamza Ahmed, and Zachariah Abdurahman – following the example of Yusuf Jama by taking Greyhound buses to JFK, and flying from there to various destinations in southeastern Europe, such as Athens, Istanbul, and Sofia, and then traveling on to Turkey and, ultimately, Syria.

Musse refused to drop the plans and "the JFK Four" continued to New York.  There, they were met by agents of the FBI and denied boarding.  Defendant Hamza Ahmed had boarded his flight, and was escorted off the aircraft by federal agents.  When three of the four were interviewed by the FBI in New York (defendant Hanad Musse left JFK without being interviewed; however, Mohamed Farah, Hamza Ahmed, and Zachariah Abdurahman were interviewed at JFK), they lied, claiming that they did not know each other, and that

11

they were all traveling to Europe, by themselves, for vacation.  In the case of defendant Mohamed Farah, this meant that he claimed to be traveling to Sofia, Bulgaria, in November, for a beach vacation lasting one day.  Upon return to Minnesota, each of the defendants was given a target letter from the U.S. Attorney's office, telling them they were targets of a federal criminal investigation into allegations of conspiracy to provide material support to a designated foreign terrorist organization.  The JFK Four were then again interviewed, this time by Minneapolis-based FBI agents.  They maintained the fictions they had given to the New York FBI agents.  (Defendant Hanad Musse had not been interviewed in New York.)

Later in November of 2014, defendant Abdullahi Yusuf, who had been at liberty since trying to leave in late May, was arrested on a criminal complaint charging him., together with Abdi Nur, with conspiring to provide material support and resources to ISIL, and with actually providing material support and resources to ISIL (the material support and resources provided was the person of Abdi Nur).  In February of 2015, defendant Hamza Ahmed was arrested, and detained pending trial.  Defendant Ahmed was therefore unable to conspire with his codefendants when, in the Spring of 2015, they began conspiring yet again to go to Syria to join ISIL.

The failure of the Fall 2014 attempt did not lead the defendants to drop their ambitions to travel to Syria.  In the Spring of 2015, they again began planning to leave the United States, go to Turkey, then go onwards into Syria to join, and fight for, ISIL.  Shortly after this third and final round of plotting began, Abdirahman Bashir decided to cooperate

with the FBI's investigation.  He wore a recording device and recorded many hours of incriminating conversations between March and April of 2015.

The defendants had hoped to make a connection in Tijuana, Mexico, with a source for false passports.  When this plan could not be completed, because Abdi Nur, in Syria, was unable to connect with the Mexican ISIL fighters who were to provide the contact information in Tijuana, Bashir, with the approval of the FBI, stated that he had a source for false passports in San Diego.

On April 17, 2015, Bashir, together with defendants Mohamed Farah and Abdirahman Daud, left home in defendant Daud's Honda Civic, bound for San Diego. Upon arrival in San Diego on Sunday, April 19, defendants Daud and Farah were arrested at a warehouse in San Diego when they took possession of fake passports from "Miguel," a San Diego police officer who had been acting the part of a procurer of fake passports. The arrests in San Diego were followed within minutes by the arrests in Minnesota of the remaining defendants:  Guled Ali Omar, Adnan Abdihamid Farah, Zachariah Yusuf Abdirahman, and Hanad Mustofe Musse.