UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA
15-49 (MDJ/FLN)

United States of America,

    Plaintiff,

v.

Guled Ali Omar,

    Defendant.

**DEFENDANT GULED ALI OMAR'S RESPONSIVE SENTENCING POSITION MEMORANDUM**

## INTRODUCTION

This Memorandum is submitted in response to portions of the Government's position on sentencing Memorandum filed on November 3, 2016. Approximately 75% of the Government's sentencing Memorandum is devoted to a detailed recitation of its factual narrative underlying the conviction of Defendant Guled Ali Omar ("Omar" or "Defendant"). The sentencing Judge is well aware of the evidence presented at trial and Omar will not use this Memorandum to rebut each portion of that saga. Defendant, during trial, questioned many of the Government's witnesses or its interpretation of various exhibits. It is clear the jury accepted all or part of the Government's version of events by convicting Omar. It is uncertain whether the jury adopted every claim made by the Government although this seems to be the implication of its sentencing Memorandum.

    This is, of course, wholly conjectural. The jury could plausibly have convicted Omar for the terrorism related offenses contained in the second superseding indictment even if individual jurors disbelieved much of the Government's evidence. Nonetheless, Defendant recognizes that the jury's verdict bears considerable weight in this case and understands the offenses resulting in his guilty verdict are significant crimes.

1

By the same token, there are a number of statements and assertions incorporated within the body of the Government's Memorandum which require either qualification or clarification. These include:

- *Omar did not radicalize Abdi Nur.* In its Memorandum, the Government argues that "Omar boasted about having radicalized Nur at the outset of the conspiracy." *Govts Mem.*, p. 13. However, an examination of the recorded conversation in which Omar supposedly made this boast does not support this sweeping statement. Instead, Omar merely shares with a co-Defendant, Warsame, that he and Nur had conversations about life and that they may have listened to Anwar Al-Aulaqi together. There is nothing in this conversation which suggests that Omar shaped Nur's radical beliefs.

- *Omar did not attempt to assist Yusuf in his second attempt to leave the United States.* The Government also asserts that "Omar admitted that he was willing to assist Yusuf with the second attempt to leave the U.S. to join ISIL." *Govts Mem.*, p. 18. According to the Government, this occurred after Yusuf heard from his prior counsel that he would be charged with a federal crime. In reality, the exhibits cited by the Government (Exh.197, 198) contain Omar's conclusion that an attempt to leave Minneapolis would only lead to Yusuf getting "caught up and… even worse charges than he is getting right now." *Govt. Mem.*, p. 18. This statement plainly undermines the Government's assertion. At trial, Yusuf testified that Omar encouraged him *not* to flee to avoid prosecution. Yusuf, in fact, resented this advice since he thought Omar was not, himself, under investigation at the time.

- *There is no clear evidence that Omar had a role in the exchange of funds between Hamza Ahmed and Adnan Farah.* At the time of his guilty plea, co-Defendant Hamza Ahmed admitted that he received financial assistance from, Adnan Farah, in Ahmed's efforts to leave the United States. The Government asserts that Omar helped orchestrate this transaction. The sole support for this claim is that "Bashir, who needed money to travel… asked Ahmed for help. Ahmed confirmed to the group that he indeed had extra money but needed to speak with Defendant Omar before committing the money." *Govts. Mem.*, p. 19. The connection between this and Ahmed's subsequent delivery of funds to Adnan Farah is inexplicable. It was apparently Bashir who approached Ahmed looking for money. Bashir did not receive funds from Ahmed, Adnan Farah received the money. Moreover, there is no indication that Ahmed actually spoke to Omar about this transaction.

