**UNITED STATES DISTRICT COURT**
**DISTRICT OF MINNESOTA**

_____

UNITED STATES OF AMERICA,

                 Plaintiff,

v.

GULED ALI OMAR,

                 Defendant.

                 **SENTENCING MEMORANDUM**
                       **AND OPINION**
                 Criminal File No. 15-49 (07) (MJD)

_____

John Docherty, Andrew Winter and Julie Allyn, Assistant United States Attorneys, Counsel for Plaintiff.

Glenn P. Bruder, Mitchell, Bruder & Johnson, Counsel for Defendant.

_____

## I.  SUMMARY OF SENTENCING DECISION

Following a jury trial, the Defendant was found guilty on all counts for which he was charged in the Second Superseding Indictment: Count 1, Conspiracy to Commit Murder Outside the United States in violation of 18 U.S.C. §§ 956(a) and (2); Count 2, Conspiracy to Provide Material Support to a Designated Terrorist Organization in violation of 18 U.S.C. § 2339B(a)(1); Counts 3 and 4, Attempting to Provide Material Support to a Designated Foreign

1

Terrorist Organization in violation of 18 U.S.C. §§ 2339B(a)(1) and 2; and Count

13[1], Attempted Financial Aid Fraud, in violation of 20 U.S.C. § 1097(a).

When imposing a sentence in any criminal case, this Court must take into

consideration the applicable guideline range calculated pursuant to the United

States Sentencing Guidelines ("USSG") and the statutory sentencing factors set

forth in Title 18 U.S.C. § 3553(a).

The Court has carefully considered all of these factors and finds that a

variance from the applicable sentencing guideline range of life in prison is

warranted.  Accordingly, the Court finds that a sentence of four hundred-twenty

(420) months is sufficient, but not greater than necessary, to comply with the

sentencing purposes set forth in both § 3553(a) and the relevant guidelines.

## II.    INTRODUCTION

Crimes that involve acts of terrorism "represent[] a particularly grave

threat because of the dangerousness of the crime and the difficulty of deterring

and rehabilitating the criminal [] thus [] terrorists and their supporters should be

---

[1]To avoid jury confusion, the jury was presented a redacted Indictment which omitted the counts against those defendants that entered into plea agreements.  As a result, the Special Verdict Form identifies the attempted financial aid fraud count as Count 10, but that same count is listed as Count 13 in the Second Superseding Indictment.

incapacitated for a longer period of time." <u>United States v. Meskini</u>, 319 F.3d 88, 92 (2d Cir. 2003).

In 2014, the Defendant agreed to conspire with others to join one of the most dangerous and violent terrorist organizations the world has ever known, the Islamic State of Iraq and the Levant ("ISIL"). By joining this conspiracy, the Defendant agreed to be part of the largest group of committed ISIL travelers from Minnesota; an ISIL terrorist cell that, left unchecked, could have caused immense destruction and the loss of many lives, both here and abroad.

As part of this cell, the Defendant watched some of the horrific propaganda videos produced by ISIL. These videos depict ISIL members killing innocent victims in the most violent and despicable manner, such as mass beheadings, shootings and in one case, a Jordanian pilot that was burned alive.

Each member of the conspiracy took affirmative steps to travel overseas to join and fight with ISIL. Some of the conspirators successfully traveled to Syria and joined ISIL; most of whom have since been killed.

The evidence at trial clearly demonstrated that each member of the conspiracy knew that what they were doing was wrong. To avoid the scrutiny of their families, friends and most importantly, law enforcement, they followed the

ISIL playbook, which counseled "fake it till you make it."  This strategy required

the conspirators to remain under the radar by going to school, working to

provide financial assistance to their families, attending the Mosque, and

remaining otherwise law-abiding.  This strategy also provided that if confronted

by law enforcement, they should loudly complain that they were being profiled

because they were Muslim.  In order to carry out this strategy, however, the

conspirators had to lie to their parents and family, to the FBI agents investigating

this case, to the grand jury and to the prosecutors.

