## UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

| | | |
|---|---|---|
| GULED ALI OMAR, | * | |
| Petitioner, | * | Criminal No.: 15-49 (MJD/FLN) |
| v. | * | |
| | | Civil No.: _____ |
| UNITED STATES OF AMERICA | * | |

\*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*

## MEMORANDUM IN SUPPORT OF
## MOTION TO VACATE OR CORRECT ILLEGAL SENTENCE

Petitioner Guled Ali Omar, through his attorneys, C. Justin Brown (Brown Law) and James M. Ventura (James M. Ventura Attorney at Law), hereby moves this Honorable Court, pursuant to 28 U.S.C. §2255, to vacate or correct his illegal sentence.

Guled Omar was just 20 years old when he was charged, along with several of his peers, with conspiring and attempting to provide material support to a terrorist organization. Omar had never before been charged with a crime, and he relied heavily on his trial counsel's advice. But from the outset, Omar was deprived of his constitutional right to effective assistance of counsel when his attorney failed to negotiate a plea agreement and, in the alternative, failed to advise Omar that he could plead guilty even without an agreement. Trial counsel's errors continued through jury selection, during trial, and at sentencing, when trial counsel failed to adequately challenge a draconian enhancement that unreasonably caused Omar's sentencing range to skyrocket. As a result of these multiple failures, Omar was convicted on all counts and is now serving a 35-year sentence in U.S.P. Leavenworth.

## I.   PROCEDURAL HISTORY

On April 18, 2015, a criminal complaint was filed charging Omar and five others with conspiring and attempting to provide material support to a terrorist organization, in violation of 18 U.S.C. § 2339(B)(a)(1) and (2). He was indicted on these same charges in a superseding indictment filed on May 18, 2015. Five months later, on October 21, 2015, a second superseding indictment was filed, adding the charges of conspiracy to murder outside the United States, in violation of 18 U.S.C. § 956(a); a second count of attempting to provide material support to a terrorist organization, in violation of 18 U.S.C. § 2339(B); and attempted financial aid fraud, in violation of 20 U.S.C. § 1097(a).

On June 3, 2016, following a four-week trial, the jury found Omar guilty on all counts. This Court sentenced Omar to 420 months' incarceration on November 16, 2016.

Omar timely filed an appeal to the Eighth Circuit on November 28, 2016, challenging his conviction for conspiracy to commit murder based on an erroneous jury instruction, and challenging his sentence on the ground that it was disproportionate as compared to both his co-conspirators and others similarly situated across the country. The Eighth Circuit affirmed Omar's convictions and sentence on August 10, 2018. *United States v. Farah*, 899 F.3d 608 (8th Cir. 2018). Specifically, the Eighth Circuit found that any error in the jury instructions for the murder count was harmless, and that Omar's sentence was not substantively unreasonable.

Omar filed a timely petition for rehearing en banc, which the Eighth Circuit denied on October 1, 2018. Omar asked his attorney to petition the Supreme Court for a Writ of

Certiorari; however, trial counsel missed the filing deadline, and the requested petition was never filed.

This Motion, pursuant to 28 U.S.C. § 2255, is timely filed.

## II.   FACTS

This case stems from the efforts of Omar and various other young Somali Americans in Minnesota to travel to Syria and join ISIL's fight against the Syrian government. The evidence at trial revealed that, over the course of a year, Omar and several peers discussed and devised plans to travel from the United States to Syria. However, the Government's evidence also supported the theory that these men were not motivated by a desire to bring harm to the United States. Indeed, this case did not involve any plots to harm Americans or to commit terrorist attacks on U.S. soil (or elsewhere). Rather, these men were deeply troubled by the brutal civil war in Syria, where the regime of Bashar al-Assad was responsible for heinous acts of violence against innocent Muslims. Their desire to join ISIL was motivated primarily by their desire to fight against the Assad regime. Ultimately, nine young men, including Omar, were charged in connection with these efforts.

### A.   Pretrial Phase

Omar was arrested in April 2015. Initially, he was charged with conspiring and attempting to provide material support to ISIL. The Government's theory was that by lending himself to ISIL's efforts, he was providing human capital to ISIL. Omar and his codefendants were later added, by superseding indictment, to the case against Hamza

Ahmed, one of Omar's peers who had been stopped in a New York airport trying to travel to Turkey.

Omar was appointed counsel pursuant to the Criminal Justice Act. At a very early stage in his case, Omar told his attorney that he wanted to plead guilty. Several of his codefendants entered into cooperation agreements with the Government; but when Omar's counsel sought a plea agreement for him, the Government declined to extend an offer. Omar was then charged, in a second superseding indictment, with conspiracy to commit murder abroad. This count was not based on any actual plot to commit murder. Rather, the Government's theory was that joining a violent organization like ISIL inherently involved a willingness and intent to commit murder on ISIL's behalf.

Omar again sought to plead guilty. The Government was willing to negotiate a plea, but it would have required Omar to plead guilty to the conspiracy to commit murder. Trial counsel informed both Omar and the Government that Omar could not plead guilty to that count because it was not supported by the facts. At that point, trial counsel refused to engage in further plea discussions with the Government. He advised Omar that, without an agreement, he had no choice but to proceed to trial. Omar's attorney did not tell him that he did not need the Government's permission to plead guilty. Omar was completely unaware that, even without an agreement, he could plead open to the indictment. Exhibit 1 (Affidavit of Guled Omar). Nor was he aware that, by doing so, he would still be eligible for a three-level reduction that would lower his Guidelines range and thus, his sentence. *Id.* Believing – based on his attorney's advice – that he had no other options, Omar proceeded to trial.

**B.     Trial**

Omar's trial started on May 9, 2016, and lasted approximately three weeks. The Government called a total of 25 witnesses, including three cooperators (one of whom was a paid informant). According to the Government, Omar and his peers had plotted over the course of a year to leave the country, and this plot occurred in three distinct phases: the spring of 2014 (Phase One), the fall of 2014 (Phase Two), and the spring of 2015 (Phase Three).

**1.     Spring 2014**

In March 2014, Hanad Mohallim – a high school student and one of Omar's peers – traveled to Syria. Around this same time, one of Mohallim's good friends, Abdullahi Yusuf, had developed an interest in Syria after writing a school paper discussing the Syrian government's slaughter of its own people – innocent Muslims. Tr. 05/13/16 at 509. Mohallim's departure spurred significant interest among his peers, including Omar, who often gathered at the local mosque to discuss the "humanitarian…crisis in Syria." Tr. 05/16/16 at 729.

Initially, this group's discussions did not center on ISIL or joining the Islamic State. Instead, they discussed the Koran, current events, and the atrocities being committed by the Assad regime. Tr. 05/13/16 at 537, 562; 05/16/16 at 736. It was not until Yusuf joined the group that the nature of the group's discussions shifted toward politics. Tr. 2633-35. This group, consisting of various young men who knew one another from school, mosque, or their neighborhoods, quickly became consumed by the conflict in Syria.

By May 2014, at least some members of the group had shifted from mere discussion to activism, and they began formulating plans to travel to Syria. Yusuf, for example, testified that by April 2014, after making contact with Mohallim, he had made the decision to join Mohallim in Syria and fight for ISIL. Tr. 05/13/16 at 579. Although Yusuf – who later cooperated against Omar – claimed that Omar gave a speech to the group stating that its purpose was "to go to Syria and fight" (*Id.* at 564), he did not initially identify Omar as one of the people who had decided to join ISIL when Yusuf was interviewed by the FBI. Yusuf also asserted that Omar had been elected "Emir," or leader of the group, *Id.* at 586; however, the testimony of other witnesses made clear that this leadership role was of a short duration, and for the limited purpose of overseeing the group's religious studies of the Koran. Tr. 05/24/16 at 2230.

According to the Government's evidence, May 2014 saw the first efforts among this group to leave the United States. One plan involved Omar, Bashir, and Yusuf Jama. According to Bashir, the three planned to travel to California using a rental vehicle and, from there, travel to Mexico and eventually to Syria. The effort was thwarted by Omar's family before the three left Minneapolis. Apparently, Omar's family felt Bashir was untrustworthy and that Omar would be at risk traveling with him. Omar, however, testified that the trip had nothing to do with traveling abroad. Rather, Bashir had previously lived in California, and Omar wanted to vacation there because he had only ever traveled to Texas.

Indeed, the evidence at trial belied Bashir's claim that this trip was the first stage of their plan to travel to Syria. Specifically, Bashir testified that he needed to go to

California to get his birth certificate so that he could obtain a passport; but he admitted that he spent the entire summer there and took no steps to obtain either. Tr. 05/23/16 at 1951-52. In addition, none of the travelers spoke Spanish, nor had they purchased any airfare from Mexico to Turkey or any other European location. The Government presented no evidence that Bashir, Omar, and Jama had sufficient funds at the time to pay for tickets abroad. Nor was there evidence that any of them even searched for airfare within Mexico or abroad at the time of their planned departure from Minnesota.

While the actual nature of the May 2014 road trip may have appeared uncertain, other members of the group made unquestioned efforts to travel to Syria during this month. On May 28, 2014, for example, Yusuf was stopped by FBI agents at the Minneapolis/St. Paul International Airport. Yusuf planned to travel to Europe, and then from Turkey to Syria. Yusuf had purchased his airfare using a Wells Fargo bank account opened at the suggestion of Abdi Nur.[1]

On May 27, 2014, the day before his scheduled departure, Yusuf went shopping with Abdirizak Warsame, Mohamed Farah, and Nur to buy clothing for his trip. Warsame, Nur, and Farah also helped Yusuf print his itinerary. Yusuf took a light rail train to the airport, purportedly to avoid surveillance.[2] The day after Yusuf was stopped at

[1] Yusuf claimed that Jama gave him $1000 for his travel, and that Omar had paid Yusuf's $200 passport fee. However, Omar denied making this payment, and no evidence was presented by the Government to support Yusuf's claim.

