UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

---

**UNITED STATES OF AMERICA**

**v.**

**GULED OMAR,**

Defendant.

**No. 0:15-CR-049 MJD**

**MEMORANDUM OF LAW/BRIEF**

**18 USC 3582(c)(1)(A)(i)**

---

**DEFENDANT'S MOTION FOR MODIFICATION OF SENTENCE BASED ON EXTRAORDINARY AND COMPELLING REASONS**

Guled Omar, by undersigned counsel, moves this Court on October 10, 2026, pursuant to 18 U.S.C. § 3582(c)(1)(A), for a reduction of his sentence based on extraordinary and compelling reasons, which include which include the disparity between his sentence that of his similarly situated co-defendants; his extensive rehabilitation including an Assessment by a terrorism expert finding an extremely low risk of recividism; and other reasons. Mr. Omar was sentenced to 360 months imprisonment in November, 2016.

This was a very serious case, but 1) Guled Omar's actions in this case, while somewhat more serious than those of his co-defendants who were allowed to plead guilty to material support and received lower sentences, did not warrant a sentence *nearly four times more severe*; and 2) his Assessment by Dr. Omi Hodwitz, a terrorism expert, and a great deal of other evidence, shows that he has been rehabilitated.

**Jurisdiction and Authority to Act**

Guled Omar is presently incarcerated, under BOP Register Number 18510-041, at FCI Leavenworth. He submitted a request for compassionate release to the warden on 3/18/25.

(Exhibit "A") Therefore, Mr. Omar has exhausted his administrative remedies under 18 USC 3582(c)(1)(A). *United States v. Hammond*, 2020 US Dist. LEXIS 67331 (DDC 2020.)

On November 1, 2023, the United States Sentencing Commission's updated Guidelines went into effect[1]. Section 3582(c)(1)(A) authorizes a court to reduce a defendant's term of imprisonment if "extraordinary and compelling reasons" warrant a reduction and "such a reduction is consistent with applicable policy statements issued by the Sentencing Commission." The Sentencing Commission stated:

> "In 2018, the First Step Act put an end BOP's gatekeeping function and allowed individuals to file motions for sentence reductions under the statute. Because the Commission lost its quorum in early 2019 and did not regain it until 2022, it was unable to amend §1B1.13 during the more than four-year period since defendants were first permitted to file such motions. During those years, courts have found extraordinary and compelling reasons warranting sentence reductions based on all of the factors the Commission identified in First Step Act—Reduction in Term of Imprisonment Under 18 U.S.C. § 3582(c)(1)(A) 2 | April 27, 2023 2007, i.e., the three specified bases of medical condition, age, and family circumstances, and the "other reasons" catchall. Commission data indicate *courts have hewed to the "extraordinary and compelling" requirement*, see U.S. SENT'G COMM'N, COMPASSIONATE RELEASE DATA REPORT (Dec. 2022), at tbls. 10, 12, & 14, and while they have found such circumstances to be present in more cases than BOP had before the First Step Act, *they have been judicious in granting relief*.
>
> Among other things, the amendment extends the applicability of the policy statement to defendant-filed motions; *expands the list of specified extraordinary and compelling reasons that can warrant sentence reductions; retains the existing "other reasons" catchall; provides specific guidance with regard to the permissible consideration of changes in the law; and responds to case law that developed after the enactment of the First Step Act.* The amendment is informed by Commission data, including its analysis of the factors identified by courts in granting sentence reduction motions in the years since the First Step Act was signed into law. It is also informed by extensive public comment, including from the Department of Justice, the Federal Public and Community Defenders, the Commission's advisory groups, law professors, currently and formerly incarcerated individuals, and other stakeholders in the federal criminal justice system." https://www.ussc.gov/sites/default/files/pdf/amendment-process/reader-friendly-amendments/202305_RF.pdf at 1-2, emphasis supplied

[1] Petitioner is aware that in May, 2026, the Supreme Court decided two cases, *Rutherford v. United States*, 2026 US LEXIS 2294 (2026) and *Fernandez v. United States*, 2026 US LEXIS 2295 (2026) which, *inter alia,* held that, contrary to the USSC Guidelines regarding a change in law, a nonretroactive change to the law cannot be the basis for a sentence reduction under 18 USC 3582(c)(1)(A)(i). The instant motion is *not* relying on that provision or on any factors *Rutherford* or *Fernandez* held are non-permissible.

**The Underlying Case in Brief**

This was a very serious case in which a group of young Somali-American men decided, for various reasons, to travel to Syria and join ISIS. Had they succeeded, it is likely they would have been killed, perhaps after killing others. Mr. Omar and his co-defendants are very glad that they were stopped before they were able to leave the US and get to Syria. He and the others have a great deal of remorse about their actions, and they want to help dissuade other young men from following in their footsteps.

Of the group of seven defendants indicted in the instant case,[2] four of them (Zacharia Abdurahman, Hamza Ahmed, Adnan Farah and Hanad Musse) were offered, and accepted, the opportunity to plead guilty to only material support to terrorism, rather than conspiracy to kill abroad. They were assessed by an expert hired by the court, and despite differing recommendations from him, they were all sentenced to **120 months**, and were all released in the past few years. Like most of the others, Mr. Omar has absolutely no criminal history, and he has very strong evidence of rehabilitation.

The three defendants who were not offered this plea agreement decided to go to trial. They were all convicted and were sentenced to 360 months (Mr. Omar and Mohamed Farah) and **420 months** (Guled Omar.) Despite his role as somewhat of a leader and his earlier radicalization (due to his brother) it is submitted that the fact that Mr. Omar's sentence was *nearly four longer* than that of his co-defendants who were allowed to plead guilty to a lesser charge is a disparity which, in combination with the other factors discussed herein, constitutes a extraordinary and compelling reason for a sentence reduction in this case.

[2] There were two others indicted separately who cooperated and received less prison time than the other seven.

**2025 Assessment by Dr. Omi Hodwitz**

In May, 2025, Mr. Omar was assessed by Dr. Omi Hodwitz, a criminologist, terrorism expert and psychologist who teaches at the University of Idaho, and who is part of the National Consortium for the Study of Terrorism and Responses to Terrorism (START) and several related groups. (See Exhibit "B," Dr. Hodwitz's Report, letter and CV)

Dr. Hodwitz interviewed Mr. Omar for four hours on May 23, 2025, and also conducted phone interviews with three of his family members. (Exhibit "B" at 1-2) Her Report was based on what she learned in her interviews, her knowledge of this case (she was provided with the sentencing transcript and opinion in this case) her knowledge of terrorism cases in general and her use of two risk assessment tools. *The Report found that Mr. Omar was rehabilitated and was not at risk of reengagement with terrorism or recidivism*. (Exhibit "A" at 9) The Report stated:

