**UNITED STATES DISTRICT COURT**
**DISTRICT OF MINNESOTA**

---

**UNITED STATES OF AMERICA**

**No. 0:15-CR-049 MJD**

**v.**

**MEMORANDUM OF LAW/BRIEF**

**ABDIRAHMAN YASIN DAUD,**

**18 USC 3582(c)(1)(A)(i)**

Defendant.

---

**DEFENDANT'S MOTION FOR MODIFICATION OF SENTENCE BASED ON EXTRAORDINARY AND COMPELLING REASONS**

Abdirahman Daud, by undersigned counsel, moves this Court on October 12, 2026, pursuant to 18 U.S.C. § 3582(c)(1)(A), for a reduction of his sentence based on extraordinary and compelling reasons, which include the disparity between his sentence and those of his similarly situated co-defendants; his extensive rehabilitation including an Assessment by a terrorism expert finding an extremely low risk of recidivism; and other reasons. Mr. Daud was sentenced to 360 months imprisonment in November 2016.

This was a very serious case, but 1) Abdirahman Daud's actions in this case were essentially the same as those of his co-defendants who were allowed to plead guilty to material support and received *much* lower sentences; and 2) his Assessment by Dr. Omi Hodwitz, a terrorism expert, and a great deal of other evidence, shows that he has been rehabilitated.

**Jurisdiction and Authority to Act**

Abdirahman Daud is presently incarcerated, under BOP Register Number 49785-298, at FCI Texarkana. He submitted a request for compassionate release to the warden on January 4, 2026 . (Exhibit "A") Therefore, Mr. Daud has exhausted his administrative remedies under 18 USC 3582(c)(1)(A). *United States v. Hammond*, 2020 US Dist. LEXIS 67331 (DDC 2020.)

On November 1, 2023, the United States Sentencing Commission's updated Guidelines went into effect[1]. Section 3582(c)(1)(A) authorizes a court to reduce a defendant's term of imprisonment if "extraordinary and compelling reasons" warrant a reduction and "such a reduction is consistent with applicable policy statements issued by the Sentencing Commission." The Sentencing Commission stated:

> "In 2018, the First Step Act put an end BOP's gatekeeping function and allowed individuals to file motions for sentence reductions under the statute. Because the Commission lost its quorum in early 2019 and did not regain it until 2022, it was unable to amend §1B1.13 during the more than four-year period since defendants were first permitted to file such motions. During those years, courts have found extraordinary and compelling reasons warranting sentence reductions based on all of the factors the Commission identified in First Step Act—Reduction in Term of Imprisonment Under 18 U.S.C. § 3582(c)(1)(A) 2 | April 27, 2023 2007, i.e., the three specified bases of medical condition, age, and family circumstances, and the "other reasons" catchall. Commission data indicate *courts have hewed to the "extraordinary and compelling" requirement*, see U.S. SENT'G COMM'N, COMPASSIONATE RELEASE DATA REPORT (Dec. 2022), at tbls. 10, 12, & 14, and while they have found such circumstances to be present in more cases than BOP had before the First Step Act, *they have been judicious in granting relief.*
>
> Among other things, the amendment extends the applicability of the policy statement to defendant-filed motions; *expands the list of specified extraordinary and compelling reasons that can warrant sentence reductions; retains the existing "other reasons" catchall; provides specific guidance with regard to the permissible consideration of changes in the law; and responds to case law that developed after the enactment of the First Step Act.* The amendment is informed by Commission data, including its analysis of the factors identified by courts in granting sentence reduction motions in the years since the First Step Act was signed into law. It is also informed by extensive public comment, including from the Department of Justice, the Federal Public and Community Defenders, the Commission's advisory groups, law professors, currently and formerly incarcerated individuals, and other stakeholders in the federal criminal justice system." https://www.ussc.gov/sites/default/files/pdf/amendment-process/reader-friendly-amendments/202305_RF.pdf at 1-2, emphasis supplied

[1] Petitioner is aware that in May, 2026, the Supreme Court decided two cases, *Rutherford v. United States*, 2026 US LEXIS 2294 (2026) and *Fernandez v. United States*, 2026 US LEXIS 2295 (2026) which, *inter alia,* held that, contrary to the USSC Guidelines regarding a change in law, a nonretroactive change to the law cannot be the basis for a sentence reduction under 18 USC 3582(c)(1)(A)(i). The instant motion is *not* relying on that provision or on any factors *Rutherford* or *Fernandez* held are non-permissible.

**The Underlying Case in Brief**

This was a very serious case in which a group of young Somali-American[2] men decided, for various reasons, to travel to Syria and join ISIS. Had they succeeded, it is likely they would have been killed, perhaps after killing others. In retrospect, Mr. Daud is very glad that he was stopped before he was able to leave the US and get to Syria. He has a great deal of remorse about his actions, and he wishes to help dissuade other young men from following in his footsteps.

Of the group of seven defendants indicted in the instant case,[3] four of them (Zacharia Abdurahman, Hamza Ahmed, Adnan Farah and Hanad Musse) were offered, and accepted, the opportunity to plead guilty to only material support to terrorism, rather than conspiracy to kill abroad. They were assessed by an expert hired by the court, and despite differing recommendations from him, they were all sentenced to **120 months**, and were all released in the past few years. *It is submitted that Mr. Daud's actions and statements in the case were not materially different from the actions and statements of the four who were offered a plea agreement* by the Government which was not extended to Mr. Daud. As noted in Paragraph 138 of the PSR, each codefendant is considered an average participant in the conspiracy. And, like most of the others, *Mr. Daud has absolutely no criminal history.*

The three defendants who were not offered the plea agreement extended to their co-defendants decided to go to trial. They were all convicted and were sentenced to **360 months** (Mr. Daud and Mohamed Farah) and 420 months (Guled Omar.) Mr. Daud's sentence was *three times longer* than that of his co-defendants who were allowed to plead guilty to a lesser

[2] While he was raised in the US since the age of nine, however, Abdirahman Daud never naturalized, and thus he faces deportation to Somalia upon release from prison.
[3] There were two others indicted separately who cooperated and received less prison time than the other seven.

charge. Even if it may have been justified at the time of sentencing, in combination with the other factors discussed herein, and particularly in light of Mr. Daud's rehabilitation, this disparity constitutes an extraordinary and compelling reason for a sentence reduction in this case.

**Sentencing Conversation**

At this instant sentencing on November 15, 2016, this Court engaged in a fascinating conversation with Abdirahman Daud, chiefly about his actions in the case, why he did what he did, and how he no longer believes those things. While Mr. Daud's rehabilitation may have been a work in progress at that point, this Court did say, "I thought we had a very good conversation." (Sentencing, at 46.)

Even before the Court began questioning him, Mr. Daud stated:

> "…I intended to travel to Syria, Your Honor, with the sole purpose of joining a terrorist organization. …I was going there strictly to fight and kill on behalf of the Islamic State… …I count on my community to reject and condemn all forms of terrorism. … I especially ask the youth to speak up and reject these ways of thinking and to …not be blind followers. …I just blindly followed everything that was told to me. …" (*Id.* at 12-14.)

In the conversation that followed, Abdirahman said he had believed that if he joined ISIS, he would probably become a martyr and enter paradise, as would his family. (*Id.* at 19.) When asked if he had to lie about his beliefs, he said, "…[Y]ou believe that anybody … against that way of thinking is an enemy…so…you lie and deceive." (*Id.* at 20.) He added:

> "Your Honor, sometimes looking back, I feel like although I had these things in my mind… that I wasn't proud of them somehow because I never addressed it to anyone I loved." (Sentencing, at 20.)

