University of Idaho

**Final Report: Assessment of Risk of Reengagement and Recidivism**
**Assessor: Omi Hodwitz, Ph.D.**
**Assessed: Abdirahman Yasin Daud**
**Completed: March 16, 2025**

*The following report provides the results of a structured professional judgement risk assessment of Abdirahman Yasin Daud, conducted by Dr. Omi Hodwitz on March 9, 2025. Dr. Hodwitz is a criminologist and terrorism expert from the University of Idaho, a research affiliate at the National Consortium for the Study of Terrorism and Responses to Terrorism (START), advisory board member for the Resolve Network, consultant for the National Counterterrorism, Innovation, Technology and Education (NCITE) Center, consultant for the Centre of Excellence-Defense against Terrorism (COE- DAT), and member of the Transatlantic Network Against Extremism (TransNex). She is also the founder and director of the Terrorism Recidivism Study (TRS) and the Guantanamo Recidivism Study (GRS).*

Structured professional judgment (SPJ) risk assessment involves using tools to assess the likelihood that individuals convicted of extremist-related crimes will reengage in criminal activity following release. Over the last decade, several SPJ tools have been created and validated, including the Violent Extremist Risk Assessment 2 Revised (VERA-2R) and the Extremist Risk Guidelines (ERG 22+). The former consists of 34 indicators divided into six domains: a) beliefs, attitudes, and ideology, b) social context and intention, c) history, action, and capacity, d) commitment and motivation, e) protective and mitigating factors, and f) additional factors. The latter consists of 22 factors divided into three domains: a) engagement, b) intent, and c) capability.[1] There is a great deal of overlap between the two tools, but each has unique characteristics; thus, the assessment of Mr. Daud incorporates elements of each tool with the goal of providing a more complete assessment that is not limited to a single set of factors.[2]

It is important to note that although risk assessment of convicted extremists is quickly becoming a common practice for legal proceedings, there is no "gold standard" and all existing tools are subject to criticism. Of primary importance, recidivism rates are notably low among convicted extremists, making it difficult to test the predictive validity of assessment tools.[3] Along similar

[1] The "+" in ERG-22+ refers to the option of adding additional factors that are relevant for the specific individual.
[2] Both tools are similar, for example, in that they include factors relating to family and peer influences, feelings of injustice or outstanding grievances, and criminal history, but they differ as well. VERA-2R, for example, includes a factor relating to a desire to die for a cause, while ERG-22+ includes a factor relating to mental health.
[3] United States recidivism studies report that approximately 3% of extremists will recidivate within the first few years of release. This is in stark contrast to recidivism rates of non-extremist offenders; reports indicate that approximately 50% will recidivate within the first few years of release. See the following studies for more information:

- Hodwitz, O. (2019). https://www.jstor.org/stable/26626865?seq=1#metadata_info_tab_contents
- Hodwitz, O. (2021). https://www.jstor.org/stable/27044233
- Bureau of Justice Statistics. https://bjs.ojp.gov/library/publications/recidivism-prisoners-released-34-states-2012-5-year-follow-period-2012-2017



To enrich education through diversity, the University of Idaho is an equal opportunity/affirmative action employer.

lines, the empirical research on the factors included in assessment tools is relatively limited and, as such, it is not clear whether specific factors are necessary and/or sufficient. The research that has been conducted focuses on factors present in extremist populations without validation that these same factors are absent from non-extremist populations.[4] Lastly, given the limited number of recidivists and the deficit of research, it has not been established that specific predictors will result in set outcomes. Thus, risk assessment is informative but not definitive.

Mr. Daud's assessment examined his past, present, and future in chronological order. Mr. Daud was given a series of structured prompts and asked to provide complete and thorough responses, with encouragement to offer additional unprompted information.[5] Mr. Daud was asked about his pre-radicalization experiences, including both childhood and teenage years. This portion of the interview focused on his relationship with his parents, peers, and other significant figures, as well as religious, cultural, and social milestones. He was encouraged to speak about his academic performance, extracurricular activities, and personality characteristics. Mr. Daud was then asked about his process of radicalization and extremist activities. In addition to the same prompts that were applied to the pre-radicalization portion of the session, Mr. Daud was questioned about the factors that facilitated radicalization, including psychological, social, cultural, and practical influences. Mr. Daud gave extensive responses to these prompts and was encouraged to elaborate beyond the prompts, as needed. Lastly, Mr. Daud was asked to reflect on his current circumstances, including his activities in prison, his relationship with family and extended community, his religious practices and beliefs, his priorities upon release, and his ideological, moral, and ethical interests and values. Throughout the duration of the interview, Mr. Daud maintained a friendly and welcoming demeanor, was thorough and generous with his responses, and gave clear indications of open honesty and willingness to cooperate. His responses are considered reliable and valid.