- *Omar did not "aid" the "JFK four" in the commonly understood sense of the term.* The Government asserts that the Defendant "affirmatively aided his co-conspirators with their contemporaneous attempt…" to travel to Syria by way of JFK in November 2014. The only reported assistance identified by the Government was that Omar attempted to dissuade his friends from their plan because he envisioned them being caught. After being himself stopped at MSP while traveling to San Diego, "Omar tried to warn his co-conspirators… by calling Musse… to encourage them to abort their plans…" *Govts.*

2

*Mem.*, p. 21. In each instance, it appears Omar discouraged the JFK four from both their plan and from carrying it out. Discouraging a criminal plan and encouraging its abandonment is not typically considered assistance even if one presumably has a common objective with the conspirators.[1]

- *Omar rebuffed Nur's effort to encourage violence in the United States.* It is clear that Omar remained in contact with Nur after he left for Syria and received, reportedly from Nur, a list containing the names and addresses of U.S. Air Force pilots operating drone aircraft in the region. Apparently, Nur was hoping that Omar and his associates would commit an act of violence against these soldiers or their families. This prospect was horrifying but, most importantly, Omar unreservedly rejected Nur's suggestion and expressed anger with him. In a portion of the secretly recorded conversation not included in the Government's Memorandum, Omar related: his anger at Nur for making this request. Omar commented to Bashir "I was like why the hell would you send me that?... how dare you"[2] (Tr. 18).

In a critical omission, the Government also neglected to disclose Omar's attempts to distance himself from his co-Defendants during spring 2015. While the Government grudgingly conceded that Omar chose not to travel at that time nor to purchase the forged passports being marketed to his co-Defendants, the Government dismisses this decision as a tactical choice. The Government asserted Omar was still wholly committed to the notion of traveling abroad in Spring 2015. The reality, reflected in Omar's recorded conversations with Bashir is different. In a March 28, 2015 conversation with Bashir, surreptitiously recorded by the Government informant, Omar made a series of statements that are more forthcoming about his perspective.[3] When Bashir encouraged Omar to purchase a forged passport and travel to Syria, the Defendant's response was "you're so sure about it bro. I'm just scared." (Tr. 19). Later in the

---

[1] There is no evidence in any trial exhibit that Omar spoke with Musse around the time of the November 2014 travel. Faced with this difficulty, the Government now asserts the call was made using the "Magic Jack" number; however, the Government has yet to identify that contact.

[2] Trial Exhibits 220 (audio) and 221 (transcript).

[3] Trial Exhibits 220 (audio) and 221 (transcript). Subsequent references to this conversation will simply recite the transcript page.

3

conversation, after Bashir pressed Omar for a commitment to promptly leave the United States and Omar refused, this discussion took place:

> GO: You're just going to be another statistic, bro.
>
> …
>
> GO: -What benefit did we bring? It's just going to be another- statistic
>
> CHS: Decree, nigga, decree. I know the statistic is Westerners dying in Kobane, nigga.
>
> …
>
> GO: That's not Allah's decree.

(Tr. 22). Here, Omar seems to be renouncing the notion that Islam requires him to become a martyr. This was made more clear elsewhere in the conversation when Omar added "I can't take a risk." (Tr. 27).

On a different occasion, Omar added that his family obligations were more important to him than seeking martyrdom abroad. In a March 26, 2015 recorded conversation, Omar told the Government's paid informant:

> At least you guys have a dad to support the family. With my mom, I am the only person she has to help is me and there's six kids at home…[4]

(Tr. 24). Omar then continued…

> if I leave right now my family is going to break apart wallahi. My little sisters are all at that age right now, that teenage years, bro… imagine those girls… with no older brother.

(Tr. 32-33).

---

[4] Trial Exhibit 218 (audio) and 219 (transcript). Subsequent references to this exhibit will simply recite the transcript page.

These conversations make it plain that Omar had meaningfully begun to disengage from his compatriots prior to his arrest and had at least began a process of gaining insight into the futility of his fascination with ISIS.