The members of the conspiracy were deeply committed to the violent

jihadist ideology of ISIL.  Because of this commitment, they were **not** deterred

when subpoenaed to testify before the grand jury or when they received a target

letter[2] from the United States Attorney's Office.  Members were **not** deterred

when physically prevented from boarding flights here in Minneapolis or in New

York City in their effort to join ISIL in Syria.  They were **not** deterred when

confronted by their parents, grandparents or siblings.

Despite all of the obstacles put in their way, the members of this conspiracy

---

[2]A target letter is sent from the United States Attorney's Office informing the recipient
that he/she is a target of a federal criminal investigation.

continued the march toward their admitted objective; to be a committed jihadi warrior, and to travel to Syria to fight, kill and become a martyr.

## III.   FINDINGS OF FACT

The Court adopts the factual statements contained in the presentence report ("PSR") as its findings of fact.  In addition, the Court adopts those facts set forth in Common Appendix A to the Government's Position on Sentencing [Doc. No. 718] and attached hereto as Common Appendix A.

In addition, the Court takes into consideration all of the evidence introduced at trial[3] when imposing sentence.

## IV.   APPLICATION OF THE GUIDELINES

The Court found the applicable guideline range was based on a total offense level of 43 and a criminal history category VI, which results in a guideline range of life in prison.

### A.   Terrorism Enhancement

The Defendant objects to the application of the 12 level enhancement pursuant to § 3A1.4.  Section 3A1.4 (a) provides for a twelve level enhancement

_____

[3]The trial took place over nineteen days, during which 26 witnesses testified for the government, 1 witness for the defense and over 300 exhibits were admitted into evidence.

for crimes that involved, or were intended to promote, a federal crime of terrorism.  A federal crime of terrorism is defined as conduct that "is calculated to influence or affect the conduct of government by intimidation or coercion, or to retaliate against government conduct" and is a crime enumerated in 18 U.S.C. § 2332b(g)(5), which list includes 18 U.S.C. §§ 956 and 2339B(a)(1).  See Section 3A1.4, Application Note 1.

There can be no dispute that the crimes for which the Defendant was convicted are specified in § 2332b(g)(5).  The next inquiry is whether the crimes of conviction were calculated to influence, affect or retaliate against a government. "Many courts . . . interpret 'calculated' as nearly synonymous with intentional. Thus, 'if a defendant's purpose in committing an offense is to 'influence or affect the conduct of government by intimidation or coercion, or to retaliate against government conduct,' application of the terrorism enhancement is warranted." United States v. Siddiqui, 699 F.3d 690, 709 (2d Cir. 2012).

The Defendant argues no evidence at trial demonstrated that he hoped to influence the actions of any nation-state, or that he hoped to influence the policy of the United States or believed his actions would influence the conduct of the Syrian or Iraqi governments.  Instead, the evidence only showed he and his co-

6

defendants were motivated to join in a religious struggle against an Islamic sect; in other words to safeguard and protect Sunni Muslims in the Middle East.

This argument has no merit as it is not necessary that the Defendant was motivated to retaliate, influence or affect the conduct of a government. It is sufficient if there is evidence that the Defendant "intended to promote a crime calculated to have such an effect, i.e., that his offenses were intended to promote a federal crime of terrorism as defined in § 2332b(g)(5), whatever [the defendant's] reason for committing them." United States v. Awan, 607 F.3d 306, 317 (2d Cir. 2010); see also United States v. Ali, 799 F.3d 1008, 1031 (8th Cir. 2015) (whether terrorism enhancement applies depends on whether offense of conviction was calculated to influence or affect the conduct of government by intimidation, not on the defendant's motive for committing the offense); United States v. Jayyousi, 657 F.3d 1085, 1115 (11th Cir. 2011) (finding that "the Guidelines's precise language focuses on the intended outcome of the defendants' unlawful acts—i.e., what the activity was calculated to accomplish, not what the defendants' claimed motivation behind it was.").