[2] Although Yusuf claimed that this strategy was recommended by both Bashir and Omar, Omar himself made several trips to the airport and never utilized public transportation.

the airport, on May 29, 2014, Nur successfully traveled Syria. Approximately ten days later, Jama successfully traveled to Syria as well.[3]

### 2.    Fall 2014

Throughout the summer of 2014, Omar had only sporadic contact with his purported co-conspirators. Their occasional activities together were typical of teens and included playing sports, such as basketball, together. This did not involve planning travel to Syria. During this period, a number of young Somali, men including Omar and other teens not connected with this group, gathered to play paintball. Although the Government attributed sinister motives to the group, none of the participants played paintball with the purpose of training to fight abroad.[4] Tr. 2248-49. Kevin Mossing, the manager of the paintball facility, testified at trial that the group included 20-40 young Somali men, and that the group simply appeared to be "a bunch of kids playing." Tr. 05/24/16 at 2144.

The focus, for some members of the group, changed again in September 2014. At that time, Yusuf received a text message from his attorney warning that he would be arrested within a "couple of weeks." Tr. 05/13/16 at 676. This renewed Yusuf's desire to

---

[3] There was no testimony linking Omar to Jama's June 9th trip. Apparently, Jama reached out to Warsame for assistance, complaining that everyone had "given up" on traveling to Syria. Tr. 05/25/16 at 2245; T. 05/23/16 at 2244. After reaching Turkey, Jama called Warsame seeking assistance on reaching Syria and making contact with ISIL. Warsame reached out to Bashir, who was then in California, and received a contact number for an ISIL operative, which Warsame then forwarded to Jama. *Id.* at 2246-47.

[4] Yusuf testified that *he* was under the impression that others were using the paintball session as a training session for combat. Tr. 05/16/16 at 756-57. However, he admitted that no one actually said this, and it was never discussed as a training session by anyone in the group. *Id.* No other witness corroborated Yusuf's claim that this was a combat training session.

leave the United States and prompted him to meet with others to discuss leaving the country. Everyone except Omar told Yusuf he should leave, at which point he started plotting, along with Daud, Adnan Farah, and Mohamed Farah, to get to Syria. *Id.* Omar, meanwhile, encouraged Yusuf to stay, warning him that attempting to flee would only make matters worse, and that he should confront his circumstances head on. This angered Yusuf, who felt that Omar believed he was not being investigated and was unconcerned about Yusuf's fate.

Many of the ensuing "plans" by Yusuf, Daud, and the Farah brothers to leave the country were farfetched and unrealistic. For example, the group discussed stealing passports from third parties, traveling to South America and then to Syria on a container ship, or taking a cruise from Brazil to Turkey. Omar was aware of these discussions but did not participate in the effort, claiming that Daud was rushing everyone to leave by November 8th.

Before Yusuf could leave the United States, he was arrested. This only encouraged other members of the group, including Mohamed Farah, Abdurahman, Musse, and Ahmed to continue their planning. Ultimately, on November 8, 2014, these four took a bus from Minneapolis to New York and attempted to leave for Syria from JFK Airport.[5] Each had booked airfare to Europe in the days prior to arriving at JFK, and some of them – according to their itineraries – were going to spend less than 48 hours in Europe. Each

[5] During the trial, the Government often referred to Mohamed Farah, Abdurahman, Musse, and Ahmed as "the JFK Four."

traveler was stopped and interviewed by the FBI, and each gave implausible stories about their planned "vacations." The four were then returned to Minnesota.

During November 2014, Omar also attempted to travel to California. Omar purchased roundtrip airfare that included a stay of several days in California. Omar's family was aware of his planned vacation, as were his friends; and in fact, he was driven to the airport by his older sister. On the way there, Omar noticed law enforcement agents following his sister's vehicle, but, feeling he was allowed to travel domestically, Omar reported for his flight. Once at the airport, however, Omar was detained by law enforcement authorities and barred from the flight. The Government presented no evidence that Omar had booked airline tickets for travel outside the United States during this timeframe, nor that he had even explored doing so.[6]

### 3.     Spring 2015

The final purported stage of the conspiracy had its genesis with Bashir's transition from committed ISIL sympathizer to paid Government operative. By December 2014, the Minneapolis teens were increasingly aware that law enforcement authorities were suspicious of their activities. Several received subpoenas to testify before the Grand Jury, including Bashir. During his initial testimony, Bashir essentially denied any knowledge of a conspiracy or efforts by local Somali Americans to travel abroad.

Bashir was later subpoenaed to testify before the Grand Jury a second time. By the conclusion of that interrogation, alarmed that authorities had much more information

---

[6] Consistent with Omar's testimony, Yusuf – one of the Government's principal informants – initially described Omar's November 2014 trip as a legitimate vacation to California.

about his activities than he previously believed, Bashir approached local FBI agents and brokered an arrangement in which he would become a paid informant for the Government. This agreement proved to be highly lucrative for Bashir: as a result of his cooperation, Bashir was paid approximately $119,000 by the Government. Bashir conceded that working for the Government as a paid informant was "the best job [he] ever had." Tr. 05/23/16 at 1959.

Between late January and April 2015, Bashir secretly recorded numerous conversations between the friends he deemed co-conspirators, including Omar. The conversations involved a wide range of topics. During these conversations, Omar made several comments that the Government later introduced to support their theory that Omar was still planning to travel abroad, despite his unwillingness to join the plans of other members of the group. At trial, Omar explained that he was often high and generally bragging during these conversations, and that he had no understanding of the implications of his teen braggadocio. Omar added that he felt challenged by Bashir to proclaim his commitment to Jihad because Bashir often taunted Omar and sought to cast doubt on his commitment to the cause. This was supported by several of the recorded conversations.

In early 2015, Bashir and his FBI handlers concocted a scheme in which Bashir told his friends he had found a contact in San Diego who could get them fraudulent passports. According to Bashir, he and his friends would use these passports to eventually get to Syria and join ISIL, avoiding detection by law enforcement.

Some of the defendants in this case, such as Daud and Mohamed Farah, eagerly accepted Bashir's invitation. Others, such as Adnan Farah, went as far as agreeing to pay

for the fraudulent document, though he did not ultimately do so. Unlike some of his friends, however, Omar refused to purchase a passport or otherwise participate in the group's plan to leave the United States, despite repeated and persistent urging by Bashir. Omar's recorded statements suggested two possible reasons for his resistance: first, he questioned whether traveling to Syria to gain martyrdom was truly in line with his beliefs and served his religion, and he had concerns about the impact to his family; alternatively – and the theory the Government advanced at trial – Omar lost faith that any of the group would be allowed to leave the country and felt that this latest plan was doomed to failure. Either way, these conversations made clear that Omar was not involved in or supportive of any attempts to travel to Syria during this timeframe.

At trial, Omar elaborated on his sentiments, explaining that his proclamations of support for this cause had, from the outset, been insincere. Omar stated that Bashir had repeatedly challenged his masculinity and courage. This was supported by Bashir's own testimony. Omar, in turn, felt the need to convince Bashir and others of his commitment to Islam, although internally, Omar felt he would quickly become a casualty and had no desire for his own death. Omar stated that when Bashir presented the passport scheme, he felt trapped and, after making a series of excuses, was finally forced to renounce the concept of identifying with ISIL altogether.

The jury apparently rejected at least part of Omar's testimony and found him guilty on all counts, including (most significantly) conspiring to provide material support to a terrorist organization and to commit murder outside the United States.

### C.    Sentencing

After trial, a Presentence Investigation was completed. Omar's base offense level for the conspiracy to commit murder count – the most serious of Omar's convictions – was 33. Presentence Investigation Report ("PSR") at 43, ¶163. However, because Omar's testimony was inconsistent with other evidence and was apparently rejected by the jury, Omar was penalized with a two-level increase for obstruction of justice. PSR at 44, ¶ 167. Although the Government attempted to depict Omar as a leader of this conspiracy, the agent completing Omar's PSR disagreed, finding instead that Omar was an average participant. PSR at 44, ¶ 166. Thus, Omar did not receive any additional points for his role in the offense. *Id.* Absent any additional adjustments, Omar's final offense level would have been 35.

Because Omar had never been convicted of (or even charged with) a crime, his criminal history score was zero, placing him in criminal history category I. PSR at 46, ¶ 189. This would have produced a sentencing range of 168 to 210 months. However, because Omar was convicted of crimes involving terrorism, a "terrorism enhancement" applied to his case. *See* USSG § 3A1.4; PSR at 43, ¶ 165. This enhancement affected Omar's guidelines in two significant ways. First, it added 12 points to his offense level, causing his offense level to soar from 35 to 47. *Id.* Second, it increased his criminal history category to VI, despite the fact that he had no prior convictions. PSR at 46, ¶ 190. Thus, Omar's recommended sentencing range skyrocketed from a potential 14-to-17.5 years, to life imprisonment.

Omar's counsel challenged the application of this enhancement on legal grounds, arguing that Omar's conduct did not fall under its purview. However, the court – relying on controlling case law – rejected this challenge. Trial counsel did not raise any other challenges to the enhancement.

Omar appeared for sentencing on November 16, 2016. The hearing began with the Court strongly admonishing trial counsel for comparing Omar and his friends to the Three Stooges, and ordering counsel to apologize. Tr. 11/16/16 at 4. Then, during his presentation, trial counsel described Omar as "a wanna-be terrorist." *Id.* at 8. This again drew the ire of the court. After Omar's allocution, the court again admonished counsel, stating, "I better not see wanna-be used with any of these codefendants. They're not wanna-bes. … Each of these defendants were committed Jihadists." *Id.* at 23.