> Structured professional judgment (SPJ) risk assessment involves using tools to assess the likelihood that individuals convicted of extremist-related crimes will reengage in criminal activity following release. *Over the last decade, several SJP tools have been created and validated,* including the Violent Extremist Risk Assessment 2 Revised (VERA-2R) and the Extremist Risk Guidelines (ERG 22+). …There is a great deal of overlap between the two tools, but each has unique characteristics; thus, the assessment of Mr. Omar incorporates elements of each tool with a goal of providing a more complete assessment that is not limited to a single set of factors.
>
> ***
>
> Mr. Omar's interview proceeded chronologically, beginning in his childhood and ending with his future. Regarding his childhood, he was asked about his relationship with his family and his peers, …school, his social and personal abilities, as well as his relationship with religion. Mr. Omar was asked to reflect on these same factors as a teenager and as a young adult, but greater emphasis was placed on his extracurricular and social activities, and his relationship with religion, his family and other significant figures. Mr. Omar was asked about his radicalization process and the factors that facilitated it, including his social and religious networks, his cultural and practical considerations, and his psychological state at the time. Lastly, Mr. Omar was asked to discuss his current life and his future ambitions. This includes his activities and programming in prison, his relationship with his family, peers and community; his relationship with religion, his psychological state, his plans and aspirations for the future, and his values, ethics and priorities.
>
> Mr. Omar is a friendly and outgoing individual and was eager to provide direct responses and unprompted information. Although he expressed nervousness at the

beginning of the interview, he quickly adapted to the interview process, providing a detailed and thorough description of his background and experiences from childhood to the present day. Mr. Omar gave every indication that he was committed to an open and honest interview. The content covered in the interview appears to be accurate and authentic and, thus, Mr. Omar's *responses are believed to be both reliable and valid.*

***

…It is important to note that the focus of the assessment is Mr. Omar's *current risk*, rather than his risk at the time of his radicalization and/or conviction, although the report will periodically refer to early risk. This recognizes the dynamic nature of many of these factors… The assessment will be based on seven overarching categories, including associates, ideology and /or grievances, and skills and resources… as well as a history of violence and intent to commit violence… and criminal history and mental health history.

**Associates**

Mr. Omar had a tumultuous childhood that would have a later influence on his path to radicalization. *His father was a drug (khat) user and was abusive to Mr. Omar's mother*. …Ahmed [his older brother] became the patriarch of the family, and *Mr. Omar began deferring to Ahmed over his mother*. …

As Ahmed grew older, he became more religious… …[When] Mr. Omar was in his early teens…Ahmed unexpectedly left the country, traveling to Somalia with a number of other young men. …[Mr. Omar] was too young to understand and recognize radicalization and the factors that prompted is bother to travel overseas. … [Later] *Ahmed explained to Mr. Omar that he had joined the fight in order to ensure a place for Mr. Omar and his family in paradise*…

*Mr. Omar's brother played a prominent role in his process of radicalization*. Members of his extended community criticized Ahmed…causing Mr. Omar to defend him… In addition, Mr. Omar was questioned by the FBI regarding Ahmed, which seemed to motivate Mr. Omar further in defense of Ahmed. …Mr. Omar's …mother, began expressing concerns that [he] was going down the same path as Ahmed. These various factors served to escalate Mr. Omar's radicalization…

At the age of 15 or 16, Mr. Omar decided to be a warrior in the name of Allah. …[He] was spending time with a group of older men who shared a similar commitment. …This group left to travel overseas, *leaving Mr. Omar behind, self-identifying as the last warrior remaining in the community, leading him to preach and recruit*…He found like-minded individuals and formed a group that served to radicalize each other further…

Mr. Omar and his peers began to see themselves as covert fighters for Allah. They became combative with the imams at their mosque… Originally inspired by Al-Shabab… the group shifted their narrative to protecting all Muslims, which was fueled by the footage of foreign fighters in Syria.

Within this context, '**associates'** is a significant risk factor…

…Mr. Omar reports that he was experiencing a number of push/pull factors that facilitated his attempts to travel overseas. His family challenged him on his beliefs and the resulting conflict quickly escalated. …[S]elect members of Mr. Omar's community succeeded in traveling to Syria, thus demonstrating that it was possible.

Although **'associates'** was a significant risk factor… his relationships have changed considerably in the last decade. He does not maintain a relationship with his former peer group with the exception of this co-defendants, which is due to their shared legal circumstances… He does not have contact with the older peers and his brother.. *Through a long process of forgiveness and reconciliation, Mr. Omar now has a prosocial and supportive relationship with his family; they are central to his current identity and his future aspirations.* Lastly, *he recognizes that imams that preached love and compassion were speaking the word of Allah*; *their narrative, not the one he adopted in his teenage years, reflects the true teachings of the Koran*.

These factors have been substantiated by Mr. Omar's family. They confirmed that Mr. Omar had developed a community of radically minded peers but has now rejected those associations… They reported on the strained relationship that he had with his mother and his siblings, which has since been repaired…

In short, Mr. Omar has broken all connections with his antisocial community… and has invested a considerable amount of time and energy in reestablishing prosocial connections… …[H]e has begun spreading the word of a loving and compassionate Allah to the other residents at FCI Leavenworth, building a faith-based community that practices inclusion and peaceful narratives. In present time, ***"associates"*** *is no longer a risk factor. … '****Associates'*** *is now a significant protective factor….*

**Ideology and/or Grievances**

Mr. Omar's **'ideologies'** and **'grievances'** were significant risk factors for engaging in extremism in his youth. Mr. Omar acknowledges this and holds himself accountable… He [and his peers] viewed themselves as the 'righteous'…thus excusing any harm or suffering violent action on their part… may have caused.

Mr. Omar's beliefs have changed considerably since he was arrested. There were several significant exchanges and factors that prompted a process of deradicalization. Following his arrest, Mr. Omar began to question his role as a religious hero… He met an incarcerated former Al-Shabab follower that knew Ahmed… The former Al-Shabab follower described… that they would "steal, lie and manipulate' …to achieve their goals. Mr. Omar began to realize that foreign fighters were indiscriminate in their actions, causing harm to innocent civilians… …[H]e suffered a period of depression…

Although still bearing shame and remorse… Mr. Omar has turned his life around… [He] feels that he has a duty to ensure that no one else follows the same path he did… Mr. Omar has rejected the Islamic State and their narratives… He developed a relationship with the prison chaplain **[wrote ltr – need]** whose forgiveness for Mr. Omar's actions helped him feel whole again. …

Mr. Omar's family confirmed his ideological transformation. …He speaks with them regularly and during those conversations, he is openly remorseful for his radical views as a youth…

Mr. Omar now serves as a religious leader in prison. He takes pride in this role…helping them deescalate conflict…and…understand that practicing compassion and understanding is a more powerful tool than zealotry. He sees all people as human beings, worthy of respect and support. For these reasons, *Mr. Omar's* ***'ideology'*** *is not a risk factor but is instead a strong protective factor.* The only grievances he currently holds are

directed towards Al-Shabab and the Islamic State, thus ***'grievances'*** *is not a risk factor for extremism but is instead a deterrent from reengagement and recidivism.*

***Skills and Resources; Criminal History; Past History of Violence***

…[A]ll three [above] categories rely on static factors that cannot be changed. Clinicians have noted the importance of dynamic risk factors over static ones…

When Mr. Omar was radicalized, he… had little skills or resources… However, he and his peers did consume online messaging … which likely contained descriptions of how to carry out successful extremist activities. In addition, one of Mr. Omar's brothers (Mohammed) was involved in a gang called the Somali Outlaws… Lastly, Mr. Omar worked as a security guard…Therefore, at the time of his arrest, **'skills and resources'** would have been a potential risk factor, albeit moderate in banding.

…Given that Mr. Omar cannot lose any potential skills tat he may have acquired but does not have the resources he once did, **'skills and resources'** is considered a low risk factor… It should be noted that *the resources that he does have are prosocial; his family is supporting him…*

Mr. Omar reported engaging in antisocial and delinquent behavior as a youth.… As a young teenager, he skipped school and, as a young adult, he engaged in drug use. He was…never prosecuted for drug use. Given his history of antisocial behavior, **'criminal history'** would have been a risk factor for extremism in his youth.

Given [his subsequent conviction herein] the banding on this risk factor has increased. '**Criminal History'** is now a significant risk factor.