**2025 Assessment by Dr. Omi Hodwitz**

In March, 2025, Mr. Daud was assessed by Dr. Omi Hodwitz, a criminologist, terrorism expert and psychologist who teaches at the University of Idaho, and who is part of the National

Consortium for the Study of Terrorism and Responses to Terrorism (START) and several related groups. (See Exhibit "B," Dr. Hodwitz's Report, letter and CV)

Dr. Hodwitz interviewed Mr. Daoud for several hours on March 9, 2025, and also conducted phone interviews with four of his family members. (Exhibit "B" at 1-2) Her Report was based on what she learned in her interviews, her knowledge of this case (she was provided with the sentencing transcript and opinion in this case) her knowledge of terrorism cases in general and her use of two risk assessment tools. *The Report found that Mr. Daud was rehabilitated and was not at risk of reengagement with terrorism or recidivism*. (Exhibit "A" at 7) The Report stated:

> Structured professional judgment (SPJ) risk assessment involves using tools to assess the likelihood that individuals convicted of extremist-related crimes will reengage in criminal activity following release. *Over the last decade, several SJP tools have been created and validated,* including the Violent Extremist Risk Assessment 2 Revised (VERA-2R) and the Extremist Risk Guidelines (ERG 22+). …There is a great deal of overlap between the two tools, but each has unique characteristics; thus, the assessment of Mr. Daud incorporates elements of each tool with a goal of providing a more complete assessment that is not limited to a single set of factors.
>
> ***
>
> …Mr. Daud was given a series of structured prompts and asked to provide complete and thorough responses, with encouragement to offer additional unprompted information. …In addition to …prompts that were applied to the pre-radicalization portion of the session, Mr. Daud was questioned about the factors that facilitated radicalization, including psychological, social, cultural and practical influences. Mr. Daud *gave extensive responses* to these prompts and was encouraged to elaborate beyond the prompts. Lastly, Mr. Daud was asked to reflect on his current circumstances, including… his religious practices and beliefs, his priorities upon release, and his ideological, moral and ethical interests and values. Throughout the duration of the interview, Mr. Daud maintained a friendly and welcoming demeanor, was thorough and generous with his responses, and gave clear indications of open honesty and willingness to cooperate. *His responses are considered reliable and valid.*
>
> ***
>
> …It is important to note that the focus of the assessment will be Mr. Daud's *current risk*, rather than his risk at the time of his radicalization and/or conviction, although the report will periodically refer to early risk. This recognizes the dynamic nature of many of these factors… The assessment will be based on seven overarching categories, including associates, ideology and /or grievances, and skills and resources…

as well as a history of violence and intent to commit violence… and criminal history and mental health history.

**Associates**

Other than his co-defendants, Mr. Daud does not maintain communication with members of his former extremist community. His association with co-defendants is limited at best, prompted by shared legal commitments… When asked about his former extremist associates, Mr. Daud emotionally, socially, and ideologically distanced himself from them, conveying a balance of dismay for their shared ideas… and *acceptance that he played a role in that community and is accountable*. …[H]e noted that at the time of his radicalization, the community perpetuated a narrative… that facilitated radicalization… He mentioned that some of his co-defendants that have since returned to society harbored some level of resentment towards the community for not actively countering radicalization, but Mr. Daud did not express similar negative sentiments. Once again, he recognized his own role in his radicalization and *held himself accountable for it.*

Mr. Daud's family members confirmed and supplemented his narrative. … They noted that Mr. Daud was very young when he was radicalized (approximately 17-18 years old) and those that mentored his radicalization were older… Each family member emphasized that Mr. Daud is older and more mature now, no longer susceptible to nor interested in unhealthy outside social and religious influences. Thus, Mr. Daud and his family members provided *a clear indication that* ***'associates'*** *is not a risk factor.*

Mr. Daud's family is central to his current identity, aspirations and values, and *they fill a key role as a rehabilitative and prosocial support system*. …Mr. Daud speaks with his parents and siblings weekly, if not daily… He expressed remorse for the repercussions his family faced in the aftermath of his legal conviction… His sister noted that Mr. Daud's eventual return to society would allow them to heal as much as it would allow him to integrate. Thus, given the presence of positive familial ties, ***"associates"*** *is a protective factor.*

**Ideology and Grievances**

*Mr. Daud is not reserved in talking about his former extremist ideology and grievances, particularly in a reflective and critical/analytical manner.* He provided a detailed summary of the process that led him to develop an affiliation with the caliphate, beginning with the narratives adopted by the Muslim and Somali-American communities in Minneapolis, *the youthful passion that grew among his peers, the impact of members of his community traveling overseas to fight with Al Shabab or the Islamic State, and the eventual adoption of the narrative that it was both a duty and an honor to engage in religious extremism*. Mr. Daud acknowledges that he began his radicalization process posturing as a method to acquire social capital and *ended it as a religious zealot.*

Mr. Daud no longer holds the same ideology or grievances. He is a practicing Muslim but has rejected teachings that led him to originally adopt an extremist identity. …[His prior interpretations] included the belief that non-Muslims were heretical, that Mr. Daud's extremist activities would ensure success for his family in the afterlife, and that he was honor-bound to fight for oppressed Somalis and Syrians with violence. When asked about his current relationship with non-Muslims, *Mr. Daud shared his commitment to an acceptance of all faiths, beliefs and people, believing that this is the true teaching of the Koran*… [and] that he is as responsible for the well-being of his family in this life as in the afterlife and extremism serves neither… He explained that, following

radicalization, he perceived [Islamic State actions] as a form of justice… When asked is current interpretation of justice….he described a just society as one within which everyone treated each other as they would like to be treated… In summary, Mr. Daud displays no evidence of his former ideology and harbors none of his previous grievances. Instead, he has embraced a narrative of respect and dignity for all. …Therefore, ***"ideology and/or grievances"*** *is not a risk factor. Instead,* ***"ideology"*** *is a protective factor.*

***Skills and Resources; Criminal History; Past History of Violence***

…[A]ll three [above] categories rely on static factors that cannot be changed. Clinicians have noted the importance of dynamic risk factors over static ones…

Mr. Daud did not have the skills or resources to engage in extremism at the point of radicalization; however, through peer influences and online messaging he adopted the necessary narrative that provided motivation to gain skills and resources. …[I]t does not appear that he was successful in acquiring weapons training, financial support, or logistical support to carry out his goal to travel overseas to fight for the Islamic State. Therefore, given that….and [because] he no longer possesses the necessary motivation, **"skills and resources"** is not a prominent risk factor. …Mr. Daud undoubtedly learned some means and methods of carrying out ideologically-oriented violence, but this appears to be limited at best, thus this category is considered *low risk,* rather than risk free.

Mr. Daud did not have a criminal history when he became radicalized… …[H]e now has a criminal history. Thus, **"criminal history"** is a risk factor.

Mr. Daud did not engage in violent behavior, nor did he experience violent behavior in his personal, social or professional life. He endorsed violence and adopted a commitment to violence… …Thus, **"past history of violence"** is evidence in theory, not in practice, and is considered low risk, rather than risk free.