Following Mr. Daud's assessment, several members of Mr. Daud's family were also interviewed. Abdir Daud, Abdirahman Yasin Daud's younger brother, was interviewed on March 14, 2025. Farhiyo Daud and Sundus Abdullahi, his mother and younger sister respectively, were interviewed on March 15, 2025. Each interview took approximately an hour and, similar to Mr. Daud, his family members were given prompts and encouraged to offer additional unprompted information. Each family member was asked to discuss Abdirahman Yasin Daud's pre-radicalization years, including his relationships within and outside the family, his activities and behaviors, and his religious, moral, and psychological characteristics. Interviewees were then prompted to reflect on Mr. Daud's period of radicalization and the factors that influenced his shift in ideology. Lastly, each family member described Mr. Daud's current beliefs, behaviors,

---

- Bureau of Justice Statistics. https://bjs.ojp.gov/library/publications/recidivism-prisoners-released-24-states-2008-10-year-follow-period-2008-2018
- U.S. Sentencing Commission. https://www.ussc.gov/research/research-reports/recidivism-federal-offenders-released-2010

[4] Violent extremism risk assessment tools, for example, include family and peer influences; to make the claim that this is predictive of ideologically-motivated violence specifically, researchers would have to determine that it is not predictive of other criminal behaviors.

[5] A brief summary of these prompts is provided in Appendix A.



To enrich education through diversity, the University of Idaho is an equal opportunity/affirmative action employer.

and priorities. All interviewees were friendly and open with their responses, providing a great deal of unprompted information. Their responses are considered reliable and valid. When relevant and appropriate, the assessment presented here is supplemented with information from these additional interviews.

Neither the VERA-2R nor the ERG-22+ assign a risk score and only the VERA-2R relies on risk banding (assigning a level of risk), but both rely on the determination of the presence or absence of factors. The assessment presented here will employ the same approach, providing a determination of presence or absence of risk and protective factors, with limited risk banding when it is deemed necessary and/or informative. It is important to note that the focus of the assessment will be Mr. Daud's current risk, rather than his risk at the time of his radicalization and/or conviction, although the report will periodically refer to early risk. This recognizes the dynamic nature of many of these factors, which is key to assessment tools, particularly the ERG-22+. The few factors that are static will be noted but not given the weight of dynamic factors, since Mr. Daud does not have the ability to change these (e.g., criminal history). The assessment will be based on seven overarching categories, including associates, ideology and/or grievances, and skills and resources (these three categories are present in both assessment tools), as well as a history of violence and intent to commit violence (VERA-2R only), and criminal history and mental health issues (ERG-22+ only).[6]

**Associates**

Other than his co-defendants, Mr. Daud does not maintain communication with members of his former extremist community. His association with his co-defendants is limited at best, prompted by shared legal commitments, rather than for social or ideological purposes. When asked about his former extremist associates, Mr. Daud emotionally, socially, and ideologically distanced himself from them, conveying a balance of dismay for their shared ideas and behaviors and acceptance that he played an active role in that community and is also accountable. When asked about his non-extremist and non-familial community members (e.g., religious, Somali-American, social), he noted that at the time of his radicalization, the community perpetuated a narrative and culture that facilitated radicalization (a focus on the Ethiopia/Somalia conflict and the Syrian war, as well as an us-versus-them mentality). He mentioned that some of his co-defendants that have since returned to society harbored some level of resentment towards the community for not actively countering radicalization, but Mr. Daud did not express similar negative sentiments. Once again, he recognized his own role in his radicalization and held himself accountable for it.