I. **THE GOVERNMENT'S MEMORANDUM GROSSLY EXAGGERATES THE NATURE AND CIRCUMSTANCES OF OMAR'S OFFENSES.**

The Defendant has no intention of minimizing the character of his conviction. Omar concedes that the crimes for which he is convicted are significant and serious offenses. However, the Government's sentencing Memorandum grossly distorts the circumstances of Omar's conviction by attempting to link him to ISIS "terror attacks in Beirut, Paris, Antwerp, Nice and San Bernardino…" as well as the "killing of fifty persons at a nightclub in Orlando." *Govts. Mem*., p. 44. These attacks occurred *after* Defendant's arrest and he was never involved in any of these nefarious acts. Indeed, had these events occurred prior to the Defendant's arrest, there is a significant likelihood that some or all of these young men—including Omar—would have reconsidered their path. Simple reality is that Omar's flirtation with ISIS, along with his co-Defendants, occurred before the truly amoral and brutish character of ISIS was revealed to this Defendant.

II. **THE GOVERNMENT'S SENTENCING MEMORANDUM EXAGGERATES THE DANGER PRESENTED BY THIS PARTICULAR DEFENDANT IN AN EFFORT TO JUSTIFY A FORTY YEAR SENTENCE.**

In its sentencing Memorandum, the Government essentially focuses on two factors to justify its recommended 40-year sentence: (1) Defendant's connection with both Al-Shabaab and ISIS and (2) Omar's multiple efforts to leave the United States. At the outset, Omar did not have meaningful contacts with either ISIS or Al-Shabaab. Omar's contacts with Al-Shabaab amount to a brother who left the United States for Somalia with whom Omar has had no contact for a decade and giving an acquaintance, who then traveled to Somalia, a ride to the airport. Here, the

only "contact" Omar had with Al-Shabaab was a personal acquaintance with two persons who may have associated themselves with that terrorist organization. It does not appear Omar has maintained communication with either[5] person. This contact amounts to little more than a suggestion Omar deserved additional punishment due to his background. Similarly, the Government's Sentencing Memorandum notes the number of social connections which Omar had at the time with others who have traveled abroad, including Troy Kastigaar, *Govts. Mem.*, p. 46. In this instance, Omar had no contact with Kastigaar, other than occasionally attending, as a child, social gathers where Kastigaar was also a guest.

In an effort to bolster its argument, the Government also attempted to cast Omar as some type of recruiter by alleging Omar is responsible for aiding or encouraging virtually every one of his co-Defendants in this scheme. *Govts. Mem.*, p. 46. This flies in the face of the PSR which labeled Omar, and the other Defendants, as "average participants." The PSR does not characterize Omar as a leader, organizer or a manager of this conspiracy. The truth is that a group of friends became influenced by ISIS propaganda, were then prompted by misguided naivete, complete with a desire to find a greater purpose in life and youthful notions of self-aggrandizement. Omar was one of that clique and interacted with his co-Defendants. To suggest these events would not have happened without Omar's involvement is a gross distortion of past events and ignored that every one of these Defendants were generally acquainted with multiple members of the conspiracy long before the series of travel efforts discussed at trial unfolded.

Omar's plans in 2012 also have little meaningful connection with the events of 2014. The Government introduced no evidence suggesting that Omar, a child, knew of his brother's travel plans to Somali. The Government's argument is that Omar's planned trip to Kenya was an effort to join Al-Shabaab is bereft of any support beyond suspicion and speculation. The Government

---

[5] At least one of those individuals has since died.

6

introduced no evidence rebutting the explanation proffered by Omar at his trial. While, admittedly, Omar's planned travel to Kenya was intended to facilitate a quasi-criminal scheme by allowing a female relative to feign marriage in a guise to enter the United States. This is dramatically different than joining a terrorist organization. Moreover, the participation of Omar's family in his 2012 trip suggest that Omar's trip to Kenya had no connection with Al-Shabaab. Since Omar's family disrupted his May 2014 trip abroad precisely because of that fear.