To determine whether the Defendant intended to promote a crime calculated to influence, affect or retaliate against a government, the Court may

draw reasonable inferences regarding the Defendant's intent in committing the crimes of conviction based on the evidence.  United States v. Mohammed, 693 F.3d 192, 201-02 (D.C. Cir. 2012).  In fact, application of a particular guideline must be determined based on all acts committed by the Defendant and his co-conspirators that were in furtherance of the conspiracy.  Section 1B1.3(a) and (b).

In this case, the evidence clearly demonstrated that the Defendant intended to join and fight with ISIL, and that members of ISIL had repeatedly called for attacks against the United States and other Western countries.  The provision of material support to ISIL, the crime for which the Defendant was convicted, would clearly promote ISIL's purposes of committing terrorist attacks here and abroad.

Based on the evidence in the record, the Court finds that the terrorism enhancement clearly applies in this case.  Overwhelming evidence was presented at trial, including the expert testimony of Charles Lister, ISIL propaganda videos, social media content from the co-conspirators, as well as the Defendant's own statements, that showed the Defendant's actions involved or were intended to promote crimes that were calculated to influence or affect the conduct of government or to retaliate against these governments.

### B.      Obstruction of Justice

The Defendant argues application of a two level enhancement for

obstruction of justice is not warranted in this case.  The fact that the jury may not

have believed his testimony at trial does not require the enhancement.  Here, the

most damning evidence against the Defendant were his statements on multiple

recordings.  He admitted he made the statements, but claimed that he was merely

bragging.  This type of discredited testimony does not establish the necessary

predicate for the obstruction of justice enhancement.

The Court disagrees with the Defendant's characterization of his

testimony.  The Defendant's false testimony was calculated to protect himself and

his co-conspirators, as well as his fellow ISIL members that are still engaged in

committing terrorist acts.  The Defendant's statements were further designed to

denigrate the cooperating defendants who opted to speak out about the nature

and extent of the conspiracy and the Defendant's role in it.  The Court thus finds

that the Defendant obstructed justice by providing such false testimony to the

jury, therefore the obstruction enhancement is warranted.

### V.    SENTENCE

The Defendant is hereby sentenced to a term of imprisonment for four

9

hundred-twenty (420) months: four hundred-twenty (420) months on Count 1;

one hundred and eighty (180) months on Counts 2, 3 and 4, and sixty (60) months

on Count 13, all terms of imprisonment to be served concurrently.  Following the

term of imprisonment, the Defendant is subject to a life term of supervised

release on Counts 1, 2, 3 and 4, and three years supervised release on Count 13,

all terms of supervised release to run concurrently.  Based on the Defendant's

current economic condition, the Court did not impose a fine, but did impose a

special assessment in the amount of $500.

## VI.    STATEMENT OF REASONS

Pursuant to the Supreme Court decision in <u>United States v. Booker</u>, 543

U.S. 220 (2005), the United States Sentencing Guidelines are no longer

mandatory.  The Court is nonetheless required to take into account the applicable

Guideline range and the pertinent Sentencing Commission policy statements.  In

addition, the Court must impose a sentence sufficient, but not greater than

necessary, to comply with the following sentencing purposes:

> (A) to reflect the seriousness of the offense, to promote respect for
> the law, and to provide just punishment for the offense;

> (B) to afford adequate deterrence to criminal conduct;

(C) to protect the public from further crimes of the defendant; and

(D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner.

18 U.S.C. § 3553(a).

The Court also considers the nature and circumstances of the offense and the history and characteristics of the defendant; the kinds of sentences available; the need to avoid unwarranted sentencing disparities among defendants with similar records who have been found guilty of similar conduct; and the need to provide restitution to any victims of the offense.

### A.    Section 3553(a) Factors

#### 1.    Nature and Circumstances of the Offense

The Defendant was considered by his co-conspirators to be the "emir" of the charged conspiracy to travel overseas to join ISIL.  In that role, he participated in several meetings per week to discuss extremist views of the Koran and to watch ISIL propaganda videos.  He claimed to have helped others join al Shabaab in 2008, and that he tried to travel to Kenya in 2012 in order to join al Shabaab. Throughout the conspiracy, the Defendant used social media, such as Facebook and Twitter, to connect with young men who left the United States to fight for

11

ISIL and al Shabaab.  In fact, his Facebook account shows he had contact with

Mohamed Hassan ("Miski") and other members of al Shabaab from 2009 to 2012.