After a lengthy allocution in which Omar apologized to the Court and his family, the judge told Omar that he did not believe anything Omar had said. Omar was then sentenced to a total term of 420 months' imprisonment. *Id.* at 32.

### III.   LEGAL STANDARD

The Sixth Amendment guarantees not only the right to counsel, but the right to effective assistance of counsel. *Strickland v. Washington*, 466 U.S. 668 (1984). In order to prevail on a claim of ineffective assistance of counsel, a petitioner must establish that (1) his counsel's performance was deficient, and (2) the deficient performance prejudiced the defense. *Id.* at 687. To establish deficient performance, a petitioner must show that, under all the circumstances, counsel's performance "fell below an objective standard of reasonableness." *Strickland*, 466 U.S. at 688. To establish prejudice, a petitioner "must

show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694.

As to prejudice, the Supreme Court explained in *Strickland* that "a defendant need not show that counsel's deficient conduct more likely than not altered the outcome of the case." 466 U.S. at 693. All that is required is a reasonable probability. When there is a "reasonable probability" that the outcome of the trial was influenced by counsel's errors, then fundamental reliability has been undermined, and the defendant has been denied his constitutional right to effective representation. *Id.*

Critically, all criminal defendants are equally entitled to effective assistance of counsel under the Sixth Amendment – regardless of actual guilt or innocence. *Kimmelman v. Morrison*, 477 U.S. 365, 380 (1986) ("[W]e" have never intimated that the right to counsel is conditioned upon actual innocence. The constitutional rights of criminal defendants are granted to the innocent and the guilty alike.").

## IV.   ARGUMENT

### 1. Ineffective Assistance During and in Relation to Plea Negotiations

Prior to trial, Omar was denied his constitutional right to effective assistance of counsel in connection with his efforts to plead guilty in this case. At various points between his arrest and trial, Omar had opportunities to negotiate a plea with the Government, and he desired to do so. However, his attorney failed to either secure a plea agreement, or to advise Omar that he could plead open to the indictment without an agreement. Ultimately, as a result of trial counsel's multiple failures, Omar proceeded to trial, was convicted, and is now serving a 35-year sentence.

Omar was initially charged only with conspiring and attempting to provide material support to a terrorist organization, which carried a maximum penalty of 15 years. Omar advised his attorney he wanted to plead guilty and instructed him to seek a plea agreement. Trial counsel made an overture, but at that time, the Government did not have an offer to extend to Omar. However, the Government expressed – repeatedly – its willingness to negotiate a plea in Omar's case, and invited counsel to propose a resolution. Despite Omar's wishes, counsel did not do so. Even as the Government threatened to file a superseding indictment charging Omar with conspiracy to commit murder abroad, counsel failed to pursue plea negotiations with the Government. Trial counsel was warned that if Omar decided to plead guilty after such charges were filed, any agreement would have to include a plea to the murder count. Still, counsel sat on his hands.

On October 21, 2015, as promised, the Government filed a second superseding indictment. Omar now faced new charges of conspiracy to commit murder abroad, and attempted financial aid fraud. This caused his sentencing exposure to skyrocket to life imprisonment. Again, the Government expressed, on several occasions, a willingness to resolve Omar's case by plea. Trial counsel incorrectly advised Omar (and the Government) that Omar could not plead guilty to the murder count because the facts would not support a conviction on that count. Even after the Government explained its basis for the count and how Omar could, in fact, plead guilty to that offense, trial counsel persisted in misadvising his client. He refused to negotiate a resolution with the Government, and he advised Omar not to plead guilty and to go to trial, which Omar did.

Omar, a 20-year-old with no criminal history, did not know trial counsel was wrong. Nor did he know – because trial counsel never told him – that even without a plea agreement from the Government, he could still plead guilty. Had he known this, he would have pleaded guilty, as was his desire all along. Had he done so – either prior to or after the second superseding indictment – he would have received credit for acceptance of responsibility and ultimately, a more lenient sentence. However, because of his attorney's multiple failures – in failing to pursue a plea, in failing to advise Omar that he could plead open, and in misadvising Omar that he could not be convicted of the murder count – Omar proceeded to trial, was convicted on all counts, and received a 35-year sentence.

### a.      Failure to Propose Plea Prior to Second Superseding Indictment

Trial counsel was constitutionally ineffective during the first round of plea negotiations when he failed to propose a plea offer for the Government's consideration prior to the filing of the second superseding indictment. Omar had an opportunity to plead guilty early on in this case, before being charged with a murder conspiracy, and when the most serious offense he faced carried a maximum penalty of 15 years. As a result of trial counsel's unreasonable errors, that opportunity was lost, and Omar was ultimately convicted of more serious offenses and sentenced to a much harsher term of 35 years.

Omar told his attorney that he wanted to plead guilty. To that end, trial counsel sought a plea offer from the Government sometime near the end of August or beginning of September 2015 – approximately two months before the superseding indictment was filed. At that time, the Government did not extend an offer to Omar, but invited counsel

to submit a proposed plea for the Government's consideration. Trial counsel suggested an offer similar to those that had been made to several of Omar's codefendants; however, the Government took the position that Omar was more culpable than those codefendants and informed counsel that any resolution would have to reflect this. After that, trial counsel abandoned any efforts to secure a plea agreement.

Trial counsel knew as early as August that the Government was threatening additional charges, and specifically, a count of conspiracy to commit murder abroad. He knew that Omar wanted to plead guilty and that the window for a guilty plea to the "material support" charges was closing soon. He also knew that the Government was willing to negotiate with Omar, and that it was up to him to propose a resolution. Finally, he knew that, once the second superseding indictment was filed, any resolution would have to include a guilty plea to the conspiracy-to-commit-murder count. Nevertheless, counsel took no action. He made no further attempts to discuss a potential plea with the Government. As a result, on October 21, 2015, Omar was charged with conspiracy to commit murder abroad.

The prejudice Omar suffered as a result of trial counsel's deficient performance cannot be overstated. Prior to October 21st, the most serious offense he was facing carried a maximum penalty of 15 years. His Guidelines range at that time, even with the terrorism enhancement, would have been 292 to 365 months – more than ten years less

(from the bottom of that range) than the sentence he is now serving.[7] That exposure skyrocketed to life imprisonment after the second superseding indictment was filed.

Meanwhile, Omar's codefendants who took advantage of the Government's offers and pleaded guilty during this window all ended up with ten-year sentences. Trial counsel should have engaged the Government in plea negotiations and proposed a resolution as he had been invited to do, prior to the filing of the second superseding indictment. Had he done so, there is a reasonable probability that Omar would have pleaded guilty and avoided the murder charges, and he would be serving a much lesser sentence.

### b. Failure to Advise Omar of Right to Plead Open Prior to Second Superseding Indictment

Alternatively, trial counsel was constitutionally ineffective for failing to advise Omar that he could plead guilty without an agreement ("plead open"), and that by doing so he could receive a two- or three-level reduction for acceptance of responsibility. To the extent that trial counsel perceived the Government's communications as an unwillingness to even entertain a plea in Omar's case (which would have been an unreasonable interpretation of the Government's communications), trial counsel should have advised Omar to plead open prior to the filing of the second superseding indictment. As explained above, trial counsel knew that Omar wanted to plead guilty, and that failing to do so prior to the second superseding indictment would result in a substantially longer

---

[7] Omar's base offense level for the material support charge would have been 26. USSG (2015), § 2M5.3; *see also* PSR at 44. After subtracting three levels for acceptance of responsibility and adding 12 levels pursuant to the terrorism enhancement (USSG § 3A1.4), Omar's adjusted offense level would have been 35. With a criminal history category VI (also pursuant to the terrorism enhancement), Omar's sentencing range would have been 292-365 months.

sentence upon conviction – whether by guilty plea or after a trial. If he believed that the Government was not willing to negotiate a plea for Omar, trial counsel should have advised Omar that he had the option to plead open. Had he done so, Omar likely would not have been charged with or convicted of the murder count, and he would be serving a lesser sentence.[8]

The Sixth Amendment right to effective counsel extends to all critical stages of a criminal case, including when a defendant is deciding whether to plead guilty or proceed to trial. *See Lafler v. Cooper*, 566 U.S. 156, 162 (2012) ("Defendants have a Sixth Amendment right to counsel, a right that extends to the plea-bargaining process"); *Von Moltke v. Gillies*, 332 U.S. 708, 721 (1948) ("Prior to trial an accused is entitled to rely upon his counsel … to offer his informed opinion as to what plea should be entered"); *see also Hawkman v. Parratt*, 661 F.2d 1161, 1170 (8th Cir. 1981) (the decision to plead guilty [or go to trial] "cannot be a conscious, informed choice if the accused relies upon counsel who performs ineffectively in advising him regarding … the feasible options"); *Colson v. Smith*, 438 F.2d 1075, 1079 (5th Cir. 1971) (citing to various Supreme Court cases noting the importance of counsel's role "in the process of deciding how to plead").

To safeguard this right, attorneys have a duty to properly advise defendants of all available options, to ensure that the defendant's decision between pleading guilty and

---

[8] Although it is possible that, without an agreement, the Government still would have chosen to file additional charges against Omar, Omar would have been in a much more favorable position at that point, having already expressed a willingness to accept responsibility for his conduct. In any event, as discussed *infra* in Section 2(e), Omar also could have pleaded open to the murder count, and he still would have been in a more favorable position.

going to trial is an informed one. The failure to advise a defendant of the option to enter an open guilty plea can, therefore, constitute ineffective assistance of counsel. *United States v. Booth*, 432 F.3d 542 (3d Cir. 2005). Further, "even if the trial itself is free from constitutional flaw, the defendant who goes to trial instead of taking a more favorable plea may be prejudiced from … the imposition of a more severe sentence." *Lafler*, 566 U.S. at 166.