…Mr. Omar…did get into fights with other children in school. …Therefore, his '**history of violent behavior'** would have been a risk factor in his youth. In addition, he embraced a violent narrative… This… is significant, making a **'history of violent behavior'** a significant risk factor. Since this is a static factor, Mr. Omar will not be able to distance himself from that history. However, it is worth noting that he has rejected his earlier narrative of violence, seeing value in deescalation and peaceful resolution, thus *this risk factor is low.*

**Intent to Commit Violence**

Mr. Omar had every intention of committing violence following radicalization… …[H]e followed in the footsteps of his older brother Ahmed and attempted to travel… He was thwarted by law enforcement. …Therefore, in his teenage years, **'intent to commit violence'** was a significant risk factor towards extremist actions that would have caused harm and suffering…

Since being incarcerated… Mr. Omar's interest in violence has evolved considerably. He is no longer inspired by extremist narratives… and he recognizes the flaws in his youthful understanding of the Koran… *He sees the role of a good Muslim as one that endorses deescalation and peaceful resolution*. When asked what justice meant to him as a youth, he replied that it was 'fighting for Muslims that were being killed unjustly.' His current understanding of justice…: justice occurs when 'every individual is able to live a life that they are happy to live, and that life is not hurting others.'

…He wants to live an uneventful life that is focused on small things, such as learning to dance, finding a partner, and supporting his family. Given that his intentions have shifted considerably, that he now self-identifies as a witness who discourages violence, and wants to become a contributing member of society… **'intent to commit violence'** *is no longer a risk factor but a protective factor.*

**Mental Health Issues**

It is beyond the scope of this report to assess the mental health of Mr. Omar. However, he does have a history of trauma and abuse and experienced a period of self-reported depression after he was arrested… His family also reported that he suffered mental and emotional trauma from his father and has only recently achieved closure from what he perceives as parental abandonment. …At the moment he is not receiving any mental health support, although he does seek counseling from the prison chaplain and his family reported that he engaged in therapeutic programming once he arrived at FCI Leavenworth. …For these reasons, **'mental health issues'** is a potential risk factor, albeit a low one since he does now appear to be sound of body and mind.

**Concluding Assessment**

*It is the opinion of this assessor that Mr. Omar is not at risk of reengagement or recidivism. He has gone through a notable transition in the past decade of incarceration, recognizing the error of his youthful ways of thinking and responding to perceived oppression.* He holds himself accountable for the choices that he made…. But also recognizes the role that outside influences played, including his father, his brother Ahmed, his older peers… and the availability of social medica that was designed to radicalize youth… *He has matured considerably, rejecting the violent narratives that he once prioritized, and seeing himself now as a witness that acts to dispel those same narratives in others.*

…He has goals that are achievable and prosocial… …He has expressed a great deal of remorse for the pain his siblings and his mother experienced following his arrest; his siblings were bullied, his family lost their Section 8 housing, and several of them lost their jobs. Mr. Omar is not yet prepared to forgive himself for these consequences, amongst others, but he is cognizant that his family has forgiven him…

*It is the opinion of this assessor that Mr. Omar be granted compassionate release.* Although he has select risk factors that carry weight, including his criminal history and potential emotional well being, his *protective factors are significant.* He has every intention of starting life anew, focused on his family, himself, and a prosocial existence." (Exhibit "B" at 1-9, emphasis supplied)

Dr. Hodwitz also submitted a letter to the Court in order to add additional context relevant to all three assessments (she assessed Mohamed Farah and Guled Omar as well.) (Exhibit "C")

**Declaration**

Guled Omar has written a Declaration apologizing for his words and actions in this case. He stated:

> "…I fully acknowledge the gravity of my case and the harm it caused.
>
> …I have spent years reflecting on the pain and grief I caused. I will never forgive myself for what my family has been through. I destroyed the integrity and trust of my community…
>
> *I was a fool. …I never want to go back to the religious dogma, the consistent teaching of hate and intolerance. Everything these extremists promised and taught us was a lie!* They preach in favor of the oppressed but in turn they oppress the same people they claim they were coming to rescue. They do not allow women the basic human functions like speaking in public or seeking education or careers. They do not allow people the human right to choose their own religion… They do not respect rules of war or laws even if those rules are Islamic or agreed upon by the respected international community.
>
> I have completed several rehabilitative… programs including the Life Connections program, which is the longest and most intensive program the BOP has to offer. After a successful completion, *I was chosen as a mentor to help my fellow participants.* This program helped me uncover a lot of the underlying issues that contributed to my bad decision-making and it also gave me new tools to help build a healthier future.
>
> ***
>
> Upon release I want to participate in programming or research aimed at preventing violent extremism. … I feel obligated to help to try to make amends. …
>
> ***
>
> Your Honor, I know that true remorse is shown in what we do, not just what we say. I want to apply everything I learned and continue my process of rehabilitation beyond these walls. …I have made some of the worst decisions a man can make but I am determined to live so that one day I can look back on my life and say at least I made up for some of the pain and hurt I caused. …"
>
> (Exhibit "D" at 1-2, emphasis supplied)

**Sentencing Parameters and Terrorism Enhancement**

Guled Omar's base offense level was 33, and without the terrorism enhancement his adjusted offense level would have been 35. His criminal history level would have been I (with no prior convictions), yielding a sentencing range of 168-210 months.

But the Terrorism Enhancement under USSG 3A1.4. resulted in an increase of 12 levels, and a criminal history category of VI, resulting in a Guidelines sentencing range of life. As

discussed more below, while under the law this enhancement does technically apply herein, the enhancement is not empirically based, and its application skews the entire sentencing process in an unfair way, ratcheting up sentences very drastically.

**Recidivism Rates in Terrorism-Related Cases are Extremely Low**

Perhaps surprisingly, recent studies have shown the recidivism rates in terrorism cases to be *extremely low*, *far lower than for other types of cases.* Dr. Omi Hodwitz created the Terrorism Recidivism Study (TRS) database in 2018, and it appears to be the first of its kind, at least within the United States. The first report based on the TRS data was published in 2021, in *Perspectives on Terrorism*, Volume 15, Issue 4 (ISSN 2334-3745) (attached here as Exhibit "E") See also *United States v. Kaziu*, 2025 US Dist. LEXIS 35715, at 14, citing this study as support for a sentence reduction.

The TRS data showed that of the 629 individuals convicted of terrorism-related offenses in the United States between September 11, 2001 and March 6, 2018, 354 of them have been released. (Exhibit "D" at 1, 3, 5) Of those 354, *only less than 3% recidivated, compared to between 30-60% of those convicted for non-terrorism-related offenses.* (Exhibit "E" at 1-2) *And none of them were subsequently charged with anything terrorism-related.* (See Table 3, Exhibit "E" at 7)

This data turns the assumption of both the government and the judge herein – that because they are ideological, there is no hope of rehabilitation in terrorism cases – *completely on its head*. Rather than terrorism cases having far greater recidivism rates than other cases, the rates are in fact *far, far lower.* Dr. Hodwitz stated:

> "…The results support the proposition that *recidivism among extremists is notably low, even with an extended period of observation*, indicating that extremists may have a very low propensity for re-offending.
> ***

Apprehensions about extremist recidivism are not new but instead reflect a growing concern in legislative and enforcement discussions. Following the attacks in September of 2001 (9/11) and the implementation of the USA PATRIOT Act, the United States experienced a significant increase in the arrest and prosecution of individuals for terrorism-related offenses. …As these offenders return to the community, their ability to reintegrate successfully is a source of concern.