**Intent to Commit Violence**

Mr. Daud expressed an intention to commit violence once he was radicalized. He reports that a considerable amount of his time while incarcerated has been dedicated to exploring the reasons and motivation behind this intention. …He has …rejected his early interpretations of Muslim beliefs and the narratives presented by others, accepting a peaceful interpretation of the Koran… and a prosocial narrative… …*Mr. Daud stated that he was dismayed that he intended to cause harm to others*, it is no longer logically defensible, and he is still trying to reconcile that this was once part of his identity. *He appears embarrassed and ashamed that, at one point, this was central to his beliefs.* ...For these reasons, ***"intent to commit violence"*** *is not a risk factor. Instead, Mr. Daud's abhorrence of violence is a protective factor.*

**Mental Health Issues**

Mr. Daud has no reported mental health diagnoses, and it is beyond the scope of this report to assess whether he has unreported mental health issues. However, Mr. Daud appears to be of sound mind… …[T]hus **"mental health issues"** is not considered to be a risk factor. His commitment to rehabilitation, to an accepting and inclusive approach to divergent religious and cultural ideals, and his emphasis on his support network and becoming a contributing member of society suggests his mental health is sound *and is a protective factor.*

**Concluding Assessment**

> *This report concludes that Abdirahman Yasin Daud is rehabilitated and is not at risk of reengagement or recidivism.* …[T]he only risk factors identified during the assessment are static factors that… do not capture nor reflect the rehabilitative process that Mr. Daud has engaged in since he was incarcerated. *All dynamic factors that are included in VERA-2R and the ERG-22+ are protective factors* in Mr. Daud's current life, providing him with prosocial opportunities and commitments, a strong support system that will help him reintegrate into society and maintain his commitment to treating all other communities with respect and dignity.
>
> These findings are supported through interviews with family members. As a central feature in Mr. Daud's life, they interact with him regularly and have observed his rehabilitative process. …Mr. Daud and his family gibe every indication that Mr. Daud is rehabilitated and will become a contributing member of society if given the opportunity." (Exhibit "B" at 1-7, emphasis supplied)

Dr. Hodwitz also submitted a letter to the Court in order to add additional context relevant to all three assessments (she assessed Mohamed Farah and Guled Omar as well.) (Exhibit "B" at 8)

**Declaration**

Abdirahman Daud has written a Declaration apologizing for his words and actions in this case. He stated:

> "…I carry the weight of my past every single day. The decisions I made – reckless and rooted in a fractured understanding of the world – caused harm. …I was wrong. And in the years since, I have been doing the hard, often painful work of becoming someone I hope my family, my community, and even this Court could be proud of.
>
> The ideas I adopted as a teenager were rooted in ignorance, immaturity and a deep desire to belong. I now understand that they were entirely flawed. *These beliefs, built on a misinterpretation of Islam, have caused immense harm* – leading many young men to lose their loves and leaving countless others displaced. As an adult, I've come to fully grasp the pain and consequences these ideologies carry. …
>
> …I've sought wisdom in pages and in prayer. I've mentored younger men who still have a chance to choose a different road. I've sat in silence with my guilt, not to drown in it – but to let it teach me. …
>
> My mother is growing older. My family, though resilient, is tired. They have carried the weight of my absence with far more grace than I deserve. I long to stand beside them, to shoulder what I once left them to bear alone. I do not see release as freedom from responsibility – I see it as a return to it.
>
> ***
>
> Thank you for reading this. Thank you for seeing not just the man I was, but the man I have worked to become. …" (Exhibit "C" at 1-2)

**Sentencing Parameters and Terrorism Enhancement**

Abdirahman Daud's adjusted offense level would have been 33 without the terrorism enhancement. His criminal history level would have been I (with no prior convictions), yielding a sentencing range of 135-168 months.

But the Terrorism Enhancement under USSG 3A1.4. resulted in an increase of 12 levels, and a criminal history category of VI, resulting in a Guidelines sentencing range of *life*. As discussed more below, while under the law this enhancement does legally apply herein, the enhancement is not empirically based, and its application skews the entire sentencing process, ratcheting up sentences very drastically.

**Recidivism Rates in Terrorism-Related Cases are Extremely Low**

Perhaps surprisingly, recent studies have shown the recidivism rates in terrorism cases to be *extremely low*, *far lower than for other types of cases.* Dr. Omi Hodwitz created the Terrorism Recidivism Study (TRS) database in 2018, and it appears to be the first of its kind, at least within the United States. The first report based on the TRS data was published in 2021, in *Perspectives on Terrorism*, Volume 15, Issue 4 (ISSN 2334-3745) (attached here as Exhibit "D") See also *United States v. Kaziu*, 2025 US Dist. LEXIS 35715, at 14, citing this study as support for a sentence reduction.

The TRS data showed that of the 629 individuals convicted of terrorism-related offenses in the United States between September 11, 2001 and March 6, 2018, 354 of them have been released. (Exhibit "D" at 1, 3, 5) Of those 354, *only less than 3% recidivated, compared to between 30-60% of those convicted for non-terrorism-related offenses.* (Exhibit "D" at 1-2) *And none of them were subsequently charged with anything terrorism-related.* (See Table 3, Exhibit "D" at 7)

This data turns the assumption of both the government and the judge herein – that because they are ideological, there is no hope of rehabilitation in terrorism cases – *completely on its head*. Rather than terrorism cases having far greater recidivism rates than other cases, the rates are in fact *far, far lower.* Dr. Hodwitz stated:

> "…The results support the proposition that *recidivism among extremists is notably low, even with an extended period of observation*, indicating that extremists may have a very low propensity for re-offending.
>
> ***
>
> Apprehensions about extremist recidivism are not new but instead reflect a growing concern in legislative and enforcement discussions. Following the attacks in September of 2001 (9/11) and the implementation of the USA PATRIOT Act, the United States experienced a significant increase in the arrest and prosecution of individuals for terrorism-related offenses. …As these offenders return to the community, their ability to reintegrate successfully is a source of concern.
>
> Historically, the empirical evidence providing direction on the frequency and severity of extremist recidivism has been limited. …[T]he need for data addressing terrorist recidivism became a matter of utmost importance.
>
> ***
>
> …[T]he primary purpose of the TRS is to assess recidivism rates among convicted extremists in the United States. For purposes of this analysis, recidivism is defined as any criminal activity, either political or apolitical, that requires the intervention of the criminal justice system. The analysis of the 2018 data set demonstrated that recidivism is quite low among political offenders; nine individuals or approximately 1.6 percent of the full sample recidivated by the spring of 2018. In addition, only four of those nine recidivated upon release; the remainder recidivated while still in prison. Of the 247 offenders released in the 2018 data, this resulted in a consistent recidivism rate of 1.6 percent. *These findings are particularly stark when compared to a non-extremist or apolitical sample of offenders. …*
>
> ***
>
> Looking at general recidivism rates, these remain low in the 2020 data. …
>
> ***
>
> …[T]he 2020 data reports a recidivism rate of 3.1 percent. … …[I]t is still in the low single digits, represents only a handful of individuals, and *remains significantly different from apolitical samples…*
>
> ***
>
> The type of recidivism is also important; *many of the questions around terrorist recidivism are rooted in the concern that, upon release, they will re-engage in political violence.* Herein lies a particularly interesting outcome. *Apart from one individual, the recidivists did not return to extremist activities following release. … The one exception had a tenuous connection to political activity at best*. This offender was originally convicted of human trafficking for profit, including smuggling members of Hezbollah. He resumed his old ways upon release, reengaging with a smuggling ring. Although his

> involvement was driven by profit, it is possible that he continued to do business with extremist organizations though this is *not documented* in his second set of convictions. Thus, crediting him with continued terrorist-related activities is generous and unconfirmed. …
>
> …[T]he recidivist data suggest several conclusions. First, *political offenders have significantly lower recidivism rates when compared to apolitical offenders.* …Second, political offenders are more likely to re-offend within the first year than in later years, compared to apolitical offenders. …Lastly, *when political offenders do recidivate, they engage in apolitical and personally motivated activities*…" (Exhibit "D" at 1, 5, 8, emphasis supplied)

In 2025, Dr. Hodwitz updated the TRS data, and her Analytical Report 2025 is attached at Exhibit "D" at 13-18. It found an *even lower recidivism rate of 2.6 % among those released.* (Exhibit "D" "at 1) The updated Report states:

> "The most recent update of the TRS was completed at the beginning of 2025. Of the 984 cases included in the TRS, 810 met inclusion criteria for analysis. …
>
> ***
>
> …At least 65% of the sample had reentered the community at the time of the 2025 update; the remainder were incarcerated.
>
> Of the 24 recidivists, 14 reoffended following release while the remaining ten committed offenses while they were incarcerated. It is important to note that recidivism rates differed among the whole sample (810 individuals) and those that had been released (526); 3.0% of the whole TRS sampled recidivated while *2.6% of the released individuals recidivated.*
>
> ...Approximately half of the reported recidivism is due to [supervised release] violations, such as driving without a license, using fake food stamps, leaving the state, and using a computer for online dating. These results suggest that released extremists are subject to high levels of scrutiny upon release, resulting in the detection of minor activities. Of the remaining incidents, most were apolitical crimes, including domestic assault, drug activity, minor theft, and counterfeiting. There was only one recidivist whose actions (human trafficking) could potentially be ideologically motivated; however, the evidence suggests that he was profit-driven rather than politically driven…
>
> …Thus, this report closes with the following evidence-based conclusion: *individuals convicted of terrorism-related offenses have a low probability of engaging in criminal activity upon release, particularly of a political nature. When compared to their apolitical counterparts, they pose minimal risk to the community.*" (Exhibit "D" at 15-18, emphasis supplied.)