Mr. Daud's family members confirmed and supplemented his narrative. During their individual interviews, each family member reported that Mr. Daud no longer associated with members of his former extremist community, and that he had no interest in reengaging with them or the larger community from which they came. They noted that Mr. Daud was very young when he was radicalized (approximately 17-18 years old) and those that mentored his radicalization were

[6] This categorization is provided by the National Institute of Justice. chrome-extension://efaidnbmnnnibpcajpcglclefindmkaj/https://www.ojp.gov/pdffiles1/nij/251789.pdf



To enrich education through diversity, the University of Idaho is an equal opportunity/affirmative action employer.

older, thus taking advantage of an inequitable age dynamic. Each family member emphasized that Mr. Daud is older and more mature now, no longer susceptible to, nor interested in unhealthy outside social and religious influences. Thus, Mr. Daud and his family members each provided a clear indication that "**associates**" is not a risk factor.

Mr. Daud's family is central to his current identity, aspirations, and values, and they fill a key role as a rehabilitative and prosocial support system. The family is threaded throughout every aspect of Mr. Daud's current life, indicating that they are a necessary and sufficient protective factor. Mr. Daud speaks with his parents and his siblings weekly, if not daily, and is committed to fostering their relationship when he returns to the community. He expressed remorse for the repercussions his family faced in the aftermath of his legal conviction and when asked what he would say to his younger self if given the opportunity, Mr. Daud stated that he would tell himself about the pain and suffering he would cause his family with the hopes that this would convince his younger self to disengage from extremist ideology. When asked about his priorities upon release, Mr. Daud placed maintaining a strong relationship with his family above all else. His family members expressed similar sentiments, noting that Mr. Daud is deeply invested in the family's health and well-being, committed to supporting them in any manner possible. His sister noted that Mr. Daud's eventual return to society would allow them to heal as much as it would allow him to integrate. Thus, given the presence of positive familial ties, **"associates"** is a protective factor.

**Ideology and/or Grievances**

Mr. Daud is not reserved in talking about his former extremist ideology and grievances, particularly in a reflective and critical/analytical manner. He provided a detailed summary of the process that led him to develop an affiliation with the caliphate, beginning with the narratives adopted by the Muslim and Somali-American communities in Minneapolis, the youthful passion that grew among his peers, the impact of members of his community traveling overseas to fight with Al Shabaab or the Islamic State, and the eventual adoption of the narrative that it was both a duty and an honor to engage in religious extremism. Mr. Daud acknowledges that he began his radicalization process posturing as a method to acquire social capital and ended it as a religious zealot.

Mr. Daud no longer holds the same ideology or grievances. He is a practicing Muslim but has rejected teachings that led him to originally adopt an extremist identity. His radicalization was facilitated by older individuals that presented Mr. Daud with misplaced interpretations of the Koran and the teachings of the prophet. These included the belief that non-Muslims were heretical, that Mr. Daud's extremist activities would ensure success for his family in the afterlife, and that he was honor-bound to fight for oppressed Somalians and Syrians with violence. When asked about his current relationship with non-Muslims, Mr. Daud shared his commitment to an acceptance of all faiths, beliefs, and people, believing that this is the true teaching of the Koran. Regarding the belief that extremism would benefit his family in the afterlife, Mr. Daud noted that the true teachings express a balance of the good that can come in the worldly life as well as the afterlife, leading him to understand that he is as responsible for the well-being of his family in



To enrich education through diversity, the University of Idaho is an equal opportunity/affirmative action employer.

this life as he is in the afterlife and extremism serves neither version of life. Finally, in reference to the belief that it is his duty and honor to use violence to fight perceived oppression, Mr. Daud definitively rejected his earlier beliefs, noting again the Muslim teachings of peace. Mr. Daud was asked about his early acceptance of Islamic State propaganda tools, such as the execution of a Jordanian pilot and other graphic displays. He explained that, following radicalization, he perceived it as a form of justice; his belief was that the caliphate established a legitimate state, and this was a form of identifying and punishing those that violated state law.[7] When asked his current interpretation of justice, he spoke of the need for communities to respect each other, treat each other with dignity, and live in peace. Similar to the golden rule, he described a just society as one within which everyone treated each other as they would like to be treated, thus ensuring a healthy, vibrant, and inclusive world. In summary, Mr. Daud displays no evidence of his former ideology and harbors none of his previous grievances. Instead, he has embraced a narrative of respect and dignity for all, with the goal of creating peaceful relations. His family members confirmed Mr. Daud's current relationship to and interpretation of Muslim teachings. They spoke of his commitment to inclusive and peaceful relationships with Muslims and non-Muslims alike and his dedication to practicing a nonviolent/helpful rather than violent/harmful way of life. According to them, Mr. Daud holds no grievances, intent only on supporting his family and making amends. Therefore, **"ideology and/or grievances"** is not a risk factor. Instead, **"ideology"** is a protective factor.