Similarly, the second factor cited by the Government, Omar's repeated efforts to leave the United States is also somewhat misleading. The testimony at trial, viewed most favorably to the Government, suggested that Omar sought to leave the United States in May 2014 but this effort was thwarted by his family. Omar sought to travel again in November 2014 to discover whether he would be permitted to board an airplane and this effort was prevented by the Government. The November 2014 trip does not appear to have been an effort to immediately leave the United States but, instead, an effort to determine whether Omar should continue pursuing this avenue. Omar's subsequent statements, including those on March 28, suggest that the November 2014 events caused him to recognize the futility of further efforts to leave.

### III.  THE GOVERNMENT ALSO EMBELLISHES THE DANGER PRESENTED BY THE DEFENDANT.

The Government suggests that Omar "has shown no remorse, no repentance and no willingness to accept what he has done violates society's norms or laws. *Govt. Mem.,* p. 50. This is not strictly true. Omar sought, as early as September 2015 to strike a deal with the Government as did several of his co-Defendants. Those Defendants were given an opportunity to appear in Court, enter a guilty plea which included a narration of their actions and an expression of remorse. Omar was denied that opportunity when the Government indicated it had no interest in entering into any plea negotiation with him. Omar sought, again, in the Spring of 2016 to

7

reach an agreement with the Government which would have avoided a conviction under 18 U.S.C. §956. The Government, again, was uninterested in this resolution.

Certainly, the U.S. Attorney is entitled to make whatever choices it wishes to in plea negotiations. However, to suggest the Defendant has showed no interest in acknowledging his responsibility when it is the Government's own actions which precluded these events from happening is disingenuous. If the Government would have shown any interest in allowing Omar to plead guilty, receiving the same consideration as it offered several of his co-Defendants, it is unclear whether this scenario would have unfolded.[6] What remains inescapable is that most of the Defendants in this case sought to negotiate a plea agreement with the Government. That process, if successful, resulted in some acceptance of responsibility by each Defendant. The gatekeeper for these admissions was the U.S. Attorney.

What is also clear is that Omar's plans, if he reached Syria, were extraordinarily vague. In general, the recorded conversations reveal Omar speculated about his own death if he traveled to Syria rather than consequences to others. Admittedly, Omar made a number of statements designed to inflate his sense of ego and self-importance concerning the great deeds he might accomplish on behalf of Islam if he reached the Middle East. Yet, Omar committed no acts of violence in the United States nor did he even possess a firearm in this country. His plans did not include attacking U.S. military forces and Omar refused Abdi Nur's enticement to commit misdeeds in the United States. Omar's behavior does not come close to that of Defendants

---

[6] This does not suggest that Defendant's testimony at trial was a cynical ploy or that his efforts to negotiate a plea agreement were a device to avoid responsibility. *If* the Government had been interested in pursuing a negotiated plea, it remains possible that the admissions sought by the Government would have been unacceptable to Omar. The plea negotiation may not have come to fruition because Omar sincerely did not believe he was culpable for any of the charged offenses. By the same token, an expression of willingness on the Government's part to negotiate a plea might have inspired a more searching dialogue between Omar, his counsel, and Omar's family concerning Omar's behavior and brought about a recognition on Omar's part that actions he believed to be innocent at the time actually contravened the law. This evolution never occurred because the Government had no interest in exploring this dialogue.

receiving sentences exceeding 15 years. The Government's request in this case seems to be based on the notion that it must craft a hierarchy among these co-Defendants similar to the organizational scheme of a business or drug trafficking organization (DTO). That is simply not a reflection of the relationship between these various high school friends and this template should not be an excuse punish Omar to a degree not justified by his actual conduct.

## **CONCLUSION**

For the above stated reasons, the Defendant respectfully requests that he be sentenced to a prison term of 15 years or less.

Dated: November 9, 2016
Respectfully submitted,

MITCHELL, BRUDER & JOHNSON
*/s/ Glenn P. Bruder*
Attorney for Defendant
7505 Metro Boulevard
Suite 325
Edina, MN 55439
(952) 831-3174