The Defendant also had a contact number for Abdi Nur, another co-conspirator

who had successfully traveled to Syria shortly after Abdullahi Yusuf's failed

attempt in May 2014.

After the close friend of Yusuf and Hamza Ahmed, Hanad Mohallim,

departed in March 2014, the Defendant explained to Yusuf that Mohallim had left

to join and fight with ISIL in Syria.  Thereafter, he brought Yusuf to the Dar al

Farooq Youth and Family Center to meet with co-conspirators Zacharia

Abdurahman, Abdirizak Warsame, Mohamed Farah, Abdi Nur and Abdirahman

Daud.  They played basketball and discussed the conflict in Syria.  They also

watched a number of "anti-West" videos prepared by ISIL.  The Defendant also

suggested that Yusuf read <u>Black Flags from the East</u>, which chronicled the rise of

the global jihad movement and presented terrorist groups Al-Qaeda and the

Taliban favorably.  Later, the Defendant gave Yusuf an ultimatum - he told Yusuf

he had to either confirm dedication to the plans to join ISIL in Syria or walk

away.[4]  Yusuf confirmed his dedication to the goals of the conspiracy, and with the Defendant's help, planned his travel overseas.

At that same time, the Defendant made his own travel plans in which he would drive to California, and from there fly to Syria.  For this trip, the Defendant withdrew $5,000 from his financial aid account and $1,200 from a personal bank account.  Less than one week before Yusuf's attempted travel, on May 24, 2014, co-conspirator Yusuf Jama rented a car and drove to the Defendant's house to pick him up, but the Defendant's family confronted them, took the car keys and prevented the Defendant from leaving.

To help Yusuf's travel, the Defendant provided him $200.  The Defendant also drove Yusuf to the passport office and helped him shop for supplies.  On May 28, 2014, Yusuf went to the Minneapolis/St. Paul airport in order to fly to Turkey.  At the airport, however, he was intercepted by the FBI and questioned about his travel plans.  At trial, Yusuf testified that the Defendant coached him on what to say to law enforcement if he was stopped, such as complaining that he was being profiled.

---

[4]The Defendant also gave co-conspirator Hanad Musse the same ultimatum.  Musse opted in immediately.

The Defendant also assisted Abdi Nur to travel to Syria. In a conversation recorded by the confidential human source, Abdirahman Bashir, the Defendant bragged about bringing Nur into the conspiracy. On or about May 29, 2014, Nur successfully traveled overseas and joined ISIL in Syria. He was later killed while fighting with ISIL.

One week after he was prevented from driving to California with the Defendant, Yusuf Jama successfully traveled to Turkey, and later joined ISIL. Jama was also killed fighting with ISIL, when he stepped on a claymore mine.

During the summer, the Defendant and his co-conspirators repeatedly watched the horrific ISIL propaganda videos which depicted mass murders and torture of innocent victims. They also met and made plans for future travel attempts. He also participated in paint ball sessions that were intended to be training for combat with ISIL.

In the fall of 2014, while helping to plan the travel of four co-defendants to New York City, the Defendant began making new plans for his own travel to San Diego. On November 6, 2014, the Defendant attempted to board a flight to San Diego, but he was intercepted by law enforcement. A few days later, his four co-defendants took a Greyhound bus to New York, and tried to fly overseas from

14

JFK airport.  The four were also prevented from traveling when intercepted by the FBI.

In other recordings made by Bashir, the Defendant can be heard talking about his previous travel attempts, as well as the attempts of his co-conspirators. From these recordings, it is clear that the Defendant considered himself to be the emir of the group.  There are also numerous recordings in which the Defendant discussed plans to obtain fraudulent passports.