In *Booth*, the Third Circuit found that the defendant was prejudiced by his attorney's failure to inform him that he could plead open to the charges against him, thereby depriving him "of the opportunity to make a reasonably informed decision regarding whether to change his plea or proceed to trial." 432 F.3d at 549-50. In that case, the defendant was charged in a two-count indictment for his role in a pipe-bomb explosion at an apartment building. *Id.* at 543. He rejected a cooperation agreement, under which he would have received a 60-month sentence. *Id.* at 544. Unaware that he could plead guilty despite his rejection of the cooperation agreement, the defendant proceeded to trial, was convicted, and was sentenced to two concurrent terms of 90 months. *Id.* His post-trial sentencing range was 78 to 97 months, compared to the 51-to-71 month range he would have faced after a three-level reduction for acceptance of responsibility had he pleaded guilty. *Id.* at 546.

The defendant subsequently filed a § 2255 motion – which the district court erroneously denied without a hearing – alleging ineffective assistance of counsel for counsel's failure to advise him that he could plead open to the indictment. *Id.* The Third Circuit reversed and remanded, finding that Booth raised sufficient allegations to support

his claim of ineffective assistance of counsel. Specifically, the court intimated that Booth's allegations, if true, would constitute deficient performance because his unawareness of a third option – to plead open – deprived him of the right "to make a reasonably informed decision" regarding pleading guilty or going to trial. *See id.* at 549. The Third Circuit also found that "Booth was prejudiced because, by proceeding to trial and becoming ineligible for the three-level adjustment for acceptance of responsibility, he was exposed to an additional 19 to 30 months imprisonment." *Id.* at 548-49.

Here, Omar suffered the same fate. Omar wanted to plead guilty, but his trial counsel failed to advise him of all of his options, and affirmatively misadvised him – once the Government declined to offer a plea – that his only option was to go to trial. Trial counsel was wrong. As in *Booth*, Omar had a third reasonable option, which was to plead guilty without an agreement. Trial counsel never advised Omar of this option. Ex. 1 (Omar affidavit).[9] Omar was completely unaware that he could plead guilty even if the Government refused to offer him a plea. *Id.* Nor was he aware that, had he done so, he could still receive credit for accepting responsibility, which would lead to a lower sentencing range. *Id.*

As in *Booth*, Omar was prejudiced by counsel's failure, first and foremost, because he missed the opportunity to plead guilty to less serious charges, which would have resulted in a significantly lower sentence than the 35 years he is now serving. In addition, because he ultimately went to trial, he became ineligible for the three-level

---

[9] The affidavit attached to this memorandum is not signed because the signed copy has not yet been received from U.S.P. Leavenworth. Counsel will supplement this petition with the signed copy as soon as it is received.

reduction for acceptance of responsibility, and he was exposed to a much higher

Guidelines sentence of life imprisonment. Finally, he received a two-level increase for

obstruction of justice (which was a result of his testimony at trial). If Omar had known

that he could plead guilty without an agreement, he would have done so. Ex. 1.

There is at least a reasonable probability that Omar would have received a lesser

sentence if he had not received effective assistance of counsel. First, it is likely that the

court would have accepted his plea. Six of Omar's codefendants pleaded guilty, and there

is no reason to believe that the court would have rejected Omar's efforts to do the same.

Second, as explained *supra* in Section 2(b), Omar's sentencing range would have been

292-365 months – well below the 35-year sentence he is now serving. Thus, even at the

high end of that range, Omar was facing a sentence that was almost five years less than

that which he ultimately received. This is more than sufficient to establish *Strickland*

prejudice.

Omar should be given the opportunity to get back what he lost due to trial

counsel's ineffective assistance: the opportunity to plead guilty and be sentenced

pursuant to the corresponding, lower Guidelines range.

### c.    Misadvice to Client Regarding Ability to Plead Guilty

Trial counsel was constitutionally ineffective for affirmatively misadvising Omar

that he was not guilty of and could not plead guilty to the elements of conspiracy to

commit murder abroad. Even after the second superseding indictment was filed, the

Government was willing to negotiate a plea in Omar's case, and Omar still desired to

plead guilty. Ex. 1. However, trial counsel misadvised Omar that the facts would not

support conviction on the murder count and advised him not to plead guilty. Trial counsel then refused to continue negotiations with the Government. As a result, Omar lost a second opportunity to obtain a plea agreement, and in turn, a lesser sentence.

After the second superseding indictment was filed, trial counsel attempted to revive plea negotiations with the Government. However, trial counsel sought only a plea to the lesser charges, maintaining that he would not advise Omar to plead guilty to the murder count – apparently based on his erroneous belief that Omar could not be convicted of that count.[10] In response, the Government asserted that there was overwhelming evidence to support the murder count, identifying some of that evidence and explaining its basis for that count. The Government also reiterated its willingness to resolve Omar's case by plea and indicated a possibility of agreeing to sentencing caps, dismissal of charges, and other relevant matters. The Government's only caveat was that any agreement must include a guilty plea to the murder count.[11] This should have erased any doubt in counsel's mind about the nature of the evidence against Omar and the fact that he could indeed plead guilty to (or otherwise be convicted of) conspiring to commit

[10] In a December 11, 2015, letter to the Government (which was sent on behalf of multiple defendants, including Omar, and signed by their respective attorneys), counsel stated that the defendants were unable to plead to the murder count "because they would not be able to establish a proper factual basis for the plea and because undersigned counsel would not advise them to enter a plea to this charge." Ex. 2 (12/11/15 letter from defense counsel to Government).

[11] Since the defense had ample notice of the Government's intent to seek a superseding indictment, as well as ample opportunity to plead guilty to the lesser charges in the first superseding indictment, the Government was unwilling at that point to entertain a plea agreement that did not include the murder count. In other words, because trial counsel failed to act earlier, Omar now had no option but to plead guilty to the murder count (or go to trial).

murder abroad. However, trial counsel did not correct his advice to Omar. He did not tell his client that he faced serious exposure on the murder count, and that the Government had rebutted his assertion that Omar's conduct could not satisfy the elements of the offense. This constitutes deficient performance.

The Supreme Court has found ineffective assistance of counsel under very similar circumstances. In *Lafler v. Cooper*, trial counsel advised the defendant not to plead guilty to assault with intent to murder, based on his belief that the prosecution could not prove intent because the victim had been shot below the waist. 566 U.S. 156, 161 (2012). As a result, the defendant went to trial, was convicted, and received a harsher sentence than that which had been offered prior to trial. *Id.* This constituted deficient performance under *Strickland* because trial counsel's advice was based on an incorrect interpretation of the law. *Id.* at 162. The Supreme Court found that the defendant was prejudiced because he lost the opportunity to plead guilty, was convicted at trial, and received a sentence more than three times greater than he would have received under the plea. *Id.* at 174.

The same occurred here. Trial counsel incorrectly believed that Omar could not be convicted of conspiracy to commit murder abroad, even after the Government explained its theory of the case and pointed out substantial supporting evidence. Based on his incorrect interpretation of the law, trial counsel advised Omar not to plead guilty and to go to trial.

If Omar had understood the nature of the evidence against him, and that the evidence did, in fact, support a conviction for conspiracy to commit murder, he would

have agreed to plead guilty to that count. But Omar trusted his attorney's advice. As a result, as in *Lafler*, he lost the opportunity to plead guilty, proceeded to trial, and ultimately received a sentence up to 11 years higher than that which he would have faced if he had pleaded guilty. As in *Lafler*, this is sufficient to establish prejudice, and Omar should be given the opportunity to plead guilty as he originally desired.

### d. Failure to Seek Plea after Second Superseding Indictment

Trial counsel was constitutionally ineffective for failing to continue plea negotiations after the second superseding indictment was filed. As explained above, trial counsel did make an early attempt to revive plea negotiations after the second superseding indictment was filed. However, he was unwilling to even contemplate an agreement on the Government's terms (requiring a guilty plea to the murder count). This was not a reasonable strategic choice; rather, his refusal to negotiate a plea on Omar's behalf – despite Omar's desire to plead guilty – was based on his apparent (and erroneous) belief that Omar could not be convicted of the murder count. This constitutes deficient performance. As a result, Omar missed out on another opportunity to plead guilty and receive a more favorable sentence.

At least twice in January – still five months before trial – the Government communicated that it was still willing to negotiate a resolution to Omar's case. Trial counsel, however, rejected the Government's attempts to resolve the case. Even after the Government indicated its willingness to agree to a sentencing cap and dismiss other counts, trial counsel refused to engage in plea discussions. Rather than learning from his prior error (in failing to secure a plea agreement earlier), trial counsel advised Omar that

he saw no benefit to the Government's proposed resolution and advised Omar that he could not plead guilty to the murder count. When the Government again sought Omar's position on a potential agreement, trial counsel took the position that the Government was not serious about engaging in plea negotiations and did not respond to the Government's inquiry.

Trial counsel should have sought a plea agreement, as Omar wanted. Trial counsel did not even discuss with the Government the potential parameters of a plea to the second superseding indictment. Thus, he was in no position to advise Omar whether he should plead guilty or go to trial. He simply assumed that the Government would not offer anything favorable. But with a life sentence on the line, this was not only unreasonable; it was reckless.