Historically, the empirical evidence providing direction on the frequency and severity of extremist recidivism has been limited. …[T]he need for data addressing terrorist recidivism became a matter of utmost importance.

***

…[T]he primary purpose of the TRS is to assess recidivism rates among convicted extremists in the United States. For purposes of this analysis, recidivism is defined as any criminal activity, either political or apolitical, that requires the intervention of the criminal justice system. The analysis of the 2018 data set demonstrated that recidivism is quite low among political offenders; nine individuals or approximately 1.6 percent of the full sample recidivated by the spring of 2018. In addition, only four of those nine recidivated upon release; the remainder recidivated while still in prison. Of the 247 offenders released in the 2018 data, this resulted in a consistent recidivism rate of 1.6 percent. *These findings are particularly stark when compared to a non-extremist or apolitical sample of offenders. …*

***

Looking at general recidivism rates, these remain low in the 2020 data. …

***

…[T]he 2020 data reports a recidivism rate of 3.1 percent. … …[I]t is still in the low single digits, represents only a handful of individuals, and *remains significantly different from apolitical samples…*

***

The type of recidivism is also important; *many of the questions around terrorist recidivism are rooted in the concern that, upon release, they will re-engage in political violence.* Herein lies a particularly interesting outcome. *Apart from one individual, the recidivists did not return to extremist activities following release. … The one exception had a tenuous connection to political activity at best*. This offender was originally convicted of human trafficking for profit, including smuggling members of Hezbollah. He resumed his old ways upon release, reengaging with a smuggling ring. Although his involvement was driven by profit, it is possible that he continued to do business with extremist organizations thought this is *not documented* in his second set of conviction. Thus, crediting him with continued terrorist-related activities is generous and unconfirmed. …

…[T]he recidivist data suggest several conclusions. First, *political offenders have significantly lower recidivism rates when compared to apolitical offenders.* …Second, political offenders are more likely to re-offend within the first year than in later years, compared to apolitical offenders. …Lastly, *when political offenders do recidivate, they engage in apolitical and personally motivated activities…*" (Exhibit "E" at 1, 5, 8, emphasis supplied)

In 2025, Dr. Hodwitz updated the TRS data, and her Analytical Report 2025 is attached at Exhibit "D" at 13-18. It found an *even lower recidivism rate of 2.6 % among those released.* (Exhibit "D" **"**at 1) The updated Report states:

> "The most recent update of the TRS was completed at the beginning of 2025. Of the 984 cases included in the TRS, 810 met inclusion criteria for analysis. …
>
> ***
>
> …At least 65% of the sample had reentered the community at the time of the 2025 update; the remainder were incarcerated.
>
> Of the 24 recidivists, 14 reoffended following release while the remaining ten committed offenses while they were incarcerated. It is important to note that recidivism rates differed among the whole sample (810 individuals) and those that had been released (526); 3.0% of the whole TRS sampled recidivated while *2.6% of the released individuals recidivated.*
>
> ...Approximately half of the reported recidivism is due to [supervised release] violations, such as driving without a license, using fake food stamps, leaving the state, and using a computer for online dating. These results suggest that released extremists are subject to high levels of scrutiny upon release, resulting in the detection of minor activities. Of the remaining incidents, most were apolitical crimes, including domestic assault, drug activity, minor theft, and counterfeiting. There was only one recidivist whose actions (human trafficking) could potentially be ideologically motivated; however, the evidence suggests that he was profit-driven rather than politically driven…
>
> …Thus, this report closes with the following evidence-based conclusion: *individuals convicted of terrorism-related offenses have a low probability of engaging in criminal activity upon release, particularly of a political nature. When compared to their apolitical counterparts, they pose minimal risk to the community.*" (Exhibit "E" at 15-18, emphasis supplied.)

**Mr. Omar's Institutional Record**

Guled Omar has had an excellent record in prison over the years. His PATTERN score from April, 2025 is a general score of -9 and a Violent Score of -3. (Exhibit "F," at 1) Low security is considered 9-30 general points or less, and a violent score of 7-24. (See Male PATTERN Risk Scoring Form, attached as Exhibit "F" at 14) *A below zero score such as Mr. Omar's is exemplary.*

The Leavenworth Chaplain wrote a strong letter of support for Mr. Omar in 2025. (Undersigned counsel had to obtain it via FOIA and the name was redacted but it was the

Chaplain, who had told Mr. Omar he would write such a letter to go in his Central File.) He stated:

> "Inmate Guled Omar has faithfully attended all relevant chapel programming while incarcerated at FCI Leavenworth. He not only attends but *has led the Islamic group for several years.* Mr. Omar recently completed the Life Connections Program… and *had a stellar reputation amongst LCP contract staff and program participants.* Mr. Omar has been previously employed as the *head chaplain orderly* at the FCI. While in this position Mr. Omar did an excellent job of keeping the Chapel facilities clean and working while *interacting with members of multiple faith groups*. Mr. Omar has *good rapport* with Chaplaincy Services and other departments…" (Exhibit "F" at 15)

Mr. Omar's disciplinary history is also quite good, with only five violations over the course of his incarceration (Exhibit "F" at 13)

Guled Omar has completed over 26 programs over the years. (Exhibit "F" at 2) Significantly, as he noted in his Declaration, he completed the Life Connections Program, which was comprised of thirteen different courses, including anger management, conflict management, managing emotions, following [a] moral compass, religious tolerance and spirituality. (Exhibit "F" at 2, 5) (As noted above in the Chaplain's letter, Guled had a "stellar reputation" with the Life Connections Program (LCP) personnel.)

Dr. Matthew Palombo wrote a letter in support of Mr. Omar, stating (as also noted below):

> "…I have interviewed his former cellmates about his life at Leavenworth…, and *people that Guled has encouraged away from terrorist organizations.* Guled has worked as a suicide prevention counselor …as well as a mediator for Muslim and non-Muslim relationships. In these roles, he is the go-to person for conflict resolution… *He has literally saved lives.*" (Exhibit "G" at 10, emphasis supplied)

In sum, it can be seen that Guled Omar has done extremely well in prison, and this, in addition to his recent Assessment and Declaration, supports a sentence reduction.

**Letters of Support**

Ten family members and others wrote letters in support of Guled Omar, noting, among other things, how he has changed very positively over the years, and how they will help him (and be helped by him) upon release. Some of them are excerpted here. His mother, **Fadumo Hussein**, wrote:

> "…I am an elderly woman now. …The ache of not knowing how he is, of not being able to see him or touch him freely, has left a wound in my heart that time has not healed.
>
> …I raised thirteen children on my own… I did the best I could… Two years ago, I lost Guled's older brother. Losing one son was a pain I pray no mother ever has to endure. … The few short visitations we've had over the years have never been enough. I leave each one with my heart heavier than before.
>
> …Over these ten years, he has changed in ways only a mother can recognize. …*I hear his deep regret. I hear the wisdom in his voice, the humility in his words, and the hope in his heart…*" Exhibit "G" at 2, emphasis supplied)

**Burhan Mohumed** wrote:

> "…I have known Guled since he was a child, and *I can attest to his remarkable transformation.* …As a child, Guled was a natural leader and deeply compassionate person, always going out of his way to help others. …[A]s a young man, his youthful ambitions and revolutionary idealism led him down the wrong path. *The person who committed those actions a decade ago is not the Guled I know today….*" (Exhibit "G" at 3, emphasis supplied)

Guled's sister **Hodan** wrote:

> "…I am a mother of four children, all of whom are on the autism spectrum. …*Despite everything Guled has been facing himself, he has been one of my greatest emotional supports*. …[H]e always reminds me that I'm not alone, even though he's the one behind bars. His phone calls, his words and his presence even from afar have helped me keep going on some of the hardest days.
>
> There was a time when my marriage was falling apart. …[Guled's] *wisdom and emotional maturity were beyond anything I could have imagined when he was a teenager. He's helped hold our family together in ways that go far beyond what anyone would expect from someone serving time.*
>
> ***
>
> Throughout his incarceration, Guled has been deeply committed to bettering himself and those around him. He's taken every opportunity to learn, educate others, and build a life of meaning even within the limits of prison walls. …

Guled was very young when he made the mistakes that led him to where he is today. He was impressionable, still figuring out who he was in a world full of noise and pressure. But the man he is now is nothing like the boy he was back then. He has grown tremendously over the years. *He has shown remorse, maturity, and a deep sense of responsibility not just to our family, but to his own process of becoming better*. …" (Exhibit "G" at 6, emphasis supplied)

**Dr. Matthew Palombo** wrote:

"…As a faculty member and advisor at Minneapolis Community and Technical College I have known Guled, his family and friends for over 10 years. …After his arrest in April 2015, he called me… and asked that I mentor and assist him with continuing college. …That began a life-long friendship… *Guled also inspired me to start a college-in-prison and reentry program, which has become one of the largest in Minnesota state history.* I have had the privilege of teaching inside many correctional facilities and mentoring hundreds of incarcerated and formerly incarcerated people… …*Guled has moved far away from his crimes and …his ongoing reparative journey is now possible on the outside.*

…Incarceration can do many things. For Guled, it has been a time of deep personal transformation and growth. *He is more patient in responding to the cares of the world; more cautious about the manipulations and rhetoric of political organizations; more tolerant and accepting of human diversity; more caring and responsive to the needs of individuals, and more willing to seek advice from mentors*. …*He is deeply remorseful for his crimes*… I am not the only one who has seen these changes. I have interviewed his former cellmates about his life at Leavenworth…, and *people that Guled has encouraged away from terrorist organizations.* Guled has worked as a suicide prevention counselor …as well as a mediator for Muslim and non-Muslim relationships. In these roles, he is the go-to person for conflict resolution… *He has literally saved lives. …*

***

…I will do all that I can to support his return to college and employment, including collaborating with his Probation Officer…" (Exhibit "G" at 9-11, emphasis supplied)

Finally, Guled's nine year-old niece, **Naima Abdi**, wrote:

"…He is the best uncle ever. He… tells me that I'm smart and beautiful and that I can do anything I put my mind to.

Even though he is not here with us, he still helps me. He gives me advice when I have trouble making friends and reminds me to be kind and confident. …My uncle also taught me how to garden. He showed me how to do it through phone calls and when we visited him. Now I love planting flowers and vegetables, and I always think of him when I'm in the garden…" (Exhibit "G" at 18-19)

## POINT I

## THERE ARE EXTRAORDINARY AND COMPELLING REASONS TO REDUCE THE SENTENCE TO TIME SERVED, INCLUDING THE DISPARITY WITH THE SENTENCES OF FOUR CODEFENDANTS, REHABILITATION AND REMORSE, AND YOUNG AGE

The Sentencing Commission's 2023 Guidelines Amendments included a catch-all provision, stating that a sentence may be reduced under 3582(c)(1)(A) "if the defendant presents any other circumstance or a combination of circumstances that, when considered by themselves or together with any of the reasons described in paragraphs (1) through (4), are similar in gravity to those described in paragraphs (1) through (4)[3]." This is often known as the "catch-all" provision.

It is submitted that, given the fact that the sentence was nearly four times longer than those of four similarly-situated co-defendants' the recent Assessment by Dr. Hodwitz, Defendant's Declaration, his institutional record, and his young age at the time of the offense, this combination of factors adds up to reasons "similar in gravity" to those specified in the statute.

There are many recent cases where sentence reductions have been granted, often based on reasons of "similar gravity," including disparity and rehabilitation. *United States v. Cannon* 2025 US Dist. LEXIS 15526 (MDGA 2025) (sentence reduced under 'catch-all' provision based on sentencing disparity with codefendants, age at the time of offense, and rehabilitation); *United States v. Whitehurst*, 2024 US Dist. LEXIS 125645 (DMD 2024) (sentence reduced based on sentencing disparity with codefendants); *United States v. Countess,* 2026 US Dist. LEXIS 34621 (DMD 2026) (sentence reduced based on sentencing disparity with codefendants, more recent

[3] Paragraphs 1-4 provide for reduction based on 1) medical circumstances of the defendant; 2) age/medical decline of the defendant; 3) family circumstances; or 4) that the defendant was the victim of serious abuse by correctional staff.

shorter sentences, young age and rehabilitation); *United States v. Jackson*, 2025 US Dist. LEXIS 65631 (DCT 2025)(30 year sentence reduced to time served based on extremely long sentence, disparity with sentences of codefendants, rehabilitation, and harsh prison conditions during the pandemic); *United States v. Harris,* 2026 US Dist. LEXIS 25526 (DMD 2026) (sentence reduced based on disparity with sentences of codefendants, more recent lower sentences, and strong rehabilitation); *United States v. Halling*, 2025 US Dist. LEXIS 31641 (DMT 2025) (sentence reduced based on combination of factors including disparity with sentence of codefendant and rehabilitation); *United States v. Willingham,* 2025 US Dist. LEXIS 165154 (SDFL 2025) (sentence reduced due to combination of factors rehabilitation, young age and lack of criminal history); *United States v. Taylor* (2025 US Dist. LEXIS 149502 (DMT 2025) (sentence reduced in part due to combination of factors including rehabilitation and remorse); *United States v. Hart*, 2024 US Dist. LEXIS 155080 (EDVA 2024)(sentence reduced under 'catch-all' provision based on lengthy sentence, young age at time of offense and rehabilitation); *United States v. Brown*, 715 F.Supp3d 1034 (SDOH 2024)(sentence reduced to time served under 'catch-all' provision based on combination of factors); *United States v. Smith*, 2024 US Dist. LEXIS 30932 (DMD 2024)(sentence reduced under 'catch-all' provision based on combination of circumstances); *United States v. Robinson,* 2025 US Dist. LEXIS (WDPA 2025) (sentence reduced under 'catch-all' provision based on lengthy sentence, young age at time of offense and rehabilitation); *United States v. Cain*, 2024 US Dist. LEXIS 153717 (WDWA 2024) (sentence reduced under 'catch-all' provision based on lengthy sentence, young age at time of offense and rehabilitation); *United States v. Moreira*, 2024 US Dist. LEXIS 19204 (DKS 2024) (sentence reduced under 'catch-all' provision based on combination of circumstances); *United States v. Brito*, 2024 US Dist. LEXIS 67541 (SDNY 2024) (sentence reduced due to a combination of factors, including young age and

rehabilitation); *United States v. Souza*, 2025 US Dist. LEXIS 22349 (DRH 2025) (sentence reduced due to a combination of factors, including rehabilitation and harsh prison conditions.)