**Mr. Daud's Institutional Record**

Abdirahman Daud has had a very good record in prison over the years. His PATTERN score from February, 2024 is a general score of 13 and a Violent Score of 15. (Exhibit "E," at 1)

Low security is considered 9-30 general points or less, and a violent score of 7-24. (See Male PATTERN Risk Scoring Form, attached as Exhibit "E" at 17) Thus, Mr. Daud is on the low end of low security, and is in a Low Security prison. (He was moved to FCI Texarkana, a Low, in 2024.)

Mr. Daud's disciplinary history is also quite good, with only five violations over the course of his 11 ½ years of incarceration (Exhibit "E" at 15-16) The most recent was *over 5 ½ years ago*, in 2021, and the most recent before that was a minor one in 2018.

Abdirahman Daud has completed over 40 programs over the years, including rehabilitative programs such as victim awareness and anger management; and a great deal of vocational courses. (Exhibit "E" at 3-4, 7-14)

In sum, it can be seen that Abdirahman Daud has done very well in prison, and this, in addition to his recent Assessment and Declaration, supports a sentence reduction.

**Letters of Support**

Abdirahman's family has submitted six remarkable letters describing how they were forced to escape to America from the Somali civil war, and the lasting effects of this trauma on the whole family. (Exhibit "F") Abdirahman, as the oldest child having spent the most time in Somalia, was likely deeply impacted. Even though Abdirahman was raised from the age of nine in America, his father's letter suggests that as a teen, he may have subconsciously sought to emulate his father's military experiences in Somalia, but without his father's guidance or understanding as to how circumstances differed between Somalia and America.

**Ahmed Adan, Abdirhman's father,** states:

> "I was born in Somalia, where boys become soldiers before they were ready. I joined the military at sixteen. In those days, survival meant silence. You did not talk about fear or pain. You just kept moving. That mindset shaped how I raised my children. I was strict, quiet, and focused on protection.

Abidrahman, my eldest, has always reminded me of myself. As a young man he was driven, hardworking and fiercely independent. He helped support our family, worked long hours, and looked out for his siblings. But he held everything in and often tried to carry too much on his own. We clashed at times because of his stubbornness, but I always trusted him. Even when we disagreed, I knew he had a good heart.

His imprisonment shattered me. I felt that I had failed him as a father. I did not talk about it. I buried the shame and heartbreak so deep that not even my wife or children could reach me. I assumed I would carry that silence for the rest of my life.

But the last ten years have changed everything. Abdirahman has grown tremendously, and through that growth he has helped heal our relationship and reshape our entire family dynamics.

He is the only one who truly knows my past. He knows about my time in the military, the friends I lost, and the danger we faced fleeing Somalia. He knows how, when we finally reached America, I felt like a man without a voice – unable to speak the language and haunted by memories I could not share.

For years, my other children struggled to understand me. My daughter once said she mistook my silence for lack of love. *But Abdirahman helped open the door. From prison, he began asking about my life. At first, I resisted. But he listened patiently and over time, I began to speak.* His words reminded me that pain needs expression, or it only grows heavier.

*Through him, I found my voice again. And with it came a new level of connection with my family. We now share stories, even painful ones, and speak to each other with honesty and care. Abdirahman made that possible*. He became a bridge between the man I was and the father I strive to be.

*He is not the same person who went into prison. Back then, he kept everything inside. Now, he speaks with thoughtfulness and purpose. He listens more, leads with compassion, and works to bring people together.* He dreams of building a future that helps others, especially those facing hardship. Even while incarcerated, he remains focused on service, growth and giving back.

My son carries regret, but more importantly he carries a sense of responsibility and a deep desire to turn his experiences into something meaningful. I believe he deserves a second chance, not just for himself but for the community he hopes to serve.

Abdirahman has a loving and stable family waiting for him. We will support him in every way possible and provide the resources he needs to successfully reintegrate into society. He is deeply loved and admired by his siblings, who look up to him and are eager to welcome him home. He will not return to isolation or uncertainty. He will return to a strong family foundation and a home filled with care, understanding and encouragement.

He has already helped me find healing. I know he can do the same for others. He has grown into a man who understands the power of reflection, truth and peace. He is a man ready to make a difference." Exhibit "F" at 1-2, emphasis supplied

**Farhiyo Mohamed, Abdirahman's mother**, wrote about the trauma of the family's expulsion from Somalia, and how Abdirahman stepped up to guide the family in the new world and was forced to take on more than any child should have to carry. She stated:

> "When Abdirahman was a boy, our lives were shaped by displacement and uncertainty. We fled Somalia, lived in refugee camps and eventually resettled in a place where nothing felt familiar. I was overwhelmed and unsure of how to start over. Abdirahman stepped in to help raise his siblings, translate for me, and guided us through a new world. *He took on more than any child should have to* and did it without complaint.
>
> [After his incarceration] *I have seen my son grow in ways I never expected*. He has taken full responsibility for his past and made the most of his time. He has participated in educational programs, earned certificates in different trades, and maintained steady employment. He has connected with people from all backgrounds and earned the respect of wardens, guards, and fellow inmates. His change is not just personal. It is visible and consistent." (Exhibit "F" at 7, emphasis supplied)

**Sakaria, Abdirahman's brother**, wrote about how Abdirahman has maintained his protection and involvement with the family even after being incarcerated, stating:

> "Growing up, Daud wasn't just a sibling. He had this steady, serious way of carrying himself that made people listen. He corrected me when I slouched, made sure I greeted elders properly, and reminded me to take care of my responsibilities. At the time, I saw it as strictness. Now I understand he was trying to teach me structure and self-respect. His care showed up in the little things, walking me home from school, asking how I was doing and making sure I stayed on track….
>
> Even from prison, Daud never stopped trying to be there for me. Though I haven't seen him in person since he was transferred out of state, our weekly phone calls became a lifeline. In just 15 minutes, he somehow managed to listen closely, offer advice, and lift my spirits. He always asked how I was doing, never making it about himself. It meant more than I can explain….
>
> Daud's influence goes beyond just me. He checks in on our relatives, keeps up with what's going on, and reminds everyone that they're not forgotten. He hasn't let go of his role in our lives, even when it would've been easier to shut down. His consistency, even through the worst of circumstances, has left a mark on everyone around him." (Exhibit "F' at 9-10)

**Sundus, Abdirahman's sister**, wrote to describe how Abdirahman has matured since being incarcerated, stating:

> "Before his incarceration, we weren't on the best terms…. [After his incarceration], I always felt his absence. When I found myself in an abusive marriage, overwhelmed and unsure, *it was Abdirahman who helped me find the strength to leave*. He reminded me that faith is not about having no fear, but about choosing to believe in something better. Even from prison, he was able to reach me in a way no one else could. His voice became my anchor during one of the darkest times in my life.
>
> We've often talked about building something meaningful together, like an orphanage that offers children more than just shelter. For him, it's about creating a place where kids feel safe, valued, and able to dream. That vision reflects the man he's become.