**Skills and Resources; Criminal History; Past History of Violence**

The categories of skills and resources, criminal history, and a past history of violence are presented together since all three categories rely on static factors that cannot be changed.[8] Clinicians have noted the importance of dynamic risk factors over static ones, since the former can be targeted for intervention, and have expressed concerns regarding the emphasis on static factors.[9] Despite this concern, static factors remain prevalent in assessment tools and will be included here, albeit briefly.

Mr. Daud did not have the skills or resources to engage in extremism at the point of radicalization; however, through peer influences and online messaging he adopted the necessary narrative that provided motivation to gain skills and resources. Despite this introduction, it does not appear that he was successful in acquiring weapons training, financial support, or logistical support to carry out his goal to travel overseas to fight for the Islamic State. In simple terms, the motivation to acquire the necessary tools and skills existed but did not manifest itself in practical application. Therefore, given that Mr. Daud was unable to acquire the necessary skills and

[7] The logic presented by Mr. Daud in response to this question is similar to the logic applied by U.S. citizens to justify capital punishment. https://www.pewresearch.org/short-reads/2021/07/19/10-facts-about-the-death-penalty-in-the-u-s/
[8] This assumes that skills and resources reflect a historical acquisition of these assets, rather than the current potential to acquire them. Mr. Daud, given his state of incarceration, does not have the potential to improve his skills or resources beyond where they currently stand.
[9] See, for example, research on Risk, Need, and Responsivity (RNR) assessments. https://pmc.ncbi.nlm.nih.gov/articles/PMC2423325/



To enrich education through diversity, the University of Idaho is an equal opportunity/affirmative action employer.

resources while motivated and, as described previously, he no longer possesses the necessary motivation, **“skills and resources”** is not a prominent risk factor. During his time as an active extremist, Mr. Daud undoubtably learned some means and methods of carrying out ideologically-oriented violence, but this appears to be limited at best, thus this category is considered low risk, rather than risk-free.

Mr. Daud did not have a criminal history when he became radicalized; he did not engage in property or violent crime when he was a youth, nor did he engage in substance use, gang activity, or any other form of deviant behavior. In addition, all members of his family confirmed that he was not a deviant child or youth. Despite this history, due to his extremist activities, he now has a criminal history. Thus, **“criminal history”** is a risk factor.

Mr. Daud did not engage in violent behavior, nor did he experience violent behavior in his personal, social, or professional life. He endorsed violence and adopted a commitment to violence as a method of fighting perceived oppression but did not have a history of violence as a point of reference. There was no reported violence in his home life, in his youthful social circles, and in his extremist activities. Similar to **“skills and resources,”** Mr. Daud was not successful in using violence, although it was part of his ideological agenda. Thus, **“past history of violence”** is evident in theory, not in practice, and is considered low risk, rather than risk-free.

**Intent to Commit Violence**

Mr. Daud expressed an intention to commit violence once he was radicalized. He reports that a considerable amount of his time while incarcerated has been dedicated to exploring the reasons and motivation behind this intention. He recognizes that this intention was fostered in part by a false interpretation of the teachings of the prophet and the Koran, paired with the youthful tendency to be influenced by peers and people in positions of authority. He has since rejected his early interpretations of Muslim beliefs and the narratives presented by others, accepting a peaceful interpretation of the Koran and teachings and a prosocial narrative, rejecting violence as a means of affecting perceived change. When asked about his relationship with violence, Mr. Daud stated that he was dismayed that he intended to cause harm to others, it is no longer logically defensible, and he is still trying to reconcile that this was once part of his identity. He appears embarrassed and ashamed that, at one point, this was central to his beliefs. His family members confirmed that Mr. Daud lacks any intent to commit violence and, instead, actively rejects it. They state that he is committed to leading a nonviolent and peaceful life, focused on inclusion and acceptance, confirming the responses that Mr. Daud provided during his interview. For these reasons, **“intent to commit violence”** is not a risk factor. Instead, Mr. Daud’s abhorrence of violence is a protective factor.