In the spring of 2015, new plans were being made for members to travel to Syria, this time through Mexico, using fraudulent passports.  During one planning session, the Defendant was recorded as saying "Once I'm there . . it's do or die, bro.  I'm killing a nigga bro . . . [On God's name] if I'm in Turkey, Ha? [I swear] I'll kill them . . . I wish a security official would try to do something to me. Freaking pigs."

In another recording, the Defendant spoke of his contacts with Nur, and claimed that the terrorists who had attacked the mall in Kenya had also traveled via Mexico.  The Defendant also told Bashir that Nur had sent him a "hit list" which contained the names and addresses of U.S. Air Force pilots who were claimed to be responsible for the deaths of ISIL members.  The Defendant

reported that Nur wanted the pilots killed as revenge. The Defendant did not carry out the plot, however, recognizing "Nur thinks it's a battlefield. He thinks it's as easy as it is over there."

In another recording, the Defendant wondered whether this trip would provide an opportunity to share the route and their fake passport contact to ISIL in order to assist foreign terrorists in entering the United States. Ultimately, given his past failures to travel, the Defendant opted not to participate in this attempt, instead deciding to employ caution to ensure his co-conspirators success. As established at trial, this attempt by Bashir, Abdirahman Daud and Mohamed Farah also failed.

### 2.     History and Characteristics of the Defendant

The Defendant is a 22 year old, second generation Somali immigrant. He reports that he witnessed domestic violence on a regular basis while growing up and was physically, emotionally and sexually abused by his oldest brother. Another brother left the United States and joined al Shabaab in 2007.

In light of this abuse, the Defendant asserts he felt protective of his mother and younger siblings, and put their needs ahead of his own. He argues that he abused drugs and alcohol, and that such use made him pliable and contributed to

his participation in the offenses of conviction.  He claims that his drug/alcohol use made him feel unclean, and when he learned of the fighting in Syria, he sensed a calling to remedy the oppression and injustice and wanted Syrians to have basic rights.

The Defendant further claims he was drawn into an extremist ideology by the fact that his brother departed to join al Shabaab, and based on the circumstances which brought his family to the United States.  Once in the United States, he and other Somali families were excluded from the core community and experienced limited contact across groups, placing them in the margins of society.  He asserts that young Somali men like himself often develop a desire to do something meaningful in their lives, and that into this maelstrom, ISIL emerged as the vehicle through which they could find a sense of purpose and identity.

The Defendant further asserts that the government's depiction of ISIL videos was selective, and that selection does not appear to be a balanced perspective of ISIL's propaganda effort, which also includes photo essays depicting agriculture, crafts and industry.  When depicting military activity, the propaganda also employs a victimhood narrative, such as dead or maimed

children, women and old people.  It was ISIL that attempted to legitimize and justify the crimes of its members, and did not honestly portray itself as a brutal terrorist organization.

Since trial, the Defendant has reported that he does not bear a grudge against those who testified against him and views his prosecution as an "intervention."  The Defendant asserts his radicalization is an outgrowth of his isolation, deprivation and childhood exposure to violence.

The Court finds that the evidence at trial clearly demonstrated that the Defendant had a long-standing and singular commitment to terrorism and to organizations that engage in and promote terrorism.  Among the defendants to be sentenced, this Defendant stands alone as one who tried three separate times to join a terrorist organization: a 2012 attempt to join al Shabaab, and two attempts in 2014 to join ISIL.  He continued to plot another attempt in 2015.

The evidence at trial also demonstrated that the Defendant is directly linked to multiple terrorists, including al Shabaab members Miski and Bashi, his brother Ahmed Omar, Shirwa from Virginia, Troy Kastigar and others.  He also aided, encouraged and assisted many young men in joining or attempting to join ISIL, including Yusuf Jama, Abdi Nur, Abdullahi Yusuf, Abdirizak Warsame,

18

Hanad Musse, Zacharia Abdurahman, Hamza Ahmed, Adnan Farah, Mohamed Farah, Abdirahman DAud and Mohamed Roble.