As in Section 2(a), *supra*, Omar was prejudiced by trial counsel's failures because he again lost the opportunity to plead guilty and obtain a more lenient sentence. Even with the more serious offense, Omar still would have faced a lesser sentence if he had pleaded guilty. Specifically, his adjusted offense level (after application of the terrorism enhancement) would have been 42, and his sentencing range would have been 360 months to life imprisonment – the bottom end of which is five years less than the sentence he is now serving.[12] Indeed, it is even possible that a negotiated agreement

---

[12] His offense level, after adding the 12-level increase under the terrorism enhancement, would have been 45. PSR at 43, ¶¶ 163 & 165. He would not have received a two-level increase for obstruction of justice, and he likely would have received a three-level reduction for acceptance of responsibility. Thus, his adjusted offense level would have been 42, which – with a Criminal History Category VI – would have yielded a sentencing

might have avoided application of the terrorism enhancement, thereby leading to an even

lower sentence.[13] Had trial counsel sought a plea from the Government, there is a

reasonable probability that Omar would have pleaded guilty and received a much lesser

sentence.

### e.   Failure to Advise Omar of Right to Plead Open after Second Superseding Indictment

Even if trial counsel believed that the Government would not extend a reasonable

offer to Omar, he should have informed Omar of the option to plead open and leave his

fate in the hands of the Court. The failure to provide this basic advice constitutes

ineffective assistance of counsel. After abandoning his attempts to obtain a plea

agreement, trial counsel misadvised Omar that he had no option but to proceed to trial.

However, this was incorrect. Omar could have pleaded open to the indictment. Had he

done so, his Guidelines range would have been lower, and he likely would have received

a lesser sentence. Instead, because of his attorney's errors, Omar believed he had no

choice but to proceed to trial, and he is now serving a 35-year sentence.

As argued more fully in Section 2(b), *supra*, trial counsel's performance was both

deficient and prejudicial, because Omar was unaware that he had a third option that

would likely result in a lower sentence, and he was thus deprived of the right "to make a

range of 360-life. U.S. SENTENCING GUIDELINES MANUAL §5.A (Sentencing Table) (U.S. SENTENCING COMM'N 2015).

[13] It is unclear whether the terrorism enhancement was applied in the cases of Omar's codefendants who pleaded guilty. However, their sentences are inconsistent with application of this enhancement, suggesting either that the enhancement was not applied, or that their pleas nevertheless resulted in significant downward departures. It is reasonably probable that Omar could have negotiated a similar benefit.

reasonably informed decision" whether to plead guilty or go to trial. *United States v. Booth*, 432 F.3d 542, 549-50 (3d Cir. 2005).

As in *Booth*, Omar was prejudiced by counsel's failure because he became ineligible for the three-level reduction for acceptance of responsibility and was exposed to an additional five years to life imprisonment. *See* 432 F.3d at 548-49. Had he pleaded open, even after application of the terrorism enhancement, Omar would have been facing a Guidelines sentence between 360 months to life imprisonment.[14] The low end of this range is five years lower than the sentence he received. Had Omar known that he could plead guilty without an agreement and still receive credit for acceptance of responsibility, and this this could, in turn, result in a lesser sentence, he would have pleaded guilty instead of going to trial. Ex. 1.

There is at least a reasonable probability that Omar would have received a lesser sentence even if he had pleaded open to the second superseding indictment. First, his sentencing range would have been lower. Based on the fact that Omar's 420-month sentence was below his post-trial Guidelines range, it is reasonably probable that the trial court would have sentenced Omar to the low end of – if not below – the 360-life range. This, alone, would have resulted in a sentence at least five years less than that which Omar is currently serving, and is sufficient to establish prejudice.

In addition, Omar's codefendants who pleaded guilty but did not cooperate – Zacharia Abdurahman, Hanad Musse, Adnan Farah, and Hamza Ahmed – all received ten-year sentences. This is a strong indication that Omar would have received a lower

[14] *See* Section 2(d), *supra*, n.14.

sentence had he pleaded guilty.[15] Indeed, in considering the need to avoid unwarranted

sentencing disparities, the court considered only the sentences of similarly situated

defendants who had been convicted after trial. *See* ECF 829 at 23-24 ("Of [the 26 cases

the court compared] four defendants were convicted by a jury … Because the Defendant

went to trial, the Court will consider only those cases that are similar to this Defendant.").

It is therefore likely that, in the event of a guilty plea, the court would have similarly

considered only those cases in which defendants had pleaded guilty (and sentenced Omar

accordingly).

Finally, the trial court likely would have been more inclined to grant a downward

variance pursuant to Omar's willingness to accept responsibility for his conduct, and

other relevant § 3553(a) factors, had it not sat through three weeks' worth of evidence

against Omar. *See United States v. Penoncello*, 358 F. Supp. 3d 815, 824 (D. Minn. 2019)

("the cost of going to trial is not just the loss of a three-point reduction in the offense

level for acceptance of responsibility. The cost is also that the judge (who has tremendous

discretion in setting a sentence) will sit in the courtroom with the defendant, hour after

hour, immersed in evidence about the horrible things the defendant has done").

As in *Booth*, Omar has set forth sufficient allegations to require an evidentiary

hearing. 432 F.3d at 543. Such a hearing is required on a § 2255 motion "unless the

motion and the files and records of the case show conclusively that the movant is not

---

[15] While Omar would have been required to plead guilty to more serious charges, his
conduct was not so much more egregious than that of his codefendants as to warrant a
sentence 25 years higher than theirs. While Omar's sentence may have been longer than
ten years, it is unlikely that it would have been 35 years if he had pleaded guilty.

entitled to relief." 28 U.S.C. § 2255(b). Here, Omar's claims "relate primarily to purported occurrences outside the courtroom and upon which the record could, therefore, cast no real light" – making a hearing all the more necessary. *Machibroda v. U.S.*, 368 U.S. 487, 494-95 (1962).

### 2. Failure to Challenge Terrorism Enhancement/Criminal History

Trial counsel was constitutionally ineffective for failing to challenge Omar's criminal history category, which was grossly inflated by the United States Sentencing Guidelines ("USSG") terrorism enhancement. *See* USSG § 3A1.4(b). Omar was just 20 years old when he was arrested in this case, and he had never before been charged with a crime. Ex. 1 (Affidavit of Guled Omar); *see also*, PSR at 45-46, ¶¶ 185-87. In other words, Omar had zero criminal history points, which in most cases establishes a criminal history category of I. PSR at 46, ¶¶ 188-89. However, because Omar was convicted of crimes involving terrorism, his criminal history category was bumped up to Category VI. PSR at 46, ¶ 190; USSG § 3A1.4(b). Trial counsel should have objected to this criminal history category as over-representing the seriousness of Omar's past criminal conduct, and he should have requested a significant downward departure on that ground. *See* USSG § 4A1.3(b)(1) ("If reliable information indicates that the defendant's criminal history category substantially over-represents the seriousness of the defendant's criminal history … a downward departure may be warranted"). The terrorism enhancement caused Omar to be viewed (and sentenced) as a career criminal with little hope for rehabilitation, despite the fact that he had never before even been charged with a crime and had led an

otherwise law-abiding life. Had trial counsel objected, there is a reasonable probability that Omar would have received a lesser sentence.[16]

Under the Sentencing Guidelines' "terrorism enhancement," 12 levels are added to the base offense level "if the offense is a felony that involved, or was intended to promote, a federal crime of terrorism." USSG § 3A1.4(a). This significant increase in the offense level already reflects the seriousness of the crime. However, the enhancement does not stop there; it also automatically increases a defendant's criminal history category to VI. USSG § 3A1.4(b). Thus, a terrorism defendant who has never been convicted of a crime stands in the same position as those who have the worst criminal histories and have demonstrated a pattern of criminal conduct and a high likelihood of recidivism. In this case, absent the terrorism enhancement, Omar's Guidelines range would have been 168 to 210 months (assuming a base offense level of 33 for conspiracy to commit murder abroad, plus two levels for obstruction of justice, and criminal history category I). However, application of the terrorism enhancement caused Omar's guidelines to soar to a recommendation of life imprisonment.

The terrorism enhancement's treatment of criminal history "flies in the face of fair, individualized sentencing," as required by 181 U.S.C. § 3553, and is illogical and unjust. *United States v. Alhaggagi*, 372 F.Supp.3d 1005, 1016 (N.D. Ca. 2019). It has been criticized by courts and scholars alike as conflating the seriousness of the offense

---

[16] Trial counsel did object to application of the terrorism enhancement, but on different grounds. Specifically, trial counsel argued that Omar's conduct was not intended to influence the action of any nation-state and thus did not fall under the purview of this enhancement. *See* ECF 708 (Defendant's Position on Sentencing) at 4-5. Here, Omar argues that trial counsel should have objected and requested a departure on other grounds.

(as represented by the offense level) with the defendant's risk of recidivism and prior contacts with the criminal justice system. *Id.* at 1013-14; *see also*, *United States v. Hodzic*, No. 4:15-cr-00049-CDP (E.D. Mo. 2019) (rejecting 30-year Guidelines sentence, noting that terrorism enhancement overstated seriousness of defendant's conduct and pointing out that ISIS commander who defendant was accused of helping, and who had committed egregious crimes abroad, would have faced same sentence)[17]; George D. Brown, *Punishing Terrorists: Congress, the Sentencing Commission, the Guidelines, and the Courts*, 23 Cornell J.L. & Pub. Pol'y 517, 520 (2014) ("The terrorism enhancement takes a wrecking ball to [the Sentencing Guidelines'] carefully constructed edifice").