**Disparity (and Other Factors in Combination)**

In *United States v. Jackson*, supra, the court recently reduced the 300 month bargained-for sentence for being a drug kingpin to time served (about 14 years) based on disparity with codefendants, rehabilitation, and harsh prison conditions during the pandemic, despite a lengthy criminal history, stating:

> "…Jackson observes that is sentence was far longer than any of his co-defendants… …[T]he Court cannot assess, based on Jackson's submission, whether such disparities were unwarranted. *He was the lead defendant*… Further, Jackson had already amassed 18 criminal history points…
>
> In his Reply, Jackson addresses those concerns… He…identifies six co-defendants with similar criminal histories… *The Court agrees with Jackson that the fact that these co-defendants (who are seemingly similarly situated to Jackson) all received substantially lower sentences favors a reduction in sentence.*
>
> Jackson next relies on the fact that he was incarcerated during the COVID-19 pandemic. …The Court is aware that out-of-cell time was significantly reduced, which limited recreation, exercise, programming opportunities, family visits and more. The fact that several years of Jackson's incarceration were during the pandemic contributes to a finding of extraordinary and compelling reasons for sentence reduction.
>
> The last factor relied upon by Jackson is his maturity, growth and rehabilitation while incarcerated. … He has participated in educational as well as vocational programming…
>
> …While his period of incarceration has not been devoid of disciplinary measures, it appears to the Court that he has made great strides toward personal growth…
>
> In combination, these four factors provide a compelling and extraordinary reason to reduce Jackson's sentence…." *Jackson,* at 7-10, emphasis supplied.

Similarly, in *United States v. Cannon*, supra, the court reduced the (de facto life) sentence for armed robbery and car-jacking to time served based on the catch-all provision, stating:

> "Subsection (b)(5) provides a 'catch-all' for granting compassionate release when the circumstances may not fit neatly into one of the categories listed…
>
> ***
>
> The Court finds that under the limited circumstances here, the *disparity of Cannon's sentence compared to that of his codefendants is of similar gravity to warrant a reduction of his sentence.* Here. Cannon suffered a substantial penalty by exercising his constitutional right to require the Government to prove his guilt beyond a reasonable

> doubt… His codefendants… made plea deals with the Government which resulted in sentences of 240 months for one defendant and 300 months for the other. …
> 
> ***
> 
> Cannon paid quite a price (84 years and 5 months) for exercising his constitutional right to a jury trial. …[R]eceiving a sentence four to five times greater than your similarly situated …codefendants is extraordinary. …
> 
> …Based on the Defendant's age at the time he committed the offense [23], the extraordinary disparity in the sentence he received compared to his codefendants, his rehabilitation while in prison, the among of time he has served on his sentence, his lack of danger to the community, and an analysis of the sentencing factors found at 18 USC 3553(a), the Court finds that Defendant's sentence will be reduced…" *Cannon*, supra, at 7, 15-19, emphasis supplied.

And in *United States v. Whitehurst*, supra, a drug and gun case, the court reduced the sentence somewhat based on disparity, even though, contrary to the instant case, much of that disparity was warranted – the court stated:

> "Whitehurst contends that the disparity between his sentence and those of his co-defendants constitutes an extraordinary and compelling circumstances that justifies a sentence reduction.
> 
> ***
> 
> Whitehurst was …sentenced to *294 months* of incarceration… The co-defendant who received the second highest sentence, Eccleston, was the only one to go to trial. … Judge Williams sentenced him to 210 months. *All other codefendants received sentences of 120 months or less…* At this point, only Whitehurst remains in prison.
> 
> …*Whitehurst was the leader* of this criminal enterprise… [W]hile several of Whitehurst's co-defendants had criminal history categories of I, II and III, Whitehurst… had a criminal history category of V…
> 
> ***
> 
> …[T]he sentences of several… co-defendants have… been reduced. … *Whitehurst's 294-month sentence now turns out to be about two and a half times higher than four of his co-defendants' sentences*, and more than triple that of the nine others. Given Whitehurst's leadership role and criminal history, a disparity …is certainly warranted; however, a sentence more than double or triple those of his co-conspirators is too great…" *United States v. Whitehurst*, supra, at 7-10, emphasis supplied.

As in *Whitehurst, Cannon, Jackson, Harris, Countess* and *Halling*, there was a very substantial disparity between the 420 month sentence received by Mr. Omar, and the 120 month sentences received by his four codefendants who were offered a plea bargain to a lesser charge. In contrast to the defendants in those cases, Mr. Omar has *no criminal history.* As in *Jackson* and

*Whitehurst,* he played a leadership role in the case, but still the extent of the disparity was unwarranted. Mr. Whitehurst's sentence was said to be about 2 ½ times longer than that of his four codefendants, while in this case Mr. Omar's sentence was close to *four times longer*, a much greater disparity.

This Court should find this extreme disparity to be an extraordinary and compelling reason (in combination with other factors) justifying a substantial sentence reduction – to time served or at least close to that.

**Terrorism Context - Case of United States v. Kaziu**

It is also very instructive to look at *Kaziu v. United States*, 108 F.4th 86 (2nd Cir. 2024) and 2025 US Dist. LEXIS 35715 (EDNY 2025), where the sentence for *conspiracy to murder* was reduced, first from 27 to 25 years, and then, on remand from the Second Circuit, to 20 years. The case, while not involving compassionate release, was similar to that of Guled Omar, and Mr. Kaziu *actually traveled* to Egypt with the intent to engage in violent jihad (and kill Americans) in Afghanistan and Somalia.

After his 924(c) count was dismissed based on *United States v. Davis*, 588 US 445, the trial court reduced Mr. Kaziu's sentence on the conspiracy to kill from 27 to 25 years, but without a full resentencing hearing. The Second Circuit remanded the case for that sentencing hearing, and then the district court reduced the conspiracy to murder sentence further, to 20 years. The Second Circuit stated:

> "*Kaziu presented plausible allegations of changed circumstances that suggest that the original rationale underlying the sentence – that he was a committed and unredeemed terrorist – no longer applies.* …
>
> First, Kaziu has exhibited virtually *no violent tendencies since his incarceration*. …
>
> *Second, Kaziu has moved on from his religious extremist ideologies.* Kaziu plausibly detailed that his relationship with the Qu'ran has changed… *Kaziu explicitly concedes that he was 'caught in an extreme interpretation of the narrative of Islam' and*

*has 'replace[d] the crude one [he] had at nineteen' with an interpretation that calls for righteous, virtuous behavior. …*

Third, Kaziu has invested in his educational future. Kaziu… has … earned his GED [and completed several other BOP classes and programs.]

Kaziu has thus plausibly claimed that he is nonviolent, has reordered his relationship with Islam, and has positioned himself to be a productive member of society. This is a foundational departure from the type of person Kaziu was when he was originally arrested, convicted and sentenced. We conclude that Kaziu adequately alleges sufficient changed circumstances so that a district judge might wisely consider his arguments at a full *de novo* resentencing." *Kaziu*, supra, at 93-94, emphasis supplied.

Then, in further reducing the sentence, in 2025, the district court stated:

" Judge John Gleeson in 2012 sentenced Kaziu to 27 years imprisonment… for *Conspiracy to Commit Murder* in a Foreign Country… Conspiracy to Provide Material Support… Attempt to Prove Material Support.. and Conspiracy to Use a Firearm. *Of primary concern to Judge Gleeson 'was that "the defendant…agreed…to kill American soldiers and others… in pursuit of [his] goal of violent jihad" and that he "took substantial steps toward providing… material support" to terrorists.'*

…Kaziu, then about 21 years old, traveled with his friend… from their homes in Brooklyn, New York, to Egypt in February, 2009, intending to wage jihad in Pakistan, Afghanistan, and Somalia…

***

… *De novo* sentencing requires the district court to reconsider the sentences imposed on each count…

***

Kaziu received three infractions over his 16 years in prison. …In 2012, he 'was involved in a dispute with another inmate…[which] resulted in a multi-person fight… And in November, 2021, Kaziu…allegedly … 'assault[ed] a member of the prison staff…'

The government argued that the last infraction, six months after the 2021 decision, marginalized his rehabilitation. … Given that the three infractions, such as they were occurred over Kaziu's lengthy sixteen years of imprisonment, the Court did not believe that they should necessarily preclude the sentence reduction.