> He no longer focuses on his past but instead looks forward to helping others build a better future." (Exhibit "F" at 13, emphasis supplied)

**Safwan, Abdirahman's 14 year old brother**, discussed how Abdirahman had continued to influence his life, even after Abdirahman was incarcerated, stating:

> "Even from prison, my brother has always tried to be involved in my life. He writes me letters, calls to check on me, and asks about things like how school is going or how I'm doing with basketball. When I started feeling out of place in school, I didn't talk to anyone about it. But I mentioned it during a call with him, and *he helped me see things differently. He didn't give me a lecture, he just made me feel heard*. That mattered a lot to me." (Exhibit "F" at 9, emphasis supplied)

**Ibrahim,** another brother who remained in Somalia until 2024, wrote to say that Abdirahman is becoming an influence in his life, even though the two have been separated for most of their lives – he stated:

> "Talking to Daud now gives me a new understanding of who he is. He speaks honestly and calmly about his past and focuses on how he can move forward. It's clear he's spent his time reflecting and trying to grow. His goal now is to do better, not just for himself, but for others too." (Exhibit "F" at 3)

Finally, **Jonathan Colon,** one of Abdirahman's fellow prisoners for 4 years, also wrote to express support for Abdirahman, stating:

> "Every day, Abdirahman dedicated time to teach the Muslim community, offering lessons in Arabic, and helping us to gain a deeper understanding of Islam. …*He played a key part in helping individuals find a sense of direction and understanding* that would later aid in their successful reintegration into society.
>
> Abdirahman's influence, however, was not limited to just those who shared his faith. *He mentored individuals from all backgrounds*, helping people with different beliefs and life experiences. He was able to engage with anyone regardless of race or faith, and was well-liked and respected by both inmates and staff alike. He offered advice and wisdom to anyone who sought it, playing a pivotal role in resolving daily conflicts and challenges faced in a prison environment.
>
> Despite his own circumstances, Abdirahman consistently made time for others and became a positive influence on many of us. His impact continues to be felt by those he mentored, and he remains a significant figure in the lives of those he helped. His example of leadership, kindness and dedication to others is one that I believe can benefit my community." (Exhibit "F" at 5)

These letters of support all point to a person, Abdirahman, who has changed his life in prison from someone who was willing to fight for the Islamic State, to one who recognizes that

true Islam is about justice and building lives that support peace and reconciliation. Abdirahman Daud has been rehabilitated from his teenage fantasies and is ready to assume the responsibilities of an adult to guide the youth in peaceful, productive paths. Now it is only necessary for the Courts to recognize this rehabilitation.

## POINT I

## THERE ARE EXTRAORDINARY AND COMPELLING REASONS TO REDUCE THE SENTENCE TO TIME SERVED, INCLUDING THE DISPARITY WITH THE SENTENCES OF FOUR CODEFENDANTS, REHABILITATION AND REMORSE, AND YOUNG AGE

The Sentencing Commission's 2023 Guidelines Amendments included a catch-all provision, stating that a sentence may be reduced under 3582(c)(1)(A) "if the defendant presents any other circumstance or a combination of circumstances that, when considered by themselves or together with any of the reasons described in paragraphs (1) through (4), are similar in gravity to those described in paragraphs (1) through (4)[4]." This is often known as the "catch-all" provision.

It is submitted that, given the fact that the sentence was *three times longer than those of four similarly-situated co-defendants, the recent Assessment by Dr. Hodwitz, Defendant's Declaration, his institutional record, and his young age at the time of the offense*, this combination for factors adds up to reasons "similar in gravity" to those specified in the statute.

There are many recent cases where sentence reductions have been granted, often based on reasons of "similar gravity," including disparity with regard to codefendants and rehabilitation. *United States v. Cannon* 2025 US Dist. LEXIS 15526 (MDGA 2025) (sentence reduced under

[4] Paragraphs 1-4 provide for reduction based on 1) medical circumstances of the defendant; 2) age/medical decline of the defendant; 3) family circumstances; or 4) that the defendant was the victim of serious abuse by correctional staff.

'catch-all' provision based on sentencing disparity with codefendants, age at the time of offense, and rehabilitation); *United States v. Whitehurst*, 2024 US Dist. LEXIS 125645 (DMD 2024) (sentence reduced based on sentencing disparity with codefendants); *United States v. Countess,* 2026 US Dist. LEXIS 34621 (DMD 2026) (sentence reduced based on sentencing disparity with codefendants, more recent shorter sentences, young age and rehabilitation); *United States v. Jackson*, 2025 US Dist. LEXIS 65631 (DCT 2025)(30 year sentence reduced to time served based on, *inter alia,* disparity with sentences of codefendants, rehabilitation, and harsh prison conditions during the pandemic); *United States v. Harris,* 2026 US Dist. LEXIS 25526 (DMD 2026) (sentence reduced based on disparity with sentences of codefendants, and strong rehabilitation); *United States v. Halling*, 2025 US Dist. LEXIS 31641 (DMT 2025) (sentence reduced based on combination of factors including disparity with sentence of codefendant and rehabilitation); *United States v. Willingham,* 2025 US Dist. LEXIS 165154 (SDFL 2025) (sentence reduced due to combination of factors rehabilitation, young age and lack of criminal history); *United States v. Taylor* (2025 US Dist. LEXIS 149502 (DMT 2025) (sentence reduced in part due to combination of factors including rehabilitation and remorse); *United States v. Hart*, 2024 US Dist. LEXIS 155080 (EDVA 2024)(sentence reduced under 'catch-all' provision based on lengthy sentence, young age at time of offense and rehabilitation); *United States v. Brown*, 715 F.Supp3d 1034 (SDOH 2024)(sentence reduced to time served under 'catch-all' provision based on combination of factors); *United States v. Smith*, 2024 US Dist. LEXIS 30932 (DMD 2024)(sentence reduced under 'catch-all' provision based on combination of circumstances); *United States v. Robinson,* 2025 US Dist. LEXIS (WDPA 2025) (sentence reduced under 'catch-all' provision based on lengthy sentence, young age at time of offense and rehabilitation); *United States v. Cain*, 2024 US Dist. LEXIS 153717 (WDWA 2024) (sentence reduced under 'catch-all'

provision based on lengthy sentence, young age at time of offense and rehabilitation); *United States v. Moreira*, 2024 US Dist. LEXIS 19204 (DKS 2024) (sentence reduced under 'catch-all' provision based on combination of circumstances); *United States v. Brito*, 2024 US Dist. LEXIS 67541 (SDNY 2024) (sentence reduced due to a combination of factors, including young age and rehabilitation); *United States v. Souza*, 2025 US Dist. LEXIS 22349 (DRH 2025) (sentence reduced due to a combination of factors, including rehabilitation and harsh prison conditions ).