**Mental Health Issues**



To enrich education through diversity, the University of Idaho is an equal opportunity/affirmative action employer.

Mr. Daud has no reported mental health diagnoses, and it is beyond the scope of this report to assess whether he has unreported mental health issues.[10] However, Mr. Daud appears to be of sound mind; he was friendly, socially refined, an engaging conversationalist, a skilled critical thinker, and gives every indication of having a balanced perspective regarding all topics of conversation covered during the assessment. In addition, his family did not report any mental health issues, believing him to be of sound mind. For the purposes of this assessment, a lack of reported issues and the positive exchange during the assessment will be interpreted as an absence of this category; thus **"mental health issues"** is not considered to be a risk factor. His commitment to rehabilitation, to an accepting and inclusive approach to divergent religious and cultural ideals, and his emphasis on his support network and becoming a contributing member of society suggests his mental health is sound and is a protective factor.

**Concluding Assessment**

This report concludes that Abdirahman Yasin Daud is rehabilitated and is not at risk of reengagement or recidivism. As summarized above, the only risk factors identified during assessment are static factors that cannot be changed, are not eligible for intervention, and do not capture nor reflect the rehabilitative process that Mr. Daud has engaged in since he was incarcerated.[11] All dynamic factors that are included in VERA-2R and the ERG-22+ are protective factors in Mr. Daud's current life, providing him with prosocial opportunities and commitments, a strong support system that will help him reintegrate into society and maintain his commitment to treating all other communities with respect and dignity.

These findings are supported through interviews with his family members. As a central feature in Mr. Daud's life, they interact with him regularly and have observed his rehabilitative process. They confirm the conclusions presented in this report. Thus, Mr. Daud and his family give every indication that Mr. Daud is rehabilitated and will become a contributing member of society if given the opportunity.

---

[10] The assessor is not a clinical diagnostician.
[11] A brief summary of these categories and assessment conclusions is presented in Appendix B.



To enrich education through diversity, the University of Idaho is an equal opportunity/affirmative action employer.

## Appendix A: Assessment Prompts

**Childhood**

- Relationship with family
- Relationship with peers
- School performance
- Psychological and identity characteristics
- Religious influences
- Community influences

**Teenage Years; Pre-Radicalization**

- Relationship with family
- Relationship with peers
- School performance
- Psychological and identity characteristics
- Religious influences
- Community influences
- Criminal and deviant activities

**Radicalization and Engagement**

- Relationship with family
- Relationship with peers
- School performance
- Psychological and identity characteristics
- Religious influences
- Community influences
- Criminal and deviant activities
- Individuals' integral to radicalization
- Narratives integral to radicalization
- Ideological orientation and beliefs
- Influence of radicalization on relationships and activities
- Factors facilitating the acceptance of violence
- Targets of radical narratives (us versus them)
- Manifestations of doubt and confidence

**The Present and the Future**

- Relationship with family
- Relationship with peers
- Psychological and identity characteristics
- Religious influences
- Community influences
- Current and future goals and priorities



To enrich education through diversity, the University of Idaho is an equal opportunity/affirmative action employer.

- Prison program participation
- Ideological orientation and beliefs



To enrich education through diversity, the University of Idaho is an equal opportunity/affirmative action employer.

### Appendix B: Assessment Categories and Conclusions

| ***Category*** | ***Type of Factor*** | ***Risk Factor*** | ***Protective Factor*** |
|---|---|---|---|
| *Associates* | Dynamic | No | Yes |
| *Ideology and Grievances* | Dynamic | No | Yes |
| *Skills and Resources* | Static (when assessing history) | Yes (low) | No |
| *Criminal History* | Static | Yes | No |
| *History of Violence* | Static | Yes (low) | No |
| *Intent to Commit Violence* | Dynamic | No | Yes |
| *Mental Health* | Dynamic | No | Yes |



To enrich education through diversity, the University of Idaho is an equal opportunity/affirmative action employer.