The Court further rejects any claim that the Defendant sought to provide humanitarian aid to the people of Syria. No reasonable person would believe that ISIL was an organization involved in charity, the protection of innocent Syrians or the pursuit of fair government because no evidence was submitted to support such a contention.

To the contrary, the government's expert, Charles Lister, testified that al Qaeda separated from ISIL in 2014 because of the sheer brutality of ISIL's blood lust. Further, ISIL distributed and publicized a number of videos showing the beheading of hostages, the shooting of innocent civilians and the burning of a Jordanian pilot. These videos dispel any notion that ISIL was a "charitable" organization.

Finally, to the extent that the Defendant argues his young age is a mitigating factor to be considered when imposing sentence, the Court rejects such argument.

In <u>Miller v. Alabama</u>, the United States Supreme Court held that "the Eighth Amendment forbids a sentencing scheme that mandates life in prison

19

without possibility of parole for juvenile offenders." Id., 132 S. Ct. 2455, 2469 (2012). The Court found that a mandatory sentencing scheme of life in prison was unconstitutional because it did not allow the sentencing court to consider that children are constitutionally different from adults for purposes of sentencing. "Because juveniles have diminished culpability and greater prospects for reform, we explained 'they are less deserving of the most severe punishments.'" Id., at 2464 (citations omitted). In reaching this conclusion, the Court also recognized that children "lack [] maturity and [have] an underdeveloped sense of responsibility, leading to recklessness, impulsivity, and heedless risk-taking"; are more susceptible to peer pressure and have a limited control over their own environment; and their character is not well-formed and their "actions [are] less likely to be evidence of irretrievable depravity." Id. Because of these attributes, the Court held that "the penological justifications for imposing the harshest sentence" on juveniles are diminished, "even when they commit terrible crimes." Id. at 2465.

This Court has previously addressed the issue of youth as a factor in sentencing in United States v. Robert James Jefferson. In that case, the Court re-sentenced the defendant who had previously been sentenced to a mandatory life

20

term of imprisonment for murders committed when he was sixteen years old,

pursuant to the <u>Miller</u> decision.  Applying the principles set forth in <u>Miller</u>, and

specifically as to whether the crimes of conviction involved reckless or impulsive

behavior due to a lack of maturity in the <u>Jefferson</u> case, this Court found that

> [w]hile the criminal conduct at issue here is certainly reckless, the Court finds that such criminal conduct did not involve rash or impulsive behavior.  The fire bombing of the Coppage home involved planning, the creation of molotov cocktails and then waiting until dark to set the house on fire.  Jefferson had plenty of time to consider what he was doing and the consequences of starting a home on fire.  He had plenty of time to back out of the plan, but he did not do so.

<u>United States v. Jefferson</u>, No. 97-276, 2015 WL 501968, at * 5 (D. Minn. Feb. 5,

2015).

Applying the principles set forth in <u>Miller</u> in this case, the Court finds that

the record does not support a downward variance from the applicable guideline

range based on his young age.  First, the Defendant was not a juvenile when he

committed the instant offense.  Second, there is nothing impulsive about the

crimes of conviction.  The Defendant participated in a conspiracy that took place

over the course of one year.  The evidence at trial showed that the Defendant had

multiple opportunities to walk away from this conspiracy, but he did not do so.

He knew what he was doing was illegal, but he chose to continue his

participation in the conspiracy until the day he was arrested.

### 3. Seriousness of the Offense, Respect for the Law and Just Punishment, Deterrence and Protection of the Public

The atrocities committed by members of ISIL are well-known, and were known to this Defendant when he made the decision to join ISIL in Syria. The fact that the Defendant took affirmative steps to join ISIL is of paramount concern given that four men have died in Syria as a result of this conspiracy: Douglas McCain, Abdi Nur, Yusuf Jama and Hanad Mohallim.

The Defendant now stands convicted of serious offenses, and respect for the law and providing just punishment warrant a significant punishment. A significant sentence is also needed for individual deterrence, given the Defendant's persistent and long-lasting role in the conspiracy. A thirty-five year sentence is justified to protect the public from Defendant's deeply held desire to become an ISIL fighter and will deter others from committing similar crimes.