It has also been criticized as lacking any empirical evidence to support an automatic increase to the worst criminal history category. *Alhaggagi*, 372 F.Supp.3d at 1014, citing *United States v. Jumaev*, Crim Case No. 12-cr-00033-JLK, 2018 WL 3490886, at *10 (D. Colo. July 18, 2018) ("The terrorism enhancement is not backed by any empirical evidence"); *see also*, James P. McLoughlin Jr., *Deconstructing United States Sentencing Guidelines Section 3A1.4: Sentencing Failure in Cases of Financial Support for Foreign Terrorist Organizations*, 28 Law & Inequality 51, 115 (2010) ("[t]here is no published statistical data demonstrating that defendants convicted of violating … anti-terrorism statutes … are any more likely to be recidivists than any other first offenders. Nothing in the history of U.S.S.G. section 3A1.4 would indicate that any

---

[17] Robert Patrick, *St. Louis County man gets 8 years in prison for aiding ISIS commander in Syria*, ST. LOUIS POST-DISPATCH (Nov. 14, 2019) https://www.stltoday.com/news/local/crime-and-courts/st-louis-county-man-gets-years-in-prison-for-aiding/article_7da1e7ab-5070-5628-85f4-2092e9ea11f4.html

reliable data was used to determine if a person convicted of a material support offense is more likely to be a recidivist"); Sameer Ahmed, *Is History Repeating Itself? Sentencing Young American Muslims in the War on Terror*, 126 Yale L.J. 1520, 1550 (2017) ("no statistically sound evidence was used"); and Symposium, *Convicted Terrorists: Sentencing Considerations and Their Policy Implications*, 8 J. Nat'l Security L. & Pol'y 347, 361 (2016) (Hon. Judge Gerald Lee: "The [G]uidelines are not based on any empirical research. There has been no study to determine how much time a terrorist should have").

Finally, the terrorism enhancement is problematic because it treats all terrorism defendants the same, failing to distinguish between more and less serious offenses, more and less culpable defendants, and varying levels of conduct. This is contrary to and incompatible with not only the structure of the Sentencing Guidelines (providing for review of numerous factors to address the particular facts of each case), but also with standard sentencing practice and 18 U.S.C. § 3553, both of which require that sentences be tailored to the unique facts and circumstances of each defendant and his case. *See Alhaggagi*, 372 F.Supp.3d at 1015-16 ("The presumption under U.S.S.G. section 3A1.4 is incompatible with 18 U.S.C. § 3553, which requires that a defendant be evaluated individually to justify his or her sentence") (quoting McLoughlin, *supra*, at 116); *see also*, *Jumaev*, *supra*, at *11 ("As countless others have commented, the Terrorism Enhancement runs contrary to these aims [of the Sentencing Guidelines]. The circumstances of individuals convicted of crimes of terrorism (or who intended to promote crimes of terrorism) differ greatly, and sentencing them without crediting those

differences results in disproportionate sentences and disparities in sentencing"); *United States v. Mehanna*, No. 09-10017-AO (D. Mass. 2012), Sentencing Tr. at 69 ("Both the 12-level adjustment to the offense level and the automatic assignment of a Criminal History Category VI which are applied in any … terrorism case, regardless of the particular facts, not only make the recommendation unuseful as a guide in a particular case but it is actually, in my view, contrary to and subversive of the mission of the Guidelines which is to address with some particularity the unique facts of a given case").

As a result of these flaws, several courts have refused to sentence terrorism defendants within the sentencing range dictated by the terrorism enhancement, even after finding that the enhancement applied and having included it in the defendants' guidelines calculations. For example, in *United States v. Alhaggagi*, the defendant was convicted of, among other things, attempting to provide material support to a terrorist organization. 372 F.Supp.3d at 1007. The defendant – who was 23 and had zero criminal history points – had participated in pro-ISIS and anti-United States chatrooms, and had opened numerous Gmail and social media accounts on behalf of and for use by ISIS. *Id.* at 1009. At sentencing, the court held that the terrorism enhancement applied, and calculated a guideline range of 324 to 405 months. *Id*. at 1008. Nevertheless, the court found that the enhancement's automatic increase of the defendant's criminal history category was inappropriate and sentenced the defendant to 188 months (the bottom of the guidelines range with a criminal history category I). *Id.*

Similarly, in *United States v. Muhtorov*, the defendant was convicted of three counts of conspiring and attempting to provide material support – in the form of both

money and himself – to a designated terrorist organization. 329 F.Supp.3d 1289 (D. Colo. 2018). Over a period of more than three years, the defendant communicated with the administrator of the terrorist organization's website, watched and helped spread terrorist propaganda, swore allegiance and attempted to send funds to the organization, drew others into his scheme, and ultimately attempted to travel to Turkey to join the organization, prepared to die as a martyr. *Id.* at 1294-95. The defendant, like Omar, had zero criminal history points, but after application of the terrorism enhancement and other relevant adjustments, his sentencing range was 324-405 months. *Id.* at 1297-1301. The sentencing judge, however, found the Guidelines "inadequate and illogical" and, after thorough consideration of § 3553(a) and other terrorism cases, granted a substantial downward variance and sentenced the defendant to a total term of 132 months. *Id.* at 1302-11. *See also, United States v. Hodzic*, No. 4:15-cr-00049-CDP (E.D. Mo. Nov. 14, 2019) (at sentencing, rejecting 30-year Guidelines sentence for defendant who recruited others and sent money to ISIS commander Abdullah Pazara in Syria, and sentencing him to 96 months); *Jumaev, supra* (rejecting 360-month Guidelines range and sentencing defendant to the 76 months he had already served); *United States v. Mehanna*, No. 1:09-cr-10017-GAO (D. Mass. 2012) (rejecting Guidelines sentence of life imprisonment for conspiracy to commit murder and other terrorism-related counts, and imposing a 210-month sentence); *United States v. Benkahla*, 501 F.Supp.2d 748, 758 (E.D. Va. 2007) (applying terrorism enhancement – establishing Guidelines range of 210-262 months –

but sentencing defendant to 121 months pursuant to downward departure for over-representation of criminal history).[18]

Here, trial counsel should have objected to the terrorism enhancement and argued for a downward departure on the grounds that it unreasonably and dramatically increased Omar's sentencing range and grossly overstated his actual criminal history, and there was no reasonable strategic reason for his failure to do so. First, the Guidelines specifically provide for such a departure, and this is a common argument in cases where the criminal history category over-represents the seriousness of a defendant's past criminal conduct. *See* USSG § 4A1.3(b). Second, and more significantly, the terrorism enhancement caused Omar to be placed in the same category as the worst repeat offenders, ignoring the fact that this was his first contact with the criminal justice system, that this case did not involve a plot or even a desire to carry out violence against the United States or any citizens thereof, and that Omar did not actually commit or attempt to commit any acts of violence. Pursuant to 18 U.S.C. § 3553(a), this grossly inflated criminal history calculation was a factor the court was required to – and did – consider in arriving at its

---

[18] Omar recognizes that other courts have considered and rejected challenges to the terrorism enhancement. *See, e.g., United States v. Meskini*, 319 F.3d 88 (2d Cir. 2003) (rejecting due process challenge to terrorism enhancement and upholding defendant's 288-month sentence in case involving plot to bomb Los Angeles International Airport); *United States v. Salim*, 690 F.3d 115 (2d Cir. 2012) (rejecting challenge to validity of terrorism enhancement and upholding defendant's life sentence where defendant assaulted prison guard in plot to obtain new counsel in terrorism case, and guard lost one eye and was partially paralyzed and brain damaged. However, these cases differ either on their facts, or on the basis of the challenge to the terrorism enhancement. Further, even these cases acknowledge the district court's discretion to disagree with and depart from the guidelines where, as here, the terrorism enhancement over-represents a defendant's past criminal conduct. *See Meskini*, 319 F.3d at 92; *Salim*, 690 F.3d at 126.

sentence. Had trial counsel objected to the terrorism enhancement on these grounds, there is a reasonable probability that Omar would have received a lesser sentence.

To the extent that trial counsel strategically thought this would not have affected the potential sentence, such a strategy was unreasonable. Omar acknowledges that, even at the lowest criminal history category, the Guidelines called for life imprisonment, due to the 12-level increase to his offense level under the terrorism enhancement. However, the terrorism enhancement's placement of Omar in the bottom right corner of the sentencing table – where the worst of the worst offenders tend to fall – acted as an anchor and tainted the court's perception of what constituted a reasonable sentence. If trial counsel argued, and the court agreed, that Criminal History Category I more accurately represented Omar's criminal conduct and risk of recidivism, there is a reasonable probability that the court would have been inclined to impose a lesser sentence.

### 3. Failure to Object to Voir Dire Questions

Trial counsel was constitutionally ineffective for failing to object to the form of voir dire in general, and specifically, to improper voir dire questions that impermissibly shifted the burden of determining prospective jurors' ability to be fair and impartial from the trial court to the individual juror. In other words, the Court asked questions in a manner that allowed prospective jurors to *self-determine* their eligibility, and trial counsel never objected. Making matters worse, when given the opportunity, trial counsel did not follow up on or further probe any individual venire person's conclusory statement that he or she could be fair and impartial.

This happened on multiple occasions. For example, on the first day of jury selection, prior to recessing for the evening, the trial court asked,

> "Anything about the nature of this case that would keep you from being a fair and impartial juror? This is a terrible case. We've talked about it… Anything about what you've read or heard or seen that would keep you from being a fair and impartial juror in this matter?
>
> I can ask a thousand questions on the issue and you know whether or not you do or not [sic] so it's just easier."

Tr. 05/09/16 (Jury Selection) at 109. Four prospective jurors indicated that they had already concluded that the defendants were guilty, and they were excused. Tr. 05/09/16 at 109-10. No other members of the panel answered this question.