***

There are four basic purposes identified by the Sentencing Commission's Guidelines that the courts are obliged to consider in rendering sentences: 'deterring crime, incapacitating the offender, providing just punishment, and *rehabilitating* the offender. … Since rehabilitation is one of the Guidelines' prime sentence factors, the Court first focused on Kaziu's rehabilitation, which obviously impacted the issues of deterrence and incapacitation. …

***

…In his most recent letter to the Court, [Kaziu] wrote that 'understanding and an open mind…made me see how self-righteous I was and the bigotry that I consumed.' He expressed remorse for his 'misguided belief and idea' and strove to 'be better as a person, a man, and a role model.' …

Kaziu's words *were not idle self-serving articulations.* …He was awarded a 'Certificate of Appreciation' by the MDC for "Exemplary Pro-Social Behavior…" after he stopped an inmate from self-harm. …

*…Kaziu's reformed beliefs demonstrated that he no longer presents the same danger to the public as in 2012…* The *BOP determined that Kaziu now presented little risk of danger…*

As for incapacitation and deterrence, *data showed an extremely low recidivism rate for offenders like Kaziu.* He directed the Court's attention to a study conducted in 2019 that 'examined recidivism rates of offenders convicted of terrorism-related offenses post-9/11 in the United States.' Omi Hodwitz, *The Terrorism Recidivism Study (TRS)*… The study found that of the 247 individuals convicted of terrorism-related offenses from 2001 to 2018 who were subsequently released, only four had recidivated, yielding a recidivism rate of 1.6%. An updated version of that study found that, of terrorism-related recidivists, only one 'return[ed] to extremist activities.' [In fact, as discussed above, he likely did *not* do so.] …

'The harshness of incarceration at MDC is a relevant factor' in resentencing… The horrible conditions at the MDC, which regrettably still exist, amplify the retributive power of a sentence. Kaziu was transferred to MDC in mid-September 2024…

***

Kaziu argued that his original sentence 'is disproportionately higher than those imposed on other similarly situated defendants.'…

***

Kaziu also provided a chart detailing the varying average sentences rendered in international and domestic terrorism prosecutions but did not cite the underlying cases… Nonetheless, *the sentences in this chart for conduct comparable to Kaziu's were drastically lower: around…11 years for a foiled violent plot.*

***

While consideration of these two defendants' sentences [there was a discussion of the 18 years imposed on Stewart Rhodes and the 22 years imposed on Enrique Tarrio, who have both subsequently been pardoned] was not necessary to support the Court's conclusion that the balancing of the 3553(a) factors warranted the 20-year sentence… they nevertheless add cogency to the Court's decision. .." *Kaziu*, 2025 US Dist. LEXIS 35715, at 1-2, 4-7, 10-11, 13-14, 16-18, 21, some emphasis supplied.

The *Kaziu* court recently found that the 25 year sentence imposed in that case (in the 2021 reduction) was *disproportionately long because the average sentence for a foiled violent plot was only 11 years.*

Like Mr. Kaziu, Guled Omar has been rehabilitated and, as found by Dr. Hodwitz, his low risk PATTERN score and the other evidence discussed above, presents an extremely low risk of recidivism. As with the statements from Mr. Kaziu, Mr. Omar's Declaration and his

conversations with Dr. Hodwitz show that he understands that his prior beliefs were based on a misunderstanding of Islam. In his Declaration he stated, "I was a fool. …I never want to go back to the religious dogma, the consistent teaching of hate and intolerance. Everything these extremists promised and taught us was a lie!" (Exhibit "D") For all of these reasons, as well as the disparity with the codefendants, Mr. Omar's sentence should be reduced to the 10 years he has already served.

**Effect of Terrorism Enhancement**

In *United States v. Hammoud*, 2022 US Dist. LEXIS 214184 (WDNC 2022), which is, like Cromitie, a terrorism case (not a sting operation, but a years-long conspiracy which provided a great deal of money to Hezbollah) - where compassionate release was granted, the court stated:

> "…From March, 1996 to July, 2000, Hammoud and ten others orchestrated a cigarette-trafficking scheme designed to support Hezbollah…
>
> ***
>
> …On resentencing in 2011, the Court granted a variance and imposed a 30-year sentence. … Hammoud has now been imprisoned over 22 years.
>
> Hammoud identifies two 'extraordinary and compelling reasons' for relief: (1) a disparity between his sentence and other sentences for comparable conduct; 2) the disproportionality in his sentence caused by the application of the 'terrorism enhancement.'
>
> …[T]he Court is persuaded that Hammoud has demonstrated 'extraordinary and compelling reasons.' First, Hammoud's 360-month sentence was 'sheer and unusual,' [quoting *United States v. McCoy*, 981 F.3d 271, 285 (4th Cir. 2020)] even after the substantial variance that the Court applied. *Hammoud had next to no criminal history.* …
>
> Hammoud's sentence was also grossly disparate compared to what courts now deem appropriate. …*Courts have since imposed more moderate penalties..* …
>
> ***
>
> *The specter of the terrorism enhancement, USSG 3A1.4, also loomed over Hammoud's sentencing.* That provision triggers dramatically-enhanced penalties at sentencing, catapulting a defendant's offense level by 12 points and ratcheting the criminal history level to the highest level, Category VI. *In Hammoud's case, the effect of the enhancement on his Guidelines sentence was extreme. His offense level jumped from 34 to 46, and his criminal history level went from the lowest (I) to the highest (VI). … As a result, his Guidelines sentence called for life imprisonment, instead of 151-188 months. Although the Court ultimately applied a variance, the Guidelines calculation – heavily weighted by the terrorism enhancement - undoubtedly influenced the sentence that Hammoud received. …*" *Hammoud,* supra, at 1-2, 4-10, emphasis supplied.

As in *Hammoud,* the effect of the terrorism enhancement herein was also extreme, ratcheting the adjusted offense level from 35 – 43, and the criminal history level from the lowest to the highest category. The Guidelines range *went from 168-210 months to life*. Even though the Court granted a downward variance to 420 months, were it not for this enhancement, which is not empirically validated[4], Guled Omar would have had a much shorter sentence.

**Other Terrorism Cases Where Compassionate Release was Granted**

In addition to *Hammoud,* supra, there are several other terrorism cases where compassionate release was granted. *United States v. Ali*, 2021 U.S. Dist. LEXIS 73320 (DMN 2021)( defendant convicted at trial of material support to Al-Shabab and still had many years left to serve); *United States v. Hassan*, 2020 U.S. Dist. LEXIS 165638 (DMN 2020) (defendant convicted at trial of material support to Al-Shabab); *United States v. Cromitie*, 2024 US Dist. LEXIS 12253 (SDNY 2024) (25 year in terrorism sting case reduced to time served)(See also *United States v. Williams*, 2023 US Dist. LEXIS 129978 [SDNY 2023][granting release to Mr. Cromitie's co-defendants); *United States v. Hassoun* 470 F. Supp.3d 804 (NDIL 2020) (compassionate release granted in a terrorism case to a young defendant who *served less than 10 years of his 23-year sentence*); *United States v. Martinez,* 1:10-cr-00798, Docket No. 157 (DMD 2025)(granting compassionate release with seven years left on a 25 year sentence, based on lower sentences in recent years, youth, mental health challenges and rehabilitation); *United States v. Hasanoff*, 2020 US Dist. LEXIS 199816 (SDNY 2020) (granting compassionate release based largely on family circumstances to a man who provided material support to Al Qaeda); *United States v. El-Hanafi*, 460 F. Supp.3d 502 (SDNY 2020) (granting compassionate release in a terrorism material support conspiracy case to a defendant who served around 10 years of his

[4] See https://www.ussc.gov/sites/default/files/pdf/amendment-process/public-comment/202308/88FR39907_public-comment_R.pdf#page=150, at 156-158

15-year sentence); *United States v. Ferizi*, 1:16-cr-042 (EDVA 2020); *United States v. Tajideen*, 1:17-cr-046 (DDC May, 2020) (granting compassionate release in a terrorism financing case to a defendant who served around three years of a five-year sentence); *United States v. Hossain*, 2020 WL 3265001, at *5 (N.D.N.Y. 2020); *United States v. Bary*, 2020 US Dist. LEXIS 18631 (SDNY 2020); *United States v. Rana*, 2020 US Dist. LEXIS 208638 (NDIL 2020.)