**Disparity with Regard to Codefendants (and Other Factors in Combination)**

In *United States v. Jackson*, supra, the court recently reduced the 300 month bargained-for sentence for being a drug kingpin to time served (about 14 years) based on disparity with codefendants, rehabilitation, and harsh prison conditions during the pandemic, despite a lengthy criminal history, stating:

> "…Jackson observes that his sentence was far longer than any of his co-defendants… …[T]he Court cannot assess, based on Jackson's submission, whether such disparities were unwarranted. He was the lead defendant… Further, Jackson had already amassed 18 criminal history points…
>
> In his Reply, Jackson addresses those concerns… He…identifies six co-defendants with similar criminal histories… *The Court agrees with Jackson that the fact that these co-defendants (who are seemingly similarly situated to Jackson) all received substantially lower sentences favors a reduction in sentence.*
>
> Jackson next relies on the fact that he was incarcerated during the COVID-19 pandemic. …The Court is aware that out-of-cell time was significantly reduced, which limited recreation, exercise, programming opportunities, family visits and more. The fact that several years of Jackson's incarceration were during the pandemic contributes to a finding of extraordinary and compelling reasons for sentence reduction.
>
> The last factor relied upon by Jackson is his maturity, growth and rehabilitation while incarcerated. … He has participated in educational as well as vocational programming…
>
> …While his period of incarceration has not been devoid of disciplinary measures, it appears to the Court tat he has made great strides toward personal growth…
>
> In combination, these four factors provide a compelling and extraordinary reason to reduce Jackson's sentence…." *Jackson,* at 7-10, emphasis supplied.

Similarly, in *United States v. Cannon*, supra, the court reduced the (de facto life) sentence for armed robbery and car-jacking to time served based on the catch-all provision, stating:

> "Subsection (b)(5) provides a 'catch-all' for granting compassionate release when the circumstances may not fit neatly into one of the categories listed…
>
> ***
>
> The Court finds that under the limited circumstances here, the *disparity of Cannon's sentence compared to that of his codefendants is of similar gravity to warrant a reduction of his sentence.* Here. Cannon suffered a substantial penalty by exercising his constitutional right to require the Government to prove his guilt beyond a reasonable doubt… His codefendants… made plea deals with the Government which resulted in sentences of 240 months for one defendant and 300 months for the other. …
>
> ***
>
> Cannon paid quite a price (84 years and 5 months) for exercising his constitutional right to a jury trial. …[R]eceiving a sentence four to five times greater than your similarly situated …codefendants is extraordinary. …
>
> …Based on the Defendant's age at the time he committed the offense [23], the extraordinary disparity in the sentence he received compared to his codefendants, his rehabilitation while in prison, the among of time he has served on his sentence, his lack of danger to the community, and an analysis of the sentencing factors found at 18 USC 3553(a), the Court finds that Defendant's sentence will be reduced…" *Cannon*, supra, at 7, 15-19, emphasis supplied.

And in *United States v. Whitehurst*, supra, a drug and gun case, the court reduced the sentence somewhat based on disparity, even though, contrary to the instant case, much of that disparity was warranted – the court stated:

> "Whitehurst contends that the disparity between his sentence and those of his co-defendants constitutes an extraordinary and compelling circumstance that justifies a sentence reduction.
>
> ***
>
> Whitehurst was …sentenced to *294 months* of incarceration… The co-defendant who received the second highest sentence, Eccleston, was the only one to go to trial. … Judge Williams sentenced him to 210 months. *All other codefendants received sentences of 120 months or less…* At this point, only Whitehurst remains in prison.
>
> …Whitehurst was the leader of this criminal enterprise… [W]hile several of Whitehurst's co-defendants had criminal history categories of I, II and III, Whitehurst… had a criminal history category of V…
>
> ***
>
> …[T]he sentences of several… co-defendants have… been reduced. … *Whitehurst's 294-month sentence now turns out to be about two and a half times higher than four of his co-defendants' sentences*, and more than triple that of the nine others. Given Whitehurst's leadership role and criminal history, a disparity …is certainly warranted; however, a sentence more than double or triple those of his co-conspirators is too great…" *United States v. Whitehurst*, supra, at 7-10, emphasis supplied.

As in *Whitehurst, Cannon, Jackson, Harris, Countess* and *Halling*, there was a very substantial disparity between the 360 month sentence received by Mr. Daud, and the 120 month sentences received by his four codefendants who were offered a plea bargain to a lesser charge. In contrast to the defendants in those cases, Mr. Daud has *no criminal history.*

While he went to trial, he likely would not have done so had he been offered the plea deal given the other four. This Court should find that, even if the sentence itself may have been justified at the time of sentencing, such a disparity is not justified. The fact that his sentence was triple that of those codefendants is now an extraordinary and compelling reason (in combination with other factors) justifying a reduction to time served.

**Terrorism Context - Case of United States v. Kaziu**

It is also very instructive to look at *Kaziu v. United States*, 108 F.4th 86 (2nd Cir. 2024) and 2025 US Dist. LEXIS 35715 (EDNY 2025), where the sentence for *conspiracy to murder* was reduced, first from 27 to 25 years, and then, on remand from the Second Circuit, to 20 years. The case, while not involving compassionate release, was similar to that of Abdirahman Daud, and Mr. Kaziu *actually traveled* to Egypt with the intent to engage in violent jihad (and kill Americans) in Afghanistan and Somalia.

After his 924(c) count was dismissed based on *United States v. Davis*, 588 US 445, the trial court reduced Mr. Kaziu's sentence on the conspiracy to kill from 27 to 25 years, but without a full resentencing hearing. The Second Circuit remanded the case for that sentencing hearing, and then the district court reduced the conspiracy to murder sentence further, to 20 years. The Second Circuit stated:

> "*Kaziu presented plausible allegations of changed circumstances that suggest that the original rationale underlying the sentence – that he was a committed and unredeemed terrorist – no longer applies. …*

First, Kaziu has exhibited virtually *no violent tendencies since his incarceration*. …

*Second, Kaziu has moved on from his religious extremist ideologies.* Kaziu plausibly detailed that his relationship with the Qu'ran has changed… *Kaziu explicitly concedes that he was 'caught in an extreme interpretation of the narrative of Islam' and has 'replace[d] the crude one [he] had at nineteen' with an interpretation that calls for righteous, virtuous behavior. …*

Third, Kaziu has invested in his educational future. Kaziu… has … earned his GED [and completed several other BOP classes and programs.]

Kaziu has thus plausibly claimed that he is nonviolent, has reordered his relationship with Islam, and has positioned himself to be a productive member of society. This is a foundational departure from the type of person Kaziu was when he was originally arrested, convicted and sentenced. We conclude that Kaziu adequately alleges sufficient changed circumstances so that a district judge might wisely consider his arguments at a full *de novo* resentencing." *Kaziu*, supra, at 93-94, emphasis supplied.

Then, in further reducing the sentence, in 2025, the district court stated:

" Judge John Gleeson in 2012 sentenced Kaziu to 27 years imprisonment… for *Conspiracy to Commit Murder* in a Foreign Country… Conspiracy to Provide Material Support… Attempt to Prove Material Support.. and Conspiracy to Use a Firearm. *Of primary concern to Judge Gleeson 'was that "the defendant…agreed…to kill American soldiers and others… in pursuit of [his] goal of violent jihad" and that he "took substantial steps toward providing… material support" to terrorists.'*

…Kaziu, then about 21 years old, traveled with his friend… from their homes in Brooklyn, New York, to Egypt in February, 2009, intending to wage jihad in Pakistan, Afghanistan, and Somalia…

***

… *De novo* sentencing requires the district court to reconsider the sentences imposed on each count…

***

Kaziu received three infractions over his 16 years in prison. …In 2012, he 'was involved in a dispute with another inmate…[which] resulted in a multi-person fight… And in November, 2021, Kaziu…allegedly … 'assault[ed] a member of the prison staff…'

The government argued that the last infraction, six months after the 2021 decision, marginalized his rehabilitation. … Given that the three infractions, such as they were occurred over Kaziu's lengthy sixteen years of imprisonment, the Court did not believe that they should necessarily preclude the sentence reduction.