### 4. Unwarranted Sentencing Disparities

The government has filed reports on national terrorism sentencings that summarize sentencing data from cases around the country in which one or more defendants have been convicted of providing, or conspiring to provide, material

support and resources to the Islamic State in Iraq and the Levant ("ISIL").

The report includes information on 26 defendants.  Of these, four

defendants were convicted by a jury.

      **a.**    <u>**United States v. Sohiel Kabir and Ralph DeLeon**</u>**, (C.D. Cal. 12-92 VAP)**

After a six and-a-half week trial, Kabir and DeLeon were convicted of

multiple counts of conspiracy to provide material support to terrorists, in

violation of 18 U.S.C. § 2339A, conspiracy under 18 U.S.C. § 371 and conspiracy

to kill officers and employees of the United States in violation of 18 U.S.C. § 1117.

Kabir was sentenced to 300 months on the conviction of conspiracy to kill

officers and employees of the United States;  180 months on the material support

convictions, and 60 months on the conspiracy charge, all terms to be served

concurrently.  DeLeon was also sentenced to 300 months on two conspiracy to

murder charges, and 180 months on the material support counts, all terms to be

served concurrently.

      **b.**    <u>**United States v. Nader Salem Elhuzayel and Muhanad Elfaith M.A. Badawi**</u>**  (C.D. Cal. 15-60)**

The defendants in this case, Elhuzayel and Badawi, used social media to

discuss ISIL and terrorist attacks, expressed a desire to die as martyrs and made

arrangements for Elhuzayel to leave the United States. Elhuzayel also had contact with ISIL operatives and supporters, including Elton Simpson, one of the perpetrators of the May 2015 attack in Garland, Texas. The two defendants also carried out a significant bank fraud to raise travel funds. Both defendants were sentenced to thirty years in prison.

The Defendant argues the Court should not exclude those cases in which the defendants were convicted of less serious offenses simply because the government offered them a more lenient plea deal. Other than the fact that the Defendant went to trial, he is considered an average participant like his co-defendants, and he did not engage in conduct that was substantially different or more culpable than his co-defendants.

The Court disagrees with the Defendant's characterization of his culpability. Nonetheless, to avoid sentencing disparities, the Court is to consider defendants with similar records who have been found guilty of similar criminal conduct. Because the Defendant went to trial, the Court will consider only those cases that are similar to this Defendant.

Based on the data as to defendants convicted of similar offenses to those in this case and the Defendant's history and characteristics, the Court finds that a

24

sentence of thirty-five years avoids unwarranted sentencing disparities.

> ### 5.   To Provide Needed Educational/Vocational Training, Medical Care or other Correctional Treatment in the Most Effective Manner

Because of the risks of re-radicalization for defendants convicted of

terrorism offenses, and the fact that no program exists, either within or outside of

the federal prison system, that meets the standards of a qualified disengagement

and deradicalization program[5], the Court finds this factor does not support a

more substantial variance from the applicable guideline range.

---

[5]The Court appointed Daniel Koehler, Director of the German Institute on Radicalization and De-radicalization Studies, to conduct a risk assessment evaluation and recommendations as to intervention needs for de-radicalization for the co-defendants who entered into Plea Agreements in this and related cases.  In addition to submitting reports to the Court, Koehler testified during a two day hearing and was subjected to cross examination by the Court, the government and the defense.  Koehler has extensive experience working with individuals involved with terror groups, including Somali jihadists and violent neo-nazi extremists.  He has counseled approximately 200 cases in the last six years, and is working to develop programs for the successful de-radicalization of those involved in terrorism related cases.  Koehler has suggested that such a program should involve expert personnel in the areas of religion, psychology, education and socialization.

### 6.    Conclusion

Taking into account all of the above, the Court finds that a sentence of four hundred-twenty (420) months is sufficient, but not greater than necessary, to comply with the sentencing purposes set forth in both § 3553(a) and the relevant guidelines.

Date: December 5, 2016

s/Michael J. Davis
Michael J. Davis
United States District Court