Subsequently, when questioning prospective juror number 49 (who was later impaneled), the court asked, "Dealing with your feelings or thoughts about terrorism, is there anything about that that's going to keep you from being a fair and impartial juror?" Tr. 05/10/16 (Jury Selection) at 165. The prospective juror simply answered, "No." *Id.* The trial court did not ask whether the juror had any strong feelings about terrorism; nor did the court (or trial counsel) probe the juror as to what thoughts or feelings she held.

A similar exchange occurred with prospective juror number 88, who was also later impaneled. The trial court stated, "I'm assuming that you've heard, read, seen things on terrorism in the world and in the United States," which the juror confirmed. Tr. 05/10/16 (Jury Selection) at 239-40. The court then said, "And the question is whether or not you have any opinions or feelings that are so strong that would keep you from being a fair and impartial juror in this matter?" *Id.* at 240. The juror said no. *Id.* Again, neither the court nor trial counsel probed the juror as to any "strong feelings" he may have held about

terrorism. Rather, the juror self-assessed his ability to be fair and impartial, despite whatever feelings he may have held.

This same manner of questioning occurred on various occasions, with various jurors, and covering not only feelings about terrorism, but also exposure to media reports. Ultimately, several jurors were selected who had either (1) never answered whether they had read, seen, or heard anything in the media about this case or had any strong feelings about terrorism, or (2) having confirmed exposure to media or having opinions and feelings about terrorism, were never probed on the nature, extent, and impact of such exposure or feelings.

The Sixth Amendment guarantees a criminal defendant the right to a fair and impartial jury. U.S. Const. amend. VI. Voir dire is the mechanism by which this right is safeguarded. As the Eighth Circuit has recognized, "a searching voir dire is a necessary incident to the right to an impartial jury." *United States v. Bear Runner*, 502 F.2d 908, 911 (8th Cir. 1974) (internal citations omitted); *see also*, *Rosales-Lopez v. United States*, 451 U.S. 182, 188 (1981) ("*Voir dire* plays a critical function in assuring the criminal defendant that his Sixth Amendment right to an impartial jury will be honored").

While a trial court has broad discretion in the conduct of voir dire, the questioning must be sufficiently probing to identify unqualified jurors. *Morgan v. Illinois*, 504 U.S. 719, 729 (1992). This is particularly important in a sensitive and highly publicized case such as this one. In such cases, the "better practice… is to direct probing questions touching areas of possible prejudice to each individual juror…" *Bear Runner*, 502 F.2d at

912. "Such exposure is necessary if the parties are expected to exercise their challenges in an intelligent and informed manner." *Id.* at 911.

The problem with the trial court's questions is that they allowed the individual venire persons – who may have had strong feelings about terrorism, or who may have been exposed to media reports about this case – to make their own determination of whether they could put their feelings and opinions aside and act as unbiased jurors. However, "the impaneling of a fair and impartial jury is 'the task of the trial judge.'" *Doret v. United States*, 765 A.2d 47, 53 (D.C. Cir. 2000) (internal citations omitted), *abrogated in part on other grounds by Crawford v. Washington*, 541 U.S. 36 (2004); *see also*, *Dingle v. State*, 361 Md. 1, 14-15 (2000) ("it is the trial judge that must decide whether … cause for disqualification exists for any particular venire person. That is not a position occupied, or a decision to be made, by … the individual venire persons").

Courts have found error when the trial court's voir dire questions were too general to sufficiently probe jurors' potential bias and allowed the jurors to subjectively assess their ability to be fair. In *Silverthorne v. United States*, the Ninth Circuit reviewed a trial court's questions about pretrial publicity. 400 F.2d 627 (9th Cir. 1968). The court found that the voir dire was inadequate because "(1) the questions propounded by the court… were calculated to evoke responses which were subjective in nature – the jurors were called upon to assess their own impartiality for the court's benefit, and (2) the entire *voir dire* examination was too general to adequately probe the prejudice issue." *Id.* at 638. The Ninth Circuit explained, "the trial court made no effort to ascertain what information the

jurors had accumulated and, consequently, had no way of objectively assessing the impact caused by this pretrial knowledge on the juror's impartiality." *Id.*

The same is true here. The questions as propounded by the trial court called upon the jurors to subjectively assess their own ability to be impartial, and often revealed insufficient information from which the court could objectively assess the juror's qualifications. In addition, the form of the questions precluded Omar from further probing (and subsequently challenging for cause) potential jurors who might have been biased against him, because they were posed in a manner that required a response only if a prospective juror identified himself as biased. *See* Tr. 05/09/16 (Jury Selection) at 109. Venire persons who subjectively determined – without any probing by the court or trial counsel – that neither the nature of the case, nor anything they may have seen, heard, or read about the case, would affect their ability to be fair never had to respond to the question. They never even had to disclose whether they harbored any particular feelings about the nature of the case, or whether they had seen, heard, or read anything about the case. "Whether a juror can render a verdict based solely on evidence adduced in the courtroom should not be adjudged on that juror's own assessment of self-righteousness without something more." *Silverthorne*, 400 F.2d at 639 (citations omitted).

Trial counsel should have, in the first instance, objected to the questions as asked. In addition, when he had the opportunity to do so, trial counsel should have asked follow-up questions of those jurors who individually indicated (without elaboration) that they did have thoughts or opinions about terrorism, or that they had heard, read, or seen something about this case. Counsel's failure to do so was unreasonable and deprived Omar of a fair

trial. Several jurors were impaneled who never disclosed what feelings, knowledge, thoughts or opinions, if any, they held about terrorism in general or about this case specifically. There is a reasonable probability that at least one of these jurors had been tainted by the media or were prejudiced based on their own feelings about terrorism, thereby entitling Omar to a new trial.

### 4. Failure to object to jury panel

Trial counsel was constitutionally ineffective for failing to object to the jury panel as not representing a fair cross-section of the community, as mandated by the Sixth Amendment. Omar and his codefendants were all black Somali-Americans. As of 2016, at the time of the trial in this case, there were approximately 57,000 people of Somali heritage living in Minnesota (the majority of which resided in Minneapolis).[19] In addition, 7.2% of Minnesota's population at the time was black or African American.[20] Nevertheless, of the entire panel of potential jurors, only two or three were black. *See* Ex. 1 (Omar Affidavit). (It is unclear whether any were of Somali heritage). Trial counsel should have objected to the makeup of the jury pool, and his failure to do so violated Omar's constitutional rights to a fair trial and to effective assistance of counsel.

The Sixth Amendment guarantee to a fair trial by an impartial injury encompasses the right to have a jury that is drawn from a fair cross-section of the community. *Taylor v.*

---

[19] *6 Minnesota men sentenced in Islamic State case*, ASSOCIATED PRESS (Nov. 15, 2016), https://apnews.com/1b2f10455e06449086bb57b7884c7282.

[20] *Minnesota Comparative Demographic Estimates, 2016 American Community Survey,* UNITED STATES CENSUS BUREAU (2016), https://factfinder.census.gov/faces/tableservices/jsf/pages/productview.xhtml?src=bkmk.

*Louisiana*, 419 U.S. 522, 528 (1975). This right is violated when a distinct segment of the community is excluded from the jury pool. A group of people is "distinct when they have a shared attribute that defines or limits their membership, and when they share a community of interest." *United States v. Black Bear*, 878 F.2d 213, 214 (8th Cir. 1989).

To establish a violation of the fair cross-section requirement, "the defendant must show (1) that the group alleged to be excluded is a 'distinctive' group in the community; (2) that the representation of this group in venires from which juries are selected is not fair and reasonable in relation to the number of such persons in the community; and (3) that this underrepresentation is due to systematic exclusion of the group in the jury-selection process." *Duren v. Missouri*, 439 U.S. 357, 364 (1979).

Here, the panel from which Omar's jury was selected did not constitute a fair cross-section of the community because the black population was substantially underrepresented. Only between two and three percent of the approximately 100-member panel were black – far lower than the overall black population of the state. Indeed, one juror during voir dire even seemed concerned about the defendant's ability to receive a fair trial, pointing out – in response to counsel's question about jurors' fears about the trial process – that "this potential jury seems steeped in whiteness." Tr. 05/10/16 (Jury Selection), at 302.

There can be no doubt that black Minnesotans constitute a distinctive group in the community, since they have a shared attribute – their race – that defines or limits their membership. *See Black Bear*, 878 F.2d at 214. Nevertheless, trial counsel never objected

to the panel's composition. Ultimately, none of the black venire people were impaneled, and the jury was comprised entirely of white people. Ex. 1 (Omar affidavit).

Omar acknowledges the difficulty in establishing the third prong of the *Duren* test – "that this underrepresentation is due to systematic exclusion of the group in the jury-selection process." *Duren*, 439 U.S. at 364. However, there was still no strategic reason for trial counsel not to object to the panel. First, there can be no question that black citizens were underrepresented in the jury pool. Trial counsel's duty to preserve and ensure his client's right to a fair trial dictated that he object to this underrepresentation. Second, this problem could have easily been addressed by the trial court (for example, by requesting additional jurors). Third, trial counsel had nothing to lose, and everything to gain. At worst, the trial court would have overruled his objection, but the objection would have been preserved for appellate review. And finally, the issue could have been raised on appeal, with a reasonable probability of relief.

### 5. Failure to Object to Improper Statements by Government

Trial counsel was constitutionally ineffective when he failed, on multiple occasions throughout the trial, to object to improper questions and comments by the Government. First, during Omar's cross-examination, the Government improperly referenced and questioned Omar about the in-court conduct of a Government witness, Ibrahim Bashi. Specifically, the Government referenced the fact that Bashi, the father of Yusuf Jama, had asked for a photo of his son when he got off the stand. Tr. 05/27/16, 2729. The Government then attempted to get Omar to speculate as to why Bashi wanted the photo, asking, "And he wanted a photo because Yusuf Jama is dead, right?" *Id.* When

Omar said he did not know why Bashi wanted the photo, the Government tried to elicit that Jama had been killed in Syria – something that Omar had no way of knowing for certain. *Id.* Omar responded only with, "That's what I heard." *Id.* Trial counsel did not object to this line of questioning.