**More Recent Terrorism Cases with Significantly Lower Sentences**

The *Hammoud* court pointed to the disparate nature of Mr. Hammoud's 30 year sentence compared to more recent sentences for material support cases, stating that the average sentence in those cases was 209 months as of 2021, or perhaps less, as defense counsel cited statistics stating that the median such sentence for those who *went to trial* was 180 months.

Undersigned counsel has also kept track of the sentences in terrorism-related cases, and has noticed a *pronounced downward trend in recent years*. While there are still a few very lengthy sentences, there are many more much lower sentences. See Appendix A, which lists 29 terrorism-related cases where the defendants were sentenced to 84 months or less between 2019-2025. Appendix A also lists another 56 terrorism-related cases where the defendants were sentenced to 120 months or less. And it is noted that, as seen by the plea bargains offered to the four codefendants, *often the exact same conduct can result in either a material support conviction, or a conviction for conspiracy to murder, depending on charging decisions and plea bargains.*

**Rehabilitation, Young Age and Other Factors**

As discussed above, the Assessment by Dr. Hodwitz, the Declaration and the institutional record all show that Guled Omar has undergone a very substantial rehabilitation process, and poses an extremely low to nonexistent risk at this time.

In addition, Guled Omar was only 19 at the time the instant offense was alleged to have begun (and only 15 or 16 when he first considered himself a jihadist). As discussed below, there are many cases where courts have recently held that the defendant's young age at the time of the offense weighed on the side of granting a sentence reduction. See i.e. *United States v. Countess*, supra (defendant was *25* at the time of the offense); *United States v. Cain,* supra (the defendant was 23 at the time of the offense); *United States v. Watts*, supra (the defendant was 20 at the time of the offense); *United States v. Kayarath*, 2024 US Dist. LEXIS 39674 (DKS 2024) (the defendant was 18 at the time of the offense); *United States v. King*, 2023 US Dist. LEXIS 196542 (NDCA 2023)(the defendant was 21 at the time of the offense); *United States v. LeBaron*, 2023 US Dist. LEXIS 199275 (SDTX 2023)( the defendant was 23 at the time of the offense.)

Finally, many courts have found that the harsher than usual prison conditions, generally during the pandemic, also lend support to a sentence reduction. See, i.e. *United States v. Souza,* 2025 US Dist. LEXIS 22349 (DRI 2025) (harsh conditions, such as frequent lockdowns, at his prison); *United States v. Jackson,* 2025 US Dist. LEXIS 65631 (DCT 2025)(harsh conditions during pandemic); *United States v. Cromitie*, supra.

In *United States v. Willingham*, 2025 US Dist. LEXIS 165154 (SDFL 2025) the court recently reduced the 384 month sentence for five armed robberies based on a combination of factors, including rehabilitation, young age, and lack of criminal history, stating:

> "…Here, while any of the Defendant's proffered reasons viewed in isolation may not warrant compassionate release, taken together, the Court finds that they are 'similar in gravity; to those enumerated in the Sentencing Commission's Policy Statement. Most significant are: *(1) Defendant's young age [22] at the time he committed his crimes; (2) his lack of criminal history*; (3) his traumatic childhood; and *(4) his rehabilitative efforts.* …
>
> While the Government is correct that Defendant's youth, lack of criminal history, and childhood abuse were 'fully disclosed in the PSU and considered at the time of

> sentencing,'…that does not preclude the Court from considering those factors in the context of the instant motion. …
>
> ***
>
> …[W]hile the Court recognizes that Defendant's crimes were serious, the Court is satisfied that Defendant is no longer a danger to the community. …[H]e was only 22 years old when he committed his crimes.
>
> …Defendant has not been cited for violent conduct once in the approximately ten years he had been incarcerated. The Defendant's disciplinary record reveals only minor, non-violent infractions. He has also demonstrated personal growth and taken positive steps towards rehabilitation…" *Willingham*, supra, at 6-7, 9, emphasis supplied.

All of the factors cited in *Willingham* apply herein – Guled Omar was *even younger* than Mr. Willingham at the time of the offense; he has not just minor criminal history, but *no criminal history*; as discussed at the Sentencing, at 27-28, and he has shown excellent rehabilitation, as noted by Dr. Hodwitz and as shown by the other evidence discussed above.

**POINT II**

**THE 18 USC 3553(a) FACTORS SUPPORT RELEASE**

Consideration of the applicable factors from 18 U.S.C. § 3553(a), as also required by § 3582(c)(1)(A), leads to the conclusion that reduction at this time of Mr. Omar's term of imprisonment to the time already served is warranted.

(a) The "nature and circumstances of the offense" and the "characteristics of the defendant." As discussed above, Mr. Omar was a young man with no criminal history who unfortunately was for a few years caught up in a very misguided and dangerous interpretation of Islam which led to his involvement in this case.

The offense was very serious, but as shown by the Assessment by Dr. Hodwitz, his Declaration, his institutional history, and his support letters, Guled Omar has not harbored those dangerous beliefs for many years now. As in *Kaziu*, supra, he has studied Islam and this, along with the Life Connections Program, the prison chaplain, and his own introspection, has taught him tolerance, humility and patience.

(b) & (c) The need to provide just punishment, afford adequate deterrence, and protect the public. A sentence reduced to the over ten years already served would constitute just punishment and adequate deterrence, and would not present any risk to the public.

As noted in *Kaziu*, supra, and discussed above, the recidivism rates in terrorism cases are only 2-3 percent. That, along with the *very clear evidence of rehabilitation herein*, shows that the time already served is sufficient to provide deterrence and protect the public.

(d) Consideration of providing needed medical care in the most effective manner. This factor suggests release rather than continued incarceration.

(e) The need to avoid unwarranted sentencing disparities. As discussed above, this factor supports a substantial reduction in sentence because his sentence was nearly four times longer than those of four mostly similarly-situated codefendants.

(f) Finally, upon consideration of the overall statutory command that all sentences, while sufficient to achieve the objectives identified in subsection (a)(2), are not "greater than necessary," 18 U.S.C. § 3553(a), the sentence of imprisonment in this case should be reduced to time served for extraordinary and compelling reasons.

**CONCLUSION**

For the foregoing reasons, this Court should reduce Guled Omar's sentence pursuant to 18 U.S.C. § 3582(c)(1)(A.)

Dated: September 10, 2026

Respectfully submitted,
*S/Kathy Manley*
KATHY MANLEY
Attorney for *Guled Omar*
26 Dinmore Road
Selkirk, NY 12158
(518) 635-4005
Mkathy1296@gmail.com