***

There are four basic purposes identified by the Sentencing Commission's Guidelines that the courts are obliged to consider in rendering sentences: 'deterring crime, incapacitating the offender, providing just punishment, and *rehabilitating* the offender. … Since rehabilitation is one of the Guidelines' prime sentence factors, the Court first focused on Kaziu's rehabilitation, which obviously impacted the issues of deterrence and incapacitation. …

> ***
>
> …In his most recent letter to the Court, [Kaziu] wrote that 'understanding and an open mind…made me see how self-righteous I was and the bigotry that I consumed.' He expressed remorse for his 'misguided belief and idea' and strove to 'be better as a person, a man, and a role model.' …
>
> Kaziu's words *were not idle self-serving articulations.* …He was awarded a 'Certificate of Appreciation' by the MDC for "Exemplary Pro-Social Behavior…" after he stopped an inmate from self-harm. …
>
> …*Kaziu's reformed beliefs demonstrated that he no longer presents the same danger to the public as in 2012*… The *BOP determined that Kaziu now presented little risk of danger*…
>
> As for incapacitation and deterrence, *data showed an extremely low recidivism rate for offenders like Kaziu.* He directed the Court's attention to a study conducted in 2019 that 'examined recidivism rates of offenders convicted of terrorism-related offenses post-9/11 in the United States.' Omi Hodwitz, *The Terrorism Recidivism Study (TRS)*… The study found that of the 247 individuals convicted of terrorism-related offenses from 2001 to 2018 who were subsequently released, only four had recidivated, yielding a recidivism rate of 1.6%. An updated version of that study found that, of terrorism-related recidivists, only one 'return[ed] to extremist activities.' [In fact, as discussed above, he likely did *not* do so.] …
>
> 'The harshness of incarceration at MDC is a relevant factor' in resentencing… The horrible conditions at the MDC, which regrettably still exist, amplify the retributive power of a sentence. Kaziu was transferred to MDC in mid-September 2024…
>
> ***
>
> Kaziu argued that his original sentence 'is disproportionately higher than those imposed on other similarly situated defendants.'…
>
> ***
>
> Kaziu also provided a chart detailing the varying average sentences rendered in international and domestic terrorism prosecutions but did not cite the underlying cases… Nonetheless, *the sentences in this chart for conduct comparable to Kaziu's were drastically lower: around…11 years for a foiled violent plot.*
>
> ***
>
> While consideration of these two defendants' sentences [there was a discussion of the 18 years imposed on Stewart Rhodes and the 22 years imposed on Enrique Tarrio, who have both subsequently been pardoned] was not necessary to support the Court's conclusion that the balancing of the 3553(a) factors warranted the 20-year sentence… they nevertheless add cogency to the Court's decision. .." *Kaziu*, 2025 US Dist. LEXIS 35715, at 1-2, 4-7, 10-11, 13-14, 16-18, 21, some emphasis supplied.

The *Kaziu* court recently found that the 25 year sentence imposed in that case (in the 2021 reduction) was *disproportionately long because the average sentence for a foiled violent plot was only 11 years.*

Like Mr. Kaziu, Abrirahman Daud has been rehabilitated and, as found by Dr. Hodwitz, his low risk PATTERN score and the other evidence discussed above, presents an extremely low risk of recidivism. As with the statements from Mr. Kaziu, Mr. Daud's Declaration (as well as his conversations with Dr. Hodwitz and with the Court during sentencing) shows that he understands that his prior beliefs were based on a misunderstanding of Islam. For all of these reasons, as well as the disparity with the codefendants, Mr. Daud's sentence should be reduced to the 10 years he has already served.

**Effect of Terrorism Enhancement**

In *United States v. Hammoud*, 2022 US Dist. LEXIS 214184 (WDNC 2022), which is, like *Cromitie*, a terrorism case (not a sting operation, but a years-long conspiracy which provided a great deal of money to Hezbollah) - where compassionate release was granted, the court stated:

> "…From March, 1996 to July, 2000, Hammoud and ten others orchestrated a cigarette-trafficking scheme designed to support Hezbollah…
>
> ***
>
> …On resentencing in 2011, the Court granted a variance and imposed a 30-year sentence. … Hammoud has now been imprisoned over 22 years.
>
> Hammoud identifies two 'extraordinary and compelling reasons' for relief: (1) a disparity between his sentence and other sentences for comparable conduct; 2) the disproportionality in his sentence caused by the application of the 'terrorism enhancement.'
>
> …[T]he Court is persuaded that Hammoud has demonstrated 'extraordinary and compelling reasons.' First, Hammoud's 360-month sentence was 'sheer and unusual,' [quoting *United States v. McCoy*, 981 F.3d 271, 285 (4th Cir. 2020)] even after the substantial variance that the Court applied. *Hammoud had next to no criminal history.* …
>
> Hammoud's sentence was also grossly disparate compared to what courts now deem appropriate. …*Courts have since imposed more moderate penalties*.. …
>
> ***
>
> *The specter of the terrorism enhancement, USSG 3A1.4, also loomed over Hammoud's sentencing.* That provision triggers dramatically-enhanced penalties at sentencing, catapulting a defendant's offense level by 12 points and ratcheting the criminal history level to the highest level, Category VI. *In Hammoud's case, the effect of the enhancement on his Guidelines sentence was extreme. His offense level jumped from 34 to 46, and his criminal history level went from the lowest (I) to the highest (VI). … As a result, his Guidelines sentence called for life imprisonment, instead of 151-188 months. Although the Court ultimately applied a variance, the Guidelines calculation – heavily*

*weighted by the terrorism enhancement - undoubtedly influenced the sentence that Hammoud received. ...*" *Hammoud,* supra, at 1-2, 4-10, emphasis supplied.

As in *Hammoud,* the effect of the terrorism enhancement herein was also extreme, ratcheting the adjusted offense level from 31 – 43, and the criminal history level from the lowest to the highest category. The Guidelines range *went from 108-135 months to life*. Even though the Court granted a downward variance to 360 months, were it not for this enhancement, which is not empirically validated[5], Abrirahman Daud would have had a much shorter sentence.

**Other Terrorism Cases Where Compassionate Release was Granted**

In addition to *Hammoud,* supra, there are several other terrorism cases where compassionate release was granted. *United States v. Ali*, 2021 U.S. Dist. LEXIS 73320 (DMN 2021)( defendant convicted at trial of material support to Al-Shabab and still had many years left to serve); *United States v. Hassan*, 2020 U.S. Dist. LEXIS 165638 (DMN 2020) (defendant convicted at trial of material support to Al-Shabab); *United States v. Cromitie*, 2024 US Dist. LEXIS 12253 (SDNY 2024) (25 year in terrorism sting case reduced to time served)(See also *United States v. Williams*, 2023 US Dist. LEXIS 129978 [SDNY 2023][granting release to Mr. Cromitie's co-defendants); *United States v. Hassoun* 470 F. Supp.3d 804 (NDIL 2020) (compassionate release granted in a terrorism case to a young defendant who *served less than 10 years of his 23-year sentence*); *United States v. Martinez,* 1:10-cr-00798, Docket No. 157 (DMD 2025)(granting compassionate release with seven years left on a 25 year sentence, based on lower sentences in recent years, youth, mental health challenges and rehabilitation); *United States v. Hasanoff*, 2020 US Dist. LEXIS 199816 (SDNY 2020) (granting compassionate release based largely on family circumstances to a man who provided material support to Al Qaeda);

[5] See https://www.ussc.gov/sites/default/files/pdf/amendment-process/public-comment/202308/88FR39907_public-comment_R.pdf#page=150, at 156-158

*United States v. El-Hanafi*, 460 F. Supp.3d 502 (SDNY 2020) (granting compassionate release in a terrorism material support conspiracy case to a defendant who served around 10 years of his 15-year sentence); *United States v. Ferizi*, 1:16-cr-042 (EDVA 2020); *United States v. Tajideen*, 1:17-cr-046 (DDC May, 2020) (granting compassionate release in a terrorism financing case to a defendant who served around three years of a five-year sentence); *United States v. Hossain*, 2020 WL 3265001, at *5 (N.D.N.Y. 2020); *United States v. Bary*, 2020 US Dist. LEXIS 18631 (SDNY 2020); *United States v. Rana*, 2020 US Dist. LEXIS 208638 (NDIL 2020.)