Then, the Government continued asking Omar not only about Jama, but also about Ibrahim Bashi's other son, Ahmed Bashi. Tr. 05/27/16, 2730-33. At one point, the Government asked Omar whether he knew what had happened to Ahmed Bashi. *Id.* at 2732. When Omar said he did not know, the Government improperly asked Omar whether he had any reason to dispute Bashi's testimony that Ahmed had been killed in Somalia. *Id.* at 2732-33. This question was posed, without objection, even though Omar had already testified that he did not recall Bashi's testimony. *Id.* at 2733.

Both of these lines of questioning were improper and should have been objected to by trial counsel. First, the questions surrounding Jama's photo were irrelevant, beyond the scope of direct examination, and did not address or relate to any issues material to the trial. The questions also improperly asked Omar to speculate as to what was in the mind of another witness. There was no legitimate purpose for these questions; they were intended only to evoke sympathy for Jama's father – indeed, for Jama himself – while villainizing Omar by suggesting that he was responsible for Jama's purported death and for Ibrahim Bashi's suffering.

The second line of questioning, related to Ibrahim Bashi's other son (Ahmed Bashi), improperly asked Omar to vouch for the credibility of another witness. Omar testified that he did not know what had happened to Ahmed Bashi, and he did not recall

Ibrahim Bashi's testimony about Ahmed's death. Nevertheless, the Government persisted, asking Omar whether he would dispute that testimony.

"It's black letter law that a prosecutor may not ask a defendant to comment on the truthfulness of another witness…" *United States v. Harrison*, 585 F.3d 1155, 1158 (9th Cir. 2009) (citing *United States v. Combs*, 379 F.3d 564, 572 (9th Cir. 2004)). Nevertheless, trial counsel did not object when Omar was forced to do precisely that. This was a lose-lose situation for Omar. If he said yes, he would appear to be attacking a father who had apparently lost both his sons, and he would lose credibility with the jury; by saying no, he bolstered the testimony and credibility of a Government witness, thereby legitimizing that witness and, in turn, the Government's case. Further, there was no legitimate purpose for this line of questioning. The Government presented no evidence of Ahmed's death (other than his father's hearsay testimony), and Omar was in no position to confirm or deny what, if anything, happened to him. Nor was Ahmed's purported death in Somalia relevant to the charges Omar was facing.

Trial counsel should have objected to both lines of questioning, and his failure to do so constitutes ineffective assistance. The Government's comments and questions served only to inflame the jury and prejudice them against Omar, creating a reasonable probability that jurors' feelings toward Omar improperly influenced their verdict.

### 6. Improperly eliciting prejudicial testimony.

Trial counsel was constitutionally ineffective for eliciting damaging and prejudicial testimony that Omar went to a gun firing range. At trial, during his cross-examination of Government cooperator Abdullahi Yusuf, trial counsel elicited that Omar

had gone to a shooting range to learn how to fire a weapon. Tr. 05/16/16 at 888. This

error was made in the context of Yusuf's testimony that he viewed the group's paintball

games as a military training exercise. Tr. 05/16/16 at 886. Trial counsel attempted to

undermine Yusuf's testimony by suggesting that there were "better options available" if

the group really wanted to engage in military training – such as going to a shooting range

and learning "how to actually fire a weapon." Tr. 05/16/16 at 888. Yusuf responded,

"that's been done before." *Id*. Rather than dropping the issue, counsel challenged that

Yusuf had never told the FBI about any attempt to learn how to fire a weapon, which

Yusuf countered with, "I'm pretty sure I mentioned that … Abdirahman Bashir and …

Guled Omar went to a firing range together." *Id.*

This was damaging testimony that, rather than undermine Yusuf's credibility – as

was counsel's intent – bolstered Yusuf's claim that the paintball games were a military

training exercise, while also bolstering the Government's position that Omar had taken

affirmative steps to prepare to fight for ISIL. Making matters worse, counsel could have

easily avoided this by simply changing the subject when Yusuf said that going to a

shooting range had "been done before." Tr. 05/16/16 at 888. It is unlikely that the jury

would have heard this testimony but for counsel's error.

There was no strategic reason for eliciting this damaging testimony, and in fact, it

is apparent from the transcript that this was a mistake. Trial counsel was unprepared for

Yusuf's response, and rather than moving on to minimize the damage of Yusuf's

unexpected answer, trial counsel pushed on, eliciting more damaging testimony about

Omar and further tainting the jury's perception of him.

### 7. Failure to sequester and call witnesses at trial.

Trial counsel was also ineffective for failing to sequester and call as witnesses, per Omar's request, his sister and his mother. Omar told his attorney that he wanted both his mother and sister to testify on his behalf, as they could have not only offered testimony to corroborate some critical aspects of his testimony, but also served as character witnesses for Omar. However, when the time came for the defense to put on its case, trial counsel informed Omar that his mother and sister could not testify because he had not sequestered them, and they had sat in the courtroom throughout the entire trial. Ex. 1 (Omar affidavit). In other words, Omar's mother and sister were precluded from testifying, not because a calculated decision had been made to not call them, but because trial counsel failed to move for their sequestration. This was prejudicial error.

There was no reason for the failure to sequester these witnesses and preserve the ability to call them during the defense case. Trial counsel knew that both these witnesses had firsthand knowledge of some of the material issues in this case, and they could have corroborated Omar's testimony as to those issues. This would have bolstered Omar's credibility and made the jury more likely to accept his testimony, while simultaneously undermining the testimony of the cooperators. This was critical because the Government's case was based almost entirely on the testimony of cooperating witnesses, and undermining their credibility would have likely led to an acquittal. In addition, Omar's mother and sister also could have testified credibly about Omar's character, some of the internal conflicts with which he was struggling, and his desire to fit in. This would have humanized him in the eyes of the jury, and would have countered the Government's

narrative that Omar was a hardened, dangerous and violent extremist. Had the jury heard from Omar's family, there is a reasonable probability that at least one juror's verdict would have been different.

### 8. Cumulative Ineffective Assistance of Counsel

Each error discussed individually above, when considered cumulatively, requires vacatur of Omar's convictions or sentence. Although the Eighth Circuit has rejected the cumulative error doctrine, *see United States v. Stewart*, 20 F.3d 911 (8th Cir. 1994), Omar asserts that this runs afoul of *Strickland v. Washington* (requiring that prejudice be assessed based on the totality of the facts). 466 U.S. 668, 695 (1984). Here, trial counsel committed multiple errors throughout the entire course of his representation that ultimately resulted in Omar serving a 35-year sentence. This sentence was obtained in violation of Omar's constitutional right to effective assistance of counsel and the laws of the United States, and it must be vacated.

### 9. Ineffective Assistance of Appellate Counsel

Appellate counsel was constitutionally ineffective for failing to raise, on appeal, an issue related to the trial court's refusal to strike for cause a juror who admitted he could have trouble staying attentive throughout the trial. During voir dire, Juror 71, who was ultimately selected to sit on the jury, apparently fell asleep. *See* Tr. 05/10/16 (Jury Selection), at 295-96. When questioned about his ability to stay awake and concentrate for long periods of time, the juror "honestly [couldn't] say" whether he would have any difficulties. *Id.* at 295. The Government moved to strike this juror for cause, and all three

defense counsel in this case joined the motion. *Id.* at 331-32. The court, however, denied the motion, and this juror was ultimately impaneled. *Id.* at 334. This was error.

Appellate counsel should have raised this error on appeal. This was a long trial (approximately three weeks) involving a total of 26 witnesses who testified for hours at a time. At times, one witness was on the stand for two-to-three days. There was a lot of information to cover, and the stakes were incredibly high (as all three defendants were facing life sentences). A case of this magnitude required – and indeed, the defendants were entitled to – an attentive jury that could stay awake, follow the testimony, and concentrate on the evidence it would then have to assess in reaching a verdict. This juror admitted he might have difficulty doing this, and in fact fell asleep while he was being questioned (along with the rest of the panel) regarding his qualifications to do so.

As a result of the trial court's refusal to strike this juror, someone who likely had trouble staying awake for and concentrating throughout the entire trial, and who probably did not hear all the evidence, was involved in deciding Omar's fate. There is a reasonable probability that if this issue had been raised on appeal, Omar's conviction would have been vacated and a new trial ordered.

## V. CONCLUSION

For the reasons described above, Petitioner Guled Omar respectfully requests that this Honorable Court grant this Motion and vacate his sentence, reduce his sentence, or grant him any other appropriate remedy to cure the constitutional violations he suffered. Omar respectfully requests a hearing on this Motion.

Respectfully Submitted,


*/s/    James M. Ventura*
James M. Ventura (# 147217)
1000 Twelve Oaks Center Drive, Suite 100
Wayzata, MN 55391
Telephone: (952) 473-8064
Facsimile: (952) 475-7042
jventura@jamesventuralaw.com


*/s/    C. Justin Brown*
C. Justin Brown (admitted *pro hac vice*)
Maryland Federal Bar No. 28110
Brown Law
1 N. Charles St., Suite 1301
Baltimore, Maryland 21201
Telephone: (410) 244-5444
Facsimile: (410) 934-3208
Brown@cjbrownlaw.com

*Attorneys for Petitioner*


## CERTIFICATE OF SERVICE

I hereby certify that on December 23, 2019, a copy of this Memorandum in

Support of Motion to Vacate or Correct Illegal Sentence was served on all parties entitled

to service via CM/ECF.


*/s/    James Ventura*
James Ventura