**More Recent Terrorism Cases with Significantly Lower Sentences**

The *Hammoud* court pointed to the disparate nature of Mr. Hammoud's 30 year sentence compared to more recent sentences for material support cases, stating that the average sentence in those cases was 209 months as of 2021, or perhaps less, as defense counsel cited statistics stating that the median such sentence for those who *went to trial* was 180 months.

Undersigned counsel has also kept track of the sentences in terrorism-related cases, and has noticed a *pronounced downward trend in recent years*. While there are still a few very lengthy sentences, there are many more much lower sentences. See Appendix A, which lists 29 terrorism-related cases where the defendants were sentenced to 84 months or less between 2019-2025. Appendix A also lists another 56 terrorism-related cases where the defendants were sentenced to 120 months or less. And it is noted that, as seen by the plea bargains offered to the four codefendants, *often the exact same conduct can result in either a material support conviction, or a conviction for conspiracy to murder, depending on charging decisions and plea bargains.*

**Rehabilitation, Young Age and Other Factors**

As discussed above, the Assessment by Dr. Hodwitz, the Declaration, the institutional record, and the letters of support all show that Abdirahman Daud has undergone a very substantial rehabilitation process, and poses an extremely low to nonexistent risk at this time.

In addition, Abdirahman Daud was only 19 or 20 at the time the offense alleged to have begun. As discussed below, there are many cases where courts have recently held that the defendant's young age at the time of the offense weighed on the side of granting a sentence reduction. See i.e. *United States v. Countess*, supra (defendant was *25* at the time of the offense); *United States v. Cain,* supra (the defendant was 23 at the time of the offense); *United States v. Watts*, supra (the defendant was 20 at the time of the offense); *United States v. Kayarath*, 2024 US Dist. LEXIS 39674 (DKS 2024) (the defendant was 18 at the time of the offense); *United States v. King*, 2023 US Dist. LEXIS 196542 (NDCA 2023)(the defendant was 21 at the time of the offense); *United States v. LeBaron*, 2023 US Dist. LEXIS 199275 (SDTX 2023)( the defendant was 23 at the time of the offense.)

Finally, many courts have found that the harsher than usual prison conditions, generally during the pandemic, also lend support to a sentence reduction. See, i.e. *United States v. Souza,* 2025 US Dist. LEXIS 22349 (DRI 2025) (harsh conditions, such as frequent lockdowns, at his prison); *United States v. Jackson,* 2025 US Dist. LEXIS 65631 (DCT 2025)(harsh conditions during pandemic); *United States v. Cromitie*, supra.

In *United States v. Willingham*, 2025 US Dist. LEXIS 165154 (SDFL 2025) the court recently reduced the 384 month sentence for five armed robberies based on a combination of factors, including rehabilitation, young age, and lack of criminal history, and traumatic childhood, stating:

> "…Here, while any of the Defendant's proffered reasons viewed in isolation may not warrant compassionate release, taken together, the Court finds that they are 'similar

> in gravity; to those enumerated in the Sentencing Commission's Policy Statement. Most significant are: *(1) Defendant's young age [22] at the time he committed his crimes; (2) his lack of criminal history*; *(3) his traumatic childhood;* and *(4) his rehabilitative efforts.* …
>
> While the Government is correct that Defendant's youth, lack of criminal history, and childhood abuse were 'fully disclosed in the PSU and considered at the time of sentencing,'…that does not preclude the Court from considering those factors in the context of the instant motion. …
>
> ***
>
> …[W]hile the Court recognizes that Defendant's crimes were serious, the Court is satisfied that Defendant is no longer a danger to the community. …[H]e was only 22 years old when he committed his crimes.
>
> …Defendant has not been cited for violent conduct once in the approximately ten years he had been incarcerated. The Defendant's disciplinary record reveals only minor, non-violent infractions. He has also demonstrated personal growth and taken positive steps towards rehabilitation…" *Willingham*, supra, at 6-7, 9, emphasis supplied.

All of the factors cited in *Willingham* apply herein – Abdirahman Daud was *even younger* than Mr. Willingham at the time of the offense; he has not just minor criminal history, but *no criminal history*; as discussed at the Sentencing, at 27-28, while he may not recall it, he was born in a horrific refugee camp in Kenya and came to the US at age 9, so there must have been some childhood trauma, though not as severe as that in *Willingham*; and he has shown excellent rehabilitation, as noted by Dr. Hodwitz and as shown by the other evidence discussed above.

**POINT II**

**THE 18 USC 3553(a) FACTORS SUPPORT RELEASE**

Consideration of the applicable factors from 18 U.S.C. § 3553(a), as also required by § 3582(c)(1)(A), leads to the conclusion that reduction at this time of Mr. Daud's term of imprisonment to the time already served is warranted. These factors are:

(a) The "nature and circumstances of the offense" and the "characteristics of the defendant." As discussed above, Mr. Daud was a young man with no criminal history who was born in a refugee camp and later had to grow up too soon. He for a few years was unfortunately

caught up in a very misguided and dangerous interpretation of Islam which led to his involvement in this case.

The offense was very serious, but as shown by his statements at sentencing, the recent Assessment by Dr. Hodwitz, his Declaration, his institutional history, and the letters of support from family members who see his transformation, and from a fellow prisoner, Abrirahman has not harbored those dangerous beliefs for many years now. As in *Kaziu*, supra, he has studied the Koran, and, as noted in Dr. Hodwitz's Assessment, at 4, he now understands that Islam teaches acceptance of all faiths and people. As stated in the letter from Jonathan Colon, he helped the Muslim community in prison gain a deeper understanding of Islam and find a sense of direction, and also mentored people from all backgrounds "playing a pivotal role in resolving daily conflicts and challenges faced in a prison environment." (Exhibit "F" at 5.)

(b) & (c) The need to provide just punishment, afford adequate deterrence, and protect the public. A sentence reduced to the over ten years already served would constitute just punishment and adequate deterrence, and would not present any risk to the public

As noted in *Kaziu*, supra, and discussed above, the recidivism rates in terrorism cases are only 2-3 percent. That, along with the *very clear evidence of rehabilitation herein*, provides a strong indication that Mr. Daud is among the 97-98 percent who will never reoffend, and therefore that the time already served is sufficient to provide deterrence and protect the public.

(d) Consideration of providing needed medical care in the most effective manner. This factor suggests release rather than continued incarceration.

(e) The need to avoid unwarranted sentencing disparities. *As discussed above, this factor supports a substantial reduction in sentence because his sentence was three times longer than those of four similarly-situated codefendants.*

(f) Finally, upon consideration of the overall statutory command that all sentences, while sufficient to achieve the objectives identified in subsection (a)(2), are not "greater than necessary," 18 U.S.C. § 3553(a), the sentence of imprisonment in this case should be reduced to time served for extraordinary and compelling reasons.

**CONCLUSION**

For the foregoing reasons, this Court should reduce Abdirahman Daud's sentence to time served pursuant to 18 U.S.C. § 3582(c)(1)(A.)

Dated: October 12, 2026.

Respectfully submitted,

*Marwa Elbially*
MARWA ELBIALLY
ELBIALLY LAW OFFICE, PLLC
704 East 15th Street
Plano, TX 75074
Email: info@elbiallylaw.com
TX Bar No. 2409-0089

*/s/ Kira A. Kelley*
Kira A. Kelley, Esq. (MN 402932)
P.O. Box 7040
Minneapolis, MN 55407
kira@climatedefenseproject.org
(802) 683-4086
*PHV Sponsoring